# Exhibit D

ORIGINAL

1

1   COUNTY COURT OF THE STATE OF NEW YORK

2   COUNTY OF ONONDAGA   :   CRIMINAL TERM

3   ------------------------------------------------

4   THE PEOPLE OF THE STATE OF NEW YORK,

5           vs.                    Indictment No.
                                   2016-0061-1
6                                  Index No. 16-0049
                                   Hearing

7   TONY W. JENNINGS,

8           Defendant.      NYSID 08709143L

9   ------------------------------------------------

10                          Criminal Courts Building
                            Syracuse, New York 13202

11                          May 19, 2016

12

13   B e f o r e:

14           HONORABLE WALTER W. HAFNER, JR,
                        Judge

15

16   A p p e a r a n c e s:

17   WILLIAM J. FITZPATRICK ESQ.
          District Attorney, Onondaga County
          BY:  JEFFREY J. SCHIANO, ESQ.
18        Assistant District Attorney

19   JOHN J. LO FARO, ESQ.
          Attorney for Defendant
20           307 S. Clinton Street
             Syracuse, New York   13202

21   Defendant Present in Person

22   Reported by:

23   Ann A. Makowiec
24   Supreme Court Reporter

25

FILED

JUN 3 0 2017

ONONDAGA CO CLERKS OFFICE

COLLOQUY

2

1    THE COURT:  All right.  People versus Tony

2    Jennings.  So we have one witness today and

3    there's a problem I heard with the grand jury

4    minutes.  So there will be no cross examination

5    today --

6    MR. SCHIANO:  We have one witness, your

7    Honor.  We can take his testimony today.  It's up

8    to the Court and it's up to Mr. LoFaro whether or

9    not he wants to begin his cross examination, and

10   then if there's any discrepancies in the grand

11   jury minutes, continue the cross examination; or

12   if he just wants to do it altogether on a

13   different day, I guess that's up to the Court and

14   Mr. LoFaro.  I have no objection to either way.

15   THE COURT:  All right.  How do you want to

16   proceed, Mr. LoFaro?

17   MR. LO FARO:  I apologize, your Honor, I

18   was talking to Mr. Jennings.  What -- what's the

19   issue, Judge, want to do what?

20   THE COURT:  You weren't told?

21   MR. SCHIANO:  Judge, the -- we are

22   awaiting the grand jury minutes.  There was one

23   witness that has testified in the grand jury,

24   that's Officer Decker.  Those minutes were

25   requested in March, specifically March 25th of

COLLOQUY                                                              3

1    2016.   However, Rose Laun from our office has had

2    to leave the office for medical reasons and we

3    don't have a date certain that she's going to

4    return.   So there are several outstanding grand

5    jury transcripts that aren't completed yet, this

6    happens to be one of them.   So as I indicated to

7    the Court, it's the practice of the other parts

8    here that we could start the hearing, Mr. LoFaro

9    can cross examine the witness as he sees fit, we

10   hold the hearing open and I'll provide Mr. LoFaro

11   the grand jury minutes as soon as I have them.   He

12   can review the grand jury minutes, and if he

13   wishes to continue his cross examination, we can

14   recall Officer Decker and continue his cross

15   examination at that point.   If he feels that

16   there's no need to continue the cross examination

17   after he reviews the grand jury minutes, we can

18   close the hearing at that point.

19          MR. LO FARO:  That's fine, your Honor,

20   we'll move forward today.

21          THE COURT:  Okay.  Call -- he's a rebuttal

22   witness?

23          MR. SCHIANO:  Yes, your Honor.  The People

24   call Officer Jeremy Decker.

25          COURT OFFICER:  Could you state and spell

4

1       your name for the Court, please?

2                THE WITNESS:  Jeremy Decker.  J E R E M Y

3       D E C K E R.

4    J E R E M Y   D E C K E R, called as a witness on behalf

5    of the People, having been duly sworn, testified as

6    follows:

7    DIRECT EXAMINATION

8    BY MR. SCHIANO:

9       Q.  Officer Decker, good morning.

10      A.  Morning.

11      Q.  Are you employed, sir?

12      A.  Syracuse Police.

13      Q.  Tell the Court how long you've worked for the

14   Syracuse Police Department?

15      A.  Over ten years.

16      Q.  And currently what is your rank and assignment

17   within the Syracuse Police Department?

18      A.  Police officer, I'm assigned to a CRT.

19      Q.  What is a CRT?

20      A.  It's a Crime Reduction Team.

21      Q.  For the record purposes, just tell us briefly,

22   what is the purpose of the Crime Reduction Team?

23      A.  We patrol the highest crime areas in the city;

24   mainly focus on gangs, drugs and guns.

25      Q.  And how long have you worked in the Crime

J. DECKER - DIRECT BY MR. SCHIANO

5

1   Reduction Team?

2       A.   Since last June.

3       Q.   All right.   And is one of the areas that you

4   patrol as -- as a member of the Crime Reduction Team

5   the area The Pioneer Homes?

6       A.   Yes, sir.

7       Q.   Tell us why that is?

8       A.   It's one of the highest crime areas in the

9   city, weekly shootings.

10      Q.   And has The Pioneer Homes -- do you have any

11  agreements with The Pioneer Homes about vehicles

12  parked in their parking lot?

13      A.   As far as I know, the Syracuse Public Housing

14  has given Syracuse Police the authority to approach

15  any persons found on the property to ascertain what

16  their lawful business is.

17      Q.   All right.   And is 100 Radisson Court part of

18  that Radisson Homes area?

19      A.   Yes.

20      Q.   I'm sorry, part of The Pioneer Homes area?

21      A.   Yes.

22      Q.   I'd like to direct your attention to January

23  5th of 2016, do you recall that date?

24      A.   Yes.

25      Q.   Were you working on that date?

J. DECKER - DIRECT BY MR. SCHIANO                6

1    A.  Yes.

2    Q.  Did you become involved in a drug investigation

3    at 100 Radisson Court?

4    A.  Yes.

5    Q.  That's in the City of Syracuse?

6    A.  Yes, sir.

7    Q.  All right.  Tell the Court, to the best of your

8    recollection, how you became involved in that

9    investigation?

10   A.  My partner and I were in the hundred block of

11   Radisson Court.  We saw a suspicious vehicle.  It was

12   a black 2003 Acura.  It was parked with two subjects.

13   When we pulled up, illuminated my spotlight on the

14   vehicle.  I noticed that the two occupants turned

15   around, looked at us and then immediately began making

16   furtive movements to their lower bodies.

17   Q.  All right.  Now, is it your regular course -- I

18   guess in your regular course of responsibilities, is

19   it common for you to illuminate cars in that area?

20   A.  It's a habit, I always do it.

21   Q.  And you do that at night?

22   A.  Yes.

23   Q.  Why do you do that?

24   A.  So I can see who I'm looking at, whether

25   they're walking on the street or they're in the

1    vehicle.

2        Q.   And tell us were -- were you driving a marked

3    car or unmarked?

4        A.   It was marked.

5        Q.   Who was driving?

6        A.   I was.

7        Q.   Tell us what happens as you approach this

8    vehicle?

9        A.   So I approached the driver's side of the

10   vehicle, my partner approached the passenger side.   I

11   immediately observe in plain view near the center

12   console area a black digital scale with a white

13   residue on top of it.

14       Q.   Okay.   I want to back you up a little bit.

15   When you say approach the vehicle, that's poor

16   language by me.   As you enter the parking lot in your

17   vehicle, your police vehicle, right, you at some point

18   you noticed this -- this other what you call a

19   suspicious vehicle, correct?

20       A.   Yes.

21       Q.   Do you remember what kind of car it was?

22       A.   It was a black 2003 Acura.

23       Q.   All right.   And was it dark out?

24       A.   Yes.

25       Q.   All right.   And when you noticed this vehicle,

J. DECKER - DIRECT BY MR. SCHIANO                    8

1    did you notice at that time whether there was anybody

2    in the vehicle?

3        A.   Yes.

4        Q.   All right.  And is it at that point that you

5    lit it up?

6        A.   Yes.

7        Q.   When I say lit it up, you shined your spotlight

8    on the vehicle?

9        A.   Yes.

10       Q.   What happens once you shine your spotlight on

11   the vehicle?

12       A.   I see the two occupants turn around, look at us

13   and then immediately start marking furtive movements

14   towards their lower bodies.

15       Q.   Tell me about those movements?

16       A.   They're just quick, sneaky movements as if

17   they're trying to conceal something.

18       Q.   Conceal something where?

19       A.   Towards their lower bodies.

20       Q.   Okay.  And do you stop your car at that point?

21       A.   Yes.

22       Q.   Tell us where specifically you park your

23   vehicle or stop your vehicle?

24       A.   I believe the front end of our vehicle was at

25   an angle toward the rear driver's side of that

1   vehicle.

2      Q.   All right.   Now -- and you stopped -- that's

3   where you stopped your vehicle?

4      A.   Yes.

5      Q.   Did you put it in park?

6      A.   Yes.

7      Q.   And you exit the vehicle?

8      A.   Yes.

9      Q.   All right.   Now, at that point was your

10   vehicle -- when you say it's angled towards the

11   driver's side of the suspect vehicle, correct?

12      A.   Yes.

13      Q.   So the front end of your vehicle is parked at

14   an angle towards the driver's side of the suspect

15   vehicle?

16      A.   I believe so, yes.

17      Q.   Okay.   And at that point, do you know, would

18   the suspect vehicle been able to get out if it wanted?

19      A.   Yeah, he could have backed out.

20      Q.   All right.   Tell us how he would have been able

21   to back out?

22      A.   Just would have had to cut the wheel really

23   hard.

24      Q.   So he wasn't blocked in?

25      A.   No.

J. DECKER - DIRECT BY MR. SCHIANO                              10

1    Q.   Fair to say?

2    A.   Fair to say.

3    Q.   All right.  Now, you exit the vehicle?

4    A.   Yes.

5    Q.   You approached the driver's side you said,

6    right?

7    A.   Yes.

8    Q.   And who approached the passenger side?

9    A.   Officer Ettinger.

10   Q.   And approximately how long from the time you

11   shined your spotlight on that vehicle until you

12   approached the driver's side of that vehicle?

13   A.   I didn't time it.  Less than a minute.

14   Q.   Okay.  And as you approach the driver's side of

15   the vehicle, what, if anything, did you see?

16   A.   A black digital scale with a white residue.

17   Q.   Did you see that immediately?

18   A.   Yes.

19   Q.   Where was it?

20   A.   In the center console area.

21   Q.   And have you seen a scale like that before?

22   A.   Yes.

23   Q.   Approximately in your career how many times?

24   A.   Hundreds.

25   Q.   All right.  And based on your training and

J. DECKER - DIRECT BY MR. SCHIANO                                    11

1   experience, what is a scale like that used for?

2       A.   Weighing drugs.

3       Q.   All right.   Did you notice whether or not the

4   scale had any sort of residue on it?

5       A.   Yes, a white residue.

6       Q.   All right.   And have you seen a white residue

7   like that before?

8       A.   Yes.

9       Q.   Specifically, have you ever seen a white

10  residue like that on a digital scale?

11      A.   Yes.

12      Q.   And in your training and experience, what is --

13  what -- what did you recognize that to be?

14      A.   Cocaine.

15      Q.   All right.   Now, after you make that

16  observation, what do you do next?

17      A.   I recovered the scale.

18      Q.   Before you did anything, you recovered the

19  scale?

20      A.   Yes.

21      Q.   Tell us how you did that?

22      A.   Reached in through the window.

23      Q.   The window was open I'm assuming?

24      A.   Yes.

25      Q.   Okay.   You recovered it how?

1    A.   Reached in the vehicle and took possession of

2    it.

3    Q.   Okay.  What did you do next?

4    A.   I alerted Officer Ettinger that I located a

5    scale with a white residue on it, then I asked the

6    occupants of the vehicle if anyone possessed or used

7    illegal drugs.

8    Q.   Okay.  And what, if anything, did they tell

9    you?

10    A.   The front passenger, Willie Jones, told me that

11    he had just used cocaine in the vehicle but didn't

12    have any left.

13    Q.   Okay.  Did the defendant, Tony Jennings, say

14    anything to you in response to that question?

15    A.   I believe he told me no.

16    Q.   Okay.  And tell us what happens next?

17    A.   Officer Ettinger had Mr. Jones exit the

18    vehicle.  He conducted a search of him for illegal

19    drugs.

20    Q.   Do you know if any illegal narcotics were found

21    on Mr. Jones?

22    A.   No.

23    Q.   Okay.  What did you do next?

24    A.   I had Mr. Jennings exit the vehicle and I

25    conducted -- began to conduct a search of him.

1    Q.  And tell us what happens when you began that

2    search?

3    A.  As I began to search Mr. Jennings, he ran from

4    my grasp.  I pursued him and tackled him to the

5    ground.

6    Q.  Okay.  And approximately how far did Mr.

7    Jennings get before you were able to detain him?

8    A.  I didn't measure.  I'd say approximately ten

9    feet.

10   Q.  From me to you?

11   A.  That's fair.

12   Q.  Okay.  And tell us what happens once -- tell us

13   how that occurs?  How do you get him, do you tackle

14   him?

15   A.  I tackled him from behind.

16   Q.  What happens next?

17   A.  We began ordering him to put his hands behind

18   his back, his left hand and arm were tucked under his

19   body, appeared that he was trying to push up off the

20   ground and keep going.  Officer Ettinger came around

21   to help me, and we were subsequently able to force his

22   hands and arms behind his back and into handcuffs.

23   Q.  Okay.  And once you got him into handcuffs,

24   tell us what happens next?

25   A.  I finished my search of Mr. Jennings.  I

J. DECKER - DIRECT BY MR. SCHIANO                          14

1    located in his front left pants pocket a clear knotted

2    section of plastic containing a beige chunky substance

3    and a hundred and ten dollars in US currency.

4        Q.   Okay.   That plastic bag containing the beige

5    substance, have you seen a plastic bag like that

6    before?

7        A.   Yes.

8        Q.   Approximately how many times?

9        A.   Hundreds.

10       Q.   What did it appear to be?

11       A.   Crack cocaine.

12       Q.   Okay.   The substance inside appeared to be

13   crack cocaine?

14       A.   Yes.

15       Q.   And at some point was a field test conducted on

16   that substance?

17       A.   Yes.

18       Q.   Are you trained to use that field test?

19       A.   Yes.

20       Q.   Used it before?

21       A.   Yes, hundreds.

22       Q.   Hundreds of times?

23       A.   (Nods head.)

24       Q.   All right.   What was the result of the field

25   test?

J. DECKER - DIRECT BY MR. SCHIANO                    15

1    A.   It was a positive reaction for cocaine.

2    Q.   And at some point was it weighed?

3    A.   Yes.

4    Q.   What was the aggregate weight of the cocaine,

5    if you recall?

6    A.   Four grams.

7    Q.   All right.  Did you find anything else during

8    your search?

9    A.   I believe Mr. Jennings had two cell phones and

10   another hundred and fifty dollars in the center

11   console area.

12   Q.   Okay.  Once you completed your search, tell us

13   what happens next?

14   A.   Completed our search, Mr. Jennings was placed

15   in the rear of our patrol vehicle, his vehicle was

16   towed and Mr. Jones was released on scene.

17   Q.   Okay.  At some point did you transport Mr.

18   Jennings to the Onondaga County Justice Center?

19   A.   Yes.

20   Q.   That's the jail?

21   A.   Yes.

22   Q.   While there, did you inquire as to whether he

23   was employed?

24   A.   Yes, we had a conversation.  I'm not sure

25   exactly where it was.

1    Q.   Okay.  And what, if anything, did Mr. Jennings

2    tell you about his employment status?

3    A.   From what I remember, he told me he was in the

4    asbestos field and that he specifically worked for

5    Hotel Syracuse but it was the off season, so he was

6    selling cocaine to pay the bills.

7    Q.   And when he made that statement to you, did you

8    ask him any questions about whether or not he sold

9    cocaine?

10   A.   No.

11   Q.   Did you ask him any questions about whether he

12   was involved in any sort of illegal activity?

13   A.   No.

14   Q.   When you first -- I'm going to ask you a couple

15   more questions.  When you first approach the vehicle

16   with your vehicle before you even got out of your

17   vehicle, okay, and you illuminated that car, was the

18   passenger ever outside the vehicle at that point?

19   A.   No.

20   Q.   So you're absolutely certain at that point both

21   occupants are inside the vehicle, yes?

22   A.   Yes.

23   Q.   Do you recall a gas can anywhere around?

24   A.   No.

25            MR. SCHIANO:  All right.  I have no

J. DECKER - DIRECT BY MR. SCHIANO

1   further questions.  Thank you.

2            THE COURT:  Do you want to cross now or

3   wait for the grand jury minutes?

4            MR. LO FARO:  We'll continue now, your

5   Honor, with the understanding that if there's

6   further cross examination that we feel is

7   necessary after our review of the grand jury

8   minutes, that we could continue at that point.

9            THE COURT:  Okay.

10  CROSS EXAMINATION

11  BY MR. LO FARO:

12      Q.   Morning, officer, how are you?

13      A.   Good.

14      Q.   Officer, you said that you saw -- you saw a

15  scale that was in plain view on the console, correct?

16      A.   In the center console area.

17      Q.   Center console.  And that you reached into an

18  open window?

19      A.   Yes.

20      Q.   Was that window open when you approached the

21  vehicle?

22      A.   I believe so.

23      Q.   And when was this arrest?

24      A.   January 5th, I believe.

25      Q.   Any idea what the weather was like at that

J. DECKER - CROSS BY MR. LO FARO

1  point in time?

2      A.  It was probably cold.

3      Q.  Yet the windows were open at all times

4  according to you?

5      A.  When I walked up, that window was open.

6      Q.  And again, with your experience, you said that

7  it appeared that there was a scale it may have been

8  consistent with weighing drugs for the purposes of

9  sale with what appeared to be cocaine residue on it?

10     A.  Yes.

11     Q.  You tested the drugs that you had ultimately

12  recovered from Mr. Jennings, is that correct?

13     A.  I believe myself and Officer Ettinger weighed

14  and tested the drugs together.

15     Q.  What was your results of that test?

16     A.  It was positive for cocaine.

17     Q.  How about the weight?

18     A.  Four grams.

19     Q.  How about the scale, did you test that for what

20  you claim was cocaine residue?

21     A.  No, sir, I didn't have a cocaine wipe that day.

22     Q.  Did you make an arrest with regard to a drug

23  paraphernalia charge?

24     A.  No, sir.

25     Q.  Is the scale in and of itself illegal?

J. DECKER - CROSS BY MR. LO FARO

1    A.   Depends on what the subject possesses.

2    Q.   Could that scale have been used for legal

3  purposes?

4    A.   Possibly.

5    Q.   Okay.  Now, there's been some testimony about

6  where your vehicle was parked.  Am I to understand

7  from your testimony that you parked at such an angle

8  that my client was not detained?

9    A.   I believe he could have backed out.

10   Q.   Was he free to leave?

11        MR. SCHIANO:  Objection.

12        THE COURT:  Sustained.

13   Q.   Could you describe once again where your

14  vehicle was parked in proximity to his?

15   A.   I believe the front of my vehicle was at an

16  angle towards the driver's side rear of his vehicle.

17   Q.   Would you say it was partially blocking his

18  vehicle?

19   A.   It's possible.

20   Q.   Why did you park it in such a way?

21   A.   Well, when the vehicle came to our attention, I

22  had to use my spotlight; and to use the spotlight

23  correctly, you have to be at a certain angle.

24   Q.   You couldn't have parked your vehicle to the

25  side and approached?

J. DECKER - CROSS BY MR. LO FARO

20

1    A.   It's a possibility.

2    Q.   You stated that upon entering the premises, the

3 parking lot, you saw what appeared to you to be a

4 suspicious vehicle, correct?

5    A.   Yes.

6    Q.   It was your testimony this was a 2003 black

7 Honda Accord, correct?

8    A.   It was a 2003 black Acura.

9    Q.   Acura, okay.  I can't think of a more

10 nondescript vehicle, what was it about that vehicle

11 that caused you to believe that was a suspicious

12 vehicle?

13    A.   Well, sir, as soon as we saw it, it was parked,

14 occupied, they made quick glances back at us and

15 immediately made furtive movements towards their lower

16 body; and my experience, those movements are

17 indicative of someone, some persons --

18    Q.   Well, I apologize, I don't mean to cut you off

19 but we'll get to the furtive movements next; but when

20 you originally stated I believe, correct me if I'm

21 wrong, that you noticed a suspicious vehicle, this is

22 before the furtive movements, so my question is what

23 about that vehicle, that 2003 Acura, black Acura, one

24 of the most common cars on the road, what was it about

25 that car that you believed was suspicious?

J. DECKER - CROSS BY MR. LO FARO

1    A.   I was just answering that question, you

2  interrupted me.

3    Q.   No, no, I apologize, I said we'll get to the

4  furtive movements, but you said the vehicle was

5  suspicious in and of itself.  So I'm wondering what

6  about that vehicle made it seem suspicious to you?

7    A.   Sir, everything happens really fast.  We pulled

8  in, immediately saw this vehicle was occupied and

9  parked, immediately look at us, start making furtive

10  movements.  It all happens at the same time.

11    Q.   Okay.  So under that theory, is any vehicle

12  that's parked in a public parking lot with two

13  occupants in it a suspicious vehicle?

14    A.   Negative.

15    Q.   And -- okay.  So this happened quickly, let's

16  go back to when you actually pulled into the parking

17  lot.  As you pulled into the parking lot, how big

18  would you say this parking lot was?

19    A.   No idea, sir.

20    Q.   How many cars would you say could park in this

21  particular lot?

22    A.   No idea, sir.

23    Q.   Would you say it was more than a hundred?

24    A.   Negative.

25    Q.   Fifty, less than fifty?

J. DECKER - CROSS BY MR. LO FARO

22

1    A.  I don't know.

2    Q.  As you pulled into the parking lot, other than

3  Mr. Jennings' vehicle, were there any other vehicles

4  in the parking lot?

5    A.  I believe there are a few.

6    Q.  Were there any vehicles to the right of Mr.

7  Jennings' vehicle as you pulled in behind him?

8    A.  I don't believe so.

9    Q.  Any vehicles to the left?

10    A.  I don't recall.

11    Q.  When you approached the vehicle, and I believe

12  what your testimony was, to the driver's side and the

13  window was down?

14    A.  Mm-mm.

15    Q.  Did you say anything to Mr. Jennings at that

16  point as you approached?

17    A.  Right away?

18    Q.  Yeah.

19    A.  I can't recall, sir.

20    Q.  Did you ask him any questions?

21    A.  I did after I recovered the scale.

22    Q.  Okay.  And what was the first time you

23  perceived what you claim are furtive movements?

24  Where -- where was your vehicle at that point or where

25  were you at that point when you observed what you

J. DECKER - CROSS BY MR. LO FARO

1   claim were furtive movements?

2      A.   We were in the parking lot approaching the

3   vehicle.

4      Q.   How far away from the vehicle were you?

5      A.   No idea, sir.

6      Q.   Was it pitch black?

7      A.   No idea, sir.

8      Q.   Was it dark?

9      A.   Yes.

10     Q.   It was evening?

11     A.   Yes.

12     Q.   Okay.  Were you ten yards from the vehicle,

13  twenty yards from the vehicle, thirty yards from the

14  vehicle?

15     A.   I didn't measure it.

16     Q.   Okay.  How about in car lengths?

17     A.   I don't know.

18     Q.   Okay.  Were you in your vehicle or were you out

19  of your vehicle when you noticed what you perceived to

20  be furtive movements?

21     A.   I was in my vehicle.

22     Q.   Okay.  And were both occupants of the vehicle

23  making what you described as furtive movements?

24     A.   Yes.

25     Q.   Okay.  There was an individual in the passenger

J. DECKER - CROSS BY MR. LO FARO                                    24

1   side of the vehicle, correct?

2       A.  Yes.

3       Q.  He was ultimately searched?

4       A.  Yes.

5       Q.  Did he have anything on him?

6       A.  Nothing was found.

7       Q.  Okay.  Yet he was making furtive movements?

8       A.  Yes.

9       Q.  But he had no drugs on him?

10      A.  None was found.

11      Q.  And there was a scale in plain view sitting on

12  the console?

13      A.  Yes.

14      Q.  Okay.  Could you describe what those furtive

15  movements were in detail?

16      A.  As I said before, they were just sneaky, quick

17  movements towards their lower bodies.

18      Q.  Okay.  But you don't have any idea how far away

19  from the vehicle you were when you observed these?

20      A.  No, sir.

21      Q.  Were they seated in the vehicle?

22      A.  I believe so, yes.

23      Q.  And you were behind the vehicle?

24      A.  Yes.

25      Q.  So how could you see into their laps and

J. DECKER - CROSS BY MR. LO FARO                                    25

 1  beneath their wastes making furtive movements if you

 2  couldn't see them?

 3     A.  As I said, they were towards his lower bodies,

 4  their lower bodies.

 5     Q.  He could have been doing anything, correct?

 6     A.  Correct.

 7     Q.  There was no crime in progress, was there?

 8     A.  Not that I know of.

 9     Q.  Okay.  They weren't breaking any laws as they

10  were parked there, were they?

11     A.  I don't believe so.

12     Q.  Just a couple of guys sitting in a parked

13  vehicle?

14     A.  And one possessed drugs.

15     Q.  As you approached -- as you approached to the

16  driver's side of the vehicle, where -- where was your

17  partner at that point?

18     A.  On the passenger side.

19     Q.  And what did he do, if you recall?

20     A.  Say again?

21     Q.  What did he do, if you recall, when he

22  approached the vehicle?

23     A.  I don't know, you'd have to ask him.

24     Q.  You didn't observe him doing anything?

25     A.  I was focused on Mr. Jennings.

J. DECKER - CROSS BY MR. LO FARO

26

1    Q.   Okay.  You said when you approached the vehicle

2    that you didn't ask him any questions, did you ever

3    ask him any questions?

4    A.   Yes, sir.

5    Q.   What were the questions that you asked him?

6    A.   I recall asking both occupants if they

7    possessed or used illegal drugs.

8    Q.   And what was their response?

9    A.   Mr. Jones told me that he had just used cocaine

10   in the vehicle and he didn't have any left.  I believe

11   Mr. Jennings told me no.

12   Q.   So this is high crime area, correct?

13   A.   Yes, sir.

14   Q.   And safe to assume that these guys have been

15   around the block a couple of times?

16   A.   I don't know.

17   Q.   And your testimony is that Mr. Jones said

18   voluntarily, yeah, I just got done doing drugs?

19   A.   Yes, sir, happens all the time.

20   Q.   Okay.  All right.  Other than the fact that you

21   claim that they moved their arms towards their mid

22   sections, anything else that you can articulate that

23   would, in your mind, create suspicion other than that?

24   A.   No, sir.

25   Q.   Did you ever ask Mr. Jennings for any

J. DECKER - CROSS BY MR. LO FARO

1    identification?

2    A.   I don't recall but I'm sure I did.

3    Q.   Did he ever produce a driver's license?

4    A.   I don't recall.

5    Q.   Did he ever produce an insurance card or a

6    registration?

7    A.   I do not recall.

8    Q.   When you approached the vehicle and you were

9    still in your vehicle, could you see the two occupants

10   in the vehicle from your vantage point inside your

11   vehicle?

12   A.   Could I see them?

13   Q.   What I'm asking is when you pulled in you were

14   in your car, correct?

15   A.   Yes.

16   Q.   You observed the defendant's vehicle, correct?

17   A.   Yes.

18   Q.   At what point did you realize there were two

19   occupants of the vehicle?  Were you still in your

20   vehicle?

21   A.   Are you asking me for a distance?

22   Q.   No, I'm asking you if you were in your car or

23   or out of your car when you noticed there were two

24   guys in there?

25   A.   I believe I already answered it, I was in my

1   vehicle.

2      Q.   My client ever explain to you what he was doing

3   there?

4      A.   I do not recall, sir.

5      Q.   When you first approached, was he polite, did

6   he communicate with you intelligently, let you know

7   what he was doing there?

8      A.   I believe he was polite.

9      Q.   Did you ever fear for your safety with regard

10  to Mr. Jennings?

11     A.   I don't know Mr. Jennings, it was our first

12  meeting.

13     Q.   Did he make any aggressive movements towards

14  you?

15     A.   No, sir.

16     Q.   You stated that you didn't make any charges for

17  paraphernalia, did you cite him for any traffic

18  infractions at all?

19     A.   No, sir.

20     Q.   So the time of the stop there, the stop was

21  devoid of any illegal activity at all at that point?

22          MR. SCHIANO:   Object to the reference.

23     There is no stop here.

24          THE COURT:   Sustained.

25     Q.   At the point that you pulled in behind the

J. DECKER - CROSS BY MR. LO FARO                                    29

1   vehicle at an angle, behind their vehicle at an angle

2   partially, blocked them in and approached the vehicle,

3   did you make any -- did you issue any traffic

4   citations?

5       A.   I did not, sir.   I believe I just answered

6   that.

7       Q.   At what point, officer, did you deem it

8   appropriate to search Mr. Jennings?   At what point did

9   you believe he was stripped of his fourth amendment

10  right to privacy, at what point in time?

11      A.   I believe when I found the scale with the white

12  residue on it.

13      Q.   Which he wasn't charged with, correct?

14      A.   Correct.

15      Q.   Which was never tested for cocaine, correct?

16      A.   I don't know if the lab tested it or not.

17      Q.   When you illuminated the vehicle, either you or

18  your partner, what was the source of that

19  illumination?

20      A.   Our vehicle spotlight.

21      Q.   Did you ever use flashlights?

22      A.   Normally we walk up to vehicles with our flash

23  lights, yes.

24      Q.   Do you remember what Mr. Jennings was wearing?

25      A.   No, sir.

J. DECKER - CROSS BY MR. LO FARO

1    Q.   Did he have a coat on?

2    A.   I do not recall, sir.

3    Q.   You said that the cocaine that you found was in

4    freestyle form, correct?

5    A.   Yes, sir.

6    Q.   Is that codified in the Penal Code, are you

7    aware, freestyle form?

8            MR. SCHIANO:   Object to the relevance of

9        this line of questioning at this point.  The way

10       the cocaine was packaged has nothing to do with

11       the stop.

12           THE COURT:   Sustained.

13   Q.   When you say freestyle, that's speculation, is

14   it not, that's an opinion, correct?

15   A.   From my experience, freestyle is a word used on

16   the street in how their specific drug is packaged.

17   Q.   But you don't presume to be inside the head of

18   Mr. Jennings, correct?

19   A.   I don't presume to be in his head.

20   Q.   With regard to where that cocaine is going,

21   what's happening with it, that's speculation?

22   A.   I don't presume to be in his head, no.

23   Q.   When you stated that you saw the two occupants

24   making furtive movements, would you have been able to

25   do that in the absence of a spotlight at that time of

J. DECKER - CROSS BY MR. LO FARO

1   night, under those conditions?

2       A.   Possibly.

3       Q.   And how would you have been able to do that if

4   it was dark and they were in a vehicle?

5       A.   I work midnight shift for a long time.   There

6   are many instances where I saw furtive movements

7   without a spotlight.

8       Q.   But you'd have to admit at that time of night

9   your visibility would have to have been limited,

10  correct?

11      A.   I believe a little bit.

12      Q.   You stated that the apartment complex or

13  whomever has an agreement that you have cart blanche

14  to approach vehicles and inquire as to what they're

15  doing there?

16      A.   It's come to our attention that they have given

17  us authority to approach any persons to ascertain what

18  their business is.

19      Q.   Ascertain what their business is?

20      A.   Yes.

21      Q.   So inquire as to what they're doing there,

22  correct?

23      A.   Yes, sir.

24      Q.   Does ascertaining what their business is

25  illuminating their vehicle?

J. DECKER - CROSS BY MR. LO FARO                                    32

1      A.   If you need to illuminate a vehicle to have

2  furtherance of your job, then, yes, it's a tool.

3      Q.   So illuminating a vehicle is the same thing as

4  asking someone what they're doing there?

5      A.   No.

6      Q.   Okay.  But that's okay?

7      A.   It's okay to illuminate a vehicle?

8      Q.   Yes.

9      A.   Is that what you're asking me?

10     Q.   Yeah.

11     A.   Of course.

12     Q.   Okay.  And is that what you believe you have

13  authorization from the apartment complex to do?

14     A.   What's that?

15     Q.   Illuminate the vehicle?

16     A.   We illuminate vehicles, yes.

17     Q.   Okay.  If there's an articulable suspicion,

18  correct?

19     A.   We illuminate persons, vehicles, it's a tool

20  that we use in our job.

21     Q.   Okay.  They don't give you the right to frisk

22  people, do they, the apartment complex?

23     A.   What's that?

24     Q.   The apartment complex itself, their -- their

25  directive issue that you are okay in questioning

J. DECKER - CROSS BY MR. LO FARO

1   individuals doesn't extend to frisking individuals,

2   doesn't supersede them of their fourth amendment

3   rights, does it?

4   A.   No, sir.

5   Q.   Did you ever give a written report with regard

6   to what the weight of the cocaine was?

7   A.   Say again?

8   Q.   Did you ever give -- did you ever give a

9   written report -- did you ever reduce that to one of

10  your police documents or records how much cocaine was

11  there by weight?

12  A.   Are you asking me if I weighed --

13  Q.   Yes.

14  A.   -- and put that in my report?

15  Q.   Yes.

16  A.   Yes.

17           THE COURT:  Maybe we ought to do the

18      sentencing of Miss Davis so that you can review

19      whatever you want to review so we don't keep Mr.

20      Baska waiting any longer.  He's been here waiting

21      since nine o'clock.

22           MR. LO FARO:  That's fine.  I don't want

23      to hold him up, if that's the Court's pleasure.

24           THE COURT:  You look like you're

25      reviewing --

J. DECKER - CROSS BY MR. LO FARO

34

1            MR. LO FARO:  Just looking over some final

2    questions, Judge.

3            THE COURT:  Let's do the sentencing.

4    You're able to do that?

5            MR. SCHIANO:  I can do it.  I don't have

6    the file.  I can do it without the file, it's not

7    a big deal.

8            (Whereupon, the case was adjourned and

9    subsequently recalled.)

10           *     *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION CONTINUED:

2    BY MR. LO FARO:

3        Q.   Officer, let me begin by saying I apologize for

4    being redundant and asking the same questions.  I know

5    they can be frustrating, but I just want to get the

6    totality of the circumstances so I understand it, the

7    Court understands it and we know how exactly how this

8    occurred.  So if I am redundant, I apologize.  I'd

9    like to go back to your approach of the vehicle.  It

10   was your testimony that you approached the driver's

11   side, correct?

12       A.   Yes.

13       Q.   And I asked you where your partner was, and was

14   it your testimony that he approach the passenger side?

15       A.   Police Officer Ettinger?

16       Q.   Yeah.

17       A.   Yes.

18       Q.   Okay.  Did you both remain on your respective

19   sides of the vehicle at all times?

20       A.   I believe Officer Ettinger came over when I was

21   struggling with Mr. Jenkins on the ground.

22       Q.   Prior thereto, did you ever go to the passenger

23   side of the vehicle?

24       A.   Negative.

25       Q.   Did you ever assist in the search of suspect

J. DECKER - CROSS BY MR. LO FARO

36

1    Jones?

2        A.   No.

3        Q.   So that search was conducted entirely by

4    Officer Ettinger?

5        A.   Yes.

6        Q.   In approaching this vehicle, you mentioned

7    several times you used the word furtive.  If I can

8    just talk about that, ask you about that just for a

9    second and then we're almost done.  Those furtive --

10   those furtive movements, I believe it was you said

11   they made movements towards their mid sections?

12       A.   Yeah, lower bodies, yes.

13       Q.   Lower bodies, okay.  And -- and you said that

14   they were sneaky, and what are you trying to say by

15   that they were sneaky, those movements, using that

16   adjective, sneaky?

17       A.   Well, they're quick.  A lot of times they're

18   out of sight.  It's as if they're trying to hide

19   something before we can get up on the vehicle.

20       Q.   I drop my cell phone almost everyday and I've

21   got to go reaching for it in my car, something of that

22   nature, is any movement sneaky?

23       A.   No, sir.

24       Q.   Could be equally consistent with almost -- just

25   about anything, correct?

J. DECKER - CROSS BY MR. LO FARO

1    A.   I don't know.

2    Q.   So, again, we're talking about speculation and

3  opinion again, correct?

4    A.   It's in my experience.

5    Q.   Okay.  Now, normally when you say they made

6  these sneaky, furtive movements below the waste, why

7  would they be doing it?

8    A.   Trying to hide an illegal item.

9    Q.   Trying to hide an illegal item, okay; but the

10  only items that were recovered were the drugs that

11  were snuggling in the pants pocket of the defendant

12  and a scale that was sitting right out there in plain

13  view, correct?

14    A.   Correct.

15    Q.   So with all those furtive movements, wild

16  speculations, all those furtive movements, nothing was

17  secreted, was it?

18    A.   The drugs were in his pocket.

19    Q.   Which is where they were the entire time,

20  correct?

21    A.   I don't know.

22        MR. SCHIANO:  Objection.  That calls for

23  speculation.  This officer has absolutely --

24        THE COURT:  Sustained.

25        MR. LO FARO:  Just one minute, your Honor.

1    Q.   Officer, you said that this was a suspicious

2    vehicle, you said that there were furtive movements.

3    Again, all I'm going to ask you is this could have

4    also been a vehicle with two buddies in it, sitting in

5    a parking lot, not doing anything other than having a

6    conversation --

7              MR. SCHIANO:  Objection, asked and

8         answered.

9    Q.   -- is that correct?

10             THE COURT:  Sustained.

11             MR. LO FARO:  I don't have any further

12        questions, your Honor.

13             THE COURT:  Redirect?

14             MR. SCHIANO:  Nothing further, Judge.  I

15        thank you for your time, officer.  Have a safe

16        day.

17             THE COURT:  When do you understand those

18        minutes will be done?

19             MR. SCHIANO:  Judge, and that was the

20        issue.  The problem is Rose Laun is out for

21        medical leave.  She was supposed to be in

22        yesterday to try to see where we are at with some

23        things.  I don't have a date certain of when she's

24        coming back.  I spoke with Rob Moran from the

25        Grand Jury Bureau yesterday who is sort of in a

1    way her supervisor.  He's expecting her to come in

2    tomorrow to -- so we can sit down and see what's

3    out there and what we have time on.  So I'll have

4    a better answer for you tomorrow.  If she does

5    come in tomorrow, which I'm expecting her to, I'm

6    going to let her know that we need these as a

7    priority.  I expect within a week.

8              THE COURT:  So you'll send a letter out

9    with the minutes?

10             MR. SCHIANO:  I will.

11             THE COURT:  When they'll be available to

12   everybody?

13             MR. SCHIANO:  I'll deliver them to the

14   Court myself and I will have a copy hand delivered

15   to Mr. LoFaro as well.

16             THE COURT:  Mr. LoFaro, let us know if you

17   want to have Officer Decker come back or not.

18   Nobody listens to me, I'm just going to leave.

19             MR. SCHIANO:  Thank you, Judge.

20             MR. LO FARO:  Thank you, your Honor.

21             COURT OFFICER:  Court is adjourned.

22                 *        *        *        *

23

24

25

COLLOQUY

1                    *       *       *       *

2                    C E R T I F I C A T E

3           This is to certify that I am a Senior Court

4    Reporter of the Fifth Judicial District; that I attended

5    and reported the above-entitled proceedings; that I have

6    compared the foregoing with my original minutes taken

7    therein, and that it is a true and correct transcript

8    thereof and all of the proceedings had therein.

9

10   _____

11   Ann A. Makowiec,
     Official Court Reporter

12   Dated:   June 28, 2017

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  All right.  People versus Tony

2   Jennings.  So we have one witness today and

3   there's a problem I heard with the grand jury

4   minutes.  So there will be no cross examination

5   today --

6        MR. SCHIANO:  We have one witness, your

7   Honor.  We can take his testimony today.  It's up

8   to the Court and it's up to Mr. LoFaro whether or

9   not he wants to begin his cross examination, and

10   then if there's any discrepancies in the grand

11   jury minutes, continue the cross examination; or

12   if he just wants to do it altogether on a

13   different day, I guess that's up to the Court and

14   Mr. LoFaro.  I have no objection to either way.

15        THE COURT:  All right.  How do you want to

16   proceed, Mr. LoFaro?

17        MR. LO FARO:  I apologize, your Honor, I

18   was talking to Mr. Jennings.  What -- what's the

19   issue, Judge, want to do what?

20        THE COURT:  You weren't told?

21        MR. SCHIANO:  Judge, the -- we are

22   awaiting the grand jury minutes.  There was one

23   witness that has testified in the grand jury,

24   that's Officer Decker.  Those minutes were

25   requested in March, specifically March 25th of

COLLOQUY

3

1   2016.   However, Rose Laun from our office has had

2   to leave the office for medical reasons and we

3   don't have a date certain that she's going to

4   return.   So there are several outstanding grand

5   jury transcripts that aren't completed yet, this

6   happens to be one of them.   So as I indicated to

7   the Court, it's the practice of the other parts

8   here that we could start the hearing, Mr. LoFaro

9   can cross examine the witness as he sees fit, we

10  hold the hearing open and I'll provide Mr. LoFaro

11  the grand jury minutes as soon as I have them.   He

12  can review the grand jury minutes, and if he

13  wishes to continue his cross examination, we can

14  recall Officer Decker and continue his cross

15  examination at that point.   If he feels that

16  there's no need to continue the cross examination

17  after he reviews the grand jury minutes, we can

18  close the hearing at that point.

19       MR. LO FARO:   That's fine, your Honor,

20  we'll move forward today.

21       THE COURT:   Okay.   Call -- he's a rebuttal

22  witness?

23       MR. SCHIANO:   Yes, your Honor.   The People

24  call Officer Jeremy Decker.

25       COURT OFFICER:   Could you state and spell

Ann A. Makowiec, Supreme Court Reporter

J. DECKER - DIRECT BY MR. SCHIANO

4

1    your name for the Court, please?

2         THE WITNESS:  Jeremy Decker.  J E R E M Y

3    D E C K E R.

4    J E R E M Y    D E C K E R, called as a witness on behalf

5    of the People, having been duly sworn, testified as

6    follows:

7    DIRECT EXAMINATION

8    BY MR. SCHIANO:

9    Q.   Officer Decker, good morning.

10   A.   Morning.

11   Q.   Are you employed, sir?

12   A.   Syracuse Police.

13   Q.   Tell the Court how long you've worked for the

14   Syracuse Police Department?

15   A.   Over ten years.

16   Q.   And currently what is your rank and assignment

17   within the Syracuse Police Department?

18   A.   Police officer, I'm assigned to a CRT.

19   Q.   What is a CRT?

20   A.   It's a Crime Reduction Team.

21   Q.   For the record purposes, just tell us briefly,

22   what is the purpose of the Crime Reduction Team?

23   A.   We patrol the highest crime areas in the city;

24   mainly focus on gangs, drugs and guns.

25   Q.   And how long have you worked in the Crime

J. DECKER - DIRECT BY MR. SCHIANO

5

1  Reduction Team?

2     A.  Since last June.

3     Q.  All right.  And is one of the areas that you

4  patrol as -- as a member of the Crime Reduction Team

5  the area The Pioneer Homes?

6     A.  Yes, sir.

7     Q.  Tell us why that is?

8     A.  It's one of the highest crime areas in the

9  city, weekly shootings.

10     Q.  And has The Pioneer Homes -- do you have any

11  agreements with The Pioneer Homes about vehicles

12  parked in their parking lot?

13     A.  As far as I know, the Syracuse Public Housing

14  has given Syracuse Police the authority to approach

15  any persons found on the property to ascertain what

16  their lawful business is.

17     Q.  All right.  And is 100 Radisson Court part of

18  that Radisson Homes area?

19     A.  Yes.

20     Q.  I'm sorry, part of The Pioneer Homes area?

21     A.  Yes.

22     Q.  I'd like to direct your attention to January

23  5th of 2016, do you recall that date?

24     A.  Yes.

25     Q.  Were you working on that date?

1    A.   Yes.

2    Q.   Did you become involved in a drug investigation

3 at 100 Radisson Court?

4    A.   Yes.

5    Q.   That's in the City of Syracuse?

6    A.   Yes, sir.

7    Q.   All right.  Tell the Court, to the best of your

8 recollection, how you became involved in that

9 investigation?

10    A.   My partner and I were in the hundred block of

11 Radisson Court.  We saw a suspicious vehicle.  It was

12 a black 2003 Acura.  It was parked with two subjects.

13 When we pulled up, illuminated my spotlight on the

14 vehicle.  I noticed that the two occupants turned

15 around, looked at us and then immediately began making

16 furtive movements to their lower bodies.

17    Q.   All right.  Now, is it your regular course -- I

18 guess in your regular course of responsibilities, is

19 it common for you to illuminate cars in that area?

20    A.   It's a habit, I always do it.

21    Q.   And you do that at night?

22    A.   Yes.

23    Q.   Why do you do that?

24    A.   So I can see who I'm looking at, whether

25 they're walking on the street or they're in the

7

1    vehicle.

2        Q.   And tell us were -- were you driving a marked

3    car or unmarked?

4        A.   It was marked.

5        Q.   Who was driving?

6        A.   I was.

7        Q.   Tell us what happens as you approach this

8    vehicle?

9        A.   So I approached the driver's side of the

10   vehicle, my partner approached the passenger side.  I

11   immediately observe in plain view near the center

12   console area a black digital scale with a white

13   residue on top of it.

14       Q.   Okay.  I want to back you up a little bit.

15   When you say approach the vehicle, that's poor

16   language by me.  As you enter the parking lot in your

17   vehicle, your police vehicle, right, you at some point

18   you noticed this -- this other what you call a

19   suspicious vehicle, correct?

20       A.   Yes.

21       Q.   Do you remember what kind of car it was?

22       A.   It was a black 2003 Acura.

23       Q.   All right.  And was it dark out?

24       A.   Yes.

25       Q.   All right.  And when you noticed this vehicle,

J. DECKER - DIRECT BY MR. SCHIANO                              8

1    did you notice at that time whether there was anybody

2    in the vehicle?

3        A.   Yes.

4        Q.   All right.  And is it at that point that you

5    lit it up?

6        A.   Yes.

7        Q.   When I say lit it up, you shined your spotlight

8    on the vehicle?

9        A.   Yes.

10       Q.   What happens once you shine your spotlight on

11   the vehicle?

12       A.   I see the two occupants turn around, look at us

13   and then immediately start marking furtive movements

14   towards their lower bodies.

15       Q.   Tell me about those movements?

16       A.   They're just quick, sneaky movements as if

17   they're trying to conceal something.

18       Q.   Conceal something where?

19       A.   Towards their lower bodies.

20       Q.   Okay.  And do you stop your car at that point?

21       A.   Yes.

22       Q.   Tell us where specifically you park your

23   vehicle or stop your vehicle?

24       A.   I believe the front end of our vehicle was at

25   an angle toward the rear driver's side of that

1  vehicle.

2      Q.   All right.   Now -- and you stopped -- that's

3  where you stopped your vehicle?

4      A.   Yes.

5      Q.   Did you put it in park?

6      A.   Yes.

7      Q.   And you exit the vehicle?

8      A.   Yes.

9      Q.   All right.   Now, at that point was your

10  vehicle -- when you say it's angled towards the

11  driver's side of the suspect vehicle, correct?

12      A.   Yes.

13      Q.   So the front end of your vehicle is parked at

14  an angle towards the driver's side of the suspect

15  vehicle?

16      A.   I believe so, yes.

17      Q.   Okay.   And at that point, do you know, would

18  the suspect vehicle been able to get out if it wanted?

19      A.   Yeah, he could have backed out.

20      Q.   All right.   Tell us how he would have been able

21  to back out?

22      A.   Just would have had to cut the wheel really

23  hard.

24      Q.   So he wasn't blocked in?

25      A.   No.

J. DECKER - DIRECT BY MR. SCHIANO                                    10

1       Q.   Fair to say?

2       A.   Fair to say.

3       Q.   All right.   Now, you exit the vehicle?

4       A.   Yes.

5       Q.   You approached the driver's side you said,

6   right?

7       A.   Yes.

8       Q.   And who approached the passenger side?

9       A.   Officer Ettinger.

10      Q.   And approximately how long from the time you

11  shined your spotlight on that vehicle until you

12  approached the driver's side of that vehicle?

13      A.   I didn't time it.   Less than a minute.

14      Q.   Okay.   And as you approach the driver's side of

15  the vehicle, what, if anything, did you see?

16      A.   A black digital scale with a white residue.

17      Q.   Did you see that immediately?

18      A.   Yes.

19      Q.   Where was it?

20      A.   In the center console area.

21      Q.   And have you seen a scale like that before?

22      A.   Yes.

23      Q.   Approximately in your career how many times?

24      A.   Hundreds.

25      Q.   All right.   And based on your training and

1   experience, what is a scale like that used for?

2       A.   Weighing drugs.

3       Q.   All right.   Did you notice whether or not the

4   scale had any sort of residue on it?

5       A.   Yes, a white residue.

6       Q.   All right.   And have you seen a white residue

7   like that before?

8       A.   Yes.

9       Q.   Specifically, have you ever seen a white

10  residue like that on a digital scale?

11      A.   Yes.

12      Q.   And in your training and experience, what is --

13  what -- what did you recognize that to be?

14      A.   Cocaine.

15      Q.   All right.   Now, after you make that

16  observation, what do you do next?

17      A.   I recovered the scale.

18      Q.   Before you did anything, you recovered the

19  scale?

20      A.   Yes.

21      Q.   Tell us how you did that?

22      A.   Reached in through the window.

23      Q.   The window was open I'm assuming?

24      A.   Yes.

25      Q.   Okay.   You recovered it how?

1     A.   Reached in the vehicle and took possession of

2  it.

3     Q.   Okay.  What did you do next?

4     A.   I alerted Officer Ettinger that I located a

5  scale with a white residue on it, then I asked the

6  occupants of the vehicle if anyone possessed or used

7  illegal drugs.

8     Q.   Okay.  And what, if anything, did they tell

9  you?

10    A.   The front passenger, Willie Jones, told me that

11 he had just used cocaine in the vehicle but didn't

12 have any left.

13    Q.   Okay.  Did the defendant, Tony Jennings, say

14 anything to you in response to that question?

15    A.   I believe he told me no.

16    Q.   Okay.  And tell us what happens next?

17    A.   Officer Ettinger had Mr. Jones exit the

18 vehicle.  He conducted a search of him for illegal

19 drugs.

20    Q.   Do you know if any illegal narcotics were found

21 on Mr. Jones?

22    A.   No.

23    Q.   Okay.  What did you do next?

24    A.   I had Mr. Jennings exit the vehicle and I

25 conducted -- began to conduct a search of him.

1    Q.  And tell us what happens when you began that

2    search?

3    A.  As I began to search Mr. Jennings, he ran from

4    my grasp.  I pursued him and tackled him to the

5    ground.

6    Q.  Okay.  And approximately how far did Mr.

7    Jennings get before you were able to detain him?

8    A.  I didn't measure.  I'd say approximately ten

9    feet.

10   Q.  From me to you?

11   A.  That's fair.

12   Q.  Okay.  And tell us what happens once -- tell us

13   how that occurs?  How do you get him, do you tackle

14   him?

15   A.  I tackled him from behind.

16   Q.  What happens next?

17   A.  We began ordering him to put his hands behind

18   his back, his left hand and arm were tucked under his

19   body, appeared that he was trying to push up off the

20   ground and keep going.  Officer Ettinger came around

21   to help me, and we were subsequently able to force his

22   hands and arms behind his back and into handcuffs.

23   Q.  Okay.  And once you got him into handcuffs,

24   tell us what happens next?

25   A.  I finished my search of Mr. Jennings.  I

J. DECKER - DIRECT BY MR. SCHIANO                14

1   located in his front left pants pocket a clear knotted

2   section of plastic containing a beige chunky substance

3   and a hundred and ten dollars in US currency.

4        Q.   Okay.   That plastic bag containing the beige

5   substance, have you seen a plastic bag like that

6   before?

7        A.   Yes.

8        Q.   Approximately how many times?

9        A.   Hundreds.

10       Q.   What did it appear to be?

11       A.   Crack cocaine.

12       Q.   Okay.   The substance inside appeared to be

13   crack cocaine?

14       A.   Yes.

15       Q.   And at some point was a field test conducted on

16   that substance?

17       A.   Yes.

18       Q.   Are you trained to use that field test?

19       A.   Yes.

20       Q.   Used it before?

21       A.   Yes, hundreds.

22       Q.   Hundreds of times?

23       A.   (Nods head.)

24       Q.   All right.   What was the result of the field

25   test?

J. DECKER - DIRECT BY MR. SCHIANO

15

1    A.   It was a positive reaction for cocaine.

2    Q.   And at some point was it weighed?

3    A.   Yes.

4    Q.   What was the aggregate weight of the cocaine,

5    if you recall?

6    A.   Four grams.

7    Q.   All right.  Did you find anything else during

8    your search?

9    A.   I believe Mr. Jennings had two cell phones and

10   another hundred and fifty dollars in the center

11   console area.

12   Q.   Okay.  Once you completed your search, tell us

13   what happens next?

14   A.   Completed our search, Mr. Jennings was placed

15   in the rear of our patrol vehicle, his vehicle was

16   towed and Mr. Jones was released on scene.

17   Q.   Okay.  At some point did you transport Mr.

18   Jennings to the Onondaga County Justice Center?

19   A.   Yes.

20   Q.   That's the jail?

21   A.   Yes.

22   Q.   While there, did you inquire as to whether he

23   was employed?

24   A.   Yes, we had a conversation.  I'm not sure

25   exactly where it was.

J. DECKER - DIRECT BY MR. SCHIANO

1    Q.   Okay.  And what, if anything, did Mr. Jennings

2    tell you about his employment status?

3    A.   From what I remember, he told me he was in the

4    asbestos field and that he specifically worked for

5    Hotel Syracuse but it was the off season, so he was

6    selling cocaine to pay the bills.

7    Q.   And when he made that statement to you, did you

8    ask him any questions about whether or not he sold

9    cocaine?

10   A.   No.

11   Q.   Did you ask him any questions about whether he

12   was involved in any sort of illegal activity?

13   A.   No.

14   Q.   When you first -- I'm going to ask you a couple

15   more questions.  When you first approach the vehicle

16   with your vehicle before you even got out of your

17   vehicle, okay, and you illuminated that car, was the

18   passenger ever outside the vehicle at that point?

19   A.   No.

20   Q.   So you're absolutely certain at that point both

21   occupants are inside the vehicle, yes?

22   A.   Yes.

23   Q.   Do you recall a gas can anywhere around?

24   A.   No.

25            MR. SCHIANO:  All right.  I have no

1      further questions.  Thank you.

2                  THE COURT:  Do you want to cross now or

3      wait for the grand jury minutes?

4                  MR. LO FARO:  We'll continue now, your

5      Honor, with the understanding that if there's

6      further cross examination that we feel is

7      necessary after our review of the grand jury

8      minutes, that we could continue at that point.

9                  THE COURT:  Okay.

10     CROSS EXAMINATION

11     BY MR. LO FARO:

12        Q.   Morning, officer, how are you?

13        A.   Good.

14        Q.   Officer, you said that you saw -- you saw a

15     scale that was in plain view on the console, correct?

16        A.   In the center console area.

17        Q.   Center console.  And that you reached into an

18     open window?

19        A.   Yes.

20        Q.   Was that window open when you approached the

21     vehicle?

22        A.   I believe so.

23        Q.   And when was this arrest?

24        A.   January 5th, I believe.

25        Q.   Any idea what the weather was like at that

1  point in time?

2      A.  It was probably cold.

3      Q.  Yet the windows were open at all times

4  according to you?

5      A.  When I walked up, that window was open.

6      Q.  And again, with your experience, you said that

7  it appeared that there was a scale it may have been

8  consistent with weighing drugs for the purposes of

9  sale with what appeared to be cocaine residue on it?

10     A.  Yes.

11     Q.  You tested the drugs that you had ultimately

12 recovered from Mr. Jennings, is that correct?

13     A.  I believe myself and Officer Ettinger weighed

14 and tested the drugs together.

15     Q.  What was your results of that test?

16     A.  It was positive for cocaine.

17     Q.  How about the weight?

18     A.  Four grams.

19     Q.  How about the scale, did you test that for what

20 you claim was cocaine residue?

21     A.  No, sir, I didn't have a cocaine wipe that day.

22     Q.  Did you make an arrest with regard to a drug

23 paraphernalia charge?

24     A.  No, sir.

25     Q.  Is the scale in and of itself illegal?

1    A.   Depends on what the subject possesses.

2    Q.   Could that scale have been used for legal

3    purposes?

4    A.   Possibly.

5    Q.   Okay.  Now, there's been some testimony about

6    where your vehicle was parked.  Am I to understand

7    from your testimony that you parked at such an angle

8    that my client was not detained?

9    A.   I believe he could have backed out.

10   Q.   Was he free to leave?

11           MR. SCHIANO:  Objection.

12           THE COURT:  Sustained.

13   Q.   Could you describe once again where your

14   vehicle was parked in proximity to his?

15   A.   I believe the front of my vehicle was at an

16   angle towards the driver's side rear of his vehicle.

17   Q.   Would you say it was partially blocking his

18   vehicle?

19   A.   It's possible.

20   Q.   Why did you park it in such a way?

21   A.   Well, when the vehicle came to our attention, I

22   had to use my spotlight; and to use the spotlight

23   correctly, you have to be at a certain angle.

24   Q.   You couldn't have parked your vehicle to the

25   side and approached?

J. DECKER - CROSS BY MR. LO FARO                    20

1      A.   It's a possibility.

2      Q.   You stated that upon entering the premises, the

3   parking lot, you saw what appeared to you to be a

4   suspicious vehicle, correct?

5      A.   Yes.

6      Q.   It was your testimony this was a 2003 black

7   Honda Accord, correct?

8      A.   It was a 2003 black Acura.

9      Q.   Acura, okay.   I can't think of a more

10  nondescript vehicle, what was it about that vehicle

11  that caused you to believe that was a suspicious

12  vehicle?

13     A.   Well, sir, as soon as we saw it, it was parked,

14  occupied, they made quick glances back at us and

15  immediately made furtive movements towards their lower

16  body; and my experience, those movements are

17  indicative of someone, some persons --

18     Q.   Well, I apologize, I don't mean to cut you off

19  but we'll get to the furtive movements next; but when

20  you originally stated I believe, correct me if I'm

21  wrong, that you noticed a suspicious vehicle, this is

22  before the furtive movements, so my question is what

23  about that vehicle, that 2003 Acura, black Acura, one

24  of the most common cars on the road, what was it about

25  that car that you believed was suspicious?

J. DECKER - CROSS BY MR. LO FARO

1    A.   I was just answering that question, you

2 interrupted me.

3    Q.   No, no, I apologize, I said we'll get to the

4 furtive movements, but you said the vehicle was

5 suspicious in and of itself.  So I'm wondering what

6 about that vehicle made it seem suspicious to you?

7    A.   Sir, everything happens really fast.  We pulled

8 in, immediately saw this vehicle was occupied and

9 parked, immediately look at us, start making furtive

10 movements.  It all happens at the same time.

11    Q.   Okay.  So under that theory, is any vehicle

12 that's parked in a public parking lot with two

13 occupants in it a suspicious vehicle?

14    A.   Negative.

15    Q.   And -- okay.  So this happened quickly, let's

16 go back to when you actually pulled into the parking

17 lot.  As you pulled into the parking lot, how big

18 would you say this parking lot was?

19    A.   No idea, sir.

20    Q.   How many cars would you say could park in this

21 particular lot?

22    A.   No idea, sir.

23    Q.   Would you say it was more than a hundred?

24    A.   Negative.

25    Q.   Fifty, less than fifty?

J. DECKER - CROSS BY MR. LO FARO

22

1    A.   I don't know.

2    Q.   As you pulled into the parking lot, other than

3    Mr. Jennings' vehicle, were there any other vehicles

4    in the parking lot?

5    A.   I believe there are a few.

6    Q.   Were there any vehicles to the right of Mr.

7    Jennings' vehicle as you pulled in behind him?

8    A.   I don't believe so.

9    Q.   Any vehicles to the left?

10   A.   I don't recall.

11   Q.   When you approached the vehicle, and I believe

12   what your testimony was, to the driver's side and the

13   window was down?

14   A.   Mm-mm.

15   Q.   Did you say anything to Mr. Jennings at that

16   point as you approached?

17   A.   Right away?

18   Q.   Yeah.

19   A.   I can't recall, sir.

20   Q.   Did you ask him any questions?

21   A.   I did after I recovered the scale.

22   Q.   Okay.  And what was the first time you

23   perceived what you claim are furtive movements?

24   Where -- where was your vehicle at that point or where

25   were you at that point when you observed what you

J. DECKER - CROSS BY MR. LO FARO

23

1  claim were furtive movements?

2      A.   We were in the parking lot approaching the

3  vehicle.

4      Q.   How far away from the vehicle were you?

5      A.   No idea, sir.

6      Q.   Was it pitch black?

7      A.   No idea, sir.

8      Q.   Was it dark?

9      A.   Yes.

10     Q.   It was evening?

11     A.   Yes.

12     Q.   Okay.  Were you ten yards from the vehicle,

13  twenty yards from the vehicle, thirty yards from the

14  vehicle?

15     A.   I didn't measure it.

16     Q.   Okay.  How about in car lengths?

17     A.   I don't know.

18     Q.   Okay.  Were you in your vehicle or were you out

19  of your vehicle when you noticed what you perceived to

20  be furtive movements?

21     A.   I was in my vehicle.

22     Q.   Okay.  And were both occupants of the vehicle

23  making what you described as furtive movements?

24     A.   Yes.

25     Q.   Okay.  There was an individual in the passenger

J. DECKER - CROSS BY MR. LO FARO

1  side of the vehicle, correct?

2    A.  Yes.

3    Q.  He was ultimately searched?

4    A.  Yes.

5    Q.  Did he have anything on him?

6    A.  Nothing was found.

7    Q.  Okay.  Yet he was making furtive movements?

8    A.  Yes.

9    Q.  But he had no drugs on him?

10    A.  None was found.

11    Q.  And there was a scale in plain view sitting on

12  the console?

13    A.  Yes.

14    Q.  Okay.  Could you describe what those furtive

15  movements were in detail?

16    A.  As I said before, they were just sneaky, quick

17  movements towards their lower bodies.

18    Q.  Okay.  But you don't have any idea how far away

19  from the vehicle you were when you observed these?

20    A.  No, sir.

21    Q.  Were they seated in the vehicle?

22    A.  I believe so, yes.

23    Q.  And you were behind the vehicle?

24    A.  Yes.

25    Q.  So how could you see into their laps and

1    beneath their wastes making furtive movements if you

2    couldn't see them?

3        A.   As I said, they were towards his lower bodies,

4    their lower bodies.

5        Q.   He could have been doing anything, correct?

6        A.   Correct.

7        Q.   There was no crime in progress, was there?

8        A.   Not that I know of.

9        Q.   Okay.   They weren't breaking any laws as they

10   were parked there, were they?

11       A.   I don't believe so.

12       Q.   Just a couple of guys sitting in a parked

13   vehicle?

14       A.   And one possessed drugs.

15       Q.   As you approached -- as you approached to the

16   driver's side of the vehicle, where -- where was your

17   partner at that point?

18       A.   On the passenger side.

19       Q.   And what did he do, if you recall?

20       A.   Say again?

21       Q.   What did he do, if you recall, when he

22   approached the vehicle?

23       A.   I don't know, you'd have to ask him.

24       Q.   You didn't observe him doing anything?

25       A.   I was focused on Mr. Jennings.

J. DECKER - CROSS BY MR. LO FARO

26

1    Q.   Okay.   You said when you approached the vehicle

2    that you didn't ask him any questions, did you ever

3    ask him any questions?

4    A.   Yes, sir.

5    Q.   What were the questions that you asked him?

6    A.   I recall asking both occupants if they

7    possessed or used illegal drugs.

8    Q.   And what was their response?

9    A.   Mr. Jones told me that he had just used cocaine

10   in the vehicle and he didn't have any left.   I believe

11   Mr. Jennings told me no.

12   Q.   So this is high crime area, correct?

13   A.   Yes, sir.

14   Q.   And safe to assume that these guys have been

15   around the block a couple of times?

16   A.   I don't know.

17   Q.   And your testimony is that Mr. Jones said

18   voluntarily, yeah, I just got done doing drugs?

19   A.   Yes, sir, happens all the time.

20   Q.   Okay.   All right.   Other than the fact that you

21   claim that they moved their arms towards their mid

22   sections, anything else that you can articulate that

23   would, in your mind, create suspicion other than that?

24   A.   No, sir.

25   Q.   Did you ever ask Mr. Jennings for any

J. DECKER - CROSS BY MR. LO FARO

27

1    identification?

2        A.   I don't recall but I'm sure I did.

3        Q.   Did he ever produce a driver's license?

4        A.   I don't recall.

5        Q.   Did he ever produce an insurance card or a

6    registration?

7        A.   I do not recall.

8        Q.   When you approached the vehicle and you were

9    still in your vehicle, could you see the two occupants

10   in the vehicle from your vantage point inside your

11   vehicle?

12       A.   Could I see them?

13       Q.   What I'm asking is when you pulled in you were

14   in your car, correct?

15       A.   Yes.

16       Q.   You observed the defendant's vehicle, correct?

17       A.   Yes.

18       Q.   At what point did you realize there were two

19   occupants of the vehicle?  Were you still in your

20   vehicle?

21       A.   Are you asking me for a distance?

22       Q.   No, I'm asking you if you were in your car or

23   or out of your car when you noticed there were two

24   guys in there?

25       A.   I believe I already answered it, I was in my

J. DECKER - CROSS BY MR. LO FARO                    28

1    vehicle.

2        Q.   My client ever explain to you what he was doing

3    there?

4        A.   I do not recall, sir.

5        Q.   When you first approached, was he polite, did

6    he communicate with you intelligently, let you know

7    what he was doing there?

8        A.   I believe he was polite.

9        Q.   Did you ever fear for your safety with regard

10   to Mr. Jennings?

11       A.   I don't know Mr. Jennings, it was our first

12   meeting.

13       Q.   Did he make any aggressive movements towards

14   you?

15       A.   No, sir.

16       Q.   You stated that you didn't make any charges for

17   paraphernalia, did you cite him for any traffic

18   infractions at all?

19       A.   No, sir.

20       Q.   So the time of the stop there, the stop was

21   devoid of any illegal activity at all at that point?

22             MR. SCHIANO:   Object to the reference.

23       There is no stop here.

24             THE COURT:   Sustained.

25       Q.   At the point that you pulled in behind the

J. DECKER - CROSS BY MR. LO FARO                          29

1   vehicle at an angle, behind their vehicle at an angle

2   partially, blocked them in and approached the vehicle,

3   did you make any -- did you issue any traffic

4   citations?

5       A.  I did not, sir.  I believe I just answered

6   that.

7       Q.  At what point, officer, did you deem it

8   appropriate to search Mr. Jennings?  At what point did

9   you believe he was stripped of his fourth amendment

10  right to privacy, at what point in time?

11      A.  I believe when I found the scale with the white

12  residue on it.

13      Q.  Which he wasn't charged with, correct?

14      A.  Correct.

15      Q.  Which was never tested for cocaine, correct?

16      A.  I don't know if the lab tested it or not.

17      Q.  When you illuminated the vehicle, either you or

18  your partner, what was the source of that

19  illumination?

20      A.  Our vehicle spotlight.

21      Q.  Did you ever use flashlights?

22      A.  Normally we walk up to vehicles with our flash

23  lights, yes.

24      Q.  Do you remember what Mr. Jennings was wearing?

25      A.  No, sir.

J. DECKER - CROSS BY MR. LO FARO                                    30

1    Q.   Did he have a coat on?

2    A.   I do not recall, sir.

3    Q.   You said that the cocaine that you found was in

4    freestyle form, correct?

5    A.   Yes, sir.

6    Q.   Is that codified in the Penal Code, are you

7    aware, freestyle form?

8              MR. SCHIANO:   Object to the relevance of

9         this line of questioning at this point.  The way

10        the cocaine was packaged has nothing to do with

11        the stop.

12             THE COURT:   Sustained.

13   Q.   When you say freestyle, that's speculation, is

14   it not, that's an opinion, correct?

15   A.   From my experience, freestyle is a word used on

16   the street in how their specific drug is packaged.

17   Q.   But you don't presume to be inside the head of

18   Mr. Jennings, correct?

19   A.   I don't presume to be in his head.

20   Q.   With regard to where that cocaine is going,

21   what's happening with it, that's speculation?

22   A.   I don't presume to be in his head, no.

23   Q.   When you stated that you saw the two occupants

24   making furtive movements, would you have been able to

25   do that in the absence of a spotlight at that time of

J. DECKER - CROSS BY MR. LO FARO

31

1    night, under those conditions?

2        A.   Possibly.

3        Q.   And how would you have been able to do that if

4    it was dark and they were in a vehicle?

5        A.   I work midnight shift for a long time.   There

6    are many instances where I saw furtive movements

7    without a spotlight.

8        Q.   But you'd have to admit at that time of night

9    your visibility would have to have been limited,

10   correct?

11       A.   I believe a little bit.

12       Q.   You stated that the apartment complex or

13   whomever has an agreement that you have cart blanche

14   to approach vehicles and inquire as to what they're

15   doing there?

16       A.   It's come to our attention that they have given

17   us authority to approach any persons to ascertain what

18   their business is.

19       Q.   Ascertain what their business is?

20       A.   Yes.

21       Q.   So inquire as to what they're doing there,

22   correct?

23       A.   Yes, sir.

24       Q.   Does ascertaining what their business is

25   illuminating their vehicle?

J. DECKER - CROSS BY MR. LO FARO                              32

1    A.   If you need to illuminate a vehicle to have

2    furtherance of your job, then, yes, it's a tool.

3    Q.   So illuminating a vehicle is the same thing as

4    asking someone what they're doing there?

5    A.   No.

6    Q.   Okay.  But that's okay?

7    A.   It's okay to illuminate a vehicle?

8    Q.   Yes.

9    A.   Is that what you're asking me?

10   Q.   Yeah.

11   A.   Of course.

12   Q.   Okay.  And is that what you believe you have

13   authorization from the apartment complex to do?

14   A.   What's that?

15   Q.   Illuminate the vehicle?

16   A.   We illuminate vehicles, yes.

17   Q.   Okay.  If there's an articulable suspicion,

18   correct?

19   A.   We illuminate persons, vehicles, it's a tool

20   that we use in our job.

21   Q.   Okay.  They don't give you the right to frisk

22   people, do they, the apartment complex?

23   A.   What's that?

24   Q.   The apartment complex itself, their -- their

25   directive issue that you are okay in questioning

J. DECKER - CROSS BY MR. LO FARO

1   individuals doesn't extend to frisking individuals,

2   doesn't supersede them of their fourth amendment

3   rights, does it?

4       A.   No, sir.

5       Q.   Did you ever give a written report with regard

6   to what the weight of the cocaine was?

7       A.   Say again?

8       Q.   Did you ever give -- did you ever give a

9   written report -- did you ever reduce that to one of

10  your police documents or records how much cocaine was

11  there by weight?

12      A.   Are you asking me if I weighed --

13      Q.   Yes.

14      A.   -- and put that in my report?

15      Q.   Yes.

16      A.   Yes.

17           THE COURT:  Maybe we ought to do the

18      sentencing of Miss Davis so that you can review

19      whatever you want to review so we don't keep Mr.

20      Baska waiting any longer.  He's been here waiting

21      since nine o'clock.

22           MR. LO FARO:  That's fine.  I don't want

23      to hold him up, if that's the Court's pleasure.

24           THE COURT:  You look like you're

25      reviewing --

J. DECKER - CROSS BY MR. LO FARO                    34

1           MR. LO FARO:  Just looking over some final

2    questions, Judge.

3           THE COURT:  Let's do the sentencing.

4    You're able to do that?

5           MR. SCHIANO:  I can do it.  I don't have

6    the file.  I can do it without the file, it's not

7    a big deal.

8           (Whereupon, the case was adjourned and

9    subsequently recalled.)

10                  *       *       *       *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS EXAMINATION CONTINUED:

2  BY MR. LO FARO:

3  Q.  Officer, let me begin by saying I apologize for

4  being redundant and asking the same questions.  I know

5  they can be frustrating, but I just want to get the

6  totality of the circumstances so I understand it, the

7  Court understands it and we know how exactly how this

8  occurred.  So if I am redundant, I apologize.  I'd

9  like to go back to your approach of the vehicle.  It

10  was your testimony that you approached the driver's

11  side, correct?

12  A.  Yes.

13  Q.  And I asked you where your partner was, and was

14  it your testimony that he approach the passenger side?

15  A.  Police Officer Ettinger?

16  Q.  Yeah.

17  A.  Yes.

18  Q.  Okay.  Did you both remain on your respective

19  sides of the vehicle at all times?

20  A.  I believe Officer Ettinger came over when I was

21  struggling with Mr. Jenkins on the ground.

22  Q.  Prior thereto, did you ever go to the passenger

23  side of the vehicle?

24  A.  Negative.

25  Q.  Did you ever assist in the search of suspect

J. DECKER - CROSS BY MR. LO FARO

36

1    Jones?

2    A.  No.

3    Q.  So that search was conducted entirely by

4    Officer Ettinger?

5    A.  Yes.

6    Q.  In approaching this vehicle, you mentioned

7    several times you used the word furtive.  If I can

8    just talk about that, ask you about that just for a

9    second and then we're almost done.  Those furtive --

10    those furtive movements, I believe it was you said

11    they made movements towards their mid sections?

12    A.  Yeah, lower bodies, yes.

13    Q.  Lower bodies, okay.  And -- and you said that

14    they were sneaky, and what are you trying to say by

15    that they were sneaky, those movements, using that

16    adjective, sneaky?

17    A.  Well, they're quick.  A lot of times they're

18    out of sight.  It's as if they're trying to hide

19    something before we can get up on the vehicle.

20    Q.  I drop my cell phone almost everyday and I've

21    got to go reaching for it in my car, something of that

22    nature, is any movement sneaky?

23    A.  No, sir.

24    Q.  Could be equally consistent with almost -- just

25    about anything, correct?

1    A.   I don't know.

2    Q.   So, again, we're talking about speculation and

3    opinion again, correct?

4    A.   It's in my experience.

5    Q.   Okay.  Now, normally when you say they made

6    these sneaky, furtive movements below the waste, why

7    would they be doing it?

8    A.   Trying to hide an illegal item.

9    Q.   Trying to hide an illegal item, okay; but the

10   only items that were recovered were the drugs that

11   were snuggling in the pants pocket of the defendant

12   and a scale that was sitting right out there in plain

13   view, correct?

14   A.   Correct.

15   Q.   So with all those furtive movements, wild

16   speculations, all those furtive movements, nothing was

17   secreted, was it?

18   A.   The drugs were in his pocket.

19   Q.   Which is where they were the entire time,

20   correct?

21   A.   I don't know.

22        MR. SCHIANO:  Objection.  That calls for

23   speculation.  This officer has absolutely --

24        THE COURT:  Sustained.

25        MR. LO FARO:  Just one minute, your Honor.

J. DECKER - CROSS BY MR. LO FARO

1      Q.   Officer, you said that this was a suspicious

2  vehicle, you said that there were furtive movements.

3  Again, all I'm going to ask you is this could have

4  also been a vehicle with two buddies in it, sitting in

5  a parking lot, not doing anything other than having a

6  conversation --

7           MR. SCHIANO:  Objection, asked and

8      answered.

9      Q.   -- is that correct?

10          THE COURT:  Sustained.

11          MR. LO FARO:  I don't have any further

12     questions, your Honor.

13          THE COURT:  Redirect?

14          MR. SCHIANO:  Nothing further, Judge.  I

15     thank you for your time, officer.  Have a safe

16     day.

17          THE COURT:  When do you understand those

18     minutes will be done?

19          MR. SCHIANO:  Judge, and that was the

20     issue.  The problem is Rose Laun is out for

21     medical leave.  She was supposed to be in

22     yesterday to try to see where we are at with some

23     things.  I don't have a date certain of when she's

24     coming back.  I spoke with Rob Moran from the

25     Grand Jury Bureau yesterday who is sort of in a

COLLOQUY                                                                    39

1   way her supervisor.  He's expecting her to come in

2   tomorrow to -- so we can sit down and see what's

3   out there and what we have time on.  So I'll have

4   a better answer for you tomorrow.  If she does

5   come in tomorrow, which I'm expecting her to, I'm

6   going to let her know that we need these as a

7   priority.  I expect within a week.

8                THE COURT:  So you'll send a letter out

9   with the minutes?

10               MR. SCHIANO:  I will.

11               THE COURT:  When they'll be available to

12  everybody?

13               MR. SCHIANO:  I'll deliver them to the

14  Court myself and I will have a copy hand delivered

15  to Mr. LoFaro as well.

16               THE COURT:  Mr. LoFaro, let us know if you

17  want to have Officer Decker come back or not.

18  Nobody listens to me, I'm just going to leave.

19               MR. SCHIANO:  Thank you, Judge.

20               MR. LO FARO:  Thank you, your Honor.

21               COURT OFFICER:  Court is adjourned.

22                    *         *         *         *

23

24

25

```
 1                    *      *      *      *

 2                     C E R T I F I C A T E

 3           This is to certify that I am a Senior Court

 4   Reporter of the Fifth Judicial District; that I attended

 5   and reported the above-entitled proceedings; that I have

 6   compared the foregoing with my original minutes taken

 7   therein, and that it is a true and correct transcript

 8   thereof and all of the proceedings had therein.

 9

10   _____
     Ann A. Makowiec,
11   Official Court Reporter

12   Dated:   June 28, 2017

13

14

15

16

17

18

19

20

21

22

23

24

25
```