UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TONY JENNINGS,

                              Plaintiff,

        -against-                                        5:17-CV-0054 (LEK/DEP)

JEREMY DECKER, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        On January 19, 2017, Tony Jennings commenced this 42 U.S.C. § 1983 action against the

City of Syracuse[1] and three officers employed by the Syracuse Police Department: Officer

Jeremy Decker, Officer Darren Ettinger, and Sergeant Robert Ocker. Dkt. No. 1 ("Complaint");

see also Dkt. No. 1-1 ("Preliminary Statement of Facts"). Plaintiff's claims all arise out of the

circumstances surrounding his January 5, 2016 arrest in Syracuse, New York. Prelim. Statement

Facts at 1. Now before the Court is Defendants' motion for summary judgment, filed on June 29,

2018 along with a memorandum and statement of material facts ("SMF"). Dkt. Nos. 53

("Motion"), 53-2 ("Defendants' SMF"), 53-3 ("Memorandum"). Plaintiff opposes the Motion.

_____

        [1] Plaintiff's initial pleading actually named the Syracuse Police Department as a
defendant, not the City of Syracuse. Dkt. No. 1 at 1. However, in a Mary 2017
report-recommendation, the Honorable David E. Peebles, U.S. Magistrate Judge, determined that
"[t]he Syracuse Police Department is an agency of the City of Syracuse and not an independent
entity subject to suit." Dkt. No. 7 ("Report-Recommendation") at 6. Judge Peebles therefore
recommended that the Syracuse Police Department be dismissed as a defendant and replaced
with the City of Syracuse, id. at 8, a suggestion later adopted and implemented by the Court, Dkt.
No. 15 ("June Order") at 2.

Dkt. Nos. 59-1 ("Opposition"), 59 ("Response to Defendants' SMF"). For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## II.    BACKGROUND

### A.  Factual Background

The supporting materials submitted in connection with the Motion make clear that Plaintiff and Defendants endorse substantially different versions of the events that occurred on January 5, 2016. Their differing narratives are set out below.

### 1.  *Defendants' Version of Events*

On January 5, 2016, Officers Decker and Ettinger were on patrol together in Syracuse, New York, near the Pioneer Homes housing complex. Defs.' SMF ¶ 4. Both Decker and Ettinger were members of the Syracuse Police Department's Crime Reduction Team, Dkt. Nos. 53-10 ("Decker Affidavit") ¶ 1,[2] 53-11 ("Ettinger Affidavit") ¶ 1,[3] a "proactive unit" focused on policing related to "guns, drugs[,] and gangs in the City of Syracuse," Dkt. No. 53-6 at 9.[4] Acting on reports of gang activity at Pioneer Homes, the Syracuse Housing Authority had, prior to Plaintiff's arrest, "granted the Syracuse Police Department authorization to arrest persons who were trespassing or had no lawful business at [] Pioneer Homes." Defs.' SMF ¶ 3.

---

[2] The Decker Affidavit was attached to Defendants' Motion as Exhibit I.

[3] The Ettinger Affidavit was attached to Defendants' Motion as Exhibit J.

[4] Exhibits C and D to Defendants' Motion (docket entries 53-6 and 53-7) contain transcripts of the two-day suppression hearing held in connection with Plaintiff's criminal trial, on May 17 and May 19, 2016. Those documents will be referred to by the testifying individual. See, e.g., Dkt. Nos. 53-6 at 8:9–32:20 ("Ettinger Suppression Hearing Testimony"), 53-6 at 33:2–57:25 ("Jennings Suppression Hearing Testimony"), 53-7 at 4:4–38:16 ("Decker Suppression Hearing Testimony").

At approximately 6:45 PM during Decker's and Ettinger's patrol, they encountered an occupied vehicle parked in a lot near "the 100 block of Radisson Court." Ettinger Supp'n Hr'g Test. at 10, 25. Using the patrol car's spotlight, Decker "illuminated" the vehicle, and the officers "noticed the occupants," two black men, "making furtive movements[,] as if the[y] were trying to conceal items." Defs.' SMF ¶ 4. According to Ettinger, those "furtive movements" consisted of "look[ing] at [the officers] and then immediately turn[ing] away," before making "dramatic movements towards their lap[s and] towards the center of the vehicle as if they were attempting to secrete or hide something." Ettinger Supp'n Hr'g Test. at 11, 29.

Finding the occupants' behavior suspicious, Decker and Ettinger parked their patrol car behind the vehicle "at an angle," but without fully blocking its path. Decker Supp'n Hr'g Test. at 9, 22. The officers then got out and approached the vehicle—Decker on the driver's side and Ettinger on the passenger's side, Defs.' SMF ¶ 5–6—and, looking through the open driver's side window, Decker noticed a digital scale near the center console covered in a "white residue" that he believed to be cocaine, Decker Supp'n Hr'g Test. at 10–11. Decker asked the vehicle's driver, later identified as Plaintiff, and its passenger, later identified as Willy Jones, whether there were any drugs in the vehicle. Id. at 12; Ettinger Supp'n Hr'g Test. at 13. Plaintiff denied having any drugs, but Jones admitted to having just used cocaine. Decker Supp'n Hr'g Test. at 12.

Ettinger asked Jones to step out of the vehicle, then put him in handcuffs and "searched him for contraband." Defs.' SMF ¶ 6; Ettinger Supp'n Hr'g Test. at 13. Simultaneously, Decker asked Plaintiff to get out of the vehicle and began to search him as well. Defs.' SMF ¶ 7. Before Decker's search could get underway, however, Plaintiff "violently pulled away and fled on foot . . . eastbound [away] from Officer Decker." Ettinger Supp'n Hr'g Test. at 14. Decker ran

after Plaintiff, tackled him from behind, and ordered him to put his hands behind his back.

Decker Supp'n Hr'g Test. at 13. But Plaintiff continued to struggle with Decker, "and 'kept his

hands under his body rather than putting them behind his back'" while trying to "push up off the

ground and keep going." Defs.' SMF ¶ 9–10 (quoting Dkt. No. 53-5 ("Omnibus Order") at 4);[5]

Decker Supp'n Hr'g Test. at 13. Ettinger ran over to help Decker, then "struck Plaintiff once with

a closed fist" near Plaintiff's right eye, allowing Decker "to pull Plaintiff's hands out from

underneath him . . . [and] to secure him in handcuffs." Defs.' SMF ¶ 16; Decker Supp'n Hr'g

Test. at 13.

Once Plaintiff had been handcuffed, Decker resumed his search and Ettinger returned to

Jones. Ettinger Supp'n Hr'g Test. at 15. In Plaintiff's front left pants pocket, Decker found "a

clear knotted section of plastic containing a beige chunky substance" that he identified as crack

cocaine. Decker Supp'n Hr'g Test. at 13–14. A field test later confirmed that identification. Id.

at 14–15. Decker also found two cell phones and a few hundred dollars in cash. Id. at 13–15.

Neither Decker nor Ettinger interrogated Plaintiff during the search. Ettinger Supp'n Hr'g Test.

at 18; Defs.' SMF ¶ 17. However, Plaintiff voluntarily told the officers that "he was uninjured"

and both officers reported that Plaintiff did not "experience any lacerations or bleeding to his

right eye." Id. After Plaintiff's arrest, Sergeant Ocker arrived on the scene. Defs.' SMF ¶ 13.

Decker and Ettinger took Plaintiff to the Onondaga Justice Center, where he was charged

with criminal possession of a controlled substance in the third and fifth degree. Id. ¶¶ 14–15.

_____

[5] The Order of Hon. Walter W. Harner was attached to Defendant's Motion as Exhibit B.
The cited page numbers for that document refer to those generated by the Court's electronic
filing system ("ECF").

While there, Plaintiff "refused medical treatment." Id. ¶ 21. To the extent that Plaintiff felt any pain as a result of his arrest, that pain lasted "for no more than one week." Id. ¶ 18.

### 2. Plaintiff's Version of Events

At approximately 5:00 PM on January 5, 2017, Plaintiff was at home when he received a phone call from Jones. Jennings Supp'n Hr'g Test. at 33–34; Dkt. No. 53-4 ("50-h Hearing Testimony") at 21.[6] Jones was staying at his girlfriend's house in Pioneer Homes near Radisson Court and asked Plaintiff for a ride "to the gas station [and] to get his car in shape." Jennings Supp'n Hr'g Test. at 34; 50-h Hr'g Test. at 18–19. Jones's car had broken down and needed, among other things, to be refilled with gas. Jennings Supp'n Hr'g Test. at 34.

Plaintiff left his home and picked up Jones, who had with him a gas can, tire inflator, and some other tools. Id. at 35–36. The pair drove to a gas station, where Jones filled up the gas can, then on to Jones's car. Id. at 35; 50-h Hr'g Test. at 19. However, Jones eventually realized that he did not have the proper tools to repair his car, so he packed up and Plaintiff drove him back to his girlfriend's house. Jennings Supp'n Hr'g Test. at 35–36; 50-h Hr'g Test. at 20.

When they arrived back at Pioneer Homes, the Radisson Court parking lot was nearly full. Jennings Supp'n Hr'g Test. at 36. Plaintiff parked in one of the few remaining open parking spots—sandwiched between a truck and another car—then he and Jones remained in Plaintiff's car for another "five to seven minutes" "making small talk." Id. at 36–37; 50-h Hr'g Test. at 22, 25–26. Finally, bothered by the smell of the full gas can, Plaintiff told Jones to "get [i]t out of [his] car." Jennings Supp'n Hr'g Test. at 37. Jones got out, removed the gas can, placed it on the ground, and continued talking with Plaintiff through the open passenger's side door. Id. at 38.

---

[6] Plaintiff's 50-h Hearing Testimony was attached to Defendants' Motion as Exhibit A.

After another "few seconds," Jones noticed that a police cruiser had parked behind Plaintiff's car, "completely block[ing it] off." Id. at 37–38; 50-h Hr'g Test. at 24. The pair had not noticed the cruiser before, both because the truck parked next to Plaintiff's car blocked their view and because the officers "had the[] lights out on . . . their police cruiser" and did not use their spotlight. Jennings Supp'n Hr'g Test. at 38; Resp. Defs.' SMF ¶ 4; 50-h Hr'g Test. at 24.

After Jones and Plaintiff noticed the patrol car, Officers Decker and Ettinger got out and "rushed" Jones, instructing him to place his hands on the hood of Plaintiff's car. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 26–27. The officers then searched Jones, looking through his pockets and asking whether he had any drugs or guns. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 26–27. One of the officers also got out his flashlight, using it to look through the windows of Plaintiff's car. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 32. However, Plaintiff claims that such a search would not have revealed any contraband, and specifically denies that there was a digital scale in his car when the officers arrived. Resp. Defs.' SMF ¶ 5; (noting that "[l]aboratory reports confirmed that a digital scale with cocain[e] residue on it[]s surface was never received at the lab . . . [and the officers] never charged [] Plaintiff . . . for the crime of criminal possession of drug paraphernalia in the second degree"); see also 50-h Hr'g Test. at 54.

Plaintiff watched Jones and the officers for about a minute, then "opened [his] car door to . . . step out of [his] car." Jennings Supp'n Hr'g Test. at 39–40, 50–51; 50-h Hr'g Test. at 32. But before he could do so, Decker "ran around," "jumped inside of [Plaintiff's] doorjamb [to] prevent[ him] from getting out of [his] car[,] . . . [and] started asking [him] questions." Jennings Supp'n Hr'g Test. at 40; Resp. Defs.' SMF ¶ 5; 50-h Hr'g Test. at 32–33. Among other things,

6

Decker asked Plaintiff whether he lived in Pioneer Homes and whether he had any contraband. Jennings Supp'n Hr'g Test. at 40–41. Plaintiff denied having any guns or drugs, and explained that he and Jones had come from the gas station and that Plaintiff was just "dropping [Jones] off." Id.; 50-h Hr'g Test. at 33–34.

Eventually, Decker asked Plaintiff for identification. Jennings Supp'n Hr'g Test. at 41; 50-h Hr'g Test. at 34. Plaintiff handed Decker his driver's license, as well as his registration and insurance information. Jennings Supp'n Hr'g Test. at 41; 50-h Hr'g Test. at 34–35. Decker told Plaintiff to step out and place his hands on the hood of his car, then began to search inside Plaintiff's coat and pants pockets. Jennings Supp'n Hr'g Test. at 42–43; 50-h Hr'g Test. at 35–36. Plaintiff objected to the search, and told Decker that it was "unnecessary" because he "didn't do [any]thing wrong." Jennings Supp'n Hr'g Test. at 43. Decker then "st[u]ck[] his hand underneath [Plaintiff's] coat[,] . . . down the back of [his] pants," and "in[-]between [his] buttocks," prompting Plaintiff to "turn around, to get [Decker] to stop." Id. at 43; Resp. Defs.' SMF ¶ 8; 50-h Hr'g Test. at 39. At that moment, Decker "grabbed [Plaintiff] and slammed [him] to the ground," causing Plaintiff to "hit [his] head on the ice in the parking lot." Jennings Supp'n Hr'g Test. at 43–44; 50-h Hr'g Test. at 8, 39. "Plaintiff immediately placed his hands behind his back to prevent the [] officers from causing [him] any more physical harm." Resp. Defs.' SMF ¶ 9. But before Decker could handcuff Plaintiff, Ettinger "ran around the car, . . . reached down on the ground[,] and [] punched [Plaintiff] in the face." Jennings Supp'n Hr'g Test. at 44; 50-h Hr'g Test. at 8, 40. Once handcuffed, Plaintiff was again searched by Decker, who "locate[d] a quantity of cocaine . . . in [Plaintiff's] pocket." Jennings Supp'n Hr'g Test. at 55; 50-h Hr'g Test. at 41.

7

After Decker and Ettinger had successfully detained Plaintiff, Sergeant Ocker arrived at the scene. Resp. Defs.' SMF ¶ 13. Ocker spoke to Plaintiff about the severity of his injuries and asked whether he needed medical attention, which Plaintiff declined. 50-h Hr'g Test. at 11–12, 42. Ocker also took photographs of Plaintiff's face, head, and hands, Compl. at 4; see also Dkt. No. 59-2 at 10–15 ("Photographs"), and filed a Use of Force report documenting the incident, Dkt. No. 59-2 at 2–3 ("CRB Disposition").[7]

The officers then brought Plaintiff to Onondaga Justice Center, where he was charged with "criminal possession of a controlled substance in the 3rd, 5th, and 7th degrees and resisting arrest." Resp. Defs.' SMF ¶ 14. While there, Plaintiff "did not receive medical treatment for his eye"—which had swollen as a result of Ettinger's punch, Compl. at 4—though Plaintiff denies refusing treatment. Id. ¶¶ 20–21. Plaintiff's account confirms that he "did not experience any lacerations or bleeding to his right eye," and that any pain in his face resulting from the arrest lasted "for no more than one week." Id. ¶¶ 17–18; 50-h Hr'g Test. at 8–9. That said, Plaintiff does claim that "later on down the line [he] started experiencing" pain in both his knee and ribs, which he attributes to the arrest. 50-h Hr'g Test. at 13–14. Those pains did not arise until approximately two weeks after the arrest and Plaintiff never sought medical attention for them, though they bother him "[s]till to this day." Id. at 14, 49–50.

### B. Procedural History

#### 1. Criminal Proceedings

Plaintiff was indicted in 2016 in state court for criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the fourth

---

[7] The CRB Disposition was attached to Plaintiff's papers as Exhibit X.

degree. Order Hon. Walter W. Harner at 2. That indictment was later superseded, and the second count changed to criminal possession of a controlled substance in the fifth degree. Dkt. No. 53-6 at 2–3. Following the May 17 and May 19, 2016 suppression hearing, the Honorable Walter W. Hafner, Onondaga County Court Judge, denied Plaintiff's omnibus motion to, among other things, "suppress[] evidence consisting of tangible property on the grounds that such tangible property was obtained by means of an unlawful search and seizure." Omnibus Order at 2. In so doing, Judge Hafner found that "the cocaine and money recovered from [Plaintiff's] person were obtained during a lawful search . . . incident to arrest." Id. at 10. A jury trial was held in February 2017, and Plaintiff was convicted on both charges and sentenced to ten years imprisonment, followed by three years post-release supervision. Dkt. No. 53-9 ("Sentencing Disposition") at 2.[8] Although it appears that Plaintiff intended to appeal his conviction and/or his sentence, Dkt. No. 53-8 ("Sentencing Hearing Transcript") at 6;[9] 50-h Hr'g Test. at 7, the status of any such appeal has not been reported to the Court.

### 2. Administrative Proceedings

At some point prior to his criminal trial, Plaintiff filed an administrative complaint before the City of Syracuse's Citizen Review Board ("CRB"), raising allegations of excessive force, illegal search, and racial profiling against Officers Decker and Ettinger, as well as allegations of false reporting against Sergeant Ocker. CRB Disposition at 2.[10] The CRB sustained all of

---

[8]  The Sentencing Disposition was attached to Defendants' Motion as Exhibit F.

[9]  The Sentencing Hearing Transcript was attached to Defendants' Motion as Exhibit E.

[10]  The CRB Disposition names the complained-against officers only as "Officer 1," "Officer 2," and "Officer 3," but the factual context provided in the CRB's decision indicates to the Court that Officers 1 and 2 are Decker and Ettinger, and that Officer 3 is Sergeant Ocker.

Plaintiff's allegations—finding that (1) Decker and Ettinger "did not follow proper protocol" in searching Plaintiff; (2) Decker and Ettinger need not have used force against Plaintiff, because he was "not resisting arrest and presented no threat;" and (3) Ocker filed an "incomplete and untruthful" use of force report, "because it appears to misrepresent [Plaintiff's] culpability through uncorroborated quoted statements," id. at 3—and recommended that Decker, Ettinger, and Ocker receive letters of reprimand and retraining, id. at 2.

### 3. Civil Proceedings

After receiving a favorable decision from the CRB, but before his criminal trial, Plaintiff filed the present Complaint. In it, Plaintiff brings six claims: (1) a Fourteenth Amendment racial profiling claim against Decker and Ettinger; (2) a Monell claim against the City of Syracuse; (3) a Fourth Amendment excessive force claim against Decker and Ettinger; (4) a Fourth Amendment illegal search claim against Decker and Ettinger; (5) a Fourth Amendment false arrest claim against Decker and Ettinger; and (6) a conspiracy claim against Decker, Ettinger, and Ocker, brought pursuant to § 1985(3).[11] Compl. at 3, 5.

Judge Peebles's March 2017 Report-Recommendation conducted a preliminary analysis of the Complaint pursuant to 28 U.S.C. § 1915, and found that it "allege[d] sufficient facts to survive review" and require a response. R. & R. at 7–8. The Court approved and adopted that recommendation in its entirety. June Order at 2.

On June 29, 2018, Defendants filed the instant Motion for summary judgment, which has since been fully briefed. Defendants argue that (1) Plaintiff's Fourth Amendment excessive force

---

[11] As explained in more detail below, see infra Part IV.E.3, Plaintiff's conspiracy claim could also be interpreted as being brought pursuant to § 1983.

claim "should be dismissed because [the] officers used reasonable force . . . and the alleged injury sustained is *de minimis*," Mem. at 2; (2) Plaintiff's Fourth Amendment illegal search and false arrest claims should be dismissed as "barred by [Plaintiff's] criminal conviction," id. at 5; and (3) Plaintiff's § 1985(3) conspiracy claim "should be dismissed because [Plaintiff] has not pleaded any evidence of conspiracy" or provided any evidence of racial animus, and, in the alternative, must be barred "by the intracorporate conspiracy doctrine," id. at 7. Defendants raise no arguments regarding either Plaintiff's Fourteenth Amendment racial profiling claim or his Monell claim against the City of Syracuse.

## III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  Preliminary Matters—Plaintiff's Fourteenth Amendment and Monell Claims

Although not expressly stated in the Complaint, Plaintiff appears to bring a claim against Decker and Ettinger for racial profiling in violation of the Fourteenth Amendment,[12] and another

---

[12]  One of the claims listed in Plaintiff's Complaint accuses Decker and Ettinger of "racial profiling," insofar as they "target[ed] inner city minorit[ies] and substantiat[ed] criminal charges as such [sic]." Compl. at 5. Such a claim is "properly subject to equal protection analysis." Marshall v. Town of Middlefield, No. 10-CV-1009, 2012 WL 601783, at *6 (D. Conn. Feb. 23, 2012) (citing Simmons v. Love, No. 09-CV-1218, 2012 WL 113665, at *5 (D. Conn. Jan. 12, 2012) ("Constitutional claims alleging racial profiling are subject to the analysis of the Fourteenth Amendment Equal Protection Clause.")).

under a <u>Monell</u> theory against the City of Syracuse.[13] Defendants' Memorandum fails to address either of those two claims, and raises no arguments that would lead the Court to believe that their dismissal is warranted at this time. Accordingly, both Plaintiff's racial profiling claim against Decker and Ettinger and his <u>Monell</u> claim against the City of Syracuse survive the Motion.

## B.  Fourth Amendment—Excessive Force

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. That language has been interpreted as "protect[ing] persons from the use of excessive force by state police officers incident to an arrest." <u>Messina v. Mazzeo</u>, 854 F. Supp. 116, 128 n.6 (E.D.N.Y. 1994) (citing <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)). Fourth Amendment claims of excessive force are governed by an objective reasonableness standard, such that no claim will lie when "the force used by the officers was objectively reasonable under the circumstances." <u>Id.</u> (citing <u>Roundtree v. City of New York</u>, 778 F. Supp. 614 (E.D.N.Y. 1991)). In making this determination, courts examine "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"

---

[13]  When a plaintiff seeks to hold a municipality liable under § 1983, he must plead—pursuant to the Supreme Court's decision in <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658, 690–91 (1978)—that the alleged deprivation of constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012) (citing <u>Monell</u>, 436 U.S. at 690–91). Therefore, Plaintiff's inclusion of the City of Syracuse as a defendant, <u>see</u> June Order at 2, must be interpreted as an attempt to bring a <u>Monell</u> claim against that entity.

Brown v. City of New York, 798 F.3d 94, 107 (2d Cir. 2015) (certain internal quotation marks omitted) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

Defendants raise two arguments in favor of their motion for summary judgment on Plaintiff's excessive force claim. First, based on the facts as stated in their SMF, they assert that "no reasonable jury could conclude that the [officers'] use of [force] was excessive and not reasonably related to the circumstances" of Plaintiff's arrest. Mem. at 3. In other words, Defendants would ask the Court to find that "Decker and Ettinger's actions of tackling Plaintiff[, as well as] Ettinger's single targeted and purposeful strike[,] w[ere] reasonably related to Plaintiff's actions of openly engaging in a crime in a public area, fleeing an officer while being searched, and concealing his hands when officers tried to secure him in handcuffs." Id. Plaintiff counters by reverting to his version of events, claiming that "the officer[]s did not have any evidence of a crime to arrest . . . Plaintiff for when removing [him] from his vehicle[,] and subject[ed] him to police brutality when slamming . . . [him] to the ground . . . [and] when . . . str[iking him] in the face with a closed fist." Opp'n at 2.

As the parties' arguments make clear, there are substantial differences between their characterization of the facts material to Plaintiff's excessive force claim. In Defendants' version of events, Plaintiff fled from Decker and continued to resist arrest until after Ettinger punched him. Because "the use of force may be reasonable against a suspect who is fleeing," Soto v. Gaudett, 862 F.3d 148, 158 (2d Cir. 2017), that account might support the dismissal of Plaintiff's excessive force claim, see also Sullivan v. Gagnier, 225 F.3d 161, 165–66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force."). But in Plaintiff's version, no flight

occurred and the circumstances surrounding Decker and Ettinger's seizure of Jones and Plaintiff call into serious question the reasonableness of the force undisputedly employed by both officers. See O'Hara v. City of New York, 570 F. App'x 21, 23 (2d Cir. 2014) ("[I]f we assume, as we must, that in effectuating [plaintiff's] arrest for a relatively minor matter, [the defendant-officer] . . . punched [plaintiff] in the face *without* provocation and then proceeded to punch him repeatedly after the [plaintiff] fell to the ground, we conclude that a reasonable jury could have found excessive force."). The facts disputed by the parties are therefore material, insofar as they would affect the outcome of Plaintiff's claim, and the dispute is genuine, because "a reasonable jury could return a verdict for" Plaintiff, were it to believe his story. Anderson, 477 U.S. at 248. Therefore, the Court rejects Defendants' first argument in favor of dismissing Plaintiff's excessive force claim.

Second, Defendants argue that the Court should grant their motion for summary judgment because "Plaintiff cannot establish that his injury was anything more than *de minimis*." Mem. at 4. "[O]n an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable." Washpon v. Parr, 561 F. Supp. 2d 394, 406 (certain internal quotation marks omitted) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)). "A de minimis use of force will rarely suffice to state a Constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), and "'[d]e minims injury can serve as conclusive evidence that de minimis force was used,'" Washpon, 561 F. Supp. 2d at 407 (quoting Carr v. Deeds, 453 F.3d 593, 606 (4th Cir. 2006)). Injuries typically considered "de minimis" include those that are "temporary and/or minor in severity." Smith v. City of New York, No. 04-CV-3286, 2010 WL 3397683, at *10 (S.D.N.Y.

Aug. 27, 2010) (granting defendant's summary judgment motion and dismissing plaintiff's Fourth Amendment claim premised on handcuffing that resulted in "red rings" around his wrists for which he did not request medical attention).

Nonetheless, multiple courts in this Circuit have held at the summary judgment stage "that even minor injuries, including scrapes and bruises, can support an excessive-force claim." Wang v. Vahldieck, No. 09-CV-3783, 2012 WL 119591, at *7 (E.D.N.Y. Jan. 9, 2012); see also id. ("[A] reasonable jury could find that dragging [plaintiff] out of her car by her hair after she had already stopped and pulled over is objectively unreasonable." (citation omitted)). In Robison v. Via, for example, the Second Circuit allowed the plaintiff's excessive force claim to proceed past summary judgment, based on plaintiff's testimony that police officer defendant "pushed her against the inside of the door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back." 821 F.2d 913, 923–24 (2d Cir. 1987) (internal quotation marks and alterations omitted). In so doing, the court found that

> [w]hile [the plaintiff] did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.

821 F.2d at 924 (citing Norris v. District of Columbia, 737 F.3d 1148, 1150–52 (D.C. Cir. 1984)).

It is undisputed that Plaintiff suffered no lacerations or bleeding as a result of Ettinger's punch—though the Complaint does note that Plaintiff suffered "[s]welling around [his] right eye, Compl. at 4—and the pictures taken by Ocker immediately following the arrest do not show any obvious injury, Resp. Defs.' SMF ¶ 17; Photographs. The parties also agree that Plaintiff

received no medical treatment for any of his claimed injuries, and that any pain in Plaintiff's face resulting from the arrest lasted no more than one week. Resp. Defs.' SMF ¶¶ 18, 20–21. However, Plaintiff asserts that the arrest aggravated an existing injury to his ribs and caused long-term pain and discomfort in his knee, 50-h Hr'g Test. at 13–14, 49–50, injuries that a reasonable jury could find to be neither "temporary [n]or minor in severity," Smith, 2010 WL 3397683, at *10. Additionally, other courts in this Circuit have found that "transient pain," such as that suffered by Plaintiff near his right eye, can support an excessive force claim, so long as the force used was objectively unreasonable. See, e.g., Yang Feng Zhao v. City of New York, 656 F. Supp. 2d 375, 390–91 (S.D.N.Y. 2009) (finding that plaintiff's claims—that an officer "patted" his face and "pressed his head down against [a] table for some unspecified period of time and with some unspecified degree of force"—were sufficient to survive summary judgment). As a result, the Court rejects Defendants' second argument and denies Defendants' request for summary judgment as to Plaintiff's excessive force claim against Decker and Ettinger.

### C. Fourth Amendment—Illegal Search

The Fourth Amendment also protects against illegal searches. U.S. Const. amend. IV. "A 'search' in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information." Conroy v. Caron, 275 F. Supp. 3d 328, 340 (D. Conn. 2017) (citing Florida v. Jardines, 569 U.S. 1 (2013)).

Defendants contend that "[t]he Court should dismiss Plaintiff's illegal search . . . claim because his conviction in a New York State criminal court bars th[at] claim as a matter of law."

Mem. at 5. In so arguing, Defendants rely heavily on the Supreme Court's holding in Heck v. Humphrey, that

> in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. 477, 486–87 (1994) (footnote and citation omitted). Because Plaintiff was validly convicted on two counts of criminal possession of a controlled substance—and because there is no indication in the record that his conviction has been overturned—Defendants contend that Plaintiff's claim is not cognizable under § 1983. Mem. at 5.

However, Defendants' argument overlooks an essential corollary to the holding in Heck: that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction." Heck, 512 U.S. at 487 n.7. This is because "a federal court's finding of a Fourth Amendment violation would not necessarily imply that a prior state conviction was unlawful if, despite the constitutional violation, the subject evidence was admissible based on such doctrines as independent source, inevitable discovery, and harmless error." Williams v. Ontario Cty. Sheriff's Dep't, 662 F. Supp. 2d 321, 329 (W.D.N.Y. 2009); see Heck, 512 U.S. at 487 n.7 ("Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not

*necessarily* imply that the plaintiff's conviction was unlawful."). At this stage of the Court's inquiry, then, the relevant question is whether the illegal search alleged by Plaintiff is the sort of "claim [that] implicate[s] the validity of Plaintiff's conviction." Zarro v. Spitzer, 274 F. App'x 31, 34 (2d Cir. 2008) (citing Heck, 512 U.S. at 487). That inquiry "is inherently a factual one." Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999).

Plaintiff's illegal search claim can easily be distinguished from the exceptional evidentiary circumstances contemplated in Heck. Plaintiff was convicted on two counts of possessing a controlled substance, charges which hinged on Decker's discovery of drugs through his allegedly unlawful search. Sentencing Disposition at 2. Plaintiff does not argue that any exception to the Heck exclusionary rule applied in his case, nor does it appear to the Court that the doctrines of independent source, inevitable discovery, and/or harmless error would be relevant. Therefore, if the Court found Decker's search to be unconstitutional, it would necessarily imply that Plaintiff's conviction is invalid. See Black v. Blackmun, No. 11-CV-2372, 2011 WL 6019394, at *2 (E.D.N.Y. Dec. 1, 2011) ("Because [plaintiff's] conviction [for weapons possession] hinged directly on the weapons procured during [an] allegedly unlawful search, an award of damages would necessarily imply the invalidity of his state court conviction."); Kaminski v. Hayes, No. 06-CV-1524, 2009 WL 3193621, at *6 (D. Conn. Sept. 30, 2009) (finding that Heck barred plaintiff's illegal search claim because "the entire evidentiary basis for the charged offenses . . . derives from a single search that is now being challenged as part of a section 1983 action"). Thus, the Court finds that Plaintiff is precluded by Heck from pursuing his illegal search claim against Decker and Ettinger, which must therefore be dismissed.

## D. Fourth Amendment—False Arrest

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). And under New York law, a plaintiff alleging false arrest must show, among other things, that "the defendant intentionally confined him without his consent and without justification." Id. (citing Broughton v. State, 335 N.E.2d 310, 313–14 (N.Y. 1975)). However, pursuant to both state law and § 1983, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" Weyant, 101 F.3d at 852 (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). An officer has probable cause to arrest when (s)he "has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (quoting Weyant, 101 F.3d at 852).

In order to properly evaluate Plaintiff's false arrest claim, the Court must first analyze the Fourth Amendment implications of his interactions with Decker and Ettinger on the evening of January 5, 2016. In Posr v. Doherty, 944 F.2d 91, 97–100 (2d Cir. 1991), the Second Circuit set out guidance for determining when, for Fourth Amendment purposes, a "seizure" rises to the level of an "arrest." It explained that

> when an officer even briefly detains an individual and restrains that person[']s right to walk away, he has effected a seizure and the limitations of the Fourth Amendment become applicable. . . . [But] not every seizure is an arrest. Whether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment

> intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness.

Id. at 97–98 (internal quotation marks and citations omitted). To quantify the "level of intrusiveness" used by officers in any given situation, a court must analyze all of "the facts surrounding the encounter" within "the totality of the circumstances." Id. at 98.

Although the Posr framework does not provide a bright-line rule, the caselaw nonetheless makes clear that, on the night of January 5, 2016, Plaintiff was arrested at least as of the moment that Decker tackled him to the ground. See, e.g., id. at 98 ("An arrest need not be formal; it may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted."); Brown v. Dirga, No. 15-CV-1086, 2017 WL 4399190, at *8 (D. Conn. Sept. 29, 2017) (finding that defendant officer—by grabbing plaintiff arrestee's arm, putting it behind his back, and pushing him up against a parked car—"used physical force in an intrusive way to restrain [plaintiff's] liberty and/or to prevent [him] from leaving . . . [such that] an arrest had occurred"); United States v. Levy, 731 F.2d 997, 1000 (2d Cir. 1984) (finding that plaintiff was arrested once ordered to "freeze" and forced to stand spread-eagle against a wall). Plaintiff may therefore maintain a false arrest claim for any period of time after he was tackled, but before the officers obtained probable cause. Lust v. Joyce, No. 05-CV-613, 2007 WL 3353214, at *2 (N.D.N.Y. Nov. 9, 2007) (holding that plaintiff could maintain a false arrest claim for the "finite period of time in between [his] initial detention . . . and the subsequent discovery of evidence providing probable cause for an arrest," if his detention during that interim period was not supported by probable cause); Gonzalez v. City of Schenectady, No. 00-CV-824, 2001 WL 1217224, at *5 (N.D.N.Y. Sept. 17, 2001) ("Plaintiff

does assert cognizable false arrest claims for the period of time between initial contact with the police and the point where the marijuana was discovered.").

Thus, summary judgment will not lie as to Plaintiff's false arrest claim if (1) a reasonable jury could find that at any point after Decker's tackle, Plaintiff's continued detention was not supported by probable cause; and (2) such a claim would not constitute "a collateral attack on [his] conviction through the vehicle of a civil suit." Heck 512 U.S. at 484 (citation omitted). Defendants argue: (1) that probable cause existed to arrest Plaintiff as a matter of law, because (a) "Officer Decker saw evidence of a crime in plain view when he spotted the digital scale on [Plaintiff's] front console," Mem. at 6 (citing Defs.' SMF ¶¶ 3–5, 23); and (b) "after [Plaintiff] fle[d] Officer Decker to avoid arrest and [was] handcuffed, Officer Decker found cocaine in Plaintiff's possession," id. at 6–7 (citing Defs.' SMF ¶ 12); and (2) that Plaintiff "cannot allege false arrest" because he "did not receive a favorable disposition" on his underlying criminal charge, Mem. at 6 (citing Heck, 512 U.S. at 478–79).

In order to evaluate Defendants' arguments and determine whether the two relevant conditions have been met in Plaintiff's case, it is useful to divide his arrest into two time periods: (1) the period after Decker's tackle but before his search (the "Initial Arrest Period"); and (2) the period during and after Decker's search that led to the discovery of cocaine (the "Post-Discovery Period"). The Court will begin by analyzing the Post-Discovery Period, since it is the more straightforward of the two.

1. *The Post-Discovery Period*

Plaintiff cannot maintain a false arrest claim for the period of his detention that occurred

during and after Decker's search, because such a claim would collaterally attack Plaintiff's conviction in violation of Heck.

As already noted above, the Supreme Court's holding in Heck requires dismissal of any § 1983 claim which would "necessarily imply the invalidity of [the plaintiff's] conviction or sentence." 512 U.S. at 487. Plaintiff's state court conviction for criminal possession of a controlled substance inevitably hinged on Decker's discovery of the cocaine in Plaintiff's pocket. Thus, awarding Plaintiff damages for any "false" detention occurring after that discovery would necessarily imply the invalidity of his state court conviction. Plaintiff's false arrest claim will therefore be dismissed insofar as it concerns the Post-Discovery Period.

### 2. The Initial Arrest Period

Plaintiff's false arrest claim for the Initial Arrest Period, however, requires a considerably more nuanced analysis. Of the two events identified in Defendants' Motion as providing Decker and Ettinger probable cause to arrest Plaintiff, Mem. at 6–7, only one occurred prior to Decker's search: Decker's discovery of the digital scale inside Plaintiff's car. But the parties dispute whether any such scale existed. While Decker and Ettinger agree that a scale covered in "a white residue" was visibly resting on Plaintiff's center console, Decker Aff. ¶ 8; Ettinger Aff. ¶ 8, Plaintiff asserts that "there was no digital scale . . . in [his] vehicle" at all that night, Resp. Defs.' SMF ¶ 5. In support, Plaintiff also points out that he was never charged with possessing drug paraphernalia, that neither Decker nor Ettinger claimed to have conducted any field tests on the scale, and that no scale was ever "received at the lab for any form of testing as contraband/evidence." Id. This factual dispute cannot be resolved at the summary judgment stage, and precludes the Court from finding as a matter of law that Decker and Ettinger had

probable cause, based on the presence of the scale, to arrest Plaintiff by tackling him.[14] See Howard v. Schoberle, 907 F. Supp. 671, 676–77 (S.D.N.Y. 1995) ("In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party."(citing Anderson, 477 U.S. at 255)).

However, Plaintiff's false arrest claim for the Initial Arrest Period nonetheless falls afoul of Heck, even though, as noted above, it was Decker's Post-Discovery Period search that was primarily responsible for Plaintiff's conviction. This is true because Plaintiff was prosecuted under New York law, which provides that "[t]he fruit of an illegal search cannot give rise, in a juristic sense, to probable cause to arrest." Ostrover v. City of New York, 600 N.Y.S.2d 243, 244–45 (N.Y. App. Div. 1993).[15] Therefore, if Plaintiff's civil claim succeeded as to the Initial Arrest Period—in other words, if a jury found that Defendants lacked probable cause to tackle Plaintiff (because no digital scale was present in his car)—it would necessarily imply that Decker

---

[14] The only other pre-search event that could feasibly give rise to probable cause was Plaintiff's alleged flight from Decker. But Plaintiff's version of events contradicts that any such flight occurred, and in any event, though a suspect's flight can, "under certain circumstances, provide reasonable suspicion to warrant a Terry stop, it does not, without more, provide probable cause to arrest." Jenkins v. City of New York, 478 F.3d 78, 89 n.12 (2d Cir. 2007).

[15] Federal law—which formed the basis for the district courts' decisions in Lust and Gonzalez—takes the contrary stance that the "fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant," Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999). Therefore, under federal law an otherwise illegal search can still provide the probable cause required to implement an arrest. See id. ("The individual defendants here lacked probable cause to stop and search Townes, but they certainly had probable cause to arrest him upon discovery of the handguns in the passenger compartment of the taxicab in which he was riding.").

and Ettinger lacked probable cause to search Plaintiff under New York law,[16] and that Judge

Hafner erred in denying Plaintiff's suppression motion. See Omnibus Order at 9 ("Decker

observed in plain view a digital scale with a white powder substance . . . . Based upon these

observations . . . Decker was authorized . . . to arrest [Plaintiff] for the crime of Criminally Using

Drug Paraphernalia."). Even Decker's later discovery of the cocaine would not have retroactively

justified the search, given New York courts' interpretation of the "fruit of the poisonous tree"

doctrine. See Ostrover, 600 N.Y.S.2d at 244–45. And without the cocaine recovered from the

illegal search, Plaintiff could not have been convicted. See People v. Mason, 415 N.Y.S.2d 31,

31 (N.Y. App. Div. 1979) (reversing a lower court's decision denying criminal defendant's

motion to suppress evidence of drug possession, and, as a result, vacating the defendant's

conviction and dismissing the indictment).

Therefore, Plaintiff's false arrest claim against Decker and Ettinger is precluded in its

entirety by Heck and must be dismissed.

**E.  Section 1985(3)—Conspiracy Claim**

A conspiracy claim brought pursuant to § 1985(3) requires a showing of "(1) a conspiracy

(2) for the purpose of depriving a person or class of persons of the equal protection of the laws,

or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the

conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or

privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)

---

[16]  According to New York's De Bour paradigm, 352 N.E.2d 562 (N.Y. 1976), officers cannot seize drugs without probable cause. See Matter of Andy E., 613 N.E.2d 571, 571 (N.Y. 1993) (although officer was justified, after detainee placed his hand in his pocket, to conduct a search for weapons, his subsequent warrantless search of a brown bag in detainee's possession containing "numerous small hard objects" later found to be drugs was illegal).

(citing Traggis v. St. Barbara's Greek Orthodox Church, 851 F.2d 584, 586–87 (2d Cir. 1988)).

Additionally, § 1985(3) "requires a plaintiff to allege that he or she is a member of a protected class and that the conspirators acted with racial, or otherwise class-based 'invidiously discriminatory motivation.'" Ali v. Connick, 136 F. Supp. 3d 270, 277 (E.D.N.Y. 2015) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

Although the Complaint does not explicitly allege the existence of a conspiracy between Decker, Ettinger, and/or Ocker, Plaintiff does accuse those defendants of using "false report[ing]" to "substantiat[e] criminal charges" against him. Compl. at 5. That phrasing mirrors the language used in the CRB Disposition, which faulted Ocker for issuing an "incomplete and untruthful" Use of Force report and for "substantiat[ing] the investigation of an occupied suspicious vehicle without conducting a thorough examination of his own." CRB Disposition at 3 (internal quotation marks omitted). Recalling that "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however artfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,'" the Court interprets those statements as forming the foundation of Plaintiff's § 1985(3) conspiracy claim. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

Defendants appear to have drawn a similar conclusion, and devote two pages in their Memorandum to addressing such a claim. See Mem. at 7–8. Specifically, Defendants argue that Plaintiff "has not pleaded any evidence of conspiracy," and has therefore failed to show that Defendants entered into an agreement and/or achieved a meeting of the minds. Mem. at 7. In addition, Defendants contend that "Plaintiff has not alleged any facts—nor is there any . . . evidence in the record—that show that the conspiratorial harm flowed from 'some racial or

perhaps otherwise class-based, invidious discriminatory animus.'" Id. at 8 (quoting Thomas, 165 F.3d at 146). For the reasons set forth below, the Court disagrees with Defendants' first argument, but nonetheless agrees that Plaintiff's conspiracy claim must be dismissed because the record does not provide adequate evidence of racial animus.[17]

### 1. Existence of a Conspiracy

The Court disagrees with Defendants' first argument, and instead finds that the current record could persuade a reasonable jury to find that a conspiracy existed in Plaintiff's case. The Second Circuit "has repeatedly held [at the motion to dismiss stage] that complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed," and that "[d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977) (citations omitted). But the Second Circuit has also cautioned that, because "such 'conspiracies are by their very nature secretive operations,' [they] may have to be proven by circumstantial, rather than direct, evidence." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (quoting Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994)).

The Court has already determined that a reasonable jury could accept Plaintiff's version of the events that occurred on January 5, 2016. See supra Part IV.B. Doing so would inevitably require that jury to reject the version of events described by Decker's and Ettinger's testimony,

---

[17]  Defendants also raise a third argument, that "[e]ven if Plaintiff had alleged sufficient facts . . . [his] conspiracy claim is nevertheless barred by the intracorporate conspiracy doctrine, which provides that 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'" Id. (certain internal quotation marks omitted) (quoting Murphy v. City of Stamford, 634 F. App'x 804, 805 (2d Cir. 2015)). Having found that Plaintiff's claim must be dismissed on other grounds, however, the Court does not reach this alternative argument.

see generally Ettinger Supp'n Hr'g Test.; Decker Supp'n Hr'g Test., as well as by Ocker's Use of Force report.[18] Both the existence of those statements, as well as the consistencies between them, could then be seen as circumstantial evidence of an agreement, either tacit or explicit, amongst the officers to protect themselves by portraying a false version of Plaintiff's arrest. See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 113 (2d Cir. 2008) ("A defendant's knowing and willing participation in a conspiracy may be inferred from . . . evidence that the defendant . . . engaged in acts exhibit[ing] a consciousness of guilt, such as [making] false exculpatory statements." (internal quotation marks and citations omitted)). Additionally, instead of simply accusing the individual defendants of conspiring with one another in a conclusory or overly generalized fashion, Plaintiff's version of the events surrounding his arrest provides a believable narrative including "specific instances of misconduct" that would explain both how and why such a conspiracy might have come about. Ostrer, 567 F.2d at 553.

The Court therefore rejects Defendants' first argument, and holds that a reasonable jury could find the existence of a conspiracy in the present matter.

### 2. Racial Animus

In asserting that "Plaintiff has not alleged any facts . . . that show that [Plaintiff's] conspiratorial harm flowed from 'some racial or perhaps otherwise class-based, invidious discriminatory animus," Mem. at 8, Defendants appear to overlook Plaintiff's "racial profiling/false report[ing]" claim in the Complaint, which forms the basis for his § 1985(3)

_____

[18]   Ocker's Use of Force report has not been made available in the record, so the Court can only speculate as to its exact contents. However, the description of that report provided in the CRB Disposition—which Plaintiff submitted with his opposition papers—indicates that it generally supports the version of events reported by Decker and Ettinger. CRB Disposition at 2.

allegations, Compl. at 5. There, Plaintiff explicitly states that "Jeremy Decker and Darren Ettinger target[ed] inner city minorit[ies] and substantiat[ed] criminal charges as such [sic]." Id.

That said, the Court nonetheless finds that the record evidence is insufficient to support a finding of racial animus sufficient to support a § 1985(3) conspiracy claim. Although Plaintiff claims he was "target[ed]" on account of his race, the record evidence does not indicate that Defendants used racial slurs or epithets during the course of Plaintiff's arrest, nor does it provide any explicit evidence of racial bias. True, Plaintiff claims that Defendants mistreated and used excessive force against him, but while "mistreatment by defendants is not irrelevant in assessing the strength of plaintiff's circumstantial evidence of race-based animus, it is certainly not sufficient to establish it." Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2d Cir. 2001); see also Coggins v. County of Nassau, 254 F. Supp. 3d 500, 511–15 (E.D.N.Y. 2017) (granting summary judgment and dismissing § 1981 discrimination claim because "the only evidence of racial animus [wa]s plaintiff's belief that [his] arrest was racially motivated").

Therefore, because Plaintiff has failed to offer sufficient evidence suggesting that Defendants' actions were racially motivated, Plaintiff's § 1985(3) claim fails.

### 3. Civil v. Race-Based Conspiracies

As a final point, it is worth noting that the Court could interpret Plaintiff's Complaint as attempting to allege both a "civil" conspiracy pursuant to § 1983 and a "race-based" conspiracy pursuant to § 1985. Biswas v. City of New York, 973 F. Supp. 2d 504, 532–33 (S.D.N.Y. 2013). The legal standards applicable to those statutory schemes are slightly different, in particular because (1) a civil conspiracy need not include allegations of racial animus; and (2) "to make out a conspiracy action under section 1983, the plaintiff must allege an underlying denial of his

constitutional rights."[19] McCloud v. Prack, 55 F. Supp. 3d 478, 483 (W.D.N.Y. 2014) (citing Myers v. Bowman, 713 F.3d 1319, 1332 (11th Cir. 2013)). Thus, in light of the Court's findings above, a § 1983 conspiracy claim would need to be premised on at least one of Plaintiff's surviving constitutional claims—namely, his allegations of excessive force and/or racial profiling.

The allegations giving rise to Plaintiff's conspiracy claim—that Defendants used "false report[ing]" to "substantiat[e] criminal charges" against him, Compl. at 5—only concern whether Defendants conspired to cover up Decker's and Ettinger's allegedly illegal use of force and arrest. But while police cover-ups can, in certain circumstances, constitute a deprivation of constitutional rights, see, e.g., Barrett v. United States, 689 F.2d 324, 332 (2d Cir. 1982) (finding the existence of a constitutional deprivation when cover-up resulted in a deprivation of due process rights); McGarty v. Town of Carmel, 997 F. Supp. 435, 437 (S.D.N.Y. 1998) (same), "the mere filing of a false police report which causes no ascertainable damage"—like Ocker's Use of Force report—"probably does not, by itself, provide grounds for a cover-up claim." Michael Avery et al., Police Misconduct: Law and Litigation § 2:42, 3d ed. 2018 (citing Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980)); see also McCloud, 55 F. Supp. 3d at 483 (finding that prison officials' intentional failure to preserve evidence in order to cover-up fellow officer's failure to protect inmate plaintiff from physical harm could not "form the predicate violation for a conspiracy claim"). Nor does Plaintiff allege that the cover-up

---

[19] The same may also be true in the case of § 1985(3) cases, but in Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 370 n.6 (1979), the Supreme Court left open the question "whether § 1985(3) creates a remedy for statutory rights other than those fundamental rights derived from the Constitution."

constituted some other form of constitutional violation, such as a deprivation of his due process rights. Therefore, exercising its authority under 28 U.S.C. § 1915(e) to "dismiss the case at any time if . . . the action . . . fails to state a claim on which relief may be granted," the Court finds that to the extent Plaintiff attempts to state a § 1983 conspiracy claim against Decker, Ettinger, and Ocker, that attempt also fails.

## V.       CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 53) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that the following claims are dismissed from this action: (1) Plaintiff's Fourth Amendment illegal search claim against Decker and Ettinger; (2) Plaintiff's Fourth Amendment false arrest claim against Decker and Ettinger; (3) Plaintiff's § 1985(3) conspiracy claim against Decker, Ettinger, and Ocker; and (4) Plaintiff's § 1983 conspiracy claim against Decker, Ettinger, and Ocker; and it is further

**ORDERED**, that the following claims survive Defendants' Motion: (1) Plaintiff's Fourteenth Amendment racial profiling claim against Decker and Ettinger; (2) Plaintiff's <u>Monell</u> claim against the City of Syracuse; and (3) Plaintiff's Fourth Amendment excessive force claim against Decker and Ettinger; and it is further

**ORDERED**, that Sergeant Robert Ocker is **DISMISSED** as a defendant in this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      January 17, 2019
                Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge