(61)

ORIGINAL   1

1   STATE OF NEW YORK:                    COUNTY COURT:

2   COUNTY OF ONONDAGA:    CRIMINAL TERM:    Part No. I:

3   - - - - - - - - - - - - - - - - - - - - - - - - -

4   THE PEOPLE OF THE STATE OF NEW YORK,
                                   Indictment#:2016-0961-1,
5                                  superceding #: 2016-0061-1
                                   Index #: 16-0049
6
         vs.                              **HEARING**
7
    **TONY W. JENNINGS,**
8                        Defendant.

9   - - - - - - - - - - - - - - - - - - - - -  CPCS 3

10

11                       Criminal Courts Building
                         505 South State Street
                         Syracuse, New York   13202
12                       **Tuesday, May 17, 2016**

13  BEFORE:    **HONORABLE WALTER W. HAFNER, JR.,**
                         County Court Judge,                 FILED
14                       Fifth Judicial District
                                                        JUL 28 2017
15  APPEARANCES:
               William J. Fitzpatrick, Esq.  ONONDAGA CO CLERKS OFFICE
16             District Attorney, Onondaga County
        BY:    JEFFREY J. SCHIANO, ESQ.
17             Assistant District Attorney
               Criminal Courts Building, Fourth Floor
18             Syracuse, New York   13202

19      BY:    JOHN A. LoFARO, ESQ.
               Attorney for the Defendant
20             307 South Clinton Street, #200
               Syracuse, New York   13202
21
               The Defendant, present in person
22

23

24
                         Reported By:
25                       Patrick J. Reagan, RDR
                         Official Court Reporter

- Jennings - 5/17/16 -

1    (Hearing commenced at 11:10 a.m.)

2         THE CLERK:  This is the matter of Tony Jennings.

3         THE COURT:  Where is Mr. Jennings?

4    (Defendant now present with Mr. LoFaro.)

5         THE COURT:  Okay.  We are here for a Mapp,

6    Dunaway and Huntley hearing today, I guess.  So do you want

7    to call your first witness?

8         MR. SCHIANO:  Yes, Judge.  The People call

9    Officer Darrin Ettinger.

10        Judge, just before we begin, just so the record

11   is clear, I would like the Court to know as well as the

12   defendant prior to the hearing, last court appearance, I

13   made an offer to this defendant which was rejected.  We

14   hadn't yet had the lab reports to indicate the weight of

15   the cocaine located on the defendant.  I told Court, as

16   well as defense counsel, I would get them as soon as

17   possible.  I did get them.  The results of that laboratory

18   report indicate that the cocaine located on the defendant

19   was 2.576 plus or minus 0.002 grams of material, which

20   contained 1,262 plus or minus 154 milligrams of cocaine,

21   making this charge a D-felony by weight.

22        And so based on that, Judge, the Court should

23   know after this hearing, I do intend on superseding the

24   indictment because I think by operation of law at this

25   point, Count Two of the indictment has to be dismissed, as

- Jennings - 5/17/16 -

1   the weight is not sufficient to establish criminal

2   possession of controlled substance in the fourth degree.

3           It is, however, sufficient to establish criminal

4   possession of controlled substance in the fifth degree.

5   But because that statute or that charge is based on the

6   purity of the cocaine, I would have to supercede the

7   indictment, which I do intend on doing.

8           I offered, again, to this defendant one last time

9   a plea to criminal possession of a controlled substance, a

10  reduced charge -- I don't even know if we could do it in

11  the fifth degree -- with a sentence of three and-a-half

12  years plus two years post-release supervision, consecutive

13  to his parole time.  He's rejected that offer, according to

14  his attorney.  I just wanted the record to be clear about

15  that.

16          THE COURT:  You say fifth degree?  Because I have

17  fourth.  Fifth degree, is it?

18          MR. SCHIANO:  Correct.  Because the weight

19  indicated in the lab report does not support the charge of

20  possession in the fourth degree.

21          THE COURT:  Okay.

22          MR. SCHIANO:  The aggregate weight initially at

23  the time of the stop, together with the packaging material,

24  did establish that weight.  It does, however, establish a

25  weight to sustain a charge of criminal possession of

4

- Jennings - 5/17/16 -

1  controlled substance in the fifth degree, for which the

2  defendant faces a maximum sentence of incarceration of four

3  and-a-half years in state prison, and he still faces 15

4  years on the top count.  I just wanted the record to be

5  clear before we start the hearing.

6          THE COURT:  So he has a prior violent and a prior

7  non-violent, correct?

8          MR. SCHIANO:  Yes, he does.

9          THE COURT:  And the fifth is?

10         MR. SCHIANO:  It's a D.

11         THE COURT:  A D.

12         MR. SCHIANO:  As I said, he is facing a maximum

13  of four and-a-half years on that charge; 15 years on the B.

14         THE COURT:  And you offered him what, three

15  and-a-half?

16         MR. SCHIANO:  I did.

17         THE COURT:  Okay.  So the minimum is two

18  and-a-half and the maximum is four and-a-half; and the

19  offer is three and-a-half.

20         And you have had enough time to discuss with your

21  client this situation here and how it looks like it can't

22  possibly get better?

23         THE DEFENDANT:  I am sorry, Your Honor?

24         THE COURT:  No, I just wanted to know if you have

25  had the opportunity to discuss with your attorney here what

- Jennings - 5/17/16 -

1    it looks like?

2              THE DEFENDANT:  Yes.

3              THE COURT:  This disposition can't get any

4    better.

5              THE DEFENDANT:  Yes, yes, Your Honor.

6              THE COURT:  You want some time to talk to him or

7    not?

8              THE DEFENDANT:  In regards to me?  I am under the

9    understanding that I am indicted on third degree and fourth

10   degree.  So there will be a new indictment for fifth

11   degree, am I correct?

12             MR. SCHIANO:  It would consist of a charge of

13   possession third and possession fifth.

14             THE COURT:  It would be third and fifth.  They

15   are offering you the fifth today.

16             THE DEFENDANT:  Third and fifth.  So fourth

17   degree is?

18             THE COURT:  -- is gone.

19             THE DEFENDANT:  Okay.  Fourth degree is gone.

20   And fifth degree is in now?

21             THE COURT:  They will give you an offer, if you

22   want to plead to the fourth degree.

23             THE DEFENDANT:  I understand that.  No, no, I

24   don't want to.

25             THE COURT:  All right.  So, do you want the take

- Jennings - 5/17/16 -

1    the chance of getting indicted for third and fifth?

2            THE DEFENDANT:  So that's what is going to

3    transpire that?  I am just trying to understand.  There

4    will be another Grand Jury proceeding to where he presents?

5            THE COURT:  A-hum.

6            THE DEFENDANT:  Okay.  I understand.

7            THE COURT:  They may indict you for third and

8    fifth.  Apparently, that's with the weight they have now.

9            THE DEFENDANT:  Okay.  Will I be allowed to

10   attend my Grand Jury?  Because my first one I wasn't

11   allowed.

12           THE COURT:  Sure.

13           THE DEFENDANT:  I would like to attend my Grand

14   Jury for this one.  Yes, Your Honor, I would like to be

15   present at this Grand Jury.

16           THE COURT:  But you realize if the People are --

17   if they get an indictment with a new Grand Jury of criminal

18   possession controlled substance third, which is what they

19   wanted you to plead to, initially, in this indictment, the

20   minimum is six years and the maximum is 15 years?  So,

21   you're looking at a minimum of six years.  I am assuming

22   Mr. Schiano says he's not going to give you this fifth

23   degree, you're saying --

24           MR. SCHIANO:  Absolutely not.

25           THE COURT:  -- after today?

7

- Jennings - 5/17/16 -

1        THE DEFENDANT:  Correct.  Correct, I understand.

2        THE COURT:  So the minimum is six years which is

3    more than the three and-a-half, he just offered you.

4        THE DEFENDANT:  Right, that's for a B-felony,

5    correct?

6        THE COURT:  Yes.

7        THE DEFENDANT:  I understand, I understand.  That

8    was the first initial offer, was the six years for the

9    B-felony, that I am charged with.  So I understand, Your

10   Honor.

11       THE COURT:  All right.  He's not going to offer

12   you the minimum.  It could be 15 years.

13       THE DEFENDANT:  Right.  Right.  I understand.

14       THE COURT:  Okay.  As long as you understand.

15       THE DEFENDANT:  Okay.

16       THE COURT:  You still want to go ahead with the

17   hearing?

18       THE DEFENDANT:  Yes, yes, Your Honor.

19       THE COURT:  Okay.

20       MR. LOFARO:  And Your Honor, again, just not to

21   be redundant, just so the record reflects, I have explained

22   to him his maximum exposure may be 15 years.  I have told

23   him the three and-a-half years is on the table, to plead to

24   a D.  And we exhaustively discussed that, albeit the fact

25   that it appears on its face to be a favorable disposition,

Ettinger - direct

1    he has rejected that.

2         Also, with regard to our hearing today, I have

3    explained to him that there are certain pitfalls that

4    accompany testifying at a suppression hearing.  And I have

5    explained to him his right with regards to testifying and

6    not testifying.  And he's adamant that he's going to

7    testify today as well.

8         THE COURT:  All right.

9    D A R R I N    E T T I N G E R, Called as a witness in behalf

10    of the People, being duly sworn, testified as follows:

11         THE COURT:  Okay.  You may proceed, Mr. Schiano.

12         MR. SCHIANO:  Thank you, Judge.

13    DIRECT EXAMINATION BY MR. SCHIANO:

14    Q.   Officer, good morning.

15    A.   Good morning.

16    Q.   Are you employed, sir?

17    A.   Yes, sir.

18    Q.   Can you tell the Court where you work?

19    A.   Syracuse Police Department.

20    Q.   How long have you been a member of the Syracuse Police

21    Department?

22    A.   Since May 2006.

23    Q.   Currently, what is your rank and assignment within the

24    police department?

25    A.   I work for the crime reduction team.

9

Ettinger - direct - Schiano

1    Q.   All right.  And I know the Court's aware, but for the
2    record purposes, what is the crime reduction team?
3    A.   It has been known, it's the guns, drugs and gangs unit.
4    We do the high priority in-progress crimes.  We are not bound
5    by the radio, as patrol.  We are looking for the violent.  And
6    we are looking for the, like I said, the guns, drugs and gangs.
7    Q.   Is that a proactive unit?
8    A.   Yes.
9    Q.   And your primary goal is guns, drugs and gangs in the
10   City of Syracuse, correct?
11   A.   Yes, sir.
12   Q.   And as part of your duties and responsibilities in the
13   crime reduction team, you spend a lot of time, your time and
14   most of your time in the high crime areas of the city,
15   correct?
16   A.   Yes, sir.
17   Q.   All right.  I would like to direct your attention to
18   January 5th of 2016, were you working on that date?
19   A.   I was.
20   Q.   Tell the Court where you were working?
21   A.   I was working Unit 526 with Officer Decker.
22   Q.   Did you become involved in a drug investigation on
23   that date?
24   A.   Yes.
25   Q.   And was that investigation involving one Tony

Ettinger - direct - Schiano

1   Jennings?

2       A.   Yes.

3       Q.   Tell the Court how you became involved in that

4   investigation?

5       A.   Well, we were on patrol in the Pioneer Homes.  The

6   Pioneer Homes and Brick Town are two gangs that have been

7   feuding violently with each other.  We were patrolling inside

8   the Pioneer Homes when, in the 100 block of Radisson Court, we

9   illuminated the vehicles in the parking lot.  And one of the

10  vehicles was occupied.  And as we illuminated the vehicle with

11  our spotlight, the occupants inside the vehicle began making

12  extreme furtive movements, looking down as if they were

13  attempting to hide or secrete items.  We pulled up and exited

14  the patrol vehicle and approached the vehicle.

15      Q.   Okay.  So when you observed this vehicle, you

16  indicated it was at the Pioneer Homes?

17      A.   Yes.

18      Q.   That a parking lot?

19      A.   It is, yes.  It's the parking lot in between the

20  buildings that include the Pioneer Homes project housing.

21      Q.   Okay.  And did you notice right away that there were

22  individuals in that vehicle?

23      A.   When we illuminated the vehicle, absolutely.

24      Q.   Okay.  And tell us specifically, when you say you

25  illuminated the vehicle, what does that mean?

Ettinger - direct - Schiano

1    A.   We have a spotlight on our vehicle that we can move

2    around.  And we illuminated that vehicle.  And the occupants

3    inside the vehicle began making furtive movements, moving

4    around, like I said, dramatically.

5    Q.   All right.  Describe for the Court, what do you mean

6    by furtive movements?  What specifically did you see the

7    occupants do?

8    A.   We illuminated them.  They looked at us and then

9    immediately turned away and began looking down, making movement

10   towards their laps, towards the center of the vehicle.

11   Q.   All right.  And tell us what you did next?

12   A.   We pulled up and exited the patrol vehicle and

13   approached that vehicle.

14   Q.   Okay.  And were you alone or were you with someone?

15   A.   I was with my partner Officer Decker.

16   Q.   When you approached the vehicle, did you approach the

17   driver's side or the passenger side of the vehicle?

18   A.   I approached the passenger's side.

19   Q.   Tell us what happens as you approached the vehicle?

20   A.   As I approached the vehicle, the front seat passenger,

21   who we identified as Willie Jones, was making movements.  He

22   attempted to get out of the vehicle.  I stopped and spoke with

23   him.  Officer Decker approached the driver's side and he

24   notified me that there was a scale in plain view in the

25   vehicle.

Ettinger - direct - Schiano

1    Q.   Okay.  And specifically, where was that scale located?

2    A.   In the console area.  The open, not the open center

3    console but like I said, the front cup holder, of the center

4    console area.

5    Q.   Tell us what type of scale it was.

6    A.   It was a digital scale.

7    Q.   Have you seen that type of scale in the past?

8    A.   Yes.

9    Q.   Approximately how many times have you seen that type

10   of digital scale?

11   A.   Hundreds.

12   Q.   All right.  And when you say you've seen it hundreds

13   of times, you have seen it while you were working as a police

14   officer?

15   A.   Yes.

16   Q.   And commonly, what is that type of digital scale used

17   for?

18   A.   Used for weighing and measuring out illegal drugs.

19   Q.   Okay.  And have you collected scales like that in the

20   past?

21   A.   Yes.

22   Q.   -- as evidence?

23   A.   Yes.

24   Q.   Approximately how many times?

25   A.   Hundreds.

Ettinger - direct - Schiano

1    Q.   All right.  Now once you and Officer Decker make the

2    observation of a scale, which is, just so we are clear, it's

3    sitting on top of the center console?

4    A.   Like I said, the open area of the center console.  Not

5    actually.  The center console was open but the front open area

6    like where the cup holder is, I guess you would say.  Kind of

7    like the front of it.  It's the open area of the console.

8    Q.   Tell us what happens after you make that observation?

9    A.   I asked Mr. Jones to step out of the vehicle.  At which

10   time he was secured in handcuffs.  And he was searched for

11   contraband.

12   Q.   Okay.  Did he make any statements to you at that time?

13   A.   Actually, yes.  When we went up to the vehicle, Officer

14   Decker had stated something, I can't remember what exactly,

15   what he said.  But Mr. Jones said that he had just gotten done

16   doing coke.  I think, Officer Decker asked:  Is there any drugs

17   in the car?  And Mr. Jones said, I just got done doing coke.  I

18   don't have any.

19   Q.   Okay.  And at that time, was he taken out of the car?

20   A.   Then he's taken out of the car.

21   Q.   All right.  And you secure him in handcuffs?

22   A.   Yes.  He is a very large male.

23   Q.   Okay.  Tell us what happens next?

24   A.   I secured him in handcuffs.  I searched him for

25   contraband.  Officer Decker then asked Mr. Jennings to step out

Ettinger - direct - Schiano

1  of the vehicle.  And at which time he begins to search Mr.

2  Jennings.

3      Q.  Okay.  And tell us what happened at that point?

4      A.  During the search of Mr. Jennings, as Officer Decker

5  was beginning to search like his front pant's pocket areas, Mr.

6  Jennings violently pulled away and fled on foot, it would be

7  eastbound, from Officer Decker.

8      Q.  Okay.  And at that point, when he flees, nothing had

9  been located on Mr. Jennings at that point, correct?

10     A.  No.

11     Q.  All right.  By the way, do you see Mr. Jennings in the

12  courtroom today?

13     A.  I do.

14     Q.  Can you just point to him for the record purposes,

15  identify what he's wearing?

16     A.  Sitting at the table with the olive colored shirt.

17         MR. SCHIANO:  Judge, for the record, I ask that

18     the record identify the defendant at this time?

19     Q.  So at that point, Mr. Jennings runs, correct?

20     A.  Yes.

21     Q.  Tell us what happened next?  Tell us what happens

22  next?

23     A.  Officer Decker pursues him.  Tackles him to the ground.

24  Mr. Jennings is struggling with Officer Decker.  His hands are

25  beneath him.  At that time, I run up and I strike Mr. Jennings

Ettinger - direct - Schiano

1    in the side of the face with a closed fist.  We eventually were

2    able to pull Mr. Jennings' hands out from underneath him and

3    secure him in handcuffs.

4        Q.   Okay.  And at the time he flees, tell us where he is,

5    is he at the vehicle at that point?

6        A.   Right when he is being searched, he is at the driver's

7    side door of the vehicle.  Officer Decker is searching him.  He

8    then flees to the left, eastbound towards the apartment

9    building, by only, like I said, about ten feet or approximately

10   ten feet.

11       Q.   Okay.  And you get him secured at that point?

12       A.   We get him secured.  I run back to -- we were only ten

13   feet away, I run back to Willie Jones, who is just standing

14   there, he didn't run, or do anything.

15       Q.   Okay.

16       A.   I actually thanked him for not running.

17       Q.   Tell us what happens next?

18       A.   Officer Decker is now searching Mr. Jennings.  In Mr.

19   Jennings' front left pants pocket, Officer Decker locates one

20   section of clear knotted plastic containing a beige chunky

21   substance.

22       Q.   Okay.  And did you have a chance to observe that bag?

23       A.   Yes.

24       Q.   All right.  Describe it for us?

25       A.   It's a section of clear knotted plastic.

Ettinger - direct - Schiano

1     Q.   And have you seen a section of clear knotted plastic

2  like that before?

3     A.   Yes.

4     Q.   Approximately how many times?

5     A.   Hundreds.

6     Q.   All right.  And did you see what was inside it?

7     A.   Yes, it was a beige, chunky substance.

8     Q.   Have you seen that substance before?

9     A.   Yes, sir.

10    Q.   Approximately how many times?

11    A.   Hundreds.

12    Q.   All right.  Tell the Court what did it appear to be to

13  you?

14    A.   Crack cocaine.

15    Q.   And at some point, was a field test conducted on that

16  beige, chunky substance?

17    A.   Yes.

18    Q.   All right.  And are you and Officer Decker trained to

19  use those field tests?

20    A.   We are.

21    Q.   What was the result of the field test?

22    A.   Positive for cocaine.

23    Q.   Tell us what happens next?

24    A.   Inside the same pocket, where it's tested later, it's

25  measured -- it's what's weighed, it's four grams of crack

17

Ettinger - direct - Schiano

1    cocaine.  Officer Decker's continuing to search.  After he

2    finds the crack, he locates $110 in U.S. currency, cash money

3    inside the same pocket, the front left pant's pocket of Mr.

4    Jennings.

5        Q.   Okay.

6        A.   He locates that.  We search the vehicle.  Inside the

7    vehicle, I locate $150 in U.S. currency, cash money, in the

8    same area where the scale was.

9        Q.   Okay.  And did you have a chance to observe the scale

10   again?

11       A.   Yes.

12       Q.   Was there any residue that you recognized on the

13   scale?

14       A.   Yes.

15       Q.   If you recall?

16       A.   I should clarify, Officer Decker had already taken the

17   scale from the vehicle.  That was at the initial stop when he

18   observed the scale.  And he let me know about the scale.  He

19   reached in and took the scale from the vehicle so that they

20   couldn't destroy evidence, so that it couldn't be tampered

21   with.

22       Q.   Okay.  And there was residue on that scale?

23       A.   There was residue on the face of the scale.

24       Q.   What was that residue consistent with?

25       A.   Consistent with cocaine.

Ettinger - direct - Schiano

1    Q.   Tell us what happens next?

2    A.   Mr. Jennings is found to be on, he is on parole.   He

3    said he ran because he was on parole.

4    Q.   Let me ask you to stop for a minute.   You said he made

5    a statement that he ran because he was on parole.   When did he

6    make that statement?

7    A.   After he was caught.

8    Q.   Was that statement the product of any question?

9    A.   No.

10   Q.   He volunteered that statement to you?

11   A.   Yes.

12   Q.   All right.   Did the defendant make any statements,

13   further statements about any injuries that he may or may not

14   have?

15   A.   He said he was uninjured.

16   Q.   Okay.   Tell us what happens next?

17   A.   We secured the money.   Mr. Willie Jones was released

18   from the scene after warrant checks were found to be negative.

19        Mr. Jennings was subsequently arrested for third,

20   fourth, seventh, resisting.   We towed the vehicle and placed a

21   hold on it for possible forfeiture.   And our S.I.D., our

22   narcotics detectives were notified of the seizure of the

23   vehicle.

24   Q.   Okay.   And at some point did you bring the defendant

25   to the Justice Center?

Ettinger - direct - Schiano

1    A.   Yes.

2    Q.   To be booked?  Tell us what happens if anything when

3    you get there?

4    A.   At booking, we were asking about employment.  He states

5    that he, he does asbestos work for Hotel Syracuse, which is

6    being remodeled.  But it's the off-season, he is not working

7    right now.  And therefore, he was selling crack cocaine to, I

8    am not sure of the word, to substitute or to --

9              MR. LOFARO:  I am going to object, Your Honor.

10        This is beyond the scope of the suppression, which is what

11        we are with right now.

12              THE COURT:  Overruled.

13   A.   He's selling crack cocaine as a way to substitute the

14   money that he's lost because he's not working right now for the

15   asbestos, remodeling --

16   Q.   Okay.  And that statement was made in response to a

17   question:  Whether or not he was employed, correct?

18   A.   Right.  Because on the arrest report, we have to ask

19   religion, education, employment, that kind of thing.

20   Q.   All right.  So it was essentially the product of

21   pedigree questions, is that correct?

22   A.   Yes, sir.

23   Q.   Did you ever ask him whether he sold crack cocaine?

24   A.   No.

25   Q.   Did you ever ask him whether he was involved in any

Ettinger - direct - Schiano

1  sort of criminal activity?

2  A.  No.

3  Q.  Okay.  So that response was purely the result of

4  asking whether he was employed, for the purposes of your

5  police report, correct?

6  A.  Right.  By this time, the investigation, we got a good

7  rapport with him.  We are filling out the -- I am sorry, the

8  arrest report, which is called a 12.  And it's the conversation

9  we had.

10  Q.  And after that, he's booked into the Justice Center,

11  correct?

12  A.  Yes, sir.

13  Q.  And that concludes essentially your part in the

14  investigation, yes?

15  A.  Yes, sir.

16          MR. SCHIANO:  All right.  Officer, I have no

17      further questions.  Stay right there, Mr. LoFaro would have

18      some questions for you.

19          THE COURT:  Okay.  Cross-examination.

20  CROSS-EXAMINATION BY MR. LoFARO:

21  Q.  Good morning, Officer, how are you?

22  A.  Good, sir.  How are you?

23  Q.  Good.  Thank you.  Officer, just let's pick up right

24  where we ended up with regard to the statement that he does

25  asbestos work that you claim he made.  And when he's not doing

Ettinger - cross - LoFaro

1   asbestos work, I believe it was your testimony that he stated

2   that he sells drugs.

3       A.   Sir.

4       Q.   And this is after the arrest?

5       A.   Yep.

6       Q.   This is after the search?

7       A.   Yep.

8       Q.   This is after he tried to run?

9       A.   Yes, sir.

10      Q.   This is after you informed him that he was on parole?

11      A.   Yes, sir.

12      Q.   And after the dust has settled, as a spontaneous

13   utterance, he tells you that he sells drugs?

14      A.   While we were filling out the 12, while we are asking

15   him questions about the 12.

16      Q.   In the hundreds of arrests or thousands of arrests

17   that you made, can you recall in a case where somebody else

18   made a spontaneous utterance like --

19      A.   Yes, sir.

20      Q.   After the arrest?  Is that typical or atypical?

21      A.   It's not typical but it happens.

22      Q.   Okay.

23      A.   Some people feel remorse about what they have done,

24   they talk about it.

25      Q.   Certainly.  Okay.  Going back to May 16th, on that

Ettinger - cross - LoFaro

1   day, when you were in patrol for crimes in progress in the

2   high crime area, is this considered a high crime area?

3       A.   Yes, sir.

4       Q.   And is this where you stated the gangs were feuding?

5       A.   Yes, sir.

6       Q.   There were some gun activity?

7       A.   Yes, sir.

8       Q.   Okay.  And in describing this parking lot that you

9   came upon, is it an apartment complex?

10      A.   It's a -- have you ever been down there?

11      Q.   I don't know if I have or haven't.  I may have but I

12  can't be positive.

13      A.   It's hard to explain.  It is a large like kind of web

14  of different buildings that encompass the Pioneer Homes.

15  McBride runs through I believe the middle of it.  And then like

16  Stewart court runs into that.  There is roads that run into it.

17  There is roads off of it to the side that are labeled, but

18  also, they also have parking for the people who live there.

19      Q.   So this area where you came upon the vehicle, those

20  parking spots in particular, if you know, were those for

21  residents of those houses surrounding that parking lot?

22      A.   Yes, I believe so.

23      Q.   Are you aware of whether or not Mr. Jones or Mr.

24  Jennings was a resident of those premises?

25      A.   Mr. Jones gave an address which was not part of the

Ettinger - cross - LoFaro

1   Pioneer Homes.  It wasn't on the "15."  Sorry.  It wasn't on

2   the incident report, because I can't remember exactly what he

3   told us.  But that wasn't part of where he was.  He wasn't

4   living there at the time.  I think he gave something down off

5   of like, if I am correct about this, like Seneca or like down

6   south, in the Valley area.  I think that's what he gave me at

7   the time.  But it wasn't part of the Pioneer Homes.

8       Q.   Did you later come to find out that he did live at

9   this Pioneer Homes?

10      A.   No, sir.

11      Q.   This parking lot, could you describe the ingress and

12   the egress for me of the parking lot, the exits and the entry

13   ways?

14      A.   There is, I am not getting the exact street names, like

15   I said.  When it comes in, the courts split with different

16   names.  But as I said, if you come off of, which is I believe

17   McBride, north or south, you would turn into the first street,

18   which is I can't remember the name of it.  And then turning,

19   coming past the first -- and then turn in, it's like a

20   horseshoe but there is only one way in and one way out.

21      Q.   Okay.  So it's two-way traffic in and out?  Just one

22   entrance and exit as the same thing?

23      A.   Two-way traffic?

24      Q.   In other words, you exit and come in from one spot

25   like a two-way street?

Ettinger - cross - LoFaro

1    A.   Yes, sir.  Yes, you could go, come, take a shift, go

2    right but eventually you have to come back and come back off

3    the same place, I believe.  I don't think there is an exit

4    anywhere north of that.  I think you have to come out of the

5    same place.

6    Q.   How big would you say that parking lot is?

7    A.   That one he was in, or the whole thing?

8    Q.   The one that he was in?

9    A.   I couldn't estimate it.  It's, it's a good sized

10   parking lot.  It's not small by any means.

11   Q.   How about any cars, maybe if that would be easier?

12   A.   Cars, I don't know how many spots there are?

13   Q.   Couple hundred or 150?

14   A.   I don't think it's that many spots.

15   Q.   No?  Okay.  Now, where were you traveling from when

16   you entered the parking lot?

17   A.   We were just on patrol.

18   Q.   Were you heading north, south on any particular

19   street?

20   A.   I can't remember.  Obviously, we were on McBride

21   because I believe, McBride, if McBride is the one that runs

22   there, which I believe that is, we had to have come on McBride

23   because there is only one way in, one way out.  We would have

24   turned left in, and then illuminated the parking lot.  So we

25   see the one car, and then we turn in, because we see them

Ettinger - cross - LoFaro

1    making all the furtive movements.

2    Q.   Okay.  So, you pulled into the parking lot, how many

3    cars did you see in the parking lot?

4    A.   I'm not sure.

5    Q.   When you first pulled into the parking lot, did you

6    see any cars other than the car of the subject?

7    A.   We were illuminating anything, any cars that were in

8    the parking lot, anybody that was there.  So I am sure there

9    was probably cars.  I can't, I couldn't give you a number.

10   Q.   Okay.  And this was January, about what time did you

11   say?

12   A.   I'm not sure.  It would be on the police report.

13   Q.   Okay.  I think it says about 6:45, does that sound

14   right?

15   A.   I am not sure.  It would be on the police report.

16   Q.   Okay.  Now, at that time of year, it would have been

17   dark, correct?

18   A.   Yes, it was dark.

19   Q.   Okay.  And?

20   A.   It's the reason why we were illuminating the vehicles

21   with the spotlights.

22   Q.   How far away were you from Mr. Jennings' vehicle when

23   you shined the spotlight on the vehicle?

24   A.   Like I said, I can't, I can't really estimate distance

25   with you.  I don't want to give you something that isn't the

Ettinger - cross - LoFaro

1  right thing.  But as we were entering, as we entered from
2  McBride into the apartment complex, as we were coming in, the
3  Radisson Court, at least is on the left, where Mr. Jennings
4  was, Mr. Jennings is now parked down inside the parking lot, a
5  ways.  I mean, I don't think he was all the way to the end of
6  the parking lot but he was more than halfway to the end of the
7  parking lot.  So it's not very, it's not very far.  But he is
8  not right up on top of us before half way.  It's a little
9  farther in the parking lot.
10     Q.  Okay.  And from your vantage point, when you first
11  shine that spotlight inside the vehicle, what exactly did you
12  see?
13     A.  Like I said before, they looked at us, recognizing it
14  was a police vehicle with the spotlights, they turned and began
15  making the furtive movements.
16     Q.  How many kilowatts is that spotlight, do you know?
17     A.  Sir, I don't know.
18     Q.  It's awfully bright, though?
19     A.  Yes, a bright spotlight.
20     Q.  Have you ever been in a situation where you had a
21  spotlight like that and you shined it in your vehicle?
22     A.  Absolutely.
23     Q.  Okay.  And that's probably going to cause some type of
24  reaction with anyone, correct?
25     A.  Not like that, sir.

Ettinger - cross - LoFaro

1    Q.   And there was nothing on Mr. Jones, correct?

2    A.   Mr. Jones, no.

3    Q.   Zero, correct?

4    A.   I don't believe there was anything on Mr. Jones.

5    Q.   Okay.  Yet it's your testimony that he was making

6    furtive movements and moving wildly also?  Okay.  After you

7    shined the spotlight in the vehicle, from your vantage point,

8    where did you proceed from there with your vehicle?

9    A.   We just pulled up and then pulled behind there, to Mr.

10   Jennings' vehicle, to kind of like the rear driver's side of

11   the vehicle.  Stopped the vehicle and approached.

12   Q.   Okay.  Did you park directly behind his vehicle?

13   A.   We weren't directly behind.  I think we were at the 45,

14   like the rear, the rear driver's side corner.

15   Q.   Do you recall if there was a car to the right or to

16   the left or both?

17   A.   There was no car to the left.  Because there was enough

18   room for Officer Decker and him to get out and do the search,

19   and then he ran.  I remember that.  And I don't believe there

20   was any car to the right because Mr. Jones is very large and we

21   were standing next to the vehicle.

22   Q.   From where your vehicle pulled, and you exited the

23   vehicle, were they free to leave at that point in time?

24   A.   Were they free to leave at what time?

25   Q.   When you pulled behind the vehicle?

Ettinger - cross - LoFaro

1          MR. SCHIANO:  I am going to object to that

2     question, Judge, whether or not this police officer --

3          THE COURT:  Sustained.

4     Q.   Based on where your vehicle was parked, could Mr.

5     Jennings have backed up and left the parking lot at that point

6     in time?

7     A.   I'm not sure.

8     Q.   Was there room for him to leave if he chose to leave?

9     A.   Like I said, I am not sure.

10    Q.   If he were to have left that vehicle, was he free to

11    leave?

12         MR. SCHIANO:  Objection.

13         THE COURT:  Sustained.

14    Q.   When you first entered the parking lot, and you saw

15    all these vehicles, in particular Mr. Jennings' vehicle, I

16    think you said your observation was that that was a suspicious

17    vehicle, is that correct?

18    A.   Based on the investigation that we were in, that we

19    were looking at a high crime area, the fact that we illuminated

20    the vehicle, that they made those extreme furtive movements,

21    absolutely.

22    Q.   Okay.  What type of a vehicle was it, do you recall?

23    A.   It was an Acura.

24    Q.   2003 black Acura.  You would agree that that's

25    probably what it was?

Ettinger - cross - LoFaro

1    A.   It would be on the police report.

2    Q.   Okay.  And anything in particular, you know, probably

3  one of the most common cars in the country, right, is an

4  Acura, 2003 Acura, is that correct?

5    A.   I couldn't tell you that, sir.

6    Q.   Would any 2003 black Acura have been a suspicious

7  vehicle?

8    A.   Any vehicle in that parking lot, that we illuminated,

9  where the passenger, where the occupants reacted that way would

10  have been a suspicious vehicle, absolutely.

11    Q.   Okay.  And again, with regard to the wild, furtive

12  movements, could you describe those again one more time?

13    A.   Like I said before, as we illuminated the vehicle.

14  They looked at the light, and then immediately recognized us as

15  a police vehicle, turned and began doing the dramatic movements

16  towards their lap, towards the center of the vehicle as if they

17  were attempting to secrete or hide something.

18    Q.   Could they also have been reaching for a file folder?

19    A.   There was no file folders.

20    Q.   Could they have been adjusting the car stereo?

21    A.   Dramatically like that?  Probably not.

22    Q.   Could they have been talking with their hands?

23    A.   No.

24    Q.   Could they have been startled that all of a sudden

25  there is a bright light in their vehicle and they are going,

30

Ettinger - cross - LoFaro

1   gesticulating, what's going on here, who is over here?

2       A.   As soon as giving -- I keep saying the same thing.

3       Q.   Okay.  All right.  When you pulled into the parking

4   lot, did you notice anything other than the suspicion -- there

5   was no crime in progress was there?

6       A.   No.  That's where a suspicious vehicle.

7       Q.   Okay.  Nothing consistent with this vehicle with

8   regards to guns or gangs though, correct?

9       A.   I am not sure.  Is that a question?

10      Q.   I am just saying that you were patrolling the area, I

11  thought you said for gangs and guns?

12      A.   Drugs, guns and gangs, the crime reduction team does.

13  We were in that area due to the fact of the high violence

14  between the P.H. gang and the Bricks gang.

15      Q.   Okay.  You mentioned that a scale was recovered, with

16  a residue on it was consistent with cocaine.  Did you charge

17  anyone in the vehicle with possession of paraphernalia?

18      A.   We did not.  We didn't have a Nik wipe, to wipe the

19  scale there.  We didn't do the criminal possession of drug

20  paraphernalia.

21      Q.   Did you test the scale -- test the scale for the --

22  did you test the residue on the scale that you claimed was

23  consistent with cocaine?

24      A.   As I stated seconds ago, we did not test it because we

25  did not have a Nik, N-i-k, test wipe with us, therefore we

Ettinger - cross - LoFaro

1  didn't test it nor did we charge him with criminal use of drug

2  paraphernalia.  If we had tested it, we would have charged him.

3      Q.  And you said that was right, that was right in plain

4  view where the drinking containers and the console was?

5      A.  I don't remember if there was a drink container in

6  there.  I am not sure if it's inside the center console.  I'd

7  say open center console, either on top of the front of it or

8  the front open area of the center console, it was in plain view

9  on the center console.

10     Q.  How much time would you guess elapsed between, you

11 know, I wouldn't say guess, but how much time elapsed between

12 when you noticed the furtive movements, and you came upon the

13 vehicle and noticed that scale?

14     A.  We observed the movements.  Quickly drive up.  Get to

15 the vehicle.  Exit as quick as we can, for officer safety.

16 Officer Decker approached the driver's side.  I approached the

17 passenger side.  Officer Decker immediately sees the scale,

18 notifies me of the scale.  Then we proceed --

19     Q.  So how much, how much time would you say elapsed

20 between the time you actually shine that spotlight, saw the

21 furtive movements, and make contact with Mr. Jones?

22     A.  I can't give you time, sir.  Not long at all.

23     Q.  When you observed those wild, furtive movements,

24 between the time that you shined the spotlight and the time

25 you approached the vehicle, that would have been plenty of

Ettinger - cross - LoFaro

1    time with those wild movements to grab that scale and stick,

2    is it under the seat, correct?

3        A.   Could that have happened?  Yes, but it didn't.

4        Q.   Okay.  All right.  That digital scale, was that the

5    reason that you believed you had reason to investigate

6    further, the observation of that digital scale?

7        A.   The digital scale with the white residue on it, yes.

8        Q.   Okay.  Now that possession of a scale, in and of

9    itself, is not a crime, is it?

10       A.   Not a crime.  No.

11            MR. SCHIANO:  Judge, I am going to object to that

12       question, whether it's a crime.

13            THE COURT:  Sustained.

14            MR. LOFARO:  I don't have any further questions.

15       Thank you, Officer.

16            THE COURT:  Thank you, sir.  Redirect?

17            MR. SCHIANO:  Nothing from the People, Your

18       Honor.  Thank you.

19            THE COURT:  You're all set.

20            THE WITNESS:  Thank you.

21            THE COURT:  Next witness?

22            MR. SCHIANO:  People rest, Judge.  Thank you,

23       Officer.

24            THE COURT:  Okay.  Mr. LoFaro, your witness?

25            MR. LOFARO:  Your Honor, I am going to call the

Jennings - direct - LoFaro

1    defendant Tony Jennings, Your Honor, to the stand.

2  T O N Y   J E N N I N G S,  Defendant, Called as a witness in

3    his own behalf, being duly sworn, testified as follows:

4  DIRECT EXAMINATION BY MR. LoFARO:

5    Q.  Good morning, Mr. Jennings.

6    A.  Good morning.

7    Q.  Mr. Jennings, you heard some of the testimony here

8  today.  I am going to call your attention back to that date as

9  well, that date being January 5th of this year.  Do you recall

10  that day?

11    A.  Yes.

12    Q.  And I am going to call your attention back to a time,

13  a little bit before the stop which is the subject of this

14  suppression hearing.  Maybe a couple, two or three hours

15  before that.  Do you recall what you were doing that day?

16    A.  Yes.

17    Q.  Could you explain that for the Court what were you

18  doing on that day?

19    A.  I was, couple hours before, maybe hour or two before,

20  or?

21    Q.  Yes?

22    A.  Hour or two before, I was at home.

23    Q.  Okay.

24    A.  I was at home watching the basketball game.

25    Q.  Okay.  Anything happen to cause you to stop watching

Jennings - direct - LoFaro

1  that basketball game and leave your premises?

2      A.   I got a phone call from my friend, Willie Jones, and he

3  asked me for a ride, so I came down to --

4      Q.   Where was Mr. Jones at the time, where did he want you

5  to pick him up from?

6      A.   At the time, he was down in Pioneer Homes.  And he was

7  in Radisson Court at his girlfriend's house, so I came.

8      Q.   Okay.  So you picked him up at Radisson Court from his

9  girlfriend's house?

10      A.   Correct.

11      Q.   So you left your home about what time?

12      A.   I am going to say maybe, maybe around five o'clock,

13  maybe.

14      Q.   And headed down to Radisson Court?

15      A.   Five o'clock that night, yes.

16      Q.   Pulled into Radisson Court, did you park or did he

17  come running out?

18      A.   No, he came out when I called him, let him know that I

19  was outside.  He came right outside.

20      Q.   Why did he want you to come and pick him up?

21      A.   He needed a ride.  I told him a little earlier that day

22  that I would give him a ride to the gas station to get his car

23  in shape.  He said needed to fill his gas can up with gas, and

24  take him around to his vehicle, to get it running and get it

25  back over to the parking lot.

Jennings - direct - LoFaro

1    Q.   Okay.  So you picked him up, at Radisson Court, where

2    did you go when you left Radisson Court?

3    A.   We went to Monde's [ph] gas station on South Salina

4    Street.

5    Q.   What type of a vehicle did he have, was his vehicle?

6    A.   No, no.  It was at -- a barbershop on Burt Street.

7    Q.   Okay.

8    A.   Behind a House of Hair.  That's the name of the

9    barbershop it was parked behind.

10   Q.   So you went to the gas station, what did you do there?

11   A.   He filled up.  I waited for him while he filled the gas

12   can up with gas.  Then we rode around to the -- to where his

13   car was.

14   Q.   What did you do when you came upon his car?

15   A.   I turned my lights and my headlights on in the car

16   because it was dark by then, five o'clock, in January.  It gets

17   dark out early.  So I had my lights on shining on his car so he

18   could see what he was doing.  He had to put air in his tires.

19   And he also had to hook the cable back up around his battery

20   because he had disconnected it for some reason; that way the

21   battery wouldn't drain completely, so.  You know, he was

22   working with that for a while but he figured out he didn't have

23   the tools that he needed to get the wires connected back to the

24   battery.  How he needed to do it.  So, after that he packed up

25   all his stuff, put it back in my car, the gas can, the

Jennings - direct - LoFaro

1   cigarette-lighter-inflator that you use to fill up basketballs,

2   tires, whatever.  You just plug it into your cigarette lighter.

3   So he put all the stuff back in the car, and I gave him a ride

4   right back around to his girlfriend house's in Radisson -- he

5   pulled --

6      Q.   Let's take that step-by-step.  You leave Burt Street.

7   You come back to Radisson Court.  Where do you enter the

8   parking lot in Radisson Court?

9      A.   Well, you come down McBride Street, and you have to

10  make a left going up Jackson Street, and then make a left in

11  into Radisson Court.  And that's where I pulled.  And it was

12  one car, in the parking lot in front of his girlfriend's

13  apartment.  There was no parking spaces.  So I was more, as

14  soon as I pull into Radisson Court, I was the second, the

15  second parking space.  I was in the second parking space.

16  There was a truck here, then it's my car where I pulled, and

17  then it was cars going along the line.  And the parking lot, it

18  probably holds maybe around I want to say probably 20 cars,

19  maybe, if not 25, at the most.

20     Q.   And were you, where you pulled into that parking

21  space, what was in front of you?  Were there more parking

22  spaces from the sidewalk or?

23     A.   Oh, no, there was bushes.  It was some bushes in front

24  of me.  And that's the first apartment complex.  The first

25  apartment complex is right there.

Jennings - direct - LoFaro

1    Q.   Were there cars on either side of you?

2    A.   Yes, it was a truck on my left-hand side, and then

3  there was a car on my right-hand side.

4    Q.   When you pulled into that parking spot, what did you

5  do next?  Were you sitting there in the car, with you?

6    A.   We were sitting there.  We was talking for probably

7  about, maybe five to seven minutes.  We was just talking for a

8  minute to just sitting there, but the gas from the gas can was

9  so strong in my car, I told him:  Listen, Willie, get that out

10  of my car.  Set that outside the car, so.

11    Q.   Just making small talk for four or five minutes?

12    A.   Yes.

13    Q.   Typical of when you drop somebody off, you are taking

14  somebody off?

15    A.   I was getting ready to go back home to finish watching

16  the game.  But he took the gas can out of the car.  And he was

17  standing outside the car.  He was adjusting his pants or

18  whatever, fixing himself, getting ready to go in the house.  It

19  was, you know --

20    Q.   What happened next?

21    A.   He turned around and he looked, and he seen a cop car,

22  and he was like shocked was the way they pulled up, they pulled

23  up directly behind my car, and blocked my car off.  And when he

24  seen them, he was like, Oh.  He said a swear word.  What he did

25  use, he was just shocked.

Jennings - direct - LoFaro

1    Q.   Did you feel like you were free to leave at that

2 point?

3    A.   No, no.  I couldn't leave.  My car was completely

4 blocked off.   The car was completely blocked off.

5    Q.   Did you see any spotlight illuminating your vehicle at

6 that point?

7    A.   No.  No, there wasn't a spotlight.  There wasn't a

8 spotlight on my car.

9    Q.   Was it dark?

10    A.   Yes, it was, it was dark.  Absolutely, it was dark

11 outside.

12    Q.   So your friend grabs his gas can, exits the vehicle on

13 the passenger side, correct?

14    A.   Right, he was outside of the car.  The gas can was

15 already on the ground.  He was just sitting there for a few

16 seconds and we was just talking.  And that's when the officers

17 pulled up, they pulled in.  We was shocked because neither one

18 of us could see them.  And just abruptly, they had -- they was

19 behind me, blocking off my car.  And I couldn't see them

20 because it was a truck on my side, coming into the parking lot,

21 so I wouldn't have been able to see them.  And he wasn't able

22 to see them.  Because they had their lights out on their, on

23 the police cruiser.  Their lights was out.

24    Q.   So your friend, Mr. Jones, exits the vehicle, he is

25 standing right outside of the vehicle?

Jennings - direct - LoFaro

1    A.    He was outside the vehicle when the officers pulled up.

2    Q.    The officers pulled up, and parked behind you.   What

3  happens next?

4    A.    They both hopped out of the car.   They both rushed him.

5  They both hopped out of their car, they rushed to him.   And

6  they asked him, though:   What was he doing?  Turn around.   Put

7  his hands, placed his hands on the hood of my car.   My door was

8  opened, on the passenger side, because he was out of the car.

9  And they just started -- I am watching, and one of the cops,

10  they got his flashlight, I could see it flashing all through my

11  car.   It was, the flashlights is flashing all through my car.

12  And they were, they are searching him.   And they are going

13  inside of his pockets, searching inside of his pants.   And he

14  is asking them, What are they doing?  Like, what's this all

15  about?   And they are telling him, We see furtive movements.

16  What do you guys got going on?  You got drugs?  You got guns on

17  you?  He is asking them, like he's upset.   He's saying, Well,

18  what reason are you searching me?  No, I ain't do nothing.   I

19  don't have anything.   So they continued just searching through

20  him.

21    Q.    What were you doing while he was being searched?

22    A.    I was sitting in the driver's seat and I was watching

23  through, through my passenger door.

24    Q.    And what happens next?

25    A.    After a few seconds of watching him do that, I opened

Jennings - direct - LoFaro

1    my car door to get out, to step out of my car.  The officer ran

2    around.  The officer that was up here testifying, that wasn't

3    the officer who placed me in handcuffs and that then searched

4    me.  So I just want that known, Your Honor.

5        Q.   Okay.  Another officer?

6        A.   He ran around, from the side where Willie Jones was at,

7    and came around to my side, and jumped inside of my doorjamb,

8    preventing me from getting out of my car.  So, I couldn't get

9    out, so I sat there.  And he started asking me questions.

10       Q.   So, not only at this point, not only is your vehicle

11   blocked but you're blocked in by the officer, you're not free

12   to leave either?

13       A.   Correct.

14       Q.   Okay?

15       A.   Correct.

16       Q.   So, as you stepped out of car, what happened next?

17       A.   I never was allowed to step out of the car.  The

18   officer started questioning me, asking me if it was guns, or if

19   it was drugs in the car.

20       Q.   What did you tell him?

21       A.   I told him, No.

22       Q.   Okay.

23       A.   I told him, No.

24       Q.   Then what happened next?

25       A.   He asked me if I lived there, or if either one of us

Jennings - direct - LoFaro

1    lived there.  I told him that his girlfriend lives in the

2    apartment.  He asked where was we coming from.  I told him we

3    was coming from the gas station.  I just brought him back from

4    working on his car.  I was dropping him off.  I told him, I

5    said, You smelled my car, it smells like gasoline.  Here is the

6    gas can right there.  So he tells me -- I asked him what this

7    was all about.  He never told me why he blocked my car off.

8       Q.   Did he ever ask you for your identification?

9       A.   Yes, he asked me for, he asked me if I had an I.D.

10      Q.   Did you produce identification?

11      A.   I told him I didn't have an I.D.  I told him I have a

12   driver's license.  And he said that was fine.

13      Q.   That's identification.

14      A.   Okay.

15      Q.   Did you produce a driver's license?

16      A.   Yes, I said I got it in my back pocket, in my wallet.

17   Could I get that for you?  He said, Yes.  So I reached in my

18   back pocket, got my wallet out and I handed it to him.

19      Q.   Was it a valid license?

20      A.   Yes.  I asked him, once I handed him my license, I told

21   him, I said, I have my registration and insurance in the glove

22   compartment, would it be okay if I go in there and get it for

23   you?  He thought for a second, then he said, yes, go ahead.  So

24   I went in, reached in, and got it for him.  And I gave it to

25   him.  He held it in his hand.  He just held it in his hand.

Jennings - direct - LoFaro

1   And he just looked at it.  Then he stuffed it in, he stuffed my

2   I.D. in his top pocket.  Then he told me to step out of the

3   car.

4       Q.   Then what happens next?

5       A.   I asked him -- I said, Step out of the car for what?  I

6   said, Did I do something wrong?  He said, Step out of the car.

7   So I stepped out of the car.  Told me to turned around, and

8   place my hands on the hood of the car.  So I turned around,

9   placed my hands on the hood of the car.  Then told me -- I

10  said, What did you stop me for like?  I was kind of upset.  And

11  I am telling him, like, I am, like, this isn't right.  You have

12  no reason to do this to me.  He said, Well, I am pulling up.  I

13  see guys making furtive movements inside of the car.  I believe

14  there is something, there is something going on.  So, he said

15  you seem like you're acting like you're real nervous.  So I

16  said, No, I am not nervous.  You're harassing me and you

17  stopped me for no reason.  So he started conducting a search.

18  So, he's checking my coat that I got on.  I got on a big Army

19  fatigue coat.  He is checking my coat.  He squeezes the top

20  pocket.  Then he sticks his hand in there.  I don't say -- I

21  don't say anything.  Then he grabs the lower part of my jacket

22  pocket, squeezes it.  And then he sticks his hand in it.  So I

23  asked the officer, I said, Why are you going inside of my

24  pockets and am I under arrest?  He said, Well, I believe there

25  is something going on and, you know, I see you making furtive

43

Jennings - direct - LoFaro

1   movements.  There has got to be something going on.  Got two

2   guys inside of a car.  I didn't understand what he was saying

3   because when he pulled up, Willie Jones wasn't inside of my

4   car, he was outside of my car getting ready to leave and going

5   to his girlfriend's apartment.

6        So, back to the search, he squeezes my right pants

7   pocket, and he sticks his hand inside of my right pants pocket.

8   So I am telling the officer, I am like, Listen, this is

9   unnecessary.  I said, This is unnecessary.  Why are you

10  violating me?

11       And he said, Well, you seem like you're real nervous to

12  me.

13       I said this ain't about being nervous, like you're

14  searching inside of my pockets and I didn't do nothing wrong.

15  He didn't even run my license or my registration or none of

16  that, until after the fact that I was arrested.

17       So now, the officer, he sticks his hand, he sticks his

18  hand underneath my coat.  And then he goes down the back of my

19  pants.  So I tell the officer, Well, whoa, you're out of line.

20  I told him, I said you're violating me now.

21       He said you seem like you're real nervous to me.  I

22  said, No, you're sitting there, searching my pockets, you got

23  your hands inside of my pants.  So I turned around, to get the

24  officer to stop.  I am telling him to take his hand out, to

25  stop.  I turned around.  And he grabbed me and he slammed me to

Jennings - direct - LoFaro

1  the ground.  I hit my head on the ice in the parking lot.  And

2  he took me down to the ground.  I am not going anywhere.  I am

3  down.

4       So I am trying to, you know, put my hands behind me so

5  he can secure me or whatever.  And the other officer that came

6  up there and testified, he ran around the car, and he came

7  around, and he reached down on the ground and he punched me in

8  the face.  This clearly assaulted me for no reason.  Just

9  strike me in the face.  And I don't understand.  Like, there

10  was no reason for it.  And the officer picked me up.  And he

11  continued searching inside of my pockets, and pulling out

12  money, and putting everything on the hood of the hood of my

13  car, and arrested me.

14  Q.   Okay.

15  A.   If I was already arrested.

16  Q.   Okay.  So again, your testimony is you picked up a

17  buddy, tried to fix his car, correct?

18  A.   Right.

19  Q.   Swung by back at the apartment complex?

20       MR. SCHIANO:  Objection, Judge.  Cumulative and

21  it's leading.

22       THE COURT:  All right.

23       MR. SCHIANO:  He is just reiterating his

24  testimony over again, in a leading fashion.

25       THE COURT:  What was the question?  I didn't hear

Jennings - direct - LoFaro

1    it.  What?

2    Q.  I said:  You swung back to the parking lot, he swung

3    back to the parking lot to drop your friend off, correct?

4    A.  Yes.

5         THE COURT:  Overruled.

6    Q.  At that point you got blocked in?

7    A.  Yes.  The officers pulled in to the car.

8    Q.  Jumped on your?

9    A.  Pulled into the parking lot, and pulled directly behind

10   my car and blocked my car off.

11   Q.  You couldn't leave, you're clearly detained?

12   A.  I couldn't leave, and they just jumped out and ran

13   straight at my friend Willie Jones, and just started searching,

14   searching him.

15   Q.  Nothing was said, just searched him immediately?

16   A.  They just started searching him.  They asked him, what

17   was he doing, while they were searching.

18   Q.  When you went to get out of the car, ran over to

19   the --

20   A.  The officer ran around, ran around my car, and you

21   know, while we was there, he was asking me the questions about

22   what was going on?  What I was doing?  He was flashing the

23   light all in my face.  And flashing it inside of my car.  Was

24   looking around.  But they never, the officers never put on a

25   big, the big strobe light he had.

Jennings - direct - LoFaro

1    Q.   Now while you were in the parking lot, talking to your

2    friend, anticipating dropping him off, were you doing anything

3    other than talking?

4    A.   No.

5    Q.   Were you making any wild, furtive movements?

6    A.   No, there was no furtive movements.  I don't

7    understand, because the cops saying that he seen furtive

8    movements, when he flashed a big light in my car, he never

9    flashed a big light in my car.

10   Q.   That's okay.  Were you making any wild, furtive

11   movements?

12   A.   No, I wasn't.  There was no furtive movements made at

13   all.  So I don't understand the reason why he even, why did he

14   even pick me, why did he even stop me?  Just because I was

15   sitting in the car?  Because the passenger was already outside

16   of, outside of my car.

17              MR. LOFARO:  Okay.  You're all right.  I have no

18      further questions, Your Honor.

19              THE COURT:  Okay.  Cross-examination?

20   CROSS-EXAMINATION BY MR. SCHIANO:

21   Q.   Mr. Jennings, how long were you in the parking lot?

22   A.   For probably for about five to seven minutes, at most.

23   Q.   Okay.  You came from the gas station?

24   A.   Gas station, first, then stopped by Burt Street to try

25   to get his car.

Jennings - cross - Schiano

1    Q.   All right.  By where?

2    A.   On Burt Street.  It was behind a house on Harris, a

3  barbershop.  That's where he had his car parked.

4    Q.   Then he is your friend?

5    A.   Willie Jones.

6    Q.   How long have you known Willie Jones?

7    A.   Since I was very, very young.

8    Q.   You sell Willie Jones cocaine?

9    A.   No.

10    Q.   Have you ever sold Willie Jones cocaine?

11    A.   No.

12    Q.   So, your testimony is you're in the parking lot, of

13  Pioneer Homes, correct?

14    A.   Correct.

15    Q.   Now, you testified that there is cars to your left and

16  cars to your right?

17    A.   Correct.

18    Q.   A truck to your left, you said?

19    A.   Correct.

20    Q.   And cars to your right?

21    A.   Correct.

22    Q.   Okay.  And at some point the first thing you see, you

23  don't see the police car, correct?

24    A.   I can't see it because there is a car on this side of

25  me.  So anything that's coming into the parking lot, I can't

Jennings - cross - Schiano

1   see anything.

2      Q.   Okay.  But you didn't see that police car initially,

3   correct?

4      A.   No.

5      Q.   First thing you see is two police officers?

6      A.   The first thing that I see?  I don't understand the

7   question.

8      Q.   At the first point you realized that there is police

9   there, you testified?

10     A.   Correct, correct, correct.  I didn't see them until

11  they pulled behind me and blocked my car off.  And I heard

12  Willie Jones say, Oh, s-h-i-t.  And I turned around and looked

13  to see what he was talking about.  I turned around to look

14  through the back windshield of my car to see what he was

15  talking about, because I didn't know what was going on.  And

16  that's when I seen the two officers inside of the car.

17     Q.   Okay.  So when you first see the police officers, they

18  were still inside their car?

19     A.   Correct.

20     Q.   Okay.  And at that point, Willie Jones is outside of

21  your vehicle, correct?

22     A.   Yes, he was outside of my vehicle.

23     Q.   You said outside.  You have in your vehicle, because

24  there was a gas can in the vehicle, correct?

25     A.   No.  He was getting ready to go in the house.  He was

Jennings - cross - Schiano

1    just talking for a second or two before he was getting ready to

2    go in the house.  He was taking out all his property.

3        Q.   At some point there was a gas can in your car?

4        A.   Correct.  Correct.

5        Q.   You said on direct examination that the smell was

6    bothering you, correct?

7        A.   Yes.

8        Q.   You told him to get out of the car with the gas can?

9        A.   Yes.

10       Q.   Okay.  And he does that, he gets out of the car?

11       A.   Correct.

12       Q.   Takes the gas can out of the car?

13       A.   Correct.

14       Q.   And it's at that point that the police come?

15       A.   After a few seconds, me and him talking.

16       Q.   What is he doing at that point, just standing outside

17   the car?

18       A.   He was taking out his, he was taking out his stuff.  He

19   was taking out the air compressor, that I mentioned that you

20   plug into the cigarette lighter, then you plug into your tire

21   and put air in there.  He took that box out of the car.  And he

22   was sitting there and he was stretching.  And I was telling

23   him, I was getting ready to go back home to finish watching the

24   game.  He was telling me, I am going in the house to --

25       Q.   The next thing?

Jennings - cross - Schiano

1   A.   Put his feet --

2   Q.   The police car shows up?

3   A.   Correct.

4   Q.   Two police officers begin to search Mr. Jones?

5   A.   They jumped out of their car.  They blocked my car off.

6   Jumped out of their car and run directly at him, both officers,

7   yes.

8   Q.   Okay.  And so, the testimony of Officer Ettinger that

9   you two were in the vehicle is incorrect?

10   A.   I believe he did testify that we both were in the

11   vehicle, yes.

12   Q.   That's incorrect?

13   A.   That's incorrect.

14   Q.   Okay.  In fact, you were in the vehicle, and Mr. Jones

15   was outside of the vehicle?

16   A.   Correct.

17   Q.   These two officers approached Mr. Jones, yes?

18   A.   Yes.

19   Q.   They begin to search him?

20   A.   Correct.

21   Q.   Approximately how long are they searching Mr. Jones?

22   A.   Maybe, maybe about 30 seconds, maybe about 40 seconds,

23   I want to say at the moment.

24   Q.   Okay.  They approached Mr. Jones.  They begin

25   searching him approximately one, two, three, up to 40 seconds

Jennings - cross - Schiano

1    maybe?

2    A.   It could have been a minute.   As a matter of fact, I am

3    going to say it was probably a minute, give or take.

4    Q.   Even better, a minute, that entire minute?

5    A.   Correct.

6    Q.   You're in the driver's seat of that vehicle, correct?

7    A.   Correct.

8    Q.   These two police officers don't know whether you have

9    a gun, do they?

10   A.   No.

11   Q.   They don't know whether you have any sort of weapon in

12   that vehicle?

13   A.   No.

14   Q.   Right?  But they are paying no attention to you,

15   correct?  For one minute, they are searching this person who

16   is outside of your vehicle?

17   A.   It was flashlights that's flashing over my head.   And

18   going in the back seat of my car, when I turned around and I

19   looked, and my door is opened while they are searching him.

20   So, I can actually see what's going on.   And I do see.

21   Q.   There is flashlights?  Listen to me.

22   A.   Okay.

23   Q.   Are they searching Mr. Jones or do they have

24   flashlights?  Are they searching your car?  Those are two

25   different things?

Jennings - cross - Schiano

1    A.   No, no, no.   They are searching Mr. Jones.

2    Q.   Okay.

3    A.   One of them is searching him, that I know.   The other

4    one is standing there, whatever he's doing, I can't really see.

5    Q.   Wait a minute.   You said that both people are

6    searching Mr. Jones.   Were both officers searching Mr. Jones

7    or one officer searching Mr. Jones?

8    A.   I am going to say it was one officer searching.

9    Q.   Okay.

10   A.   But they both jumped out on him.

11   Q.   Okay.   Where is the other officer?

12   A.   He was standing right there with him.

13   Q.   Right next to him?

14   A.   Yes, on the passenger side.

15   Q.   Okay.   You're in the vehicle, correct, is this

16   correct?

17   A.   Correct.

18   Q.   For a minute?

19   A.   Correct.

20   Q.   Until you decide -- this is your testimony -- to get

21   out of the vehicle?

22   A.   Correct.

23   Q.   And it's at that point, that one of the two officers,

24   not Officer Ettinger?

25   A.   Correct.

Jennings - cross - Schiano

1    Q.   Walks around the vehicle and detains you, correct?

2    A.   Well, he kind of, he kind of sprinted around, and --

3    Q.   Detained you, correct?

4    A.   Correct.

5    Q.   All right.  And at that point, it's your testimony

6    that he places you on the vehicle?

7    A.   Well, he was asking me questions first.

8    Q.   All right.  He asked you some questions?

9    A.   Correct.

10   Q.   What does he ask you?

11   A.   He asked me what was going on?  Where we was coming

12   from?

13   Q.   Did you answer him?

14   A.   Yes.

15   Q.   Okay.  What else did he ask you?

16   A.   He asked me what was going on.  Where was we coming

17   from?  What was we doing?  Was there guns and was there drugs?

18   Was we selling drugs?  Was we getting high?  Was we using?

19   Q.   Okay.  Did you answer those questions?

20   A.   Correct.

21   Q.   All negative, correct?

22   A.   Correct.

23   Q.   All right.  And do you know what, at that point, if he

24   noticed the scale that was in the center console of your

25   vehicle?

Jennings - cross - Schiano

1    A.   There was no scale inside of my car.

2    Q.   Okay.

3    A.   So I have no idea where he gets it from.  I never was

4   charged with a scale.  I seen it in the police report.  I was

5   never charged with a scale.  And I don't know where it came

6   from, or what this officer did.

7    Q.   Okay.  So is it your testimony in this hearing that

8   there was no scale in your car?

9    A.   There was no scale in my car.

10   Q.   You had no scale?

11   A.   No scale.

12   Q.   Okay.  So you're detained outside the vehicle, you're

13  searched?

14   A.   Well, I give him my license.  He asked me for I.D.   I

15  told him I had a license.  So I gave him my license.  And I got

16  my registration and the insurance card out of the glove

17  compartment, box, and I gave it to him.  And he grasped it in

18  his hand.  He looked at my license, and he tucked my license in

19  his top pocket.  And the rest of the paperwork, he put on the

20  hood of my car.  He told me to step out.

21   Q.   All right.  And at some point, did you run away?

22   A.   No.

23   Q.   Okay.  So you never ran from either of the two police

24  officers?

25   A.   I never ran.

Jennings - cross - Schiano

1    Q.  Okay.  Did you ever indicate to them that you ran

2  because you were on parole?

3    A.  Never.

4    Q.  So you're being searched, and at some point the

5  officers locate a quantity of cocaine, correct?

6    A.  Correct.

7    Q.  And that is your cocaine, correct?

8    A.  Correct.

9    Q.  Okay.  And you had that cocaine in your pocket?

10    A.  Correct.

11    Q.  Which pocket?

12    A.  My left pocket.

13    Q.  All right.  Okay.  How about the money that was in the

14  car, did they find money in the vehicle?

15    A.  Correct.

16    Q.  Was that your money?

17    A.  Correct.

18    Q.  How about the money in your pocket, was that your

19  money as well?

20    A.  Correct.

21    Q.  Now after the two police officers located these items,

22  but not the scale, correct, the scale wasn't there?

23    A.  I am just now hearing about this scale.  When I seen

24  the police report, I never knew, I never, I never was charged

25  with drug paraphernalia or whatever the case may be.

Jennings - cross - Schiano

1    Q.   At some point you're brought to the Justice Center,

2   correct?

3    A.   Correct.

4    Q.   And when you get there, you answered some questions

5   about your employment status?

6    A.   At the Justice Center?

7    Q.   Yes.

8    A.   No.

9    Q.   Do you ever answer any questions about whether or

10  not -- did either police officer ask you if you were employed?

11   A.   No.

12   Q.   He never asked if you were employed?  Did you ever

13  indicate that you worked in asbestos?

14   A.   From these, the arresting officer?

15   Q.   Yes.

16   A.   Does he ever ask me was I employed?

17   Q.   Yes.

18   A.   Yes, yes, yes, he did.

19   Q.   He did?

20   A.   Yes.

21   Q.   What did you tell him?

22   A.   I told him that I work in construction and I was

23  currently employed at the time.

24   Q.   Employed, or?

25   A.   Employed, employed at the time.  I was currently

Jennings - cross - Schiano

1   working at the time.

2       Q.   All right.  So you did not say that you were not

3   employed, that you worked in asbestos, that you were

4   unemployed but that you were selling cocaine or drugs?

5       A.   No.  I never made a statement to him telling him that I

6   sold anything.

7             MR. SCHIANO:  All right.  Mr. Jennings, I have no

8        further questions at this time.  I thank you for your time,

9        sir.

10            THE WITNESS:  Okay.

11            THE COURT:  Redirect?

12   REDIRECT EXAMINATION BY MR. LOFARO:

13       Q.   Just real quick.  You said you were employed, that was

14   the answer that you had given, in construction, correct?

15       A.   Correct.

16       Q.   Could you tell the Court who you were working for?

17       A.   H.V.H. Incorporation Enterprises.

18       Q.   What were your job duties?

19       A.   I was doing demolition work and asbestos work.  But I

20   was currently employed.  The job that I was doing at the time

21   was demolition.

22            MR. LOFARO:  Okay.  I have no further questions,

23        Your Honor.

24            MR. SCHIANO:  Nothing further, Judge.

25            THE COURT:  You're all set.  Thank you.  Any

- Defendant rests -

1    other witnesses?

2              MR. LOFARO:  I do not, Your Honor.

3              THE COURT:  No?

4              MR. SCHIANO:  Judge, I would ask if the Court is

5    willing, in light of the defendant's testimony, I would

6    like, if I could have a brief adjournment to call a

7    rebuttal witness, if the Court is willing to do so?

8              THE COURT:  Sure.  Are you going to call Officer

9    Ettinger again?

10             MR. SCHIANO:  No, I was going to call Detective

11   Decker -- or excuse me, it's not detective -- Officer

12   Jeremy Decker.

13             THE COURT:  Is it something you could do this

14   week then?

15             MR. SCHIANO:  I can certainly try.

16   (On the record scheduling discussion.)

17             THE COURT:  How about Thursday?

18             MR. SCHIANO:  Thursday, I should be able to do,

19   Judge.

20             THE COURT:  What's your schedule?

21             MR. LOFARO:  Thursday is fine with me, Your

22   Honor.

23             THE DEFENDANT:  Excuse me, Your Honor?  I had

24   filed a motion.  And --

25             MR. LOFARO:  Pro se?

- Defendant - discussion -

1        THE DEFENDANT:  Yes.  I know, I thought it was

2 just an affidavit, my statement on the account of what

3 happened what I wanted to testify to.  But it was in the

4 form of a motion.  And I would like to know if, I mean, my

5 attorney, he is in agreement if that can be sent in.  I had

6 already sent a copy to Mr. Schiano, the district attorney.

7 And I sent one to you as well.  I gave a copy to my lawyer.

8        THE COURT:  And the Court sent it to your

9 attorney.  We don't take pro se motions on April 20th.

10        THE DEFENDANT:  Right.  I had got a copy back

11 from you letting me know that you had sent it to my

12 attorney.  And I was just I was hoping we were both in

13 agreement, if he could just add to that, or if that could

14 just be accepted?  We were both on the --

15        MR. LOFARO:  I think what he is talking about is

16 something, same thing, we are here for a motion right now,

17 it's kind of a moot point.  It was just a letter to the

18 Court.  But the letter is basically asking for what we were

19 asking for at the suppression hearing, so.

20        THE DEFENDANT:  I mean, I would like that.

21        MR. LOFARO:  You can't file a motion if you're

22 represented by counsel.  You can't file.

23        THE DEFENDANT:  No, no.

24   (Attorney/client conference .)

25        THE DEFENDANT:  All I wanted is for my lawyer to

- Defendant - discussion -

1    add to that, if that could be accepted?

2           THE COURT:  There is nothing to add to.

3           THE DEFENDANT:  Okay.

4           THE COURT:  Right?

5           THE DEFENDANT:  Could we just go with that as

6    well, with what I submitted?  I mean, we are both in

7    agreement.

8     (Attorney/client conference.)

9           THE DEFENDANT:  The affidavit in support of the

10   motion.

11    (Attorney/client conference.)

12          THE COURT:  Maybe he is asking, seeing this is

13   sworn to, he wants this to be included in his testimony?

14   Is that what you're saying?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  That's what he is saying.

17    (Attorney/client conference.)

18          THE COURT:  It is an affidavit here.  He wants

19   this to be included.  While Mr. Schiano cross-examined him.

20          MR. SCHIANO:  I don't understand what the point

21   of him.  He just testified.

22          THE COURT:  I don't know.

23          MR. SCHIANO:  He is trying to incorporate an

24   affidavit through his testimony?  I don't understand.

25          THE COURT:  Mr. Jennings, you can't use written

61

- Defendant - discussion -

1    affidavits because oral testimony is what is the evidence,

2    and Mr. Schiano has an opportunity to cross-examine you.

3    He can't cross-examine an affidavit, okay?  So I can't, it

4    can't be added.  If that's what you are asking.

5            THE DEFENDANT:  Okay.  But, but not the

6    affidavit?

7            MR. LOFARO:  He is telling you, you can't testify

8    by affidavit.

9            THE DEFENDANT:  Okay, Your Honor.

10           MR. LOFARO:  He can't cross-examine the

11   affidavit.  That's what the Judge is saying.

12           THE DEFENDANT:  Okay.

13   (Attorney/client conference.)

14           THE COURT:  All set then?

15           THE DEFENDANT:  Yes.  Yes.

16           MR. SCHIANO:  Thank you, Judge.

17   (Adjourned at 12:23 p.m.)

18               *              *              *

19

20                C E R T I F I C A T E

21           I, Patrick J. Reagan, a Senior Court Reporter,
     Fifth Judicial District, State of New York, do hereby certify
     that the foregoing is a true and correct transcript of my
22   stenographic notes taken in the above-entitled matter, recorded
     at the time and place first above-mentioned.

23

     Date: 7/26/17   _____

24                   Patrick J. Reagan, CSR, RDR
                     250 Criminal Courts Building
25                   Syracuse, New York   13202