ORIGINAL

- VOLUME - TWO -

1    STATE OF NEW YORK:                    COUNTY COURT:

2    COUNTY OF ONONDAGA:    CRIMINAL TERM:    Part No. I:

3    - - - - - - - - - - - - - - - - - - -  Box 505

4    THE PEOPLE OF THE STATE OF NEW YORK,
                              Indictment #: 2016-0961-1,
5                             superceding #: 2016-0061-1
                                 Index #: 16-0049
6
          vs.                          **TRIAL**
7
     **TONY W. JENNINGS,**
8                         Defendant.

9    - - - - - - - - - - - - - - - - - - -  CPCS 3

10
                              Criminal Courts Building
11                            505 South State Street
                              Syracuse, New York   13202
12                            **February 6, 7 and 8, 2017**

13   BEFORE:        **HONORABLE STEPHEN J. DOUGHERTY,**
                         County Court Judge,
14                       and a jury

15   APPEARANCES:
                    William J. Fitzpatrick, Esq.
16                  District Attorney, Onondaga County
          BY:    JOSEPH J. CENTRA, ESQ.
17                  Assistant District Attorney
                    Criminal Courts Building, Fourth Floor
18                  Syracuse, New York   13202

19        BY:    JOHN A. LoFARO, ESQ.
                    Attorney for the Defendant
20                  307 South Clinton Street, #200
                    Syracuse, New York  13202
21
                    The Defendant, present in person
22                                              FILED

23                                          JUL 28 2017

24                              ONONDAGA CO CLERKS OFFICE

                              Reported By:
25                            Patrick J. Reagan, RDR
                              Official Court Reporter

- Jennings - Trial - 2/7/17 -

1        But I have to tell you that if there is any

2   misbehavior, and I told you this, if there is any

3   misbehavior in the courtroom, you will forfeit your right

4   to be here, okay?  And if there is any misbehavior outside

5   the courtroom, you could potentially forfeit your right to

6   be here.

7        So, what I am going to suggest to you, Mr.

8   Jennings, is behave yourself.  Be here for the trial so you

9   can hear everything that's taking place during the course

10   of your trial, and help Mr. LoFaro defend the case.

11        Anything else we need to say about that, Mr.

12   LoFaro?

13        MR. LOFARO:  No, Your Honor.

14        THE DEFENDANT:  Your Honor?  I don't -- I didn't

15   never refused court.  I know that's, you stated yesterday

16   that court was to start at 10:30.  I was called this

17   morning and told that I had traffic court or misdemeanor

18   court, for instance.  So I refused that.  But I never

19   refused to come to this court because I was told it was

20   10:30.

21        THE COURT:  Okay.

22        THE DEFENDANT:  I don't understand.

23        THE COURT:  Well, if it's a misunderstanding,

24   that's one thing.  But you have to go where they need you

25   to go.  When they bring people over for my calendar, they

- Jennings - Trial - 2/7/17 -

1    may need you to come over for that too, so they don't have

2    to make special trips.  I leave that up to the deputies.

3    And yourself, just it's good that you want to be here and

4    let's keep it that way.  My calendars over the next couple

5    days are not so long, so we won't have the delay that we

6    had today.

7              Mr. Centra, are you ready to go with your opening

8    and with witnesses?

9              MR. CENTRA:  Yes, Judge.  Just briefly, at the

10   end of yesterday, Mr. LoFaro asked for the Grand Jury

11   testimony from the defendant.  I have turned that over.  I

12   turned that over to him yesterday after court.

13             THE COURT:  I know you previously put it in the

14   file.  We got a copy of your cover letter.

15             MR. CENTRA:  I have.

16             THE COURT:  Mr. LoFaro, you have that?

17             MR. LOFARO:  I do, Your Honor.

18             THE COURT:  And anything else, Mr. LoFaro, you

19   want to put on the record before we bring the jury?

20             MR. LOFARO:  No, Your Honor.

21             THE COURT:  Okay.  Let's have the jury, please,

22   Mary.  We don't have any potential witnesses in the

23   courtroom, do we?  John, we don't have any witnesses in the

24   courtroom, do we?

25             MR. LOFARO:  No.

- Jennings - Trial - 2/7/17 -

192

1      THE DEFENDANT:  No.

2      MR. LOFARO:  No, Your Honor.

3      THE COURT:  Great.  Thank you.

4  (The jury entered the courtroom at 10:56 a.m.)

5      THE COURT:  Good morning, folks.  We are in the

6  presence of the jury.  Mr. Centra, Mr. LoFaro, Mr.

7  Jennings.

8      Ladies and gentlemen, I apologize for the delay.

9  I had a much bigger calendar this morning than we

10  anticipated.  We had an awful lot of cases on.  We did get

11  through all of them.  Our calendar tomorrow is very small.

12  Our calendar the next day is very small, so that's good.

13  We will get started much closer to the time I would like to

14  get started, so I do apologize for that.

15      Now we are ready to hear the opening statements

16  of counsel.  And then we will go into the proof of the

17  case.  Mr. Centra, are you ready to deliver your opening

18  statement?

19      MR. CENTRA:  I am, Your Honor.

20      THE COURT:  Go right ahead.

21      MR. CENTRA:  Thank you, Judge.

22  (Opening statement by Mr. Centra:)

23      MR. CENTRA:  It's approximately 6:45 in the

24  evening, January 5th 2016.  Patrol officer sees a

25  suspicious vehicle in a parking lot.  They shine their

- Centra - Opening - 2/7/17 -

1  spotlight on that vehicle.  In that vehicle, they see two

2  individuals.  One of them being Tony Jennings.  They look

3  in that vehicle.  They see a digital scale, what appears to

4  be cocaine on it.  The officer asks Mr. Jennings to exit

5  that vehicle.  It was at this point he attempts to run.  My

6  name is Joe Centra, and I am here representing the People

7  of the State of New York.

8        January 5th 2016, Officers Jeremy Decker and

9  Darrin Ettinger are patrolling the 100 block of Radisson

10 Court in the City of Syracuse, when they see this vehicle.

11 As I said, they shine their light on this vehicle just to

12 see what's going on.  It's about 6:45 in January.  It's

13 dark out.  They approach the vehicle.  They see two

14 occupants in the vehicle.  And the two occupants, once the

15 lights shine on the vehicle, begin making what the officer

16 described as furtive movements -- movements towards their

17 lower body, which they believe look like they are trying to

18 conceal or hide something.

19        Officer Decker approaches the driver's side door,

20 where Tony Jennings is sitting.  And he sees a digital

21 scale with what appears to be cocaine sitting on it in

22 plain view.

23        Now based on what he saw, Officer Decker asks

24 Tony Jennings to step out of the vehicle so he could search

25 him for any potential illegal drugs.  Tony Jennings steps

- Centra - Opening - 2/7/17 -

1   out of the vehicle, and Officer Decker begins to search

2   him.  As Officer Decker begins to search him, Tony Jennings

3   then begins to run.  Officer Decker chased him for a brief

4   period and was able to catch up to him and take him into

5   custody after a brief struggle.

6           Now as Officer Decker was searching Tony

7   Jennings, he found $110 in cash and a bag of cocaine in his

8   pocket, and a cellphone.

9           Jennings was then arrested for possessing this

10  cocaine that was in a bag, in his pocket.

11          Officer Ettinger further searched Tony Jennings'

12  vehicle, and in there he found an additional $150 cash, and

13  another cellphone.  And I stated previously, Officer Decker

14  had found the scale in that vehicle.

15          Tony Jennings was then arrested for possessing

16  cocaine.  It was tested on the spot by the officers.

17          And while they are preparing the arrest report,

18  in their vehicle, they asked Tony Jennings a basic

19  question:  If he was employed?  And he told them that he

20  was currently out of work and that he was selling crack to

21  get by.  Those are the officers that you're going to hear

22  from.

23          You're also going to hear from Jennifer Wilson,

24  who is a forensic chemist who works for the Center for

25  Forensic Sciences.  And she will tell you how she came to

- Centra - Opening -

1    be involved in this case involving Tony Jennings.  She will

2    tell you how she analyzed the substance that was recovered

3    by Officer Decker on that day from Tony Jennings.  She will

4    tell you that she weighed the substance, and the aggregate

5    weight of the substance as a whole, was 2.57 grams.  She

6    will further tell you that she tested the substance, and

7    the substance tested positive for cocaine.

8         And she will also say she further tested the

9    substance for the purity of the cocaine in the substance.

10   She found that that substance, 2.57 grams total had

11   actually contained 1,267 milligrams of pure cocaine within

12   there.

13        You are finally going to hear from Sergeant David

14   Proud, with the Syracuse Police Department.  Sergeant Proud

15   will tell you about his training and experience in law

16   enforcement.  And he will tell you his training and

17   experience investigating drug-related crimes.  He has years

18   and years on the job.  And he will tell you that the

19   phones, the money, and the scale along with the amount of

20   cocaine that was found on Tony Jennings on January 5th

21   2016, is not consistent with personal use of the drug

22   cocaine.  He will tell you it's more consistent with a

23   person possessing the drugs with intent to sell it.

24        By the end of this case, I intend to show you

25   that Tony Jennings possessed over 500 milligrams of

- Centra - Opening -

1    cocaine.  I intend to show you that the amount of cocaine

2    on his person would not be used for personal use.  That is,

3    that his intent was to sell that cocaine.  And I intend to

4    show you that Tony Jennings is guilty, guilty of criminal

5    possession of a controlled substance in the third degree,

6    and criminal possession of a controlled substance in the

7    fifth degree.  Thank you, everybody.

8            THE COURT:  Thank you, Mr. Centra.  Mr. LoFaro,

9    does defense wish to give an opening statement?

10            MR. LOFARO:  I do, yes, Judge.

11            THE COURT:  Okay.  Go right ahead, sir.

12            MR. LOFARO:  Thank you, Your Honor.

13    (Opening statement by Mr. LoFaro:)

14            MR. LOFARO:  Good morning, ladies and gentlemen.

15    How are you?  Ladies and gentlemen, I am going to start

16    with a quote that I gleaned from a novel by, excuse me,

17    Anitol France.  I picked up an old dusty book and I know I

18    am dating myself.  I don't know if any of you recall the

19    Old Book Warehouse on Bear Street.  But it used to be my

20    home away from home.  I used to spend an awful lot of time

21    there.  And my current home is still littered with books

22    that I acquired at the Book Warehouse.  It was one of my

23    favorite places.  I know you're probably not a lover of

24    classics, the sixth grade novel by Mr. Anitol France.  Who

25    is Anitol France?  He was a French author in the 1800's.

- LoFaro - Opening -

1    He was a journalist.  He was a poet.  And he was a social

2    activist.  And Anitol France was a Nobel Prize winner.  And

3    one of the quotes that I have always looked to and gleaned

4    what I believe is a lot of wisdom from the quote that says:

5    Justice is the means by which established injustices are

6    sanctioned.

7              Now, let's think about that for a minute.  I am

8    sure in 1903, in France, and here in the United States,

9    that was probably much more true than it is today.

10   However, unfortunately, regrettably, I think that that's

11   still true to a large extent here in the United States.

12   Justice, justice is the means by which established

13   injustices are sanctioned.  Now, what that means is we are

14   saying it's okay to cut corners.  It's okay to do certain

15   things that shouldn't be done to try and get to where we

16   want to be.  And that's not what we believe in.  That's not

17   what we believe.  That's not what our system of criminal

18   justice is predicated on, in the 21st century.

19             I know I used a couple analogies yesterday.  I

20   want to use the analogy today.  I was never very good at

21   these.  But I am sure you're all familiar with the mazes

22   that we used to have as kids, where you're supposed to try

23   and follow the lines all the way through until you

24   ultimately find the opening at one end, from the opening at

25   the other end.  I never engaged in those because I could

- LoFaro - Opening -

1    never do them.  I would always do them in pen.  I would

2    make a mess of them.  I never tried to do those.  But,

3    obviously if they are done correctly, if they are done

4    properly, if I could equate that to police procedure,

5    police procedure requires that you follow one step after

6    another, after another, until you do it the way it's

7    supposed to be done.  You need to go and not find a brick

8    wall, and if you do find that brick wall, you need to turn

9    back and you need to start over again.

10             Oftentimes, regrettably, unfortunately, we are

11   stripped of our rights, Fourth Amendment rights or whatever

12   rights they may be.  And we do what we need to do.  And we

13   rationalize that the ends justifies the means.  And we

14   can't ever allow that to happen.  Because the end doesn't

15   justify the means.  We can't take a pen, and start at that

16   little square, which is the start, and draw a line across

17   the page and go to the end because that's not, again, what

18   our system is predicated on.

19             You heard Mr. Centra talk about the charges that

20   are now pending, and what happened.  Well, that's his

21   version of what happened.  But you're the ultimate deciders

22   of, if that's actually what happened or if that's not what

23   happened.  Because what you're going to hear from my

24   client, and who is cloaked with a presumption of innocence

25   as we already spoke about, and he doesn't have to testify.

- LoFaro - Opening -

1    He can sit there because the burden of proof is on the

2    People.  They have to prove this case beyond a reasonable

3    doubt.  He doesn't have to say a thing.  But he can't wait

4    to get up there on the stand and tell you what happened.

5    He is eager to tell you what happened.  Because he was

6    ripped of his constitutional rights.  And he wants to let

7    you know what happened to him.

8         Now, it's easy to sit here and say, okay, you

9    know, and I am going to be very blunt.  I am going to be

10   very candid.  It's easy to say, well, the police officers

11   came into what they considered a high crime area, and saw a

12   suspicious vehicle.

13        And I hope -- let me backtrack just for one

14   minute.  The laws that we adhere to today are promulgated

15   on common sense.  So that's one thing that I am going to

16   ask all of you to do, when you look at this evidence, use

17   your common sense.  Use your intelligence.  And apply your

18   common sense to the facts.  Because when you hear these

19   facts, you're going to go -- you're going to scratch your

20   head.  You're going to go:  Wait a minute, that doesn't

21   make any sense.  He wouldn't do that.  He couldn't have

22   been doing that.  And unfortunately, some of these things

23   that are done, these established injustices, are improper

24   police practices and improper police procedures.

25        Now, Mr. Centra talked about a suspicious

- LoFaro - Opening -

1    vehicle.  A suspicious vehicle.  What is a suspicious

2    vehicle?  The evidence is going to show that he was in a

3    vehicle.  There was nothing suspicious about his vehicle.

4    It was a sedan; it was a car.  Nothing suspicious about the

5    vehicle.

6           You're going to hear about furtive movements.

7    Furtive movements.  Again, it's a shortcut.  It's an

8    around-end.  It's what police officers do to get where they

9    want to go.

10          Furtive movements more often than not means

11   fishing expedition.  Let's throw the constitution out the

12   window.  Let's throw the bill of rights out the window.

13   Let's strip him of his constitutional rights, and just go

14   searching for whatever we want to search for, because he's

15   a black man, parked in a car doing nothing.  Doing nothing.

16          And you're going to hear him testify.  He is

17   going to tell you what he did.  He is going to tell you a

18   true story, what actually happened.  His buddy -- they were

19   watching a basketball game.  Left the basketball game to

20   help out a friend, you know.  I tend to try and stay away

21   from cliches.  But the cliche that I am going to use right

22   now encapsulates exactly what happened to this gentleman

23   over here:  No good deed goes unpunished.  His friend

24   called him.  He had a car that hadn't been started.  It was

25   freezing cold.  They went out.  They took a taxi cab.  This

- LoFaro - Opening -

1   car stunk like crazy.  They had, they had gas -- they were

2   trying to get his buddy's car going.  They went over to the

3   car.  Couldn't get it going.  They opened the hood.  Their

4   hands were freezing, everything.  They put -- they are not

5   auto mechanics.  They could not get the car started.  So

6   doing a favor for his friend, he goes and tries to help him

7   get that vehicle started.  Doesn't start.  His friend

8   doesn't have a car.  He picked him up, because he is

9   driving.  They couldn't get his friend's car started.  Nice

10  move, to bring his friend back to his residence, and drop

11  him off.

12          They are sitting in the parking lot, in a parking

13  space, minding their own business.  They are not doing

14  anything.  They are not committing any crime.  They are not

15  causing a disturbance.  They are two friends talking in a

16  vehicle.  He is dropping his buddy off.  He is going to

17  talk to him for a couple of minutes, and drop him off.

18          As they are sitting in the car, the police

19  officers roll in.  And they deem this, that's a suspicious

20  vehicle.  Well, again I am going to be blunt.  I am going

21  to be candid.  Why is it a suspicious vehicle?  Two guys

22  sitting in a car talking to one another?  There is nothing

23  suspicious about that.  It's just an area where there is

24  a -- certain evidence, he is a black man.  There is a

25  certain crime rate.  And because there is a certain crime

- LoFaro - Opening -

1   rate, there is a certainty in there, these police officers

2   deem it appropriate to take that around and to try and make

3   one of these established injustices the normal.  To try and

4   sanction that type of behavior, it's wrong.  It's not what

5   we believe in.  This gentleman right here has every right

6   to pick up his buddy, help him out, drop him off.  Try and

7   help him start his car.  And go on about his business.

8           On that day, before this set of circumstances

9   that befell them, that's all he was doing, he was going to

10  finish watching his basketball game.  What happened

11  instead?  Because he had a suspicious vehicle, and furtive

12  movements?  Which again, means nothing more than we are

13  going to try and search you if we can, and we are going to

14  say that we had a right to -- whether we have a right to or

15  whether we don't.

16           So, that's where you're at with regards to this.

17  And again, there are two different, there are two different

18  allegations here.  One is possession.  And one is with

19  intent to sell.  So again, we go back to that mental state.

20           I don't mean to be flippant.  And I dlon't mean

21  to say that Mr. Centra is not telling you everything that

22  you need to hear.  But, again, I am going to back to what I

23  said first:  Common sense.  Common sense.  You're going to

24  see, you're going to see the drugs.  So you're going to see

25  a bag.  You're going to see the size of it.  Mr. Centra's

- LoFaro - Opening -

1    own words:  A minute amount of drugs.  A small amount of

2    drugs.   Your common sense is immediately going to tell

3    you:  This guy is not distributing or selling anything.

4    And I don't care what Officer Proud says, because you're

5    not going to believe it, because it doesn't make any sense.

6    Using your common sense, you're going to realize what

7    Officer Proud is saying doesn't make sense.  These are two

8    guys in a car, with an infinitessimally small amount of

9    what is considered a controlled substance.

10           That's the allegation.  If you find that, even if

11   you find he possessed that, you're certainly not going to

12   under any set of circumstances believe that he was selling

13   it.  And he had a pittance on him.  Couple hundred bucks.

14   And certainly pocket change.  Everyone has a couple hundred

15   dollars on them or access to a couple hundred dollars.  And

16   he also had that infinitesimally small amount of cocaine.

17   You're going to hear him try and say, yes, he was going to

18   bust it up later.  And the reason that it was in one small

19   tiny little bag was because if he was ultimately arrested

20   sometime later down the road, it wasn't packaged for sale.

21   Well, you're going to see this exhibit.  And it couldn't be

22   packaged for sale.  It's too small.  There is nothing to

23   package.  Each package would be able to fit on a head of a

24   pin.

25           So there is no sale here.  And there is no intent

- LoFaro - Opening -

1    to sell.  And again, your common sense is going to show you

2    that.  So that's all you have to do is use your common

3    sense.  And listen to this man over here, because he is

4    going to tell you what happened that day.

5              Again, no good deed goes unpunished.  I ask that

6    you not allow this system to sanction these injustices, and

7    make it the norm, because that's not what our system is

8    predicated on.

9              So, again, I thank you all for being here.  And

10   that's really the only thing I am going to ask you, is to

11   use your common sense, apply your common sense to the law

12   as I hear it, and as these facts come out, because they are

13   going to speak for themselves.  And I am confident that

14   you're going to do the right thing.  Thank you very much.

15             THE COURT:  Thanks, Mr. LoFaro.  Mr. Centra,

16   ready to call your first witness?

17             MR. CENTRA:  I am, Your Honor.

18             THE COURT:  Okay.

19             MR. CENTRA:  First witness is Officer Jeremy

20   Decker.

21   J E R E M Y    D E C K E R, Called as a witness in behalf of the

22    People, being duly sworn, testified as follows:

23             THE COURT:  Good morning, Officer.

24             THE WITNESS:  Good morning, sir.

25   DIRECT EXAMINATION BY MR. CENTRA:

Decker - direct - Centra

1    Q.   Good morning.

2    A.   Good morning.

3    Q.   Would you state where you're employed?

4    A.   Syracuse Police.

5    Q.   And what is your position there?

6    A.   I am a police officer with the crime reduction team.

7    Q.   What is the crime reduction team?

8    A.   It's a small pro-active 12-man unit that patrols the

9    highest crime areas in the city.

10   Q.   And how long have you been in law enforcement?

11   A.   Almost 11 years.

12   Q.   And can you kind of go through your general duties and

13   responsibilities in your position right now?

14   A.   We just, I work with a partner, police officer

15   Ettinger.   Like I said, we patrol the high crime areas in the

16   city.   We focus on guns, gang members and drugs.

17   Q.   Now have you been involved in drug investigations

18   during the course of your career?

19   A.   Yes, hundreds.

20   Q.   Now I am going to draw your attention to January 5th

21   of 2016.   Do you recall that date?

22   A.   Yes, sir.

23   Q.   And were you working in your capacity with the

24   Syracuse Police on that date?

25   A.   Yes.

Decker - direct - Centra

1    Q.   Now at any point on this date did you become involved

2    in a drug investigation?

3    A.   Yes.

4    Q.   Could you describe how you became involved in this

5    investigation?

6    A.   We were in Pioneer Homes.  It's part of the Syracuse

7    Housing Authority.  Patrolling that area, it's a high crime

8    area.  Lots of shots-fired.  Lots of drugs, robberies,

9    assaults.  You name it.  So we were in this area.  We were in

10   the 100 block of Radisson Court.  And we see a suspicious

11   vehicle.  What's suspicious about it is, it's dark.  We lit

12   with my spotlight.  I was driving.  And the two occupants in

13   the vehicle immediately looked at us, and began making furtive

14   movements.

15   Q.   Could you describe what furtive movements are, sir?

16   A.   Furtive movements to me are they are quick, sneaky,

17   actions, normally out of our view.  And in my experience, it's

18   always someone trying to hide an illegal item, whether it be

19   drugs or a weapon.

20   Q.   Could you describe the furtive movements that you saw

21   when you shined your light on this vehicle?

22   A.   Like I said, they looked, saw that we were the police,

23   turned back around, looked down, they were making quick

24   movements, out of our sight.  Towards their lower bodies.

25   Q.   Now what happened after you witnessed this?

207

Decker - direct - Centra

1    A.   We approached the vehicle.

2    Q.   And what happened when you approached this vehicle?

3    A.   I approached the driver's side window.  Immediately,

4  and in plain view, I observed a black digital scale, with a

5  white residue, which is consistent with cocaine, right near the

6  center console area.  I recovered that.

7    Q.   Now could you describe the vehicle that you approached

8  on this day?

9    A.   It was a black Acura.  I believe it was New York plate

10  GWS 7631.

11    Q.   Officer, I am going to show you what has been marked

12  as People's Exhibit 1.  Take a look at Exhibit 1.  Tell me, do

13  you recognize this?

14    A.   Yes, sir.

15    Q.   What do you recognize that as?

16    A.   The black digital scale.

17    Q.   Is that the exact digital scale that you just

18  testified to that you saw on that date?

19    A.   Yes, sir.

20         MR. CENTRA:  I move to enter Exhibit 1 into

21    evidence.

22         THE COURT:  Mr. LoFaro, any objection to 1 coming

23    in, the scale?

24         MR. LOFARO:  No, Your Honor.

25         THE COURT:  1 is received.

208

Decker - direct - Centra

1    Q.   Now after you approached the vehicle and saw the

2    scale, in plain view, did you speak with the driver of the

3    vehicle?

4    A.   I spoke with the occupants of the vehicle.

5    Q.   Okay.  Now who do you first speak with?

6    A.   I immediately recovered the scale.  Then I asked both

7    occupants if they possessed or used drugs.

8    Q.   And what happened next during the course of your

9    investigation?

10   A.   The front passenger, who was identified as Willie

11   Jones, told me he just used cocaine in the vehicle but he

12   didn't have any left.

13   Q.   And what did you do next after hearing this?

14   A.   Officer Ettinger was on his side.  He had Mr. Jones

15   exit the vehicle, conducted a search of him, which was negative

16   for illegal drugs.  I then asked Mr. Jennings, who was in the

17   driver's seat, to exit the vehicle, and I began a search of

18   him.

19   Q.   Do you see Mr. Jennings here in court today?

20   A.   Yes, sir.

21   Q.   Could you point to him and describe an article of

22   clothing that he's wearing?

23   A.   He is wearing a tan shirt and pants over there.

24              THE COURT:  Let the record reflect the Officer

25        has pointed and identified Mr. Jennings.

Decker - direct - Centra

1    Q.   Now what happened after he stepped out of the vehicle?

2    A.   I began a search of him.  I was holding onto the back

3    of his pants with one hand.  I began to go in his front right

4    pocket, and he took off running.

5    Q.   And what happened after he started running?

6    A.   I chased him maybe approximately 10 feet, tackled him

7    from behind to the ground.

8    Q.   And what happened after that?

9    A.   He resisted briefly.  With Officer Ettinger's help, we

10   put him in handcuffs and I continued my search.

11   Q.   And what if anything did you find during the course of

12   your search?

13   A.   In his front left pants pocket, he had a clear knotted

14   section of plastic with a beige, chunky substance and $110 in

15   cash.

16   Q.   I am now going to show you what's been marked as

17   Exhibit 2, People's Exhibit 2, do you recognize Exhibit 2?

18   A.   Yes, sir.

19   Q.   What do you recognize that as?

20   A.   It was the drugs that I found in Mr. Jennings' pocket.

21   Q.   On the date that you testified to?

22   A.   Yes.

23   Q.   And how can you tell that those were the drugs?

24   A.   It's similar in appearance.  It's not chunky like it

25   was that day, but it has my seal on the top.

210

Decker - direct - Centra

1    Q.   And how did you mark that seal?

2    A.   With my initials, and my I.B.M., and date and time.

3            MR. CENTRA:  I move to enter Exhibit 2 into

4    evidence?

5            THE COURT:  Mr. LoFaro, any objection to 2 coming

6    in?

7            MR. LOFARO:  No, Your Honor.

8            THE COURT:  2 is received.

9    Q.   Now you said it was a beige, chunky substance.  In

10   your training and experience in law enforcement, what did this

11   appear to you?

12   A.   Crack cocaine.

13   Q.   Now, during your years in law enforcement, did you

14   receive any training on identifying and testing illegal

15   substances?

16   A.   Yes, sir.  At the police academy.

17   Q.   Did that involve cocaine?

18   A.   Yes.

19   Q.   And did that involve field-testing these substances?

20   A.   Yes, sir.

21   Q.   And did you in fact field-test this substance?

22   A.   Yes.

23   Q.   And what if anything did it test positive for?

24   A.   Cocaine.

25   Q.   And how did you test this substance?

Decker - direct - Centra

1   A.   I used the 904 Reagent field test kit.

2   Q.   Now after you recovered these items from Mr. Jennings,

3   what did you do next during the course of your investigation?

4   A.   I believe we conducted an inventory search of the

5   vehicle.   The vehicle ended up being towed.   And some other

6   items were recovered also.

7   Q.   Do you recall what items were recovered?

8   A.   There were two cellphones, and an additional $150 cash.

9   And I believe that's it.

10   Q.   Did you find any drug-use paraphernalia during the

11   search of Mr. Jennings?

12   A.   No, sir.

13   Q.   Did you find any drug-use paraphernalia during the

14   search of the vehicle?

15   A.   No, sir.

16   Q.   You stated he was placed under arrest at this point?

17   A.   Yes.

18   Q.   And did Mr. Jennings make any statements to you after

19   he was placed under arrest?

20   A.   We were filling out the arrest report in the vehicle.

21   He was in the back seat.   One of the boxes in the arrest report

22   asks if you're employed.   And he said, no.   He had been working

23   some construction job at Hotel Syracuse, but was out of work,

24   and was selling cocaine to make money.

25   Q.   Now going back to your initial approach of the

Decker - direct - Centra

1   vehicle, do you receive training in, I guess, procedure when

2   approaching vehicles?

3       A.   A lot of it, it's just experience.

4       Q.   Is there a certain, I guess, procedure that you would

5   go through in the initial search in what could lead you to,

6   you know, further investigation into an initial inkling of a

7   crime?

8       A.   Yes.  You get field training when you're with a senior

9   officer.  And the experience is, you have there, and when

10  you're on your own, it's just being involved with numerous

11  incidents over my career that has taught me more than anything.

12      Q.   Did everything that you did there on that day follow

13  the procedure that you had been trained in?

14      A.   Yes, sir.

15              MR. CENTRA:  I have no further questions for this

16  witness.  Thank you, Officer.

17              THE COURT:  All right.  Mr. LoFaro,

18  cross-examination for Officer Decker?

19              MR. LOFARO:  Yes, Your Honor.

20  CROSS-EXAMINATION BY MR. LOFARO:

21      Q.   Officer Decker.

22      A.   Good morning, sir.

23      Q.   How are you?

24      A.   Good.  How are you?

25      Q.   Good.  Thank you.  Officer Decker, just for

213

Decker - cross - LoFaro

1   clarification if you could, you said that you noticed a

2   suspicious vehicle and that you knew it was a suspicious

3   vehicle because it was dark?  Were you referring to the

4   vehicle, were you referring to the time of day?

5       A.   When I said, I said it was dark outside, I believe.

6       Q.   Okay.  I think your testimony was, and I don't know if

7   we need it read back or we can just move forward, you said:   I

8   knew it was a suspicious vehicle because it was dark.

9       A.   I think you misunderstood.

10      Q.   I misunderstood?

11      A.   Yes, sir.

12      Q.   Okay.  What caused you to believe that that black

13  Acura was a suspicious vehicle, the vehicle itself -- not the

14  occupants, not the furtive movements -- what was it about that

15  vehicle that drew your attention?  What do you believe was

16  suspicious about a black Acura?

17      A.   Like I said before, when I turned my spotlight on the

18  vehicle, and both occupants noticed our presence, and began

19  making furtive movements, that made it suspicious.

20      Q.   So prior to your turning your flashlight on, it wasn't

21  a suspicious vehicle, correct?

22      A.   Correct.  We were driving through the parking lot, yes.

23      Q.   Okay.  Now, you said that this is a high crime area,

24  the shots fired -- were there any shots fired?

25      A.   What day?

Decker - cross - LoFaro

1    Q.   This day, during, immediately prior to this arrest?

2    A.   I would have to go back through the 911 dispatch notes

3    so I could answer that.

4    Q.   Was there any type of disturbance at all in that

5    parking lot on that particular evening when you approached

6    that vehicle with your spotlight?

7    A.   I don't believe so.

8    Q.   Now, you mentioned furtive movements, and you

9    described it as like movements down towards their laps or

10   towards the lower part of their persons, correct?

11   A.   Yes, sir.

12   Q.   Okay.  Now, when you ultimately inventoried that

13   vehicle, what you allege you took into evidence, was a scale,

14   correct?

15   A.   I did take a --

16   Q.   How big was the scale?

17   A.   It's right here in front of me, sir.

18   Q.   Tiny?  Black and dark, correct?

19   A.   Yes.

20   Q.   And that was right on top of the console?

21   A.   It was right near the center console.

22   Q.   Right near the console?

23   A.   Yes.

24   Q.   Plain view?

25   A.   Yes.

215

Decker - cross - LoFaro

1    Q.   Okay.  You saw these furtive movements, but when you

2    inventoried the vehicle, they hadn't secreted a single thing,

3    had they?

4    A.   I found drugs on Mr. Jennings.

5    Q.   Correct.  But no reason to believe those drugs weren't

6    on Mr. Jennings, correct?

7    A.   You know, it's -- I don't want to speculate.

8    Q.   Okay.  Now, you spoke about the money that you had

9    recovered.  Could you explain that to me again?  What was the

10   first amount of cash and where did you find that?

11   A.   It was $110 in his front left pants pocket.

12   Q.   Okay.  And then you said at a later date you recovered

13   a different amount of cash, is that true?

14   A.   On the same date, sometime later, Officer Ettinger

15   recovered $150 from the vehicle.

16   Q.   From the vehicle?

17   A.   Yes, sir.

18   Q.   Okay.  Officer, do you recall testifying about these

19   events before the Grand Jury, correct?

20   A.   Yes, sir.

21   Q.   Okay.  Now do you recall telling the Grand Jury at

22   that time that your testimony right now, that there was

23   another $110 in the console?  Do you recall telling the Grand

24   Jury at that time that there was $100 cash in his other

25   pocket?

216

Decker - cross - LoFaro

1    A.   All I recall is 110 in his front left.  And 150 in the

2    center console.

3    Q.   Okay.  Any reason why you would have told the Grand

4    Jury that it was $100 cash in the other pocket, in the left

5    pocket, and $100 in the other pocket?

6    A.   How much again?

7    Q.   At the Grand Jury, I believe it's your testimony that

8    there was $110 in cash?

9    A.   Okay.

10   Q.   In his front left pocket?

11   A.   Okay.

12   Q.   And $100 in cash in his other pocket?

13   A.   No, I don't recall that, sir.

14          MR. LOFARO:  Okay.  Do I need this marked, Your

15   Honor?

16          THE COURT:  What is it?

17          MR. LOFARO:  The Grand Jury minutes.

18          THE COURT:  No, you have asked him.

19          MR. LOFARO:  Okay.

20   Q.   You testified, Officer, I believe that there was no

21   drug paraphernalia, correct?

22   A.   The only drug paraphernalia that would be considered

23   drug paraphernalia I had was the scale.  He asked about user

24   paraphernalia.

25   Q.   You said that it appeared that there was drug residue

217

Decker - cross - LoFaro

1   on the scale, correct?

2      A.   Correct.

3      Q.   Did you take any drug residue off of that scale and

4   test it to see whether or not that was actually drugs or if it

5   wasn't drugs?

6      A.   That day we didn't have a cocaine wipe on us, so, no.

7      Q.   So, it appeared to be, you're claiming drug residue

8   but it was never tested?

9      A.   It was sent to the lab to be tested.  So I don't know

10   if the lab tested it or not.

11      Q.   Okay.  Did you charge him with possession of drug

12   paraphernalia for being in possession of that scale?

13      A.   No, sir.

14      Q.   Okay.  When you looked at the drugs, in that packet

15   right there, that Mr. Centra brought up to you, you said, are

16   these the drugs that you recovered from Mr. Jennings, you said

17   they looked similar, not identical, just similar?

18      A.   Well, I think the lab, it was a beige, chunky

19   substance.  If you look at it, I think what the lab does is

20   they have to crush it up into a powder.  So, it's not chunky

21   like it was when I recovered it, sir.

22      Q.   Okay.  And was it you yourself that did the reagent

23   field test?

24      A.   Yes, sir.

25      Q.   And once that was, once you conducted, once you

Decker - cross - LoFaro

1    finished conducting that reagent field test, what did you do

2    with the drugs at that point?

3        A.   I believe they were later taken to the Public Safety

4    Building.  Packaged, sealed and turned in.

5        Q.   What did you do, what was your immediate procedure

6    with regards to the drugs themselves?  You say you believed

7    they were turned into the PSB.  What did you personally do

8    with them?

9        A.   Our procedure is they were taken to the Public Safety

10   Building.

11       Q.   By whom?

12       A.   Ourselves.

13       Q.   Did you personally take them to the Public Safety

14   Building?

15       A.   I believe so.

16       Q.   You don't recall?

17       A.   Probably if I recovered them, and I turned them in,

18   that's what happened.

19       Q.   Okay.  But as you sit here, you can't be 100 percent

20   positive that you brought them, is that?

21       A.   It's over a year, I had hundreds of arrests since then.

22       Q.   I know memory is fallible.  I am not chiding you for

23   it.  I am just asking you, as you sit there, you cannot be 100

24   percent positive you brought those drugs to the Public Safety

25   Building, is that correct?

Decker - cross - LoFaro

1    A.   I am 100 percent sure.   Do you know why?   Because I

2   recovered them.   And I turned them in.   This is my seal.   I

3   tested them.

4    Q.   So now you're 100 percent sure?

5    A.   I am 100 percent sure.

6              MR. LOFARO:   Okay.   Officer Decker, thank you

7   very much.   No further questions.

8              THE WITNESS:   Thank you.

9              THE COURT:   Officer, could I ask you, just maybe

10   help out the jury:   What is a cocaine wipe that you

11   referred to?

12    A.   It's like one of those, you go to a restaurant, they

13   give you a little square package like a clean wipe to wipe your

14   hands.   Same package, except it's just a test for cocaine.

15   Positive or negative.   It's like -- paper, you wipe the

16   surface, the scale, and they will give you a positive or

17   negative reaction to cocaine.

18              THE COURT:   You indicated that you didn't have

19   any in the patrol car that evening?

20    A.   No, sir.

21              THE COURT:   Thank you.   Anything else, Mr.

22   Centra?

23              MR. CENTRA:   Just briefly.

24   REDIRECT EXAMINATION BY MR. CENTRA:

25    Q.   Officer, you testified that you're driving through the

Decker - redirect - Centra

1  parking lot of Pioneer Homes?

2      A.   Yes, sir.

3      Q.   And that's the Radisson Courts included in there?

4      A.   Yes, sir.

5      Q.   Is Pioneer Homes a place where you frequently patrol?

6      A.   Yes, sir.

7      Q.   Is there a reason for that?

8      A.   It's a high crime area.  It's a gang neighborhood.

9  It's part of the, it's also owned by Syracuse Housing, and they

10  asked for our help.

11      Q.   Syracuse Housing asked for your help in what way?

12      A.   Enforcing their trespass list.  They have a huge

13  trespass list of people they don't want on the property.  And

14  if we find them on the property, they want us to arrest them.

15      Q.   So you did simply, when you were driving through

16  Pioneer Homes, was flash a light on a vehicle, initially,

17  correct?

18      A.   Yes.

19            MR. CENTRA:  I have nothing further.

20            THE COURT:  Mr. LoFaro, any other questions for

21      Officer Decker?

22            MR. LOFARO:  Yes.

23  RECROSS-EXAMINATION BY MR. LOFARO:

24      Q.   Again, I know it was quite sometime ago, but very

25  briefly, what did you say the aggregate weight was of the

221

Decker - recross - LoFaro

1   drugs that you had testified?

2       A.   I believe it was four grams.

3       Q.   Four grams?

4       A.   Yes, sir.

5               MR. LOFARO:  Okay.  Thank you.  No further

6       questions, Your Honor.

7               THE COURT:  All set.

8               MR. CENTRA:  Just one more.

9               THE COURT:  Yes.

10  REDIRECT EXAMINATION BY MR. CENTRA:

11      Q.   When you test the aggregate weight, is that just the

12  substance within the bags or do you test the weight of the

13  bags included within that?

14      A.   The weight of the bag is included.

15              MR. CENTRA:  Nothing further.

16              THE COURT:  All set?

17              MR. LOFARO:  Yes, Your Honor.

18              THE COURT:  Thanks, Officer.  You're all set.

19      Thank you for your time.

20              THE WITNESS:  Yes, sir.

21              THE COURT:  Mr. Centra, your next witness?

22              MR. CENTRA:  Officer Darrin Ettinger.

23  D A R R I N   E T T I N G E R, called as a witness in behalf of

24      the People, being duly sworn, testified as follows:

25  DIRECT EXAMINATION BY MR. CENTRA:

222

Ettinger - direct - Centra -

1    Q.   Good morning, Officer.

2    A.   Good morning.

3    Q.   Would you state where you're employed for the record?

4    A.   Syracuse Police.

5    Q.   And what is your position there?

6    A.   I work for the crime reduction team.

7    Q.   And how long have you been in law enforcement?

8    A.   Since May 8th of 2006.

9    Q.   Can you describe what your general duties and

10   responsibilities are in your position right now?

11   A.   For the crime reduction team, where we are a unit

12   that's specialized for high crime areas.  Shots-fired.  Simply

13   put, we do mostly drugs, guns and gangs.

14   Q.   Now had you been involved in drug investigations

15   during the course of your career?

16   A.   Yes.

17   Q.   Approximately how many?

18   A.   Hundreds.

19   Q.   I am going to draw your attention to January 5th of

20   2016, do you recall this date?

21   A.   Yes.

22   Q.   And were you working in your capacity with the

23   Syracuse Police on that date?

24   A.   Yes.

25   Q.   Now at any point on this date, did you become involved

Ettinger - direct - Centra -

1  in a drug investigation?

2  A.   Yes.

3  Q.   Would you describe how you became involved in that

4  investigation?

5  A.   I was working Unit 526 with my partner, Officer Decker.

6  We were patrolling -- patrolling around the Pioneer Homes.

7  It's a City of Syracuse Housing complex.  As we were coming

8  into the hard walk of Radisson Court, we observed a vehicle

9  parked in one of the spots facing, it would be eastbound.  It

10  was occupied by two males.  As my partner illuminated the

11  vehicle, both males looked back at us.  They had like a shocked

12  look on their face.  They immediately turned back to their

13  laps.  They started making all the furtive movements as if they

14  were attempting to hide something.  So we pulled up.  We exited

15  the vehicle.  And we approached.

16  Q.   And what did you do as you approached this vehicle?

17  A.   Officer Decker approached the driver's side of the

18  vehicle.  I approached the passenger side of the vehicle.  As I

19  approached the passenger side, Officer Decker made me aware

20  that I observed a scale in plain view inside the vehicle.  He

21  had asked the occupants of the vehicle if there was any drugs,

22  or if they were using drugs.  And the front seat passenger, who

23  now I am next to talking with, stated that he had just done

24  cocaine in the vehicle.

25  Q.   And after obtaining this information, what did you do

224

Ettinger - direct - Centra -

1    next during the course of your investigation?

2        A.   I asked the front seat passenger to step out.

3        Q.   What happened after that?

4        A.   Front seat passenger identified as Willie Jones

5    complied.  Stepped out.  I secured him in handcuffs.  And I

6    searched him for contraband.  I did not find anything.  At

7    which time we were at now like the back trunk area of the

8    vehicle.  Standing there, Officer Decker asked the driver seat

9    occupant, found to be Tony Jennings, to step out of the

10   vehicle.

11       Q.   And did you, were you able to get a look at the driver

12   of the vehicle?

13       A.   Yes.

14       Q.   Do you see him in court today?

15       A.   Yes.

16       Q.   Could you point to him and describe an article of

17   clothing that he is wearing?

18       A.   Wearing the olive colored shirt.

19            THE COURT:  Let the record reflect that the

20       Officer has identified Mr. Jennings.

21       Q.   Now after you heard Officer Decker ask him to step out

22   of the vehicle, what did you do next during the course of this

23   investigation?

24       A.   I am standing with Mr. Jones who is still in handcuffs

25   at the back of vehicle.  Mr. Jennings and Officer Decker are at

Ettinger - direct - Centra -

1    the driver's side of the vehicle.  So they are just, just

2    around the corner of the vehicle from me.  And Officer Decker,

3    my partner, is conducting a search of Mr. Jennings.  During the

4    search, Mr. Jennings flees from Officer Decker.  And he runs

5    towards the sidewalk.  So he is running eastbound, towards the

6    -- I guess up on the sidewalk.  It's a very short distance.

7    And he gets tackled by Officer Decker.  At which time he is

8    struggling.

9         I run up to help Officer Decker who is struggling with

10   Mr. Jennings.  I strike Mr. Jennings in the side of the, right

11   side of the head with a closed fist, and then we struggle with

12   Mr. Jennings, and we force his hands behind his back and we

13   secure him in handcuffs.  Then I immediately run back to Mr.

14   Jones, who is still standing at the back of the vehicle, or the

15   vehicle handcuffed.  And he is saying, he was like, I am not

16   going anywhere.  I am not going anywheres.

17        Q.   So what did you do next after all this occurred?

18        A.   After that, Officer Decker searched Mr. Jennings.  We

19   performed warrant checks.  And eventually, Mr. Jones was

20   released from the scene.

21        Q.   And what did you do after that?

22        A.   The vehicle, I searched the vehicle for contraband.  I

23   also conducted, I am sorry, I completed an inventory of the

24   vehicle, prior to it being towed.

25        Q.   And what if anything did you find in this vehicle?

226

Ettinger - direct - Centra -

1    A.   The center console had $150 inside of it which was

2  collected, seized for possible forfeiture.

3    Q.   Did you find anything else in the vehicle?

4    A.   I believe there was a cellphone of Mr. Jennings that

5  was also collected.

6    Q.   And what did you do next during the course of your

7  involvement in this case?

8    A.   After the vehicle was towed, we transported Mr.

9  Jennings to booking, and I completed the case.

10    Q.   Do you recall if Mr. Jennings made any statements to

11  Officer Decker while in booking?

12    A.   While we were filling out the arrest report, and the

13  arrest report includes name, date of birth, pedigree

14  information, also includes employment status, religious status.

15  When we asked about his employment status, he states he was

16  unemployed.  He went on to explain that he had been working

17  construction, I believe, for Hotel Syracuse.  But due to the

18  time of the year, he was unemployed.  That he was selling crack

19  cocaine to supplement the money that he was now not getting

20  because he was unemployed.

21    Q.   Officer, during the course of your involvement in this

22  investigation, did you find any drug-use paraphernalia at all?

23    A.   No.

24    Q.   Now do you go through training in how to, I guess,

25  conduct yourself during an investigation of this sort, police

Ettinger - direct - Centra -

1  training?

2      A.   Yes.   During the police academy, we have crimes in

3  progress and that gives us scenario-based experiences.

4      Q.   Now did you follow the requisite police procedure that

5  you had been trained in when conducting this investigation?

6      A.   Yes.

7           MR. CENTRA:   I have no further questions.   Thank

8  you, Officer.

9           THE WITNESS:   Thank you.

10          THE COURT:   Mr. LoFaro, cross-examination for

11  Officer Ettinger?

12  CROSS-EXAMINATION BY MR. LOFARO:

13     Q.   Good morning, Officer.   How are you?

14     A.   Good.   How are you?

15     Q.   Good.   Thank you.   I am going to ask you the same

16  question that I asked your partner with regard to the vehicle

17  itself.   You entered that parking lot, I know it's within his

18  testimony, and the district attorney has presented this to be

19  a high crime neighborhood?

20     A.   Yes.

21     Q.   So, I understand that.   When you pulled into that

22  parking lot, was there a crime in progress that you could see?

23     A.   A crime in progress that I could see, no.

24     Q.   Any type of disturbance in that parking lot?

25     A.   No.

228

Ettinger - cross - LoFaro

1    Q.    When you testified that there was a suspicious

2  vehicle, what was the first thing that caused, when did you

3  draw that conclusion that that vehicle was suspicious?

4    A.    I believe that as we were coming into the parking lot,

5  there are other cars parked in there.  It's not common for

6  people to just to sit in the parking lot in the vehicle.  So

7  that alone is suspicious.  And then when you illuminate

8  somebody, and they see you and they immediately turn down and

9  begin to make furtive movements, as if they were trying to hide

10 something.  I mean, that raises our suspicions even more.

11   Q.    So just the mere fact that there are two gentlemen

12 sitting in a vehicle, in a parking lot, in and of itself gives

13 rise to that being a suspicious vehicle, that's enough?

14   A.    It gives rise to us to inquire.  This is a City of

15 Syracuse public housing complex.  It is inundated with criminal

16 activity.  Shots-fired, homicides, larcenies.  The City of

17 Syracuse Housing complex has even asked us to approach people,

18 make sure they live there.  We are allowed to approach cars,

19 approach people inside the complex itself, and see to make sure

20 if they live there.

21   Q.    But as you approached the vehicle, all you really saw

22 was two guys sitting in a car, correct?

23   A.    A-hum.

24   Q.    With regard to these furtive movements, again, I will

25 ask you the same question that I asked Officer Decker, you

229

Ettinger - cross - LoFaro

1  haven't inventoried the vehicle, and you both testified that

2  it appeared by their furtive movements that they were

3  attempting to secrete something, is that correct?

4      A.  Could -- yes.

5      Q.  Now, a small amount of money was recovered?  A small

6  amount of cocaine was recovered from the pocket?  There was a

7  scale, sitting on the console, correct?

8      A.  Yes.

9      Q.  So it's your testimony that they were moving as though

10  they were attempting to secrete something.  But after you

11  inventoried the vehicle, you testified there was no drug

12  paraphernalia.  All you found was the drugs on the person, and

13  the other thing on the console that they, of course, the small

14  scale that they obviously didn't attempt to secrete that.  If

15  they had even known you were there, so when you inventoried

16  that vehicle, they hadn't secreted anything at all, had they?

17      A.  They could have had drugs in the pocket, I mean.  I can

18  go into what I believe could be happening there.

19      Q.  No, we would rather not engage in --

20      A.  You're saying:  Nothing secreted.  I am saying that he

21  had drugs in his pocket.  There was a scale here.  They didn't

22  have much time by the time we saw them, we pulled up and jumped

23  out.  They are not doing this slowly.

24      Q.  Yes?

25      A.  If this had been a handgun or something, we were moving

1   up quickly.  Obviously, the scale was in plain view.  And he

2   had, not a small amount of drugs, but a substantial amount of

3   drugs on him.

4       Q.   Okay.  Now I understand as you said there was no

5   disturbance, it wasn't a crime in progress?

6       A.   Right.

7       Q.   When you pulled into the parking lot, admittedly,

8   there was no crime in progress.  The fact that there were two

9   gentlemen sitting in a vehicle, in and of itself raised some

10  type of an eyebrow to you.  When you pulled into the parking

11  lot, behind them, were they free to go or did you block them

12  in?

13      A.   We did not block them in.  We pulled up so if they were

14  parked forwards, like facing -- so nose into the spot.  We

15  pulled up just before them, so we were not blocking them in.

16      Q.   So at that point in time could they have been trying

17  to exit the vehicle and go into the apartment complex and

18  watch a ball game?

19      A.   Absolutely.

20      Q.   Okay.

21      A.   Would we still have tried make to contact with them?

22  Absolutely.  We do this all the time.  We do this repeatedly

23  all the time.  In all of the -- in most of our, if not all of

24  the Syracuse City housing complexes, we go up to cars:  Do you

25  live here?  Yes, I do live here.  Could I see your ID, please?

Ettinger - cross - LoFaro

1    Yes.  Show your I.D., they live right here, and they are gone.

2        Q.    Certainly, now that's a far cry from coming up on a

3    vehicle and shining a spotlight in it, isn't it?

4        A.    It's all we could see in the vehicle.  If it was an

5    empty vehicle, I wouldn't walk up -- I walk up to a vehicle

6    that people are in.

7        Q.    Correct.  I understand that.

8        A.    That's what I am saying.

9        Q.    But, do you understand there is a Fourth Amendment

10   right that people are entitled to as well, correct, now this

11   is in the passenger compartment of that vehicle, correct?

12       A.    No.  He was in the driver's seat.  And the front seat

13   passenger is in the passenger seat.

14       Q.    Correct?

15       A.    Driver's side.  Passenger seat. (Indicating.)

16       Q.    Correct.  So, they were in that vehicle, doors closed,

17   correct?

18       A.    Yes.

19       Q.    So that also is different than the inquiry with regard

20   to somebody who is a pedestrian who is on a public walkway?

21       A.    I don't -- I mean, I am not going to sit here and try

22   to say there was a difference between that, because anybody

23   could drive their car into Radisson Court and park there, and

24   sell drugs, or have a gun, or do violence.  So I mean, in both

25   respects, if you're outside of the vehicle, well, you're just a

Ettinger - cross - LoFaro

1   bit -- if you're inside a vehicle, our inquiry is to make sure

2   that you have a reason to be there, that you live there.

3       Q.  So, so, is it your testimony that Mr. Jennings and the

4   other person in his vehicle aren't entitled to the same right

5   to privacy as someone in a non-crime area?

6               MR. CENTRA:  Objection, Your Honor.  You're

7       asking him to testify to a legal basis.

8               THE COURT:  Sustained, sustained.

9   BY MR. LOFARO:

10      Q.  Okay.  With regard to that scale that was inventoried,

11  do you recall who took possession of that scale, was it you or

12  was it --

13      A.  Officer Decker.

14      Q.  Officer Decker?  Okay.  And are you aware of any

15  testing that was done to the scale with regards to residue

16  that may not have been on it?

17      A.  We didn't have nic-wipes available for the testing.  We

18  collected it, and sent it to the lab.  Whether or not a lab

19  tested it, I am not sure.  But there was a white residue on the

20  surface of the scale.

21      Q.  Okay.  All right.  That cocaine that has been entered

22  as an exhibit, how was that packaged?

23      A.  Freestyle.

24      Q.  Was it, just a yes or no, in one single bag?

25      A.  Yes, one section of knotty plastic.

Ettinger - cross - LoFaro

1          MR. LOFARO:  Okay.  Thank you, Officer.  No

2    further questions.

3          THE WITNESS:  Thank you, sir.  I appreciate it.

4          THE COURT:  Anything else?

5          MR. CENTRA:  Nothing further.

6          THE COURT:  Thanks, Officer.  You're all set.

7          THE WITNESS:  Thank you, sir.  I appreciate it.

8    Thanks, guys.

9     (Witness off witness stand.)

10          THE COURT:  Mr. Centra, your next witness?

11          MR. CENTRA:  Jennifer Wilson.

12   J E N N I F E R    W I L S O N, Called as a witness in behalf

13   of the People, being duly sworn, testified as follows:

14          THE COURT:  Miss Wilson, good morning.

15          THE WITNESS:  Good morning.

16          THE COURT:  Mr. Centra, when you're ready.

17          MR. CENTRA:  Thank you.

18   DIRECT EXAMINATION BY MR. CENTRA:

19   Q.   Good morning.

20   A.   Good morning.

21   Q.   Would you state for the record where you're employed?

22   A.   I am employed at the Onondaga County Center for

23   Forensic Sciences.

24   Q.   And is this an accredited facility?

25   A.   Yes, it is.

Wilson - direct - Centra

1   Q.   Can you explain how a lab becomes accredited?

2   A.   Accreditation process involves a team of usually

3   between four and six inspectors that come into the laboratory.

4   They go through all aspects of the lab, including training,

5   personnel, our procedures.  And they evaluate everything that

6   we do for our analysis in the building.

7   Q.   Now could you state what your occupation at the lab

8   is?

9   A.   I am a forensic chemist.

10   Q.   And how long have you been employed in this capacity?

11   A.   I have been employed as a forensic chemist for

12   approximately 16 or 17 years.  Previous to that, I was a

13   laboratory technician, still within the drug unit.

14   Q.   Would you describe what your duties are in your

15   position?

16   A.   My primary duties are the analysis of evidence that is

17   turned into the laboratory by various police agencies to

18   determine whether they contain, excuse me, a controlled

19   substance or marijuana.

20   Q.   Now what type of schooling or training have you

21   received for this position you're employed at?

22   A.   I have two bachelors degrees from SUNY Oswego.  The

23   first was in public justice, with a minor in forensic science.

24   And the second is in biology.

25        I have attended numerous trainings including one at the

235

Wilson - direct - Centra

1    FBI academy in Quantico, Virginia.   And I had extensive

2    on-the-job training before I began any analysis.

3        Q.   Now do you read any scientific literature to keep

4    yourself up-to-date in your field?

5        A.   Yes, I do.

6        Q.   Have you ever taught courses and lectured in your

7    field?

8        A.   Yes, I do.

9        Q.   Can you describe what your day-to-day duties are?

10       A.   Day-to-day, my primary duties are the analysis of

11   evidence to determine whether or not they contain a controlled

12   substance.

13       Q.   Now have you had the occasion to chemically analyze

14   substances to determine whether the substance is or contains a

15   controlled substance?

16       A.   Yes, I have.

17       Q.   Approximately how many times?

18       A.   Thousands.

19       Q.   Have you had the occasion to chemically analyze

20   substances to determine whether the substance is or contains

21   cocaine?

22       A.   Yes, I have.

23       Q.   And how many times have you done that?

24       A.   Thousands.

25       Q.   Is cocaine a controlled substance?

236

Wilson - direct - Centra

1     A.   Yes, it is.

2     Q.   And is it also a narcotic drug?

3     A.   Under the law of New York State, yes, it is.

4     Q.   Now do you make these analyses as regular part of your

5   duties?

6     A.   Yes, they are.

7     Q.   Now have you had the occasion to testify in the courts

8   of New York in this area before?

9     A.   Yes, I have.

10    Q.   Approximately how many times?

11    A.   Approximately thirty.

12    Q.   Now any point did you become involved in a case

13   involving an individual by the name of Tony Jennings?

14    A.   Yes, I did.

15    Q.   Now what was your assignment in regards to this case?

16    A.   My assignment was to analyze a piece of evidence that

17   was turned into the laboratory.

18    Q.   I am going to show you what has been marked and

19   entered as Grand Jury Exhibit 2.  I am going to ask you if you

20   recognize this exhibit?

21    A.   Yes, I do.

22    Q.   Is that the same one that you were asked to analyze?

23    A.   Yes, it is.

24    Q.   How were you able to identify this item?

25    A.   My initials, the date and time that I opened the

Wilson - direct - Centra

1    evidence bag, are clearly on the bag, and my initials and some

2    other markings on the inner packaging.

3        Q.   Do you recall when you marked this item?

4        A.   May 5th 2016.

5        Q.   When did you first come in possession of Exhibit 2?

6        A.   May 2nd 2016.

7        Q.   And when you first were assigned to this, where did

8    you initially get this item from?

9        A.   I got the piece of evidence from our evidence intake

10   section in the laboratory.

11       Q.   Is that a secure area?

12       A.   Yes, it is.

13       Q.   Who has access to it?

14       A.   The evidence intake staff and approximately three

15   supervisors.

16       Q.   Now is Exhibit 2 in substantially the same condition

17   now as when you last saw it?

18       A.   Yes, it is.

19       Q.   What did you do with Exhibit 2 after you received the

20   item from the evidence intake area?

21       A.   I brought it back to my area of the laboratory, and

22   stored it until I began my analysis.

23       Q.   Did anyone else have custody of Exhibit 2 from the

24   time that you received the item from the evidence intake area

25   until you analyzed it?

238

Wilson - direct - Centra

1    A.   No, they did not.

2    Q.   And could you describe what the condition of Exhibit 2

3  was when you first saw the item?

4    A.   It was a knotted piece of plastic which indicated a

5  chunky substantial.

6    Q.   Is that plastic that you just described still enclosed

7  in Exhibit 2?

8    A.   Yes, it is.

9    Q.   Now, when you received Exhibit 2, did you break the

10 seal on Exhibit 2?

11   A.   Yes, I did.

12   Q.   When did you do that?

13   A.   On May 5th 2016.

14   Q.   And where did you do that?

15   A.   In my work space in the laboratory.

16   Q.   Now when you opened Exhibit No. 2, what did you first

17 do with this item?

18   A.   The first thing I did was to take out the chunky

19 material and the packaging.  I weighed them together.  Then I

20 emptied out the chunky material and I weighed just the

21 packaging so that I could get the weight of just the chunky

22 material.

23   Q.   And what was the result of the weight of that chunky

24 material?

25   A.   The weight was 2.576 grams.

Wilson - direct - Centra

1    Q.   And that's not including the packaging material that

2    you described?

3    A.   Correct, it's just the chunky material.

4    Q.   Now after weighing this material, what did you do

5    next?

6    A.   The next thing I did was to begin my analysis.  The

7    first part of that is to do a color test known as a Scott color

8    test.  This is a three-step process.  If all three steps are

9    positive, it's indicative for the presence of cocaine.

10   Q.   And can you describe exactly what you did while

11   testing this item?

12   A.   I took a very small amount of chunky material and I put

13   it into a glass tube.  I added a few drops of a Scott reagent.

14   I looked for a blue precipitate to form.  Then I added a few

15   drops of concentrated hydrochloric acid.   The blue precipitate

16   dissolved.  I then added a small amount of chloroform and I

17   looked for pink or blue color.  If all three of those steps are

18   positive, then it is indicative for the presence of cocaine.

19   Q.   Was this indicative for cocaine?

20   A.   Yes, it was.

21   Q.   Now after this test, did you do any other additional

22   testing to this item?

23   A.   Yes, I did.

24   Q.   And what additional testing did you do?

25   A.   The next test I did involves some instrumentation known

Wilson - direct - Centra

1    as gas chromatography mass spectrometry.  These are two

2    instruments that are interfaced together that separate,

3    tentatively identify the components in the sample.  I then

4    reviewed that data and made my determination about what the

5    substance is.

6       Q.   And can you explain exactly what you did in regards to

7    this testing with Exhibit No. 2?

8       A.   I took a very small amount of the sample.  I put it

9    into a glass vial.  I then filled the glass vial with methanol.

10   I then placed that sample on the instrument, and the

11   instrument, then it was then run through the instrument.

12      Q.   And what was the result of this testing?

13      A.   The chunky material is cocaine.

14      Q.   And did you do any further testing?

15      A.   I did.

16      Q.   And what did you further test for?

17      A.   I did a quantitation on the sample.  I, by performing a

18   quantitation, I can tell the pure amount of cocaine that's in

19   the sample.

20      Q.   And how did you do this?

21      A.   I used an instrument known as a gas chromatograph flame

22   ionization detector.

23      Q.   Can you describe what you did when testing Exhibit 2

24   in this matter?

25      A.   I took the chunky material, and the first thing I

241

Wilson - direct - Centra

1  needed to do was to grind it up so that it's powdery, so I had

2  a homogenous sample.  I then made out three separate Aliquoits.

3  I ran those three samples from each of those Aliquoits.  And I

4  used that data to make my determination.  A-l-i-q-u-o-i-t-s.

5       Q.   What were the results of this testing?

6       A.   The sample was 49 percent pure cocaine.

7       Q.   Were you able to determine how many milligrams of

8  cocaine were enclosed within that sample?

9       A.   Yes, I was.

10       Q.   How were you able to do that?

11       A.   By performing a calculation.

12       Q.   Can you describe how you did that?

13       A.   I multiplied the weight of the chunky material by the

14  purity to determine that there is 1,262 milligrams of cocaine.

15       Q.   And are these tests that you just described here today

16  recognized in the scientific community for cocaine detection?

17       A.   Yes, they are.

18       Q.   So after you did this test that you last testified to,

19  what did you do next during the course of your analysis?

20       A.   I separated out what is now powdery material from the

21  package.  I resealed it in the evidence bag.  I also wrote a

22  report reporting my findings.

23       Q.   And from these tests that you performed, were you able

24  to come to a conclusion as to what the substance is or

25  contained in Exhibit 2, was?

Wilson - direct - Centra

1   A.   Yes, I did.

2   Q.   And what was your conclusion?

3   A.   It is cocaine.

4   Q.   Can you state the basis for your opinion here?

5   A.   Based on my experience, training, and education.

6        MR. CENTRA:   I have no further questions.

7        THE COURT:   Okay.   Mr. LoFaro, cross-examination

8   for Miss Wilson?

9        MR. LOFARO:   Yes.

10  CROSS-EXAMINATION BY MR. LOFARO:

11  Q.   Good morning, Miss Wilson.

12  A.   Good morning.

13  Q.   How are you?

14  A.   Good.

15  Q.   I hope you can bear with Alexander Pope, that a little

16  learning is a dangerous thing.   I may bumble a bit.   You're

17  certainly the expert.   Just a few, a few questions with regard

18  to some of the tests that you were talking about.   You stated

19  that you did a gas -- I am sorry, what was the first test you

20  said you performed?

21  A.   The Scott colored test?

22  Q.   Oh, so, did you do a color test?

23  A.   Yes, sir.

24  Q.   And which color test was that?

25  A.   The Scott.

243

Wilson - cross - LoFaro

1   Q.   Okay.  And you did a gas chromatography test?

2   A.   Gas chromatography mass spectrometry, yes.

3   Q.   I am sorry.  Did you say infra residue spectrometry

4   test as well or not?

5   A.   I used G.C.M.S.  I.D.  I did not use infrared.

6   Q.   Okay.  Now, why did you not conduct that test, just

7   out of curiosity?

8   A.   That test is used to determine the base form of the

9   cocaine, which is not required for this court.  That is used

10  primarily for Federal Court.

11  Q.   Okay.  It is, it is true, is it not, that the

12  combination of the Y. G.C.M.S. and the I.R. are reported to be

13  the highest, highest, highest confidence identification?

14          THE COURT:  Hold up a second.  Folks, can you

15      hear the questions?  Yes?

16          JUROR:  No.

17          THE COURT:  Speak up a little, John.

18          MR. LOFARO:  Okay, Judge.

19  Q.   The G.C.M.S. (GC/MS) and I.R., is that the best way to

20  tell what actually is in there?

21  A.   GC mass-spec is pretty much infallible.

22  Q.   Okay.  Isn't it true that there is no one infallible

23  system in a laboratory?

24  A.   True, there is no infallible system.

25  Q.   Let's see.  Now, I know that you stated you got this

Wilson - cross - LoFaro

1  from the lab.  Where is that laboratory located that you

2  originally received those drugs from?

3      A.  Are you referring to the evidence intake section?

4      Q.  Yes.

5      A.  It is part of our laboratory.  It's on the same floor

6  that I work in.

7      Q.  And where is that?

8      A.  It's at this Onondaga County Center for Forensic

9  Sciences.

10     Q.  Okay.  Now, is all of that evidence tagged and dated

11 and timed as to where it came from, how it found its way to

12 you, who brought it there, all that stuff recorded?

13     A.  Yes, it is.

14     Q.  Okay.  Do you have any records of how that came to you

15 or when it was when it was delivered to you, and by whom?

16     A.  I do not have those records.

17     Q.  Okay.  And prior to those drugs that you tested

18 landing in your lab in your facility, do you know, do you have

19 any idea -- you may not, don't guess, if you know -- do you

20 know where they were prior to reaching your laboratory?

21     A.  Before they got to our evidence intake section, no, I

22 do not.

23     Q.  Okay.  When you first came on those drugs, was there a

24 label on them?

25     A.  On there is a label on the evidence bag.

Wilson - cross - LoFaro

1    Q.   On the package evidence itself, yes?

2    A.   On the evidence bag, yes.

3    Q.   And what did that, what did that bag say?

4    A.   The white labeling?

5    Q.   Yes.

6    A.   There are agency numbers on there.  Usually the

7    officers that brought the evidence or collected the evidence,

8    and there is usually brief description on that label.

9    Q.   I know you obviously, I wouldn't ask you to guess how,

10   it's prior to reaching you, but once it reaches your

11   laboratory, how are those drugs stored?

12   A.   They are stored in the evidence intake section of our

13   laboratory which is a secure area.

14   Q.   In addition to being secure, what other controls do

15   they have other than it just being secured?  What temperature

16   are they stored at?  Any specific temperature?

17   A.   They are, this evidence would have been stored just at

18   room temperature.

19   Q.   What safeguards are taken so these drugs that are

20   stored in your lab aren't subject to high temperature

21   melt-down points, bacterial contamination, and things like

22   that, residue materials on some of the instruments that you

23   use?  What are the safeguards that you put into place so none

24   of those things happen?

25   A.   The laboratory is a secure building.  You can't just

Wilson - cross - LoFaro

1    walk into the laboratory.  You have to have access or be given

2    access into the building.  The same goes for the evidence

3    intake section.  We also have numerous cameras recording who

4    comes into the laboratory on a daily basis, as far as to make

5    sure that there was no contamination.  Was that your question?

6        Q.   Yes.  Yes.

7        A.   Before the sample was run on the G.C. mass-spec, a

8    blank was run before it, so that I knew there was, that there

9    was nothing on the instrument or in the column of the

10   instrument before that sample went through the instrument.

11       Q.   Okay.  And your laboratory, your laboratory itself, is

12   that from time to time subject to an independent inspection by

13   the State or the County?

14       A.   It is done by the State and it is the inspected by

15   ASCLD lab.

16       Q.   Now with regard to your results, again, I know you

17   said that you believe that process that you used to be nearly

18   infallible, but isn't it true that you could get false

19   positives and false negatives also?

20       A.   After my examination, it goes through a series of

21   reviews, not only by myself but by other peers within the

22   laboratory.  If there was any type of issue, that would have

23   been found and addressed then.

24            MR. LOFARO:  Okay.  All right.  Thank you very

25       much.  I have no further questions, Your Honor.

247

Wilson

1          THE COURT:  Mr. Centra?

2          MR. CENTRA:  I have nothing further.

3          THE COURT:  You're all set, ma'am.

4          THE WITNESS:  Thank you.

5          THE COURT:  Could I please have counsel at the

6   Bench for a moment?

7    (Also present at the Conference at Bench is the defendant.)

8          THE COURT:  Folks, I was just questioning

9   counsel.  I know Mr. Centra has another witness ready to

10  go.  They assure me, we will be done by 12:30.  Then we can

11  take our lunch break.  So if you folks are willing, we will

12  go forward with one more witness.  Does that sound all

13  right?  All right.

14          Mr. Centra, do you want to call your witness for

15  us?

16          MR. CENTRA:  Next witness is Sergeant David

17  Proud.

18  D A V I D   P A T R I C K   P R O U D, Called as a witness in

19  behalf of the People, being duly sworn, testified as

20  follows:

21          THE COURT:  Good afternoon, Sergeant.

22          THE WITNESS:  Good morning, sir.

23  DIRECT EXAMINATION BY MR. CENTRA:

24  Q.  Good morning.

25  A.  Good morning.

Proud - direct - Centra

1    Q.   Would you state where you're employed, for the record?

2    A.   The City of Syracuse Police Department.

3    Q.   And how long have you been in law enforcement?

4    A.   For approximately 28 years.

5    Q.   And what is your position with Syracuse Police?

6    A.   I am currently assigned as a detective sergeant within

7    the special investigations division.

8    Q.   And what is the special investigations division?

9    A.   It's a unit, thank you, it's a unit that's tasked with

10   all levels of drug and weapons-related cases.  The cases range

11   from street corner quality of life type issues, the

12   investigation of persons that were loitering on the street for

13   the purpose of using and selling illicit drugs and possessing

14   weapons.  To case investigations, which would be more targeted

15   investigation, which is looking at a particular individual,

16   maybe a particular group, or a particular location that's

17   involved in the sale of narcotics or illicit drugs, or weapons

18   possession.  As well as undercover operations, and long-term

19   eaves-droppings or wiretap investigations.

20   Q.   Could you describe what your specific duties and

21   responsibilities are there?

22   A.   My duties are to oversee all those operations, as well

23   as field calls from the District Attorney's office, or calls

24   from citizens that are looking to act as confidential

25   informants, or that are providing information to the police

Proud - direct - Centra

1   department, as well as setting up debriefing and monitoring the

2   daily activities of the detectives that are conducting all

3   those previously mentioned types of investigations.

4      Q.   Sergeant, in your years in law enforcement, have you

5   received any types of narcotics training?

6      A.   I have.  I received my initial training in the Onondaga

7   County Police Academy, when I was hired as a police officer.

8   And from that point forward, I spent approximately all but two

9   years of my 28 years involved in narcotics enforcement.

10         So over the course of those years, I received yearly

11   training as far as updates, legal updates, updates on drug

12   trends, as well as certification in the use of field test kits.

13   And I am currently the lead instructor for the Syracuse Police

14   academy for all drug-related topics and informant management,

15   as well as an assistant instructor for the Onondaga County

16   Sheriff's Department, the Drug Enforcement Administration, as

17   well as Syracuse University.

18      Q.   Now how many drugs investigations have you personally

19   been a part of?

20      A.   I will say well over a thousand.

21      Q.   And how many drug arrests have you made?

22      A.   Hundreds.

23      Q.   How many arrests have you made involving the drug

24   cocaine?

25      A.   Again, I would say hundreds.

Proud - direct - Centra

1    Q.   Okay.  And have you arrested individual users of the

2    drug cocaine?

3    A.   I have.

4    Q.   Have you arrested people who sell cocaine?

5    A.   I have.

6    Q.   Now have you ever worked undercover as part of your

7    investigations?

8    A.   Well, assigned to the investigation, special

9    investigations division, I personally, approximately two

10   and-a-half years working solely in an undercover capacity.

11   Q.   While you were working undercover, did you purchase

12   drugs?

13   A.   I did.

14   Q.   Did that involve cocaine?

15   A.   It did.

16   Q.   And have you worked with confidential informants

17   before?

18   A.   I have.  While assigned as an investigator, police

19   officer, and detective within the special investigations

20   division, and on a more limited basis as a detective sergeant,

21   it would be part of the daily duties to work with confidential

22   informants.  As a supervisor within the special investigations

23   division, I work with the detectives that are working with the

24   informants, and basically give them guidance on how to work

25   with the informants.

Proud - direct - Centra

1    Q.   So, have, well, while working with confidential

2    informants, have they made controlled drug buys at your

3    request?

4    A.   They have.

5    Q.   Does that include controlled buys for cocaine?

6    A.   It does.

7    Q.   And have you previously testified in courts as an

8    expert witness before?

9    A.   I have.  I have testified in the Onondaga County

10   superior courts as well as the Federal court system.

11   Q.   Now in your training and experience in supervising and

12   investigation of hundreds of crimes, do you know generally how

13   much cocaine an individual using the drug for personal use

14   would have on their person?

15   A.   Yes.  You're talking about a 10th of a gram, two 10ths,

16   maybe three 10ths of a gram would be the amount that a strictly

17   user is going to possess.

18   Q.   And in your training and experience, what is the

19   street value of an individual dose of cocaine?

20   A.   A 10th of a gram is going to go for approximately 10

21   dollars.  That's notwithstanding supply and demand elements

22   that may come in, I am -- myself as a customer, that's coming

23   from the deep suburbs, and the dealer knows this.  That will

24   oftentimes be supplied.  So that 10th of a gram or $10 bag of

25   cocaine is now going to become a $30 or $40 bag of cocaine for

1   the same amount.

2        Q.   Now, do you know approximately how many individual

3   doses of cocaine would be in 2.5 grams of cocaine?

4        A.   Yes.   You would be talking somewhere in the area of 25

5   individual doses.  Again, notwithstanding, you know, it could

6   be more if I am breaking off smaller pieces for unknown

7   customers.

8        Q.   And do you know approximately what the street value of

9   that amount of cocaine would be?

10       A.   You're going to be talking a minimum of two hundred and

11   fifty dollars ($250).

12       Q.   Now is there usually a difference between the

13   packaging of cocaine between an individual user and a person

14   selling the drug?

15       A.   Yes.  Usually, a person that has purchased crack

16   cocaine for personal use, they may have it loose in their

17   pocket, just a small rock.  Or it could be packaged in a folded

18   up piece of paper, small section of plastic.  As opposed to

19   dealers, when they are holding.  The common trend in this area

20   is for dealers to hold what's referred to as freestyle crack

21   cocaine.  What that is is one bulk amount of product that's

22   held.  Then any amount that's desired by a customer can be

23   broken off and provided.  If, as a customer, if I have six

24   dollars to spend or I have thirteen dollars to spend, the

25   dealer can break off that amount of product.  It also makes the

Proud - direct - Centra

1    product more readily disposable and easier to hide.

2         With our fine upstate New York weather, it's usually

3    raining or snowing, so if you were engaged in a foot pursuit

4    with a police officer, or a car chase, you can very easily just

5    bring over the bag, discard the substance.  Hopefully it will

6    be destroyed by the elements or traffic or easily lost.

7         Q.   Now in your training and experience investigating

8    these, the drug-related crimes, cocaine that is purchased or

9    sold, is it normally 100 percent of the drug cocaine the

10   substance that is possessed?

11        A.   No, it's not.

12        Q.   Now how are you, you discussed that you arrested and

13   investigated individuals who use the drug and individuals who

14   sell the drug, how are you able to determine that individual

15   is possessing the drug just for their personal use?

16        A.   Basically through conversations.  And it could be --

17   there are a multiple of different scenarios could be presented.

18   But when we are conducting an investigation, we may be watching

19   a particular dealer, and we may be watching all the customers

20   approach.  The customers come and go, while the dealer may stay

21   put.  Or they may be mobile, going to different locations.  But

22   the customers will come to the location and then depart.  Then

23   they are stopped and found in possession of a small amount of

24   products.  Again, dependent upon the scenario, we might

25   actually take an affidavit and we might have them do showup

Proud - direct - Centra

1    identifications.  All dependent upon what the investigation is

2    that day.

3       Q.   And is there anything that could be on the possession

4    of a person accused of selling a drug, that would be

5    indicative of intent to sell?

6       A.   Yes, there is multiple tools of the trade, if you will,

7    that are indicators of possession with the intent to sell.

8    That would be:  Multiple cellular phones.  Digital scales.

9    Packaging materials.  Large sums of currency, with no

10   legitimate means of employment.

11            MR. CENTRA:  I have no further questions for this

12        witness.  Thank you, Sergeant.

13            THE COURT:  Okay, Mr. LoFaro, cross-examination

14        for Sergeant Proud?

15            MR. LOFARO:  Yes.

16   CROSS-EXAMINATION BY MR. LOFARO:

17      Q.   Good afternoon, Sergeant.

18      A.   Good afternoon.

19      Q.   How are you?

20      A.   Goods.  Thanks.

21      Q.   Sergeant, 2.7 grams of cocaine, would you call that a

22   bulk amount?

23      A.   Yes, I would.

24      Q.   You would?  Would you call that a small amount or

25   would you call that a minute amount of cocaine?

255

Proud - cross - LoFaro

1     A.   I wouldn't call it a minute amount, by any stretch, no.

2     Q.   Small?

3     A.   Relative to?

4     Q.   Generally speaking, reasonable man standard?

5     A.   It's an amount that it's small, compared to someone's

6 in possession of a kilo.  But it's not small in possession of

7 someone that's got a 10th of a gram.

8     Q.   Again, you're educating me, because I am not sure how

9 this could be done.  But how is an amount that small broken up

10 in individual doses?

11    A.   As I had previously stated, it's just broken off the

12 bulk amount and provided to the customer.  Broken off with a

13 fingernail.  Broken off with a razor blade.  Broken off by

14 anything.

15    Q.   Often times, cocaine is packaged individually for sale

16 as well, isn't it?

17    A.   That's not really the consistent trend at this point.

18 Fifteen years ago or so, that was the common trend.  But

19 persons involved in the street level sale of narcotics have

20 been educated through other dealers, through the legal process,

21 to attempt to avoid an intent to sell charges.  They are no

22 longer packaging in small ziplock bags in those individual 10th

23 of a gram amounts.  The common trend at this point is to hold

24 it freestyle, to avoid that automatic charge.

25    Q.   Which ultimately, they are being charged with anyway,

256

Proud - cross - LoFaro

1   with what is now known as what has been created as a different

2   area altogether, allowing an opportunity to make more arrests

3   called freestyle, correct?

4       A.   I can't say correct one way or the other.  I am not

5   sure what you're asking the question?

6       Q.   When you said, when you said that 2.7 grams could be

7   broken up in individual doses, how many individual doses did

8   you estimate that to be?

9       A.   You're talking 2.7 grams.  It would be approximately 27

10  individual doses.

11      Q.   Okay.  Like a 28-pack of Budweiser, but that's

12  personal use, isn't it?

13      A.   I couldn't tell you that.  If you're working at a bar

14  and have 28 Buds, I assume you may be selling it.

15      Q.   You're asking, you always use the word "bulk."  You

16  used that more than once.  People do have things in volumes of

17  more than 25, 26 doses, it could be for personal use as well,

18  couldn't it?

19      A.   If they are involved in the sale, yes, based on 27

20  years of Drug Enforcement experience, that would not be

21  consistent with personal use.

22      Q.   But you couldn't be positive of that, could you not,

23  not with regard to intent, because only one person knows what

24  an intent is, that's the person whose head is attached to the

25  crime, am I correct?

Proud - cross - LoFaro

1    A.    Again, I am not?

2    Q.    You're just speculating with regard to what his intent

3    may or may not have been, correct?

4    A.    No, I am not speculating.  I am making a comment based

5    on 27 years of narcotics enforcement, and talking to hundreds

6    of drug dealers and drug users.

7    Q.    But that is your opinion and nothing more, correct?

8    A.    That's correct, is my opinion.

9              MR. LOFARO:  Thank you, Sergeant.  I appreciate

10   it.

11             THE COURT:  Anything else, Mr. Centra?

12             MR. CENTRA:  No, Your Honor.

13             THE COURT:  Thanks, Sergeant.

14   (Witness off witness stand.)

15             THE COURT:  Mr. Centra, any other witnesses or

16   proof on behalf of the People?

17             MR. CENTRA:  No, Judge.  The People rest at this

18   time.

19             THE COURT:  All right.  Ladies and gentlemen, the

20   People have rested their direct proof, which is perfect

21   timing for us, because it's a good time to break for lunch.

22   You haven't heard the entire case.  You haven't heard the

23   summations of counsel.  You haven't heard the law.  So, I

24   am going to tell you to enjoy your lunch.  We will have you

25   back here, we will start back up at 1:30.  We have to take

258

- People rest -

1   some legal matters outside your presence, at this point,

2   anyways.

3            So, basically, don't talk about the case amongst

4   yourselves.  Again, there is more that's going to come, as

5   far as at least summation of counsel and the law.  We may

6   hear some witnesses on behalf of the defense.  I don't know

7   that.  So don't talk about the case among yourselves.  Let

8   me know if anybody does try to talk to you about the case.

9            And enjoy your lunches.  And we will have you

10  back here.  And we will start back up at 1:30, okay.  Thank

11  you.

12   (Jury left the courtroom at 12:23 p.m.)

13            THE COURT:  We are outside the presence of the

14  jury, with both counsel and Mr. Jennings.

15            And first, you were going to remind me this

16  morning, Mr. Centra, you had turned over your Rosario to

17  Mr. LoFaro.  That was done, correct?

18            MR. CENTRA:  Yes, Your Honor.

19            THE COURT:  Done before we started opening

20  statements, correct?

21            MR. LOFARO:  Correct, Judge.

22            MR. CENTRA:  Judge, that was done yesterday after

23  court.

24            THE COURT:  All right.  Mr. LoFaro, are you

25  acknowledging that, correct?

- Motion - LoFaro -

1    MR. LOFARO:  I do, Your Honor.

2    THE COURT:  The People have rested their case.

3    Mr. LoFaro, is there a motion?

4    MR. LOFARO:  Yes, Judge.  I move that the charges

5    be dismissed.  I don't think that they have shown there was

6    a chain of custody with regards to the drugs themselves.

7    And I don't think that they proved each and every element

8    of the case as they are required.

9    THE COURT:  Mr. Centra?

10   MR. CENTRA:  Judge, we heard from four witnesses

11   this morning.  Two of them being officers that were

12   involved in the actual arrest of Mr. Jennings, who both

13   testified that on January 5th 2016, at the 100 block of

14   Radisson Court in Syracuse.  They approached the vehicle,

15   that the defendant was seated in.  During the course of

16   their investigation they searched Mr. Jennings, and on his

17   person they found a bag of cocaine.  On top of that they

18   found further evidence as Detective or Sergeant Proud

19   showed was indicative of sale.  A scale, cash, multiple

20   cellphones.  That cocaine that was found on Mr. Jennings

21   was in fact brought to the lab and tested by Jennifer

22   Wilson, who in fact told us that there was 2.57 grams of

23   cocaine, aggregate weight.  That the substance in fact did

24   test positive for cocaine.  And that in fact, a substance

25   as a whole contained I believe it was 1,267 milligrams of

- Motion - LoFaro -

1    cocaine within there.  Which meets all the elements in the

2    crimes alleged.  Therefore, I would ask for you to deny the

3    defense's motion.

4         THE COURT:  With regards to the two counts,

5    criminal possession of controlled substance in the third

6    degree, and criminal possession of controlled substance in

7    the fifth degree, I believe the People have made out a

8    prima facie case as to each and every one of the elements

9    of those two counts.

10        So, I will deny the defendant's motion at this

11   time for a trial ordered dismissal.

12        Mr. LoFaro, we are going to resume at 1:30.  Do

13   you have witnesses for us?

14        MR. LOFARO:  I do, Your Honor.  I have Mr.

15   Jennings and I have his employer, if his employer will be

16   here with us.  I am not sure if he was going to testify or

17   not.  If he is willing to be here this afternoon, I would

18   like to call him briefly too, Judge.

19        THE COURT:  I know you had given us a list of

20   potential witnesses.  Mr. Jennings' employer, what is his

21   name?

22        MR. LOFARO:  I believe Howard Davis.

23        THE DEFENDANT:  Howard Davis.

24        MR. LOFARO:  It's like the Olympic boxer, Judge.

25   Howard Davis.

- Witness discussion -

1   THE COURT:  That's Mr. Davis?

2   MR. LOFARO:  Yes.

3   THE COURT:  And we have Mr. Davis, potentially,

4   and Mr. Jennings.  Anybody else?  I am not holding you to

5   this, John.  I am wondering for scheduling purposes?

6   MR. LOFARO:  I don't think we are going to have

7   any other witnesses.

8   THE DEFENDANT:  We are still waiting for Willie

9   Jones.  He is incarcerated, Your Honor.  I had let this

10  known back in December.  And before then that, you know, he

11  is a witness in regards to this case.  And he is definitely

12  needed.

13  THE COURT:  Where is he, Mr. Jennings?

14  THE DEFENDANT:  I'm not sure.  He is in the

15  Department of Corrections.  And he was a witness that was

16  in the car with me.

17  THE COURT:  I know.  I know who Mr. Jones is with

18  regards to this case.

19  THE DEFENDANT:  Okay.

20  THE COURT:  I don't know if he is going to be

21  here to testify.  What I would plan to do today, gentlemen,

22  is to take the testimony of Mr. Davis.  And if Mr. Jennings

23  chooses to testify, we will take his testimony.  That will

24  get us until about 2:30, correct?

25  MR. CENTRA:  I believe so, Your Honor.

- Witness discussion -                              262

1       THE COURT:  So we could go right to summation of

2   counsel after that.  And then we will charge them and send

3   them out in the morning.

4       THE DEFENDANT:  I still need my witnesses.  That

5   I haven't had Willie Jones, the opportunity for him to

6   testify on my behalf.  And also Mr. Chaplain and Hatisha

7   Holmes.

8       THE COURT:  Here is the way this works.  The way

9   this works is the People get their witnesses ready.  They

10   bring their witnesses in.  And if the defense wants

11   witnesses, they have to get them ready to bring them in.

12   Okay.  That's up to Mr. Jennings and Mr. LoFaro as to how

13   that works.

14       So I will let the two of you talk.  And we will

15   resume at 1:30.  Okay.  Anything else, Mr. Centra?

16       MR. CENTRA:  No, Your Honor.

17       THE COURT:  You have the exhibits?

18       MR. CENTRA:  I do.

19       THE COURT:  Okay.  You keep the exhibits.  All

20   right.  1:30.

21    (Recessed for lunch at 12:28 p.m.)

22                   *              *              *

23

24

25

- Afternoon session - 2/7/17 -

1        AFTERNOON SESSION - 2/7/17

2    (Trial continued on Tuesday, February 7, 2017 at 1:41 p.m.)

3            THE COURT:  Thank you.  Have a seat.  Thanks.

4    Back in session outside the presence of the jury.  And we

5    have both counsel and we have Mr. Jennings.  And John, not

6    that there is a burden on you to call any witnesses, but

7    are you prepared?

8            MR. LOFARO:  Yes, Your Honor, I am.  I am going

9    to call Tony Jennings -- not right now -- and I am going to

10   call his employer first, if I may, Howard Davis.

11           THE COURT:  My understanding is that with regards

12   to any offer of proof, basically his testimony is going to

13   be to rebut what one of the police officers said about him

14   not working and selling drugs?

15           MR. LOFARO:  That's correct, Your Honor.

16           THE COURT:  Okay.  You don't have any problem

17   with that, do you, Mr. Centra?

18           MR. CENTRA:  Judge, limited to that Judge, I have

19   no objection.

20           THE COURT:  Okay.  Let's have the jury, please?

21   (The jury entered the courtroom at 1:44 p.m.)

22           THE COURT:  Folks, good afternoon.  You had to go

23   outside and enjoy the nice weather.  We're here with the

24   jury, Mr. Centra, Mr. LoFaro and Mr. Jennings.  And the

25   People have rested their case.

1          And Mr. LoFaro, does the defense wish to call a

2    witness?

3          MR. LOFARO:  Yes, Your Honor, I would like to

4    call Howard Davis, Your Honor.

5          THE COURT:  All right.  Let's have Mr. Davis,

6    please.

7    H O W A R D    D A V I S, Called as a witness in behalf of the

8    Defendant, being duly sworn, testified as follows:

9          THE COURT:  All right.  Mr. LoFaro?

10   DIRECT EXAMINATION BY MR. LOFARO:

11   Q.   Good afternoon, Mr. Davis.

12   A.   Good afternoon.

13   Q.   How are you?

14   A.   Pretty good.

15   Q.   Mr. Davis, I am going to call your attention back to

16   January 5th of 2016.  Were you employed at that time?

17   A.   Yes.

18   Q.   How were you employed?

19   A.   Well, currently the employer.

20   Q.   Okay.  What's the nature of your business?

21   A.   Construction.

22   Q.   And what is the name of the company that, do you own a

23   company?

24   A.   Yes.

25   Q.   What is the name of the company that you own?

Davis - direct - LoFaro

1    A.   H.B.H. Construction.

2    Q.   And you currently own that company?

3    A.   Yes.  Yes.

4    Q.   And that's how you earn your living today, with the

5  construction company?

6    A.   That's correct.

7    Q.   Now, were you the owner of that company in January of

8  2016?

9    A.   Yes, I was.

10   Q.   Okay.  Would you tell the jury a little bit about the

11 nature of your business?

12   A.   Yes.  We pretty much, we get into doing commercial

13 build-out.  Roofing.  Siding.  Demolition.  Asbestos abatement.

14 Pretty much anything that falls in the general construction.

15   Q.   So are you a general contractor?

16   A.   Yes.

17   Q.   Okay.  And on January 5th at 2016, was the defendant

18 Tony Jennings, was he in your employ at that time?

19   A.   Yes, he was.

20   Q.   What were his job duties working for your company at

21 that time?

22   A.   We were currently working on a project that he was a

23 laborer doing demolition work.

24   Q.   How, as of January 5th 2016, on that date, how long

25 had he been an employee of yours?

266

Davis - direct - LoFaro

1    A.   He started 2013.

2    Q.   Okay.  Now, in January, of 2016, did you have regular

3 work at that point in time?

4    A.   Yes, I did.

5    Q.   On that day, that week, was he working?

6    A.   He was supposed to have been to working that day, but

7 he wasn't there.  I got a phone call saying that:  No call, no

8 show.

9    Q.   No call, no show on January 5th 2016?

10   A.   Yes.

11   Q.   The day he was arrested?

12   A.   Yep.

13   Q.   Prior to the 5th of January, was he working with you

14 consistently and regularly on a daily basis?

15   A.   Yes, he was.

16   Q.   How many hours a week would you say he worked for you?

17   A.   Between 25 to 35 hours a week.

18   Q.   Okay.  Do you recall, I know it's been a while, do you

19 recall any of the particular jobs that you were working on at

20 the time?

21   A.   Harbor loft.  It's on Harbor Street, Emerson Street.

22   Q.   Emerson?

23   A.   Emerson or Harbor.

24   Q.   That's the job that Mr. Jennings was working on also?

25   A.   Yes, he was.

Davis - direct - LoFaro

1    Q.   Did you ever -- did your company ever do any work at

2  the Hotel Syracuse?

3    A.   Never, no.

4    Q.   Okay.

5          MR. LOFARO:  No further questions, Your Honor.

6  Thank you very much.

7          THE COURT:  All right.  Mr. Centra, any

8  cross-examination?

9          MR. CENTRA:  Yes, just some questions.

10  CROSS-EXAMINATION BY MR. CENTRA:

11    Q.   Mr. Davis, how are you doing today?

12    A.   Pretty good.  How are you doing?

13    Q.   Good.  So you work, you know, on a construction

14  business, correct?

15    A.   Yes, that's correct.

16    Q.   You stated that you know the defendant Tony Jennings,

17  correct?

18    A.   Yes.

19    Q.   And you know him since about 2013?

20    A.   Yes.

21    Q.   Is it just, was it just a work relationship or do you

22  know him personally?

23    A.   More work.

24    Q.   Work?

25    A.   I got to know him personally from working with him.

Davis - cross - Centra

1    Q.    And so in regards to the job that you described, do

2    you normally work there in the daylight hours?

3    A.    Yes.

4    Q.    And on January 5th, you stated that Mr. Jennings was a

5    no-call, no-show?

6    A.    Yes.

7    Q.    On that date?  And you later found out that he was

8    arrested?

9    A.    Yes, I did.

10    Q.    That was the reason for his no-show?

11    A.    Yes.

12    Q.    But he works in the daylight hours, correct?

13    A.    Yes.

14    Q.    And you know what time he was arrested?

15    A.    No.

16    Q.    You don't know?

17    A.    No.

18    Q.    So he should have been there during the day?

19    A.    Yes.

20    Q.    All right.  Now do you have any sort of business

21    records or keep any sort of business records, paystubs to show

22    his employment?

23    A.    Yep.

24    Q.    Do you have those here by chance?

25    A.    No.

1    Q.   And do you recall how much he was paid?

2    A.   Well, it depends on the job.  Normally, between if it's

3    a non-rate private job, which that job he worked on, it was $13

4    an hour.  Now on a rate job, it's more like $40 an hour.

5    Q.   Mr. Davis, would you say it would be unusual to hear

6    that somebody works two jobs to make a living?

7    A.   Works two jobs?

8    Q.   Yes, just in general, like?

9    A.   No. I said --

10             THE COURT:  He said:  I do not.

11   A.   I don't find that unusual.  I do that with my own

12   company.

13   Q.   It's a possibility for somebody to work a job and then

14   do something else on the side, correct?

15   A.   Yes, I guess.

16             MR. CENTRA:  I have nothing further.

17             THE COURT:  Okay.

18             MR. CENTRA:  Thank you, Mr. Davis.

19             THE COURT:  Anything else, Mr. LoFaro?

20   REDIRECT EXAMINATION BY MR. LOFARO:

21   Q.   Yes, Judge.  I apologize, Mr. Davis, I may have been

22   remiss.  The 5th was the day he was arrested.  So obviously,

23   he was a no-show -- he was arrested, I am guessing, is it

24   possible that he was a no-show on the 6th or the 7th or one of

25   the other days, shortly in proximity with his arrest?  Because

Davis - redirect - LoFaro

1    I have to concur with the D.A. on the 6th, during the day, he

2    would have been with you.  He didn't get arrested.

3                   THE COURT:  The 5th.

4                   MR. LOFARO:  5th, rather.

5       A.   Well, I remember getting a phone call from my job

6    foreman saying that Tony Jennings was a no-call, no-show two

7    days in a row.

8       Q.   Okay.  So that was relayed to you through your

9    foreman?

10      A.   Yes.

11      Q.   Okay.  Now either way, obviously, it has been quite

12   some time since early January of 2016, but it's absolutely

13   undisputed that he worked for you up to that date that he was

14   arrested, correct?

15      A.   Yes.

16                   MR. LOFARO:  Okay.  No further questions, Your

17       Honor.

18                   THE COURT:  Mr. Centra, anything else?

19                   MR. CENTRA:  Just briefly.

20   RECROSS-EXAMINATION BY MR. CENTRA:

21      Q.   Mr. Davis, there is kind of a conflicting testimony

22   here.  You stated that he was a no-show the 5th, correct?

23      A.   Yes.

24      Q.   And I guess now it come out that it could have been

25   possibly another date?

Davis - cross - Centra

1  A.  Well, it goes back to what I was saying.  Is that I had
2  got, I received a phone call from my job foreman saying he was
3  a no call no-show two days in a row.  And that had to have
4  been, that was the next day.

5  Q.  Well, okay.  The next day being the 6th?

6  A.  Yes, yes.  The 6th.

7  Q.  So you got the call on the 6th that he hadn't been
8  there for two days.  So that would be the 5th and the 6th?

9  A.  Yes.

10  Q.  All right.  So he doesn't show up on the actual day of
11  the 5th, is what you're testifying to?

12  A.  He wasn't there on the 5th.  And he wasn't there on the
13  6th.

14           MR. CENTRA:  Thank you.

15           THE COURT:  All set?

16           MR. LOFARO:  Yes, Judge.

17           THE COURT:  Thank you, sir.  I appreciate your
18      time.

19           THE WITNESS:  Yes, thank you.

20           THE COURT:  Mr. LoFaro, any other witnesses?

21           MR. LOFARO:  Yes, Your Honor.  I call Tony
22      Jennings.

23  T O N Y    J E N N I N G S, Defendant, Called as a witness in
24      his own behalf, being duly sworn, testified as follows:

25           THE COURT:  Before I begin, could I have counsel

Jennings - direct

1    at the Bench for one moment, please?

2     (Conference at Bench.)

3     (Photo previously marked Defendant's Exhibits A.)

4              THE COURT:  All right.  Mr. Jennings has been

5    sworn in.  Mr. LoFaro, when you're ready?

6              MR. LOFARO:  Okay.

7    DIRECT EXAMINATION BY MR. LOFARO:

8    Q.  Good afternoon, Mr. Jennings.

9    A.  Good afternoon.

10   Q.  How are you?  Mr. Jennings, we are going to go back to

11   that same period of time too, January 5th of 2016.  And if you

12   could, you know, just to cut to the chase, and I don't have to

13   go through all of the exposition that everybody has already

14   heard.  I have already kind of informed them what you were

15   doing on that day.  But let's pick it up around whatever time

16   it was you would have, like around four or five o'clock?

17   A.  Okay.

18   Q.  On January 5th at 2016, if I could.  Do you recall

19   that date?

20   A.  Yes, absolutely.

21   Q.  What were you doing on that day around that time?

22   A.  On that day, on January 5th, good afternoon, everybody.

23   On January 5th, 2016, it was like around five o'clock when I

24   received a phone call from a friend of mine.  His name is

25   Willie Jones.  And he asked me if I could give him a ride to go

Jennings - direct - LoFaro

1    get his car.  He wanted to do some work on his vehicle.  So I

2    told him, I said I would come down there, I would give him a

3    ride and I would help him out.  This was around five o'clock

4    now.

5        Q.   Mr. Jennings, I don't mean to interrupt, but I kind of

6    have to from time to time just to lay a proper foundation.

7    Everybody knows where we are going with this.  He gave you a

8    call.  He asked you to come down where?

9        A.   To the Pioneer Homes.

10       Q.   Where were you at that point in time of the day?

11       A.   Dewey Ave.?  It's over off of, that's where I stay, 119

12   Dewey Ave.  It's over like you're heading towards Solvay, off

13   of Genesee behind Harrison Bakery.

14       Q.   Okay.

15       A.   I came from home.

16       Q.   Okay.  And he asked you to meet him there?

17       A.   He asked me to meet him.

18       Q.   Continue?

19       A.   He asked me to meet him at Pioneer Homes.  I got in my

20   car.  I came down there to the Pioneer Homes, picked him up.

21   He went to a, it's a gas station on the south side.  He brought

22   his tools with him in the car.  He had an air inflator.  It's

23   like you can plug it into your car, and you can put air in your

24   tire or bicycle, football, anything.  Because the car had been

25   sitting for a while.  So, he wanted me to give him a ride, so

Jennings - direct - LoFaro

1   he could attend to it, and then move it from that area, back to

2   where he lived at with his girlfriend in Pioneer Homes.

3       So we stopped by the gas station.  And probably by the

4   time I get down there, it's like 5:20 almost, I want to say

5   maybe 5:20, because I left my house around about five o'clock.

6   So I get there with him to the gas station.  He puts the gas in

7   his gas can.  And I take him back around on Burke Street behind

8   a barber shop so he can attend to his car.

9       So he gets out of the car.  He takes all his tools out

10  with him that he used to fix his car.  And he tells me, okay, I

11  see you later.  So I said, well, this, it's cold out here, it's

12  January-like.  Like you have got to walk from here even for a

13  few blocks away, you got to walk from here, walk a way back

14  over there, I am not going to do that.  I am not going to leave

15  you out in the cold.  Plus, you need some light to see what you

16  have to do, what you're doing.

17      So I turn my high beams on the car, while he lifted the

18  hood, and he was working on his car.  And he didn't have the

19  proper tools that he needed.  He was back there fighting with

20  it for a minute trying to get it to start.  He couldn't get the

21  cables wrapped around the battery properly because he undid it.

22  He didn't want the battery to drain by the time he got back to

23  it.

24      Now, after fighting with it for a while, he was like,

25  it's not going to start.  I don't have the right tools.  Da,

Jennings - direct - LoFaro

1   da, da.  So far, so, I tell him, I said, well, we have been

2   sitting here for a while.  It's like, it's, we was there for a

3   period of time.  So I would say maybe it was like around 6:30

4   that he was back there, trying to put air in the tire.  The air

5   wouldn't go in.

6          So now, he gets back in the car.  Brings all the stuff

7   in with him, his tools.  And I take him back to the Pioneer

8   Homes to his girlfriend's house, to the parking lot, Radisson

9   Court.

10          And we are sitting inside the car for a while.  We are

11  just talking.  We were just talking.  But he had that gas can

12  inside of my car.  And it was, the smell was strong.  So I told

13  him, I said, Listen, Willie, take that gas can, take it out of

14  the car, put it out of my car.  He said, I will, but I have to

15  go in the house anyway.  So, you know, we are saying our

16  fair-wells, whatever.

17          He is getting out of the car, taking the stuff out of

18  the back seat, his tools that he brought with him.  And I am

19  waiting for him to shut the door.  He was just, he looks up,

20  excuse my language, but he says:  Oh, shit.  So I turn around

21  and I look to see what he was talking about.  And I see a

22  marked police vehicle, with no lights on, pulled directly

23  behind me.

24          Now, when you come into Radisson Court, I didn't

25  neither seen them coming, there was a car parked on the left

Jennings - direct - LoFaro

1   side.  It's a truck parked on the left side of me.  And there

2   is a car parked on the right side of me.  So I am actually in

3   between two cars.  And the flow of traffic to come into this

4   parking lot, it's only one way in, and one way out, when you go

5   in either one of the courts.  So, you have -- do you have

6   pictures, John?  Could I see the pictures so I could show them

7   what I am talking about?

8        Sorry about that.

9   (Showing Defendant's exhibit to Mr. Centra.)

10   Q.   Your Honor, I am going to show the defendant what has

11   been marked as Defendant's Exhibit A.

12   A.   Okay.  I mean.

13   Q.   Do you want to mark it with a mark?

14   A.   Mark it?

15   Q.   What are you trying to, what are you trying?

16   A.   I am trying to explain to them the way that the

17   officers came in and where I was parked.  They couldn't see me,

18   and I couldn't see them oncoming, and due to the fact they had

19   their lights off.  There was never a high beam, like he said,

20   that he flashed on my car.  Never seen a high beam.  It was

21   just that the area, how they pulled in, they blocked me off, so

22   I couldn't back out.  I couldn't back out of the parking space.

23   But the picture is right here.

24        (Indicating.)

25   Q.   Do you want to mark it?

1    A.  No, I don't need to mark it.  They should be able to

2    see.

3                THE COURT:  Before you show it to the jury, are

4    you offering it?

5    A.  Yes.

6                THE COURT:  Not you.

7                MR. LOFARO:  Yes, Judge.

8                THE COURT:  Any objection?

9                MR. CENTRA:  Judge, I just ask for proper

10   foundation.  I am not sure, I've never been to the area.  I

11   am not sure exactly where it is.

12               THE COURT:  What does the picture depict?  What's

13   it of, a photograph?

14               MR. LOFARO:  The entryway to the Pioneer Home

15   development.

16   A.  I am scribbling down on the paper where I was parked at

17   in my car.

18               THE COURT:  I will receive it.

19   A.  Okay.

20   BY MR. LOFARO:

21   Q.  This is where you were parked?

22   A.  Right where I scribbled, this paper, so they could have

23   an idea on how it was.  The parking lot is empty right now in

24   the pictures.  But the night of January 5th, it was other

25   vehicles that was parked inside of the parking lot.  And with

Jennings - direct - LoFaro

1   the truck parked on one side, I wasn't able to see who was

2   coming into the parking lot because of the way you have to come

3   in.

4        Now, once they blocked my car off, and I turned around

5   and looked, because I see my friend, he was standing there and

6   he is like, excuse my language, again he says:  Oh, shit.  So,

7   I turned and I looked.  And immediately they rushed, jumped out

8   of the car.  They blocked my car off, and they jumped out of

9   the car.  And they, both of the officers run to my passenger

10  that was in the car with me, Willie Jones.  And immediately

11  they started searching him.  They grabbed him.  And I remember

12  Officer Decker, I guess that was him, I didn't know his name at

13  the time, but the one Darrin Ettinger, he was actually

14  searching him.  I am looking through the open car door because

15  when he got out of the car, he was getting his stuff out, and

16  when they pulled up, that's what startled him so.

17       They jumped out of the car, and immediately they

18  started searching him.  So while he is holding him from, I

19  guess he must have thought he was going to run, whatever, but

20  they asked him, what are you guys doing?  What have you got?

21  Have you got drugs on you?  Whatever, you got guns in the car?

22  We are like, No, we ain't doing nothing.  I am just getting

23  dropped off, like.  I live here.  I am going to my girlfriend's

24  house.  So they like, No, oh, no.  I see is two guys sitting

25  over here, you have to be doing something.  Like something is

Jennings - direct - LoFaro

1    going on.  Just tell us, you got some dope on you?  You have

2    got some guns on you?  Something?  So, he's like, No, I ain't

3    got nothing on me.

4         So the officers, I am watching through the door,

5    through the passenger side door, he got his pants, pulled open,

6    he's flashing his flashlight in there, and we didn't even do

7    anything wrong.

8         So, I go to get out after watching this for a couple

9    minutes.  You know, they was watching me, flashing their

10   flashlight through the back window of the car.  I guess the

11   one, Jeremy Decker, when he was holding him, I guess from -- he

12   thought I was going to run or go somewhere.  So, now he comes

13   around to, I go to get out of my car, after sitting, watching

14   this for a while to get out to see what's going on.

15   Immediately, Officer Jeremy Decker runs around the car and

16   jumps into the doorjamb of my car.  So I am asking him, what's

17   going on?  Why are you stopping me from getting out of my car?

18   Like, why did you block my car off?  He goes, he didn't say

19   anything at first.  He is just standing there.  I guess he is

20   watching what's going on over there.  What's going on on the

21   other side of the passenger side with his partner.

22        But then I am asking him.  I am like, Did I do

23   something wrong?  Then he responded, he goes, What do you guys

24   got?  You got some what -- are you getting high?  You got some

25   dope on you?  You got guns in the car?  I am like:  No.  I am

Jennings - direct - LoFaro

1    like, why did you block my car off?  So, he didn't answer my

2    question.  I kept asking him repeatedly, like:  Why are you

3    blocking my car?  Like I didn't do nothing wrong.  So he asks

4    me, he said:  Do you live here?  I said, No, my friend lives

5    here.  He is going home.  That's his girlfriend house, like.

6    You see the gas can stuff.  He said, Well, what are you doing?

7    I said, I just gave my friend a ride from working on his car.

8    I came from home, gave my friend a ride working on his car.

9    And I am, I am dropping him off.  This is his establishment.

10   He lives here.  So he goes, Well, you got any drugs, anything

11   inside of the car?  Guns?  Because I know something is going

12   on, I see two guys making furtive movements inside of a car.

13   There has to be something going on.  So I tell him, I said:

14   There is nothing going on now.

15        As far as a scale, that he said, he reached through my

16   window, my car door was already opened, and I was talking to

17   him, trying to have a conversation with him.  But he kept

18   overpowering me with:  Where is, where is the drugs?  Where is

19   the guns?  I said:  Listen, officer, are you going to let me go

20   about my business or no?  He was:  No, there is something,

21   something has to be going on.  So, once I explained to him that

22   you know, I was dropping a friend off, I was on my way back

23   home, I didn't live down there.  And he asked me, he said:  Do

24   you have identification?  He asked me if I had an I.D.  I told

25   him, I said, No, I don't have I.D.  I have a driver's license.

Jennings - direct - LoFaro

1        Well, he said, that's identification.  Sure, let me,

2   let me have that.  So I said it's in my back pocket in my

3   wallet.  I am going to reach back there.  I am going to get it.

4   He said, Go ahead.  I went, my back pocket.  I got my wallet.

5   And I opened it.  Got my license out, and I gave it to him.  He

6   took it.  Looked at it, flashed his flashlight on it.  And then

7   didn't say anything.  He didn't check it.  He didn't run my

8   name to see if, you know, if there was any warrants or let me

9   know if there was a traffic infraction or violation of

10  something that transpired.  He just told me that he seen me

11  making furtive movements.  So he stopped me.  Now, he -- so

12  while he is sitting there, and he's not saying anything, I

13  said:  Well, I have my registration and insurance in the glove

14  compartment.  Would it be okay if I go in there, get my

15  registration and insurance and provide you with that?  He

16  looked, flashed his lights in the glove compartment, said:

17  Sure, go ahead.

18        I reached over, reached to the glove compartment, got

19  my registration and insurance out, and handed it to him.  He

20  took it, looked at it, flashed a light over it.  Took my I.D.

21  Put it in the top of his pocket.  And then sat the rest of the

22  paperwork on the hood of the car, and then told me to step out

23  of my car.  So I step out of my car.  For what?  He said:  Step

24  out of your car.

25        Now I am under pressure.  I am under pressure and

Jennings - direct - LoFaro

1    duress.  Like this is all unnecessary.  Like I didn't do

2    anything wrong.  So now the Officer, he tells me to get out of

3    the, I am scared because I don't know just how they ran down on

4    us.  I get out of the car.  He said:  Turn around, place your

5    hands on the hood of the car.  I get out of the car, turn

6    around, place my hands on the hood of the car.  Immediately, he

7    just starts searching me.  So he grabs my top coat pocket.  I

8    am wearing a Army fatigue coat.  It's cold outside.  I am

9    wearing an Army fatigue coat.  He takes his hand, squeezes it,

10   and then he sticks his hand in there, in the pocket.  I don't

11   know -- I don't think anybody, I am wondering why this officer

12   would go inside of my pocket.  So he grabs the bottom pocket of

13   the Army jacket, coat, and he squeezes it.  Then he sticks his

14   hand inside of it.  So, I said:  Officer, listen:  Why are you

15   going inside of my pockets like, am I under arrest?  He tells

16   me, Well, you're acting like you're real nervous right now.  I

17   tell you, I pulled up.  I see two guys making furtive

18   movements.

19          There was no way to see me do anything or my passenger

20   in the car because there was cars blocking us.  And the

21   passenger was already outside of my car, where you pulled up,

22   so you just saying this.  And you have no reason to even bother

23   me or even stop me.

24          So he is checking inside of my coat pockets.  And he's

25   not giving me a reason or even reading me my rights or telling

Jennings - direct - LoFaro

1   me that I am under arrest.  But yet he is searching inside of
2   my pockets, violating me.

3           So now he squeezes my right pants pocket.  And then he
4   sticks his hand in there.  Then he lifts the back tail of my
5   coat.  He lifts it up.  He takes his hand and goes from the
6   back around to the front, and then comes back around and then
7   sticks his hand down the back side of my pants.  I feel his
8   hands in between my buttocks, and I tell the officer,  I said,
9   Well now, you're violating me.  I said, Officer, you're
10  violating me now.  And this is unnecessary.  You're out of
11  line, like I didn't do nothing wrong.

12          I turned around and tried to get the officer to take
13  his hand out of my pants because of the violation that I felt
14  that he grabbed me, took me, and slammed me to the ground.  I
15  hit my head on the ice, in the parking lot, because it was cold
16  out there.  I told him, I said, I said:  All of this is
17  unnecessary.

18          That's when the other officer ran from the other side
19  of the car, came around, and knelt down on one knee, and he
20  punched me in the face.  For no reason.  Glasses went to the
21  side.  They still broken now, to this date, because of that.
22  But excuse me, excuse me.  They picked me back up.  The officer
23  picked me back up.  Put me back up against the car.  I
24  continued to, they continued to search.  Continued to search.
25  Stuck his hand in my left pocket.  That's when he pulled out

Jennings - direct - LoFaro

1    the contraband that I had in my pocket.  But I never disputed

2    the fact that I was in possession of this contraband.  It was

3    just the fact of how you went about it.  You had no right to do

4    that to me.  You violated my constitutional rights.  There was

5    no reason.  You lied, and you said that there was all types of

6    paraphernalia in my car, that I was never even charged with.  I

7    told him that this was never inside of my car.  I found out

8    about this during the course of this trial, and other court

9    proceedings, that there is evidence that was going to be

10   presented that wasn't even charged against me.  You never had

11   no probable cause or reason to pull me from my car.  This

12   officer never did his job the way he was supposed to do it.

13              MR. CENTRA:  Judge, I am going to object here.

14       It calls for speculation.

15              THE COURT:  Hold up, sir.  We are just going to

16       talk about the facts.  Mr. LoFaro, why don't you bring us

17       back to some questions.  Get to the facts, please.

18   BY MR. LOFARO:

19       Q.   Okay.  Mr. Jennings, just move it along.  What the

20   Judge is asking, move it along with factual perspective,

21   without the, without -- obviously, you're very emotional, so I

22   understand the feelings get in the way.  But, really, you just

23   get to the facts for the jury.  So what happened after that,

24   just from a factual perspective?  What happened,

25   chronologically?

Jennings - direct - LoFaro

1    A.   After that, the officer, he ran around, when I hit the

2    ground, I placed my hands behind my back because I didn't want

3    no misconception or anything that I was resisting or trying to

4    do anything.  I was trying to get the officer to take his hands

5    out of my pants.  But I ended up getting slammed to the ground.

6    I never ran from the officer like which he testified to and

7    said that I ran from him.  I was being violated.  I tried to

8    get the officer to stop.  So, once he slammed me to the ground,

9    they picked me up, continued their search.  Then he found the

10   contraband in my left pants pocket.  I don't know if I was

11   arrested before that, or arrested then.  But they picked me up

12   off the ground, they put the cuffs on me, and I was arrested.

13   Q.   Mr. Jennings, there has been some testimony that after

14   you were arrested, and brought downtown, that you made a

15   statement with regard to being unemployed and selling drugs

16   because of your unemployment.  And we just heard from another

17   witness, but if you could answer to that, please?

18   A.   I never, I never made a statement to the officer

19   telling him that I was unemployed.  I was working at the time

20   for HBH Corporation Enterprises, and that was my current job.

21   Q.   As of January 5th, you were gainfully employed?

22   A.   As of January 5th.

23   Q.   How many hours a week were you working?

24   A.   Around what he said, around 25 to 30, if it was like an

25   unrated job or whatever.  Whenever it's a rate job, we would

Jennings - direct - LoFaro

1    get, we would get the full amount of hours, the 40 hours a

2    week.

3        Q.   So obviously, if you were employed, you're not going

4    to tell somebody you're unemployed?

5        A.   Absolutely.  I never told the officer that I was

6    unemployed.  I never, I never told him that.  I never told him

7    that I sold drugs.  I never mentioned that.  And the drugs that

8    I was in possession of, when it was given to me, I was told

9    that it was another substance, that it was the drug Molly.  And

10   the way you use the drug Molly, you put it into your drink, you

11   dissolve it.  And that's what I was under the impression that I

12   had, what was given to me.

13       And the reason I didn't show up for work on that day is

14   because I was, I was, I was going to celebrate.  I had just got

15   accepted for two-year, for my financial aid for two-year degree

16   at ITT Technical Institute.  And I was happy about that.  I

17   didn't get a chance.  I didn't, I didn't show up for work that

18   day.  And I was, I was just --

19       Q.   Mr. Jennings, there has been a lot of talk about going

20   through the vehicle and inventorying the -- what you were

21   doing and what you weren't doing.  If you could just rewind

22   for a brief moment and go back to your testimony with regard

23   to when you first noticed the police vehicle behind you.  Were

24   you or the other passenger in the vehicle doing what were you

25   doing -- what were you doing?

Jennings - direct - LoFaro

1    A.   I was in the vehicle.  And I was sitting there talking,

2   talking to my passenger as he was out of the car, retrieving

3   the rest of his property, because he was leaving, I recall.

4    Q.   Just let me stop you.  When you ultimately noticed

5   those two officers, did you make any suspicious movements?

6   Did you do anything inside the compartment of that vehicle?

7    A.   No.

8    Q.   Did you secrete anything at that point?

9    A.   No, never.  There was nothing to secrete.

10   Q.   There was a small black scale that was entered into

11  evidence that they are claiming was on the console of your

12  vehicle.

13   A.   That scale was never inside of my car.

14   Q.   It was never inside your vehicle?

15   A.   That car was, it was never, I never even seen it

16  before.  I haven't even been charged with it.  He said that it

17  was cocaine on top of it.  I haven't, I haven't even seen the

18  lab reports for the results of it.  They say this was their

19  probable cause for pulling me out of my car.

20              MR. CENTRA:  Judge, I am going to object to this.

21              THE COURT:  Mr. LoFaro, you have to keep to the

22      question, please.

23  BY MR. LOFARO:

24   Q.   Okay.  There has been testimony that there was one

25  cellphone, two cellphones.  I don't know if they were yours.

Jennings - direct - LoFaro

1    I don't know if they were the other passenger's.  I haven't

2    seen any cellphones in evidence.  Did you have a cellphone?

3        A.   I hear you saying that I was using a cellphone to sell,

4    to sell drugs or something like those.  One of the phones

5    didn't even work.  One of them is for Internet purposes.  When

6    I had a Wi-Fi, Wi-Fi zone area; it's a 4G network phone.  It

7    picks up -- the Internet speed is fast.  And I use that for

8    that.

9        My other phone is my family phone, that I use for my

10   employer and for my mother and my kids or whatever, and so

11   forth.  That's what I use the phone for.  The other phone is,

12   it's not even activated, but there was two phones.  Yes, there

13   was two phones.

14       Q.   Okay.  All right.

15       A.   Those were inside of my car, in the console, the

16   console area.

17       Q.   And there was about $210 in cash.  How do you explain

18   that?

19       A.   Yes.  Well, I do work.  And I do keep cash on me.  Now

20   sometimes when I go in the house, I will leave my money on the

21   coffee table.  Or I might leave it in the kitchen or I might

22   leave it in the dresser.  And if I am on the go, I am going

23   from my apartment, I am going to my mom's house or I might be

24   running errands or whatever, not all the time, I want to go in

25   the drawer and get my money out of there, just in case I might

289

Jennings - direct - LoFaro

1    need to get some gas.  My nieces might need something.  Or I

2    might just want to buy something.  I might want to go shopping

3    and do something.  I will have money in the car.  I always keep

4    money in my car, whether it was $50, $60.  I always keep money

5    around.  But as far as anything else arising out of that, as

6    far as me being a drug dealer because of?

7         Q.   Let me stop you right there.

8         A.   Phones and --

9         Q.   Final question, unless there is anything else you want

10   to add:  On January 5th 2016, you, at that point in time, did

11   you have any intention at that point in time of selling or

12   distributing drugs in any way, shape or form?

13        A.   No.  Absolutely not.  I have never even sold drugs.  I

14   have never even sold drugs.  I had it and my intentions was to

15   celebrate because I was happy, that I was getting ready to

16   embark on something, do something different.  I had just got

17   accepted for my financial aid at school, at ITT tech.  It's

18   unfortunate because they are shut down in Central New York,

19   after, after about nine months, after about nine months after I

20   got approved.  And I was supposed to start my classes the very

21   next day.  And actually, my professor for --

22                   THE COURT:  Mr. LoFaro?  Mr. LoFaro?

23                   MR. LOFARO:  Okay.

24        A.   My professor forwarded you my schedule.

25        Q.   Right.

Jennings - direct - LoFaro

1    A.   At the time, but you said you never received it.

2              MR. CENTRA:  Judge, once again, this is.

3              THE COURT:  Let Mr. LoFaro ask you a question.

4              MR. LOFARO:  Okay.  I think those are all the

5    questions I had, Mr. Jennings.  So, I thank you for your

6    testimony.

7              Your Honor, I have no further questions.

8              THE COURT:  Okay.  Mr. Centra, cross-examination?

9    CROSS-EXAMINATION BY MR. CENTRA:

10   Q.   Mr. Jennings, how are you doing today?

11   A.   All right.

12   Q.   I guess I will just kind of cover, go right into it.

13   So you stated here on January 5th 2016, you were actually

14   present at the Pioneer Homes with your buddy Willie Jones?

15   A.   Yes.

16   Q.   All right.  And you were sitting in your car and you

17   were at Radisson Court, and you're sitting in your vehicle,

18   it's your vehicle, correct?

19   A.   Yes.

20   Q.   Is that a black Acura?

21   A.   Yes.

22   Q.   And you were in the driver's seat, right?

23   A.   Yes.

24   Q.   Now it was around 6:30 or a little after that, you

25   state that officers approached your vehicle?

Jennings - cross - Centra

1    A.   6:40-ish?   6:43 or something like that.   I seen, I can

2   remember from the police report, yes.

3    Q.   Okay.   And then at some point it was Officer Decker

4   eventually came to the driver's side where you are, right?

5    A.   Yes.

6    Q.   And Officer Ettinger went to the passenger side,

7   right?

8    A.   No.   When they first pulled up, both officers exited

9   their vehicle, and ran straight to the passenger because he was

10   already outside of the car.   Willie Jones.   So they both was

11   over on the passenger side.

12    Q.   So Officer Ettinger stayed over there, and then

13   Officer Decker came over to your side?

14    A.   No.   After, after he assisted him in the search of

15   Willie Jones, then he came around to my side, once I opened the

16   door, to try and get out of the car.

17    Q.   And you stated when you spoke with your attorney here,

18   that on numerous, number of occasions, Officer Decker asked

19   you if there were drugs in the vehicle, if you had any drugs

20   on you, right?

21    A.   Correct.

22    Q.   You repeatedly told him no?

23    A.   Correct.

24    Q.   And Officer Decker states that he saw a scale and

25   that's why he asked you to step out of the vehicle, right?

Jennings - cross - Centra

1    A.   No, I actually -- he testified that he reached through

2    the window of my car.   That my window was down in January, and

3    he reached through the window of the car, over me, and through

4    the car is what he testified to, and he retrieved it from the

5    center console.

6    Q.   But he said that he saw that, and it was based on

7    that, that he asked you these questions and eventually asked

8    you to step out of the vehicle, right?

9    A.   For to arrest me or?

10   Q.   To step out of the vehicle, to?

11   A.   Because of the scale?

12   Q.   I am just asking, did he ask you to step out of the

13   vehicle?

14   A.   Yes, he asked me, he asked me to step out of the

15   vehicle.

16   Q.   You repeatedly told him that you had nothing on you.

17   But here you just testified again that you actually did have

18   drugs on you?

19   A.   Yes.

20   Q.   So you lied to Officer Decker?

21   A.   I mean, he had no reason to be questioning me in

22   regards to.

23          THE COURT:  Mr. Jennings, Mr. Jennings.  Mr.

24   Jennings, the question was, it calls for a yes or no

25   answer.

Jennings - cross - Centra

1           Mr. Centra, why don't you re-ask your question.

2      A.   I am not really understanding the question.

3      Q.   So, you told Officer Decker that you didn't have any

4  drugs on you, when you in fact know that you did, correct?

5      A.   Right.

6      Q.   And the reason that you told him that you didn't

7  because you knew that you would be trouble if he found those

8  drugs on you, right?

9      A.   Correct.

10     Q.   So when he began to search you, you ran because you

11 knew that if he found that, you would be in trouble?

12     A.   I never ran.  The officer stuck his hands inside of my

13 pants.  And I turned around to get Officer Jeremy Decker to

14 take his hands out of my pants, and he slammed me to the

15 ground.

16     Q.   And then eventually, you got taken into custody,

17 further searches were done, correct, on your vehicle and your

18 person?

19     A.   I am not -- can you repeat that?

20     Q.   So, you were eventually taken into custody, and your

21 person was --

22     A.   Correct.

23     Q.   -- further searched, that's when he found the cocaine

24 in your pocket, correct?

25     A.   When I was taken to jail?

Jennings - cross - Centra

1    Q.   No.   When you were taken at that point, when you were

2    secured by Officer Decker in the parking lot?

3    A.   Okay.   He picked me up off the ground.

4    Q.   He continued to search you?

5    A.   Then he put me back on the, placed me back on my car,

6    in handcuffs, and then he went inside of my pockets.

7    Q.   And that's where he found the cocaine that was in your

8    pocket?

9    A.   I was unaware that it was cocaine until -- or pure

10   cocaine or crack.   I don't know what they said it was.   But I

11   was told that it was Molly, that I was in possession of Molly.

12   But, I mean.

13   Q.   And then you also, you also had the amount of cash,

14   the $110 in your pocket, correct, that you previously stated?

15   A.   Correct.

16   Q.   That they also searched your vehicle, they found the

17   cellphones that you stated that were in the vehicle, correct?

18   A.   Correct.

19   Q.   And there was also some cash that you said that you

20   keep in your car?

21   A.   I keep in my car.

22   Q.   All right.   And then, you're eventually actually

23   arrested for possessing that cocaine after Officer Decker

24   tested it, correct?

25   A.   Cocaine?   Or I am not sure, because it was, I was

Jennings - cross - Centra

1   charged with possession of crack.  And crack, in the fourth

2   degree.   Third degree, fourth degree, and seventh degree, I was

3   charged with.

4       Q.   That was for possession of a controlled substance, not

5   specifically, and crack is another form of cocaine, correct?

6       A.   I guess so.  I believe.  I'm not sure.

7       Q.   And when you were actually arrested, and placed in the

8   vehicle, you were asked a number of questions, just basic

9   pedigree information, birthday, address, things like that?

10      A.   Yes.

11      Q.   And you were actually asked if you were employed, and

12  did you tell them that you were employed by HBH Construction?

13      A.   Yes.  It was more, it wasn't more of a question.  It

14  was like it was implied.  Because I have my certifications

15  inside of my wallet.  He had my wallet.  And I have my asbestos

16  abatement card from I think the Department of Labor to show my

17  certification; and my OSHA for me to be able to do construction

18  to go for -- I have both of my cards in my wallet.  So when you

19  go through there, he says:  You work in construction?  And he

20  is telling me because he is looking at them, so.

21      Q.   So you let him know that you were working in

22  construction then?

23      A.   Yes.

24      Q.   And you stated that, you're telling us that you stated

25  that you didn't tell him that you were selling that cocaine?

1    A.   No, I have never, I never made a statement to either

2    one of the officers telling them that I sold cocaine or any

3    drug.

4    Q.   Now, like I asked your employer, it's not strange for

5    somebody to have multiple jobs, right?  You said you worked

6    25, 30 hours a week, correct?

7    A.   Depending on the job that I may be doing.

8    Q.   So it's not unusual, you know, for somebody to have a

9    second job doing something else on the side if you're not

10   getting the hours you want, I am not saying you specifically?

11   A.   On the side, on the side, two jobs?  Or?

12            MR. LOFARO:  Objection, Your Honor.  It calls for

13       speculation.

14            THE COURT:  I am not sure of the relevance.  But,

15       we will move on, okay, Mr. Centra?

16   BY MR. CENTRA:

17   Q.   So, you stated that you were celebrating, that you

18   were moving on to better your life, get a, you got accepted

19   for financial aid for the two-year graduate?

20   A.   I got accepted for a two-year's associates degree at

21   ITT technical and computer software for troubleshooting for --

22   Q.   You found, you found the best way to celebrate that is

23   to buy some drugs and celebrate?

24   A.   I didn't never say that I bought the drugs.  I said

25   that it was given to me.  And I was told that it was Molly.

Jennings - cross - Centra

1    And I was going to use it to celebrate the fact of that.

2        Q.   Mr. Jennings, isn't it true that you had been

3    convicted of the felony crime of criminal possession of weapon

4    in the second degree on June 11th 2007?

5        A.    Correct.   I pled guilty to that.

6                  MR. CENTRA:   I have no further questions.   Thank

7    you, Mr. Jennings.

8                  THE COURT:   Mr. LoFaro, anything else?

9                  MR. LOFARO:   No, I have no further questions.

10                 THE COURT:   Okay.   Mr. Jennings, you're all set.

11       (Witness off witness stand.)

12                 THE COURT:   Step down.   Mr. LoFaro, any other

13   witnesses or proof on behalf of the defendant?

14                 MR. LOFARO:   No, Your Honor.   The defense rests.

15                 THE COURT:   The defense rests.

16                 Ladies and gentlemen, the defense has rested.

17   And that will close the proof in the case.   Here is what I

18   am going to do.   We need to take some legal matters outside

19   of your presence.   And then I am going to give counsel some

20   time to put their thoughts together to give you their

21   closing arguments, okay?   And after we hear their closing

22   arguments, we will see what the time is.   But I think we

23   will break for the day, and then tomorrow morning, we can

24   come in fresh.   I will give you the charge, the final

25   charge in the law.   And let you start your deliberations

298

- Defense rests -

1   okay.

2           So, why don't I give the attorneys a little time

3   to get their thoughts together.  We will break and come

4   back in here hopefully at 2:45, okay?

5           Don't talk about it amongst yourselves or don't

6   let anybody talk about it to you.  And promptly report to

7   us any attempt by anybody to talk to you about the case

8   okay?  Thank you.

9   (Jury left the courtroom at 2:28 p.m.)

10          THE COURT:  We are outside the presence of the

11  jury, with Mr. Centra, Mr. LoFaro, Mr. Jennings.  And the

12  defense has rested.  And Mr. LoFaro, do you want to renew

13  your trial order of dismissal motion?

14          MR. LOFARO:  Certainly, Judge.

15          THE COURT:  Anything you want to add to it?

16          MR. LOFARO:  No, Your Honor.

17          THE COURT:  I do find that the People have made

18  the elements of each offense, made a prima facie case as to

19  each of the elements of both offenses.  I do intend on

20  submitting both of those charges to the jury.

21          So now, this segues into a good time for a charge

22  conference.  Mr. Centra, besides the standard C.J.I. charge

23  that I intend to give, is there anything else that you want

24  me to have the jury consider?

25          MR. CENTRA:  Not in regards to the charges,

- Charge requests -

1    Judge.

2            THE COURT:  Okay.  And Mr. LoFaro, any other

3    charges you want me to consider?

4            MR. LOFARO:  No, Your Honor.

5            THE COURT:  All right.  So, I think we are all

6    set.  I don't want to talk for too long, so you guys can

7    put your thoughts together as far as your summations go.

8    Anything else you want to talk about, Mr. Centra?

9            MR. CENTRA:  No, Your Honor.

10           MR. LOFARO:  No, Judge.

11           THE COURT:  Okay.  So, what we can do is we will

12   break.  I will give you guys 15 minutes to put your

13   thoughts together.  Then that will get us to quarter of

14   3:00.  I assume we will be done hopefully no later than

15   3:30.  I plan on letting them break for the day.  We will

16   bring them back in, my calendar is small tomorrow.  We are

17   impaneling a Grand Jury but I think between the, I am going

18   to have them come in at 10 o'clock.  And hopefully, I can

19   charge from 10:00 to about 11:00.  And then we will send

20   them out, okay?

21           MR. LOFARO:  Sounds good.

22           THE COURT:  Okay.  All right.  We will break

23   until quarter of 3:00.

24           MR. LOFARO:  Thank you, Judge.

25    (Recessed at 2:30, and Trial continued at 2:50 p.m.)

- Closing statements -

1       THE COURT:  All set?

2       MR. LOFARO:  Yes, Judge.

3       THE COURT:  We are back in session, outside the

4  presence of the jury, with Mr. Centra, Mr. LoFaro, Mr.

5  Jennings.  And gentlemen, are we ready to proceed with

6  closing arguments?

7       MR. CENTRA:  Yes, Your Honor.

8       MR. LOFARO:  Yes, Your Honor.

9       THE COURT:  And anything else we need to talk

10  about before we get to that?

11       MR. CENTRA:  Judge, I was just planning on using

12  the podium.  Is there a way to be able to roll it up a

13  little further?

14       THE COURT:  I believe it's on wheels.   I don't

15  know the "snake" there, I don't know if that's a good idea,

16  Joe.

17       MR. CENTRA:  That's fine.  I will use it where it

18  is.

19       THE COURT:  Use a table if you want.  Why don't

20  we have the jury, and we will listen to the closing

21  arguments.

22  (Pause for jury entering the courtroom at 2:52 p.m.)

23       THE COURT:  All right.  We are back in presence

24  of the jury.  Mr. LoFaro, Mr. Centra, Mr. Jennings.

25       And the proof is closed.

- Closing - LoFaro -

1        Ladies and gentlemen, we now turn to the closing

2   arguments or summation of counsel.  As I told you earlier,

3   Mr. LoFaro will go first.  Mr. LoFaro?

4   (Closing statement by Mr. LoFaro:)

5        MR. LOFARO:  Ladies and gentlemen, thank you so

6   much for your time.  I really, really appreciate you being

7   here, as I stated before.  And I know, you know, I like to

8   think I am a good judge of character.  I think you're all

9   doing your best.  You're doing a great job as you have been

10  listening attentively throughout the proceeding.

11       I am going to go back to, I'm not going to sit

12  here all day, but I am going to go back to what I feel is

13  very, very important, the precepts that I talked about

14  before we all started.  The maze.  The shoes.  The

15  different analogies that I drew.  But the main point being:

16  You can't take short cuts.  And law enforcement has a very,

17  very, very difficult job to do in the 21st century.  I have

18  nothing but the utmost respect for it.

19       With that being said, they have taken a solemn

20  oath to uphold the law.  And they can't short circuit that

21  by doing an around-end, or doing a shortcut in going to get

22  through that maze to the end.  And the problem with that

23  is, like Martin Luther King said:  Injustice anywhere is a

24  threat to justice everywhere.  What that means is, when law

25  enforcement continues to engage in the same activities,

- Closing - LoFaro -

1    they become the new norm.  They become the new status quo.

2    And that can't happen because that threatens the very

3    fabric of our criminal justice system.  That's a problem.

4         Now, when I talk about becoming the new norm,

5    this new status quo:  Putting little fail safes in place to

6    start to change things to their advantage -- not that they

7    don't have an inherent disadvantage; it's a tough job to

8    do -- but when you look at things like we have heard over

9    and over again, you heard the officers up there testify

10   about a suspicious vehicle.  About furtive movements.

11   About bulk sales.  And freestyle sale of drugs.  They are

12   all things that are put in place -- and I hate to say it

13   and regrettably, to do an around-end.  And that is the very

14   basic law that they are sworn to uphold because furtive

15   movement has come to mean:  You're in a car.  Period.  In

16   what we consider a high crime neighborhood.

17        If I listen to the officers, not going to say

18   that their testimony wasn't credible.  I am not going to

19   say that.  A lot of the things that they had to say wasn't

20   believable.  But from where I am sitting, it sounds very

21   scripted.  Their testimony was almost identical to one

22   another.  And the reason it sounds scripted is because in a

23   sense it is scripted.  They know how that's -- that's the

24   way, that's the means to the ends.  That's how you make an

25   arrest.  That's how you roll up on a vehicle with two

- Closing - LoFaro -

1   civilians sitting in a vehicle, having a conversation with

2   one another after they try to fix a car, wanted to get back

3   to a basketball game, not bothering anybody.

4           What happens?  Police vehicle rolls in, blocks

5   them in.  And one of the officers testified, when they

6   asked him,  What made it suspicious?  He said, Dark.  That

7   really wasn't fleshed out.  But later on we heard with

8   regard to why was it a suspicious vehicle.  Incredulously,

9   the testimony given was, well, there were two individuals

10  in the vehicle.   There were two individuals in the

11  vehicle.

12          The Fourth Amendment requires more.  We have a

13  right to privacy.  Two individuals were in the vehicle.

14          Now there was also some testimony given that they

15  had been told they can ask people if they live in the

16  building.  Again, we go back to them being inside the

17  compartment of the vehicle.  And I am going to ask you for

18  a minute to try and put yourself in a place of Mr.

19  Jennings.  I have done this -- imagine what it would be

20  like if you, any one of you, pulled into your own driveway,

21  and law enforcement was given carte blanche to roll right

22  up you, and behind your driveway, and say:  Is this your

23  house?  Is this your driveway?  Do you live here?  Can I

24  see the I.D. to be sure you live here?  I think we would be

25  appalled.  I think we would be mortified.  And the thing

- Closing - LoFaro -

1 is, just because it's a high crime area doesn't mean there

2 is a trip to the Fourth Amendment rights, doesn't mean that

3 you can't sit there and drop a friend off at his house.

4 It's just ludicrous.  It just doesn't make any sense.  So

5 you know, clearly what we have here, again, is an ability

6 to get from point A to point B, without you know doing what

7 needs to be done.

8   And that was done, that was what was doing with

9 Mr. Jennings.  You know, it's just not right.  So, beyond

10 that, we have got a couple of charges here.  And again, I

11 am going to impress upon you and ask you to, when you

12 deliberate, use common sense, common sense, common sense,

13 common sense, common sense.  Because common sense is going

14 to get you where you need to be when you start looking at

15 this case.

16   Now, again, I love Mr. Centra.  I don't want to

17 use his words against him.  They were his words.  There was

18 a minute amount of cocaine.  There was a small amount of

19 cocaine.  Well, there was a small amount of cocaine.  You

20 saw the amount of cocaine.  It was a tiny little bit of

21 cocaine which is even smaller than it was -- this bag

22 before they busted it up in a powder.  There was nothing to

23 it.  So, again, common sense.

24   You saw Officer Proud say that, you know:  Oh,

25 yes, that's freestyle.  Freestyle.  Again, that's an

- Closing - LoFaro -

1    around-end.  Freestyle.  It's another way to say it's not

2    packaged in glassine envelopes.  And I asked him if it was

3    a small amount?  He said:  No.  No, it's bulk.  Well, it's

4    not bulk.  Common sense.  Common sense.  We all know what

5    the word "bulk" means.  This isn't bulk.  This isn't bulk.

6    Tied in a little bag.  That's not something that you can

7    distribute.  There was no intent to sell.

8         Clearly, if he was in possession of drugs at all,

9    it was for personal use, just by virtue of that tiny, tiny

10   little bag in the way it was packaged.  We can't make an

11   around-end and say:  Oh, yes, well, I know since it wasn't

12   packaged for sale, how do we get around the fact that it's

13   not packaged for sale?  How do we get around the fact that

14   it's not packaged for sale?  We say they sell it, when it's

15   not packaged for sale, we end up with this term called

16   "freestyle."  How do we justify stopping a vehicle and the

17   yanking of the passengers out and stripping them of their

18   Fourth Amendment right?  We will say they are making

19   furtive movements.  Furtive movements.

20        You know, again I submit to you, furtive

21   movements, as you heard over here, it sounded scripted to

22   me.  I don't know.  I am hoping it sounded scripted to you

23   too.  Because it generally is.  Because it's what's said

24   over and over and over again.  And furtive movements

25   really, generally, unfortunately means:  Fishing

- Closing - LoFaro -

1   expedition.  We want to grab -- excuse me -- we want to

2   grab these people, and see if they have anything on them.

3   We are going to see if they do, so we are going to find a

4   way to do it.  That's what has been done.  And is it right?

5   No, it's not.  It's contrary to the Fourth Amendment of the

6   Constitution, the Bill of Rights.  It allows him to be free

7   of unlawful searches and seizures.

8          Just like we all have a right to, you know, again

9   not to keep an example, we can all think of an example in

10  our own -- a friend's car in a shop, take me to the grocery

11  store.  I have got to pick up some groceries.  You go to

12  drop him off.  You pull into their driveway, and you're

13  talking to them.  You get, you get your car switched.  It

14  doesn't make any sense.  You know, you may think that there

15  should be different rules that apply in a high crime area.

16  But there has got to be something.  There has to be

17  something more than when I am -- there has to be something

18  more than caprice.  There has to be something more than

19  just a hunch.  You know what?  Why, just two guys in the

20  car.  There is a car parked.  There is two guys in it.  We

21  better identify a way to get them out of that car and

22  search it.  Um-um.  Really, it's crap.  It's not real.  It

23  shouldn't have happened.  This poor guy, all he did was

24  pick up a friend, bring him to his car, and try and get the

25  car started.  And he went to drop him off.  What happened

- Closing - LoFaro -

1    from there?  You heard.

2          And again, it's not proper.  I don't think by any

3    stretch of the imagination you can find any intent to sell.

4          And now let's, before I wasn't even going to talk

5    about this, since we had the witness come in to testify.

6    You heard his employer.  Said he was gainfully employed.

7    Gainfully employed at the time he was arrested.  Had been

8    working 25 to 30 hours a week, in construction.  He made

9    mention of asbestos cards.  He was gainfully employed.  And

10   again, I don't have, I don't ever mean to impune the

11   dignity of anyone that gets on that witness stand.  We got

12   to look again at common sense.  Common sense.  What is the

13   likelihood that Mr. Jennings, who was not a stupid man, who

14   lives in what we been told is a high crime area, is going

15   to say to a police officer, make this spontaneous

16   declaration and the utterance:  Things are a little slow,

17   yes.  I sell drugs on the side.

18         If did he, he should be on America's dumbest

19   criminals, because I don't think anybody would do,

20   certainly Mr. Jennings never would do that.  So I am

21   telling you and asking you to look at that from a common

22   sense perspective, and evaluate what the likelihood is that

23   Mr. Jennings is going to go:  Yes, things are a little

24   slow, I sell drugs on the side.  That's not going to

25   happen.  It didn't happen.

- Closing - LoFaro -

1      Not only did he didn't say it, but because he

2 doesn't sell drugs.  He explained what he was doing with

3 the drugs.  He thought it was Molly.  He was celebrating.

4 He goes to school.  Works.  So, this isn't a drug dealer.

5 It's a guy that you heard was gainfully employed, by his

6 own testimony, his employer's testimony.  And he testified

7 that he was going to school.  So he was trying to do the

8 right thing, get his life in order.  The fact that he lives

9 in an impoverished area where the crime rate is a little

10 bit higher doesn't deprive him of his constitutional

11 rights.  He is entitled to those.

12      I know and I respectfully submit to you that when

13 you go back over all of the evidence that you have heard,

14 that you ask yourselves if that testimony didn't sound a

15 little contrived.  It didn't sound a little bit too

16 rehearsed, a little bit too scripted with regard to, again:

17 Freestyle, furtive movements, suspicious vehicle.  These

18 are all ways that law enforcement has used as of late to

19 try and get around the law and deny somebody the protection

20 of their Fourth, by our Constitution.

21      So, you know, I am asking you to return a verdict

22 of not guilty.  And remember, that presumption of innocence

23 that he is cloaked with, remember that you heard up here,

24 and my final thought, again, is going to go over whatever

25 you must go over, but I think common sense is something

- Closing - LoFaro -

1    that all of you individuals are going to be able to use to
2    your benefit.
3            Again, everything is promulgated on common sense.
4    Apply the law.  Use your common sense.  And from a
5    layperson's perspective, just take a step back and go:
6    Wow, yes, this makes sense; this makes sense.  But what,
7    you know, that didn't make any sense.  He wouldn't do that.
8    And what did they say?  Suspicious vehicle, furtive
9    movements?  He wasn't doing anything.  It's clear, I wasn't
10   doing anything.  Common sense.  So again, I thank you all
11   for your time.  And I thank you for your service.
12           THE COURT:  Thanks very much, Mr. LoFaro.  Mr.
13   Centra, all set?
14   (Closing statement by Mr. Centra:)
15           MR. CENTRA:  I am, Your Honor.  Once again, I
16   would like to thank you all for your patience and your
17   attention during the course of -- the trial is one day, the
18   jury selection was too.  But, I think you had you just
19   heard testimony from a number of witnesses here.  The Judge
20   is going to ask you to consider their testimony during your
21   deliberations.  Now as the Judge said, I am required to
22   prove the elements of each crime beyond a reasonable doubt.
23   And as I told you when you first started this thing, I
24   welcome that burden.
25           Now Tony Jennings is charged with two counts

- Closing - Centra -

1    here.  First Count, being criminal possession of a

2    controlled substance in the third degree.  The Second

3    Count, being criminal possession of a controlled substance

4    in the fifth degree.

5         Now both of these require me to prove that he

6    knowingly and unlawfully possesses a narcotic drug, in this

7    case:  Cocaine.  The difference between the two counts is,

8    the Judge will tell you, is "the intent to sell" portion

9    which you have heard throughout this trial, for the

10   criminal possession of controlled substance in the third

11   degree.  And then for the fifth degree count, that deals

12   with the weight of the cocaine contained in, the actual

13   amount of the substance found on Mr. Jennings.  As the

14   Judge will tell you, he has to show that there is five

15   hundred milligrams or more of cocaine contained in that

16   substance.

17        Now you heard during the course of this trial

18   that Tony Jennings was found with 2.57 grams and within

19   that 2.5 grams of substance was 1,262 milligrams of

20   cocaine.  And that the amount that was possessed by Mr.

21   Jennings on that date would not be the amount that a person

22   would have for personal use.  That the amount that he had

23   on him was indicative of the intent to sell.  And based on

24   this information, I am going to ask you to find the

25   defendant guilty on both counts.

- Closing - Centra -

1        Now we heard from a number of witnesses today.

2   The first being Officer Jeremy Decker.  And Officer Decker

3   told us on January 5th 2016, they were, him with Officer

4   Ettinger, they were patrolling Radisson Court area, the

5   Pioneer Homes.  And I know that Mr. LoFaro got up here and

6   he started going on about the Fourth Amendment right.

7   Fourth Amendment right.  Right to search and seizure.  That

8   is, his rights were violated.  And I want you to listen to

9   the Judge.  That's one of the Judge's jobs was to determine

10  that.  And he is going to ask you to look at the law as it

11  applies to these counts.  And I am saying, these cops did

12  not violate any right.  There is a procedure that they

13  have, and there is certain rights that they have to

14  determine certain things.  And all they did in this case,

15  was shine a light on a vehicle, the two males in it.   And

16  in a high crime area where they were told to patrol because

17  this is a high crime area.  They were members of a specific

18  crime reduction team, and that's their job.  They didn't

19  just rush up there.  They didn't run in there.  You heard

20  the testimony.  They shined a light.  That's when they saw

21  the movements of Mr. Jennings and the passenger of the

22  vehicle.  It was those movements.  What escalated it?  You

23  heard these officers, they are trained.  There is certain

24  policies, procedures that they go through.  And furtive

25  movements are one of the things it looks like they were

- Closing - Centra -

1    trying to conceal something, so that raises their

2    suspicion.  That allows them to go at least inquire to

3    what's going on, and that's what they did.

4         And when they went and inquired to what was going

5    on.  Officer Decker stated that he approached the vehicle.

6    Officer Ettinger approached the vehicle, and they saw this

7    scale.  You will be able to take a look at that.  That

8    scale was sitting in the vehicle.  And that raised their

9    suspicion, obviously, a little more.  They saw the scale.

10   They saw the white substance on the scale.  And that led

11   them to believe that there may be narcotics in the car, or

12   on in the possession of Mr. Jennings or the passenger in

13   the vehicle.  So it was based on this that Mr. Jennings was

14   asked to step out of the vehicle.

15        Now Officer Decker's testimony is, once he

16   stepped out of the vehicle, he began to search Mr.

17   Jennings.  And he ran.  And there is a short chase, about

18   10 feet I believe he said, and he ended up catching him,

19   taking him into custody.  There was a struggle.  Like it's,

20   why did he run?  It's because he knew he had the drugs on

21   him.  He knew that he was going to get in trouble if he got

22   caught.

23        And on top of finding the cocaine in Mr.

24   Jennings' pocket, he also found the cash.  It ended up

25   totaling about $260 in cash, including the cash that was

- Closing - Centra -

1    found in the vehicle.  The scale.  And then the cellphones

2    that were found in the vehicle, Mr. Jennings stated were

3    there.  I am just going to ask you to ask yourself, common

4    sense, why would somebody have two cellphones?  Mr.

5    Jennings states:  One cellphone for personal use; and one

6    cellphone just for Internet.  It's 2017.  That's -- it's

7    not reasonable to believe.  The reason he had those two

8    cellphones was testified to by Sergeant Proud.

9         And then Tony Jennings was taken into custody.

10   And he was asked the pedigree information.  And as both the

11   officers told you, he just gave up the information.  He

12   never said he wasn't working.  He stated that he was -- he

13   stated that he was employed in construction.  But he was on

14   a down-time.  So, he was selling, selling crack cocaine to

15   supplement that.

16        Then we heard from Jennifer Wilson, who was the

17   forensic chemist assigned to analyze the substance in this

18   case, the cocaine.  She weighed that substance.  She told

19   us she tested it.  She told us the whole procedure that she

20   went through.  And she told us how she initially received

21   the substance from the secure area, she normally grabbed it

22   from.  And that she initially emptied the bag to get the

23   substance, to get the aggregate weight of all the powder in

24   here.  This isn't all cocaine.  This is the aggregate

25   weight of the substance of the whole.  And as Sergeant

- Closing - Centra -

1  Proud told you, it's never 100 percent cocaine.  It's cut
2  with stuff, something.  And she told you that the aggregate
3  weight, the substance as a whole, was 2.576 grams.  And she
4  told you that the substance that she tested came back
5  positive for cocaine.  And she testified that cocaine is in
6  fact a narcotic drug.  And she further tested the substance
7  to find out just how much cocaine was inside that 2.57
8  grams.  And she told us that that substance that was in
9  Tony Jennings' possession contained 1,262 milligrams of
10  cocaine.  And as Judge Dougherty will tell you when he
11  reads you the charge, to find Mr. Jennings guilty of
12  criminal possession of a controlled substance in the fifth
13  degree, you must find that he possessed 500 milligrams or
14  more of cocaine.  Here, he possessed 1,262 milligrams.
15  That's well over the 500 milligrams that's required by law.
16       And finally we heard from Sergeant David Proud.
17  He told us about his experience in law enforcement.  He has
18  almost thirty years investigating and participating in drug
19  investigations.  He has been undercover.  He has made
20  controlled buys of cocaine.  He has had individuals make
21  controlled buys on his behalf.  And he told us generally
22  how much individual doses of cocaine an individual user
23  would have on him.  And he told us that each dose of
24  cocaine is approximately one-tenth of a gram.  And now we
25  know that the substance found on the defendant, the cocaine

- Closing - Centra -

1    mixture, was 0.57 grams that the substance contained

2    cocaine.  And what Sergeant Proud told us, that this is 25

3    individual doses of cocaine.  Yes, it looks like it's a

4    small amount.  But that's what the law says.  And that's

5    what his experience tells us.  And when I -- I know that

6    Mr. LoFaro is trying to use my words against me when I said

7    it was a minute amount.  When I ask you to look at the law,

8    I know that it seems like a minute amount.  But that's what

9    the law states.  That's what I am asking you to look at

10   here.  It seems like a minute amount.  It's all relative,

11   in regards to everything else, as Sergeant Proud said.

12        Now that 25 individual doses of cocaine right

13   there shows Tony Jennings' intent to sell, on top of the

14   fact that he had $260 cash on him.  He had the two

15   cellphones.  He had no drug-use paraphernalia at all.  You

16   heard all the officers testify to that.  And on top of

17   that, he had on him a scale.  You're not using this if you

18   have a drug for personal use.

19        Now, you heard Mr. Jennings.  He got up and he

20   testified here in court.  And one of the things the Judge

21   is going to ask you to do, and one of the things I brought

22   up during our jury selection is that you're the judge of

23   credibility here.  You're the ones that have to take a look

24   and determine the credibility of the witnesses.  I want you

25   to listen to the Judge's instructions carefully.  That you

- Closing - Centra -

1    alone get to determine the truthfulness, the accuracy, the

2    testimony of each witness.  He will tell you that there is

3    a certain thing that you can look for to determine the

4    credibility, like:  Was the testimony plausible?  Likely to

5    be true?  Did the witness have a bias that could affect

6    their truthfulness of the statement?  Did the witness have

7    interests in the outcome of the case?  Did the witness make

8    any inconsistent statements?  Or did the witness have a

9    motive to lie?  Those are the things I am going to ask you

10   to consider when looking in determining the witnesses that

11   you heard here today.

12        I want you to take a look at Tony Jennings'

13   testimony.  Now, this whole time they had been painting him

14   out like he's the victim here.  That the police harassed

15   him.  That they planted a scale on him.  That they beat him

16   up.  That you know, this was all, this was all for nil.

17   That this shouldn't have happened.

18        And like I said, I want you to just look at the

19   testimony of Officers Decker and Ettinger, and then look at

20   the testimony of Tony Jennings.  It's obviously a great

21   divide there.  And ask yourselves:  Who do you believe the

22   credible witnesses are.

23        Now Mr. Jennings gave you the story about how he

24   was violated.  And each of the facts he gave can

25   immediately poke holes in the legal theory here, the law

- Closing - Centra -

1    that the Judge is going to read to you.  And you heard Mr.

2    Jennings up there, and he was in fact talking about the law

3    himself.  He seemed to look into, he brought up the

4    charges.  I want you to look at the testimony that he gave.

5    He admitted on the stand that he was not truthful with

6    Officer Decker.  He admitted that on numerous occasions.

7    Officer Decker asked him:  Are there drugs in the vehicle?

8    Do you have any drugs on you?  He said, No.  Why did he say

9    no?  Because he knew he had drugs on him, and he knew if he

10   was caught, that he was going to get in trouble.

11        Like I said, his testimony just conveniently

12   pokes holes.  He admitted to, he admitted to possessing the

13   drugs, right?  But conveniently, he didn't think it was

14   cocaine.  He thought it was Molly.

15        He says that the scale was planted.  No scale, no

16   intent to sell.  He says he didn't admit to selling

17   cocaine.  Once again, it goes to the intent to sell.

18        And finally, like I said, he gets the two phones.

19   One is for personal use and one is for Internet.  Like I

20   said, who has two phones for those purposes?

21        Like I said, the defense wants you to believe

22   that this is a case where his rights were extremely

23   violated.  And like I said, you know, that's why we have

24   the court system.  That's why the Judge determines whether

25   these searches -- these seizures, rather, were adequate.

- Closing - Centra -

1    And all I am stating here is that those officers approached

2    where they were allowed to be, Pioneer Homes.  The Syracuse

3    Housing Authority asked them to be there.  They are in a

4    high crime area.  They are doing their job patrolling.  And

5    all they simply did was shine a light.  And it's based on

6    what they saw, the step-by-step, the procedure that they

7    are trained to do, which led them to asking Mr. Jennings to

8    get out of the vehicle, to what they saw.  They shined the

9    lights, step one.  They see the movements which raised

10   their suspicion.  They, once again, walk over to the

11   vehicle.  They see the scale right there.  Their suspicions

12   just keep rising.  That's why they did what they did.  They

13   weren't out there just looking for Mr. Jennings to harass

14   him.  They definitely didn't plants drugs on him.  And he

15   admitted that.

16           Like I said, the Judge will tell you, to prove

17   criminal possession of a controlled substance in the third

18   degree, it must be shown that Tony Jennings possessed a

19   narcotic drug with the intent to sell it.  With criminal

20   possession of controlled substance in the fifth degree, it

21   must be shown that Tony Jennings possessed a drug that

22   contained 500 milligrams or more of cocaine.

23           We know he possessed it.  It was in his pocket.

24   We know that he knew it was in there because that's why he

25   ran from Officer Decker.  How do we know that he had the

- Closing - Centra -

1    intent to sell?  Like I said, many reasons.  25 individual

2    doses of cocaine.  No individual user would possess that.

3    He was found with cash.  And the two cellphones.  He had

4    the scale to weigh the cocaine for sale.  There was no

5    drug-use paraphernalia found on him.  And he also admitted

6    to the officers that he possessed it with the intent to

7    sell to make some money on the down-time while he wasn't

8    working.

9              Finally, we know that the drugs he possessed were

10   1,262 milligrams of cocaine contained in there.  We heard

11   that from the testimony of Jennifer Wilson.

12             And based on this evidence, I am going to ask you

13   all to find Tony Jennings guilty.  Guilty of criminal

14   possession of controlled substance in the third degree, and

15   guilty of criminal possession of controlled substance in

16   the fifth degree.  Once again, I thank you all for your

17   time.

18             THE COURT:  Thank you, Mr. Centra.  Ladies and

19   gentlemen, I think it is a good time to break.  It's 20

20   after 3:00, I will give you my final admonitions.  I would

21   like you here tomorrow at about 9:45.  My calendar is

22   small.  We start normally between 9:00 and 9:15.  I hope to

23   be done with it by 10 o'clock.  And what I will do is, at

24   10:00 or when we start, I will read you the charge.  And

25   that usually takes between 30 and 45 minutes.  I will read

320

- Jury recess for day -

1   you the charge.

2          The reason I want you to come in a little earlier

3   is because we will have lunch menus for you.  And you can

4   pick out what you want for lunch.  We will give you the

5   charge.  We will finish that sometime around eleven

6   o'clock, and soon after that, you will get your lunches,

7   and we can have you deliberating.  So, hopefully that will

8   go all according to plan.

9          Your job part is to be here by 9:45.  And before

10  that, as far as this evening goes, this afternoon and this

11  evening, do not converse either among yourselves or with

12  anyone else about anything related to the case.  Of course,

13  don't take any money or anything else regarding this case.

14  Promptly report to me any incident within your knowledge

15  involving any attempt by any person to influence you in any

16  way.  You're not going to visit the Pioneer Homes or

17  anywhere else that has been indicated as a potential place

18  where this occurred.  Certainly, don't read any news

19  accounts or listen to any accounts.  Don't attempt to

20  research any fact, issue or law regarding this case.  And

21  don't communicate with anyone about the case by any means

22  including social media.  All right?

23          With that, I wish you all a great afternoon, a

24  great night.  See you tomorrow morning.  And we will give

25  you the charge then.  Thank you.

321

- Trial procedure discussion -

1    (Jury left the courtroom at 3:22 p.m.)

2            THE COURT:  All right.  We are outside the

3    presence of the jury with Mr. Centra, Mr. LoFaro and Mr.

4    Jennings.  And gentlemen, we are ready to charge the jury

5    in the morning.  Is there anything else we need to talk

6    about this evening?

7            MR. CENTRA:  Not from the People, Your Honor.

8            MR. LOFARO:  No, Your Honor.

9            THE COURT:  All right.  The exhibits, there is

10   one photograph, I think?

11           MR. LOFARO:  Yes, Judge.

12           THE COURT:  You put in?

13           MR. LOFARO:  Yes.

14           THE COURT:  And Joe, you have the two exhibits?

15   What I normally do is if there is no objection by either of

16   you, as soon as I am done with the charge, we send the

17   exhibits in to the jury.

18           MR. CENTRA:  That's fine with me.

19           THE COURT:  No problem.

20           MR. LOFARO:  Fine, Judge.

21           THE COURT:  That way they don't have to write a

22   note and ask.  And obviously, we will keep you guys close.

23   We will get your cellphone numbers, and you will be close

24   in case they need anything as the day goes on tomorrow.

25           As I said, we are going to order their lunches.

322

- Recess for day -

1    Before they even come in here, we will have those, we get

2    that moving along.  And finish up in the morning, okay?

3              MR. LOFARO:  Sounds good.

4              MR. CENTRA:  Sounds good.

5              THE COURT:  Thanks.  Thanks, Pat.

6    (Recessed for the day at 2:23 p.m.)

7              *              *              *

8              MORNING SESSION - 2/8/17

9    (Trial continued on Wednesday, February 8, 2017, at 10:23 a.m.)

10             THE COURT:  Gentlemen, why don't you come up.  I

11   have got a copy of the verdict sheet.

12   (Blank Verdict sheet marked Court's Exhibit A.)

13             THE COURT:  We are back in session with Mr.

14   Centra, Mr. LoFaro, Mr. Jennings.

15             And gentlemen, before I bring the jury in, there

16   are two charges that I am going to be reading to the jury.

17   One is about Mr. Jennings being in custody.  I will, again,

18   I will note, no negative inference against him due to his

19   financial inability to post bail.

20             Also going to talk about the fact that Mr.

21   Jennings was given the opportunity to wear civilian clothes

22   and chose not to.  And you're not to make any negative

23   interference or speculate on the reason for that.

24             And finally, Mr. Jennings had the opportunity to

25   appear in front of the jury without restraints, and chose

- Jury charge discussion - 2/8/17 -

1   not to.  And I will talk to them about that.

2              And any objection to that, Mr. Centra?

3              MR. CENTRA:  No, Your Honor.

4              THE COURT:  Mr. LoFaro?

5              MR. LOFARO:  No, Your Honor.

6              THE COURT:  All right.  And there has been a lot

7   of talk during the course of this trial about whether the

8   search of Mr. Jennings was lawful or not.  Here is what I

9   am going to say about that:  It's not the function of the

10  jury to decide whether or not the evidence that was

11  received in trial was obtained as a result of an unlawful

12  search.  It is the Court's responsibility to determine the

13  legal issue of whether property was obtained from a

14  defendant as a result of an unlawful search and seizure,

15  prior to trial.  And in this case, as required by law, the

16  Court conducted an evidentiary hearing prior to trial to

17  ascertain the circumstances under which the property was

18  obtained, and determined whether the evidence was obtained

19  in contravention of the defendant's constitutional rights.

20  The Court ruled that the tangible property obtained from

21  the defendant in this case did not result from an unlawful

22  search and seizure, and was therefore admissible, as

23  evidence at trial.  The legal issue of whether the tangible

24  property received in evidence against this defendant was

25  obtained as a result of an unlawful search and seizure was

- Jury charge discussion -

1   previously determined by the Court prior to trial, as

2   required by law.  You are not to make your own

3   determination on this legal issue in your deliberations.

4   You're bound by the Court's ruling as to the admissibility

5   of such evidence and are not permitted to reconsider the

6   Court's ruling in your deliberations.  Mr. Centra, any

7   objection to that?

8            MR. CENTRA:  No, Your Honor.

9            THE COURT:  Mr. LoFaro?

10           MR. LOFARO:  Yes.  I object, Your Honor.  Only

11   because prior to us breaking yesterday, you had asked Mr.

12   Centra and I if we had any jury charges that we would

13   request other than the standard jury charges.  We both

14   said, no.  There was no request that jury charge be made,

15   which is outside the standard jury charges.  So I would

16   object to that.

17           THE COURT:  And I note your objection.  And I

18   appreciate it, Mr. LoFaro.  I will say that my job as the

19   judge is to instruct them on the law, not the facts.  Both

20   of you made some comments about the legality of the search.

21   It wasn't just Mr. LoFaro.  And I, to tell you the truth,

22   was taken aback that this continued during the course of

23   the trial because there has been a suppression hearing.

24   And unlike a confession that cannot be relitigated in front

25   of a jury, the case law is clear.  The suppression issue is

- Jury charge discussion -

1    done by the judge.  It is the law of the case.  And in this

2    case, the judge determined that it was lawful; and that's

3    the end of it as far as a question of fact goes.  It

4    becomes a question of law.  Which, it's a, the

5    determination has already been made.

6              So understanding the objection of Mr. LoFaro, I

7    am going to give that instruction.  It wasn't something

8    requested by Mr. Centra or Mr. LoFaro.  I feel it's my duty

9    to alert the jury as to that.

10             THE DEFENDANT:  Excuse me, Your Honor?

11             THE COURT:  Hold on, Mr. Jennings.  I am not

12   done.

13             THE DEFENDANT:  Okay.

14             THE COURT:  We also talked about the exhibits

15   going in without the jury requesting those exhibits.  I

16   know Mr. Centra has the three of them, correct, gentlemen?

17             MR. CENTRA:  I have two.

18             THE COURT:  And Mr. LoFaro you have the third?

19             MR. LOFARO:  Yes.

20             THE COURT:  We will put those together.  We are

21   going to send it in with the verdict sheet, which is Court

22   Exhibit A.  I have given a copy to both counsel.

23             Mr. Centra, any objection to the verdict sheet?

24             MR. CENTRA:  No, Your Honor.

25             THE COURT:  Mr. LoFaro?

- Jury charge discussion -

1     MR. LOFARO:  No, Your Honor.

2     THE COURT:  All right.  So the other thing,

3  gentlemen, I need to impanel a new Grand Jury around eleven

4  o'clock.  So what I intend to do is charge the jury.  We

5  will send them out as soon as I am done.  And then we are

6  going to tell them that we are going to have a break

7  between 11:00 and about 12:30, where they can certainly

8  send out notes.  But we won't be able to get back to them

9  until then because my court staff also needs a break,

10  especially Mr. Reagan who has to impanel the Grand Jury

11  with me, okay?  All right.

12     THE DEFENDANT:  Could I speak?

13     THE COURT:  Yes, Mr. Jennings.  Do you want to

14  say something?

15     THE DEFENDANT:  Thank you.  Well, I object, you

16  know, in regards to all that evidence that has represented

17  to the jury, to the jury, Your Honor.  It was insufficient.

18  And one of the testimony was faulty.  I provided the Court

19  with documentation from city investigators that

20  investigated these officers in regards to this case, and

21  the charges charged and they found him guilty of

22  misconduct.  And this was the chief of police, who

23  cooperated with these investigators.  I provided the courts

24  with these papers, and they haven't even been taken into

25  consideration.  I wasn't allowed to present that to the

- Argument - Jennings -

1   jury.  My whole defense is being stripped right now as to

2   wherein these officers obtained evidence illegally.  They

3   violated my constitutional rights on illegal search and

4   seizure.  They never had probable cause to even pull me out

5   of the car -- a criminal charge.

6          THE COURT:  Hold on, Mr. Jennings.  That issue

7   was decided by I believe it was Judge Hafner.

8          THE DEFENDANT:  Judge Hafner made a decision in

9   error, Your Honor.

10          THE COURT:  Listen, listen.

11          THE DEFENDANT:  I have it.  Do you want --

12          THE COURT:  You can make that decision.  See, the

13   legal process has steps.  Should you get convicted -- which

14   I don't know that that's going to happen -- should you get

15   convicted, you can appeal all of these things.  If you get

16   acquitted, none of them matter.  But the decisions of the

17   Court have been followed all the way through.  Mr. LoFaro

18   has done a fantastic job on your behalf, I must tell you.

19          THE DEFENDANT:  Yes, he has, Your Honor.

20          THE COURT:  Certainly things you wanted him to

21   bring up, he could not bring up because the decisions,

22   those have already been decided.  But you have the right to

23   appeal all of these things.  So let's get started with our.

24          THE DEFENDANT:  I understand, Your Honor.  But

25   you're stripping me of my whole defense.

- Argument - Jennings -

1          THE COURT:  I am not.

2          THE DEFENDANT:  By explaining to the jury that

3     they are not to consider the fact that the search was

4     conducted illegally, and they had no probable cause.

5          THE COURT:  I understand.

6          THE DEFENDANT:  I have no defense.  If you

7     instruct the jury to look at the evidence in light of my

8     testimony that I provided, and my whole defense of what my

9     lawyer did.

10          THE COURT:  Mr. Jennings, I understand your

11     concern.  I made my ruling.  I am making my ruling on the

12     law.  And it can be appealed, should you lose.

13          THE DEFENDANT:  Okay.

14          THE COURT:  Have the jury.

15          THE DEFENDANT:  For the record, Your Honor, I

16     object to all evidence and testimony.

17          THE COURT:  Yes, and you have done so.

18     (The jury entered the courtroom at 10:32 a.m.)

19          THE COURT:  Good morning, ladies and gentlemen.

20     Thank you again for your attendance.  We are here with the

21     jury.  We are here with both counsel, Mr. Centra, Mr.

22     LoFaro, and Mr. Jennings.

23          And we have heard the summation of counsel

24     yesterday afternoon.  It is now time to hear my

25     instructions on the law.  I want to commend both the

329

- Court Charge -

1   attorneys for the job they did representing their sides of

2   the case.  They are both professional; I believe they both

3   did a very good job.

4           Folks, I am going to instruct you on the law.  I

5   am going to review the general principles of law that apply

6   to this case, and in all criminal cases.  Then I will

7   define the crimes charged in this case, explain the law

8   that applies to those, and spell out the elements of each

9   charged crime.  And then I am going to outline the process

10  of jury deliberations.

11          The law requires in all criminal cases that the

12  Court set bail.  Here, Mr. Jennings has been unable to make

13  the bail that was set.  You are to draw no inference

14  whatsoever against Mr. Jennings due to his financial

15  inability to post bail.  That is not evidence of anything.

16  The defendant Mr. Jennings has the right to appear in front

17  of the jury at trial wearing civilian clothes; and the

18  right to appear in front of jury wearing prison garb if he

19  so chooses.  The defendant has considered his right to

20  appear in front of you in prison garb.  You're not to

21  speculate on the reason for the defendant choosing to wear

22  prison garb.  You're not to have any sympathy for or bias

23  against the defendant because of the clothes he chose to

24  wear, I am sorry, during the trial.

25          The fact that the defendant has chosen to appear

- Court Charge -

1    in front of the jury at trial, in prison garb, has no

2    relevance to your determination of whether the defendant is

3    guilty or not guilty of the charged crime and should not be

4    considered by you in your deliberations.

5         Also, Mr. Jennings has a right to appear in front

6    of the jury at trial without any restraints.  And the right

7    to appear in front of the jury at trial in restraints if he

8    chooses.  Neither the Court nor the Sheriff's Department

9    required the defendant to be restrained.  The defendant

10   chose to appear in front of the jury in restraints.  You're

11   not to speculate on the reason for the defendant choosing

12   to appear in front of the jury in restraints.

13        You're not to have any sympathy for or bias

14   against Mr. Jennings because of the fact that he chose to

15   be in restraints.  The fact that the defendant has chosen

16   to appear in front of the jury in restraints has no

17   relevance to your determination of whether the defendant is

18   guilty or not guilty of a charged crime, and should not be

19   considered by you in your deliberations.

20        During these instructions, I am not going to

21   summarize the evidence.  If there is any reference to

22   evidence or my failure to refer to evidence that expresses

23   no opinion about the truthfulness, accuracy, or importance

24   of any particular evidence.  In fact, nothing I have said

25   in the course of this trial was meant to suggest that I

- Court Charge -

have an opinion about the case.  If you have formed an

impression that I do have an opinion, you must put it out

of your mind and disregard it.  It's not my responsibility

to judge the evidence here.  That's yours.  You and you

alone are the judges of the facts.  You and you alone are

responsible for deciding whether the defendant is guilty or

not guilty.

It is not the function of the jury to decide

whether or not evidence that was received at trial was

obtained as a result of an unlawful search or seizure.   It

is the Court's responsibility to determine the legal issue

of whether tangible property was obtained from a defendant

as a result of an unlawful search or seizure prior to this

trial.

In this case, as required by law, the Court

conducted an evidentiary hearing prior to trial to

ascertain the circumstances under which the tangible

property was obtained, and determined whether the evidence

was obtained in contravention of the defendant's

constitutional rights.  The Court ruled that the tangible

property obtained from the defendant in this case did not

result from an unlawful search and seizure, and was

therefore admissible as evidence in this trial.

The legal issue of whether the property received

in evidence against the defendant was tainted as a result

- Court Charge -

1  of an unlawful search and seizure was previously determined

2  by this Court prior to trial, as required by law.  You are

3  not to make your own determination on this legal issue in

4  your deliberations.  You are bound by the Court's ruling as

5  to the admissibility of such evidence, and are not

6  permitted to reconsider the Court's ruling in your

7  deliberations.

8          In your deliberations, you may not consider or

9  speculate about matters relating to sentence or punishment.

10  If there is a verdict of guilty, it will be my

11  responsibility to impose an appropriate sentence.

12          When you judge the facts, ladies and gentlemen,

13  you are to consider only the evidence.  The evidence in

14  this case includes the testimony of the witnesses, and the

15  exhibits that were received in evidence.  Testimony that

16  was stricken from the record or to which an objection was

17  sustained must be disregarded by you.

18          Exhibits that were received in evidence will be

19  sent in to the deliberation room with you for your

20  inspection and consideration.

21          In evaluating the evidence, you may consider any

22  fact that is proven and any inference that may be drawn

23  from such fact.  To draw an inference means to infer, find,

24  conclude that a fact exists, or does not exist based upon

25  proof of some other fact or facts.  An inference must be

1    only drawn from a proven fact or facts, and then only if

2    the inference flows naturally, reasonably and logically

3    from the proven fact or facts.  Not if it is speculative.

4              Therefore, in deciding whether to draw an

5    inference, you must look at and consider all the facts in

6    the light of reason, common sense, and experience.

7              We are now turning to the fundamental principles

8    of our law that apply in all criminal cases:  The

9    presumption of innocence, the burden of proof, and the

10   requirement of proof beyond a reasonable doubt.  Throughout

11   these proceedings the defendant is presumed to be innocent.

12   As a result, you must find the defendant not guilty unless

13   on the evidence presented at this trial you conclude that

14   the People have proven the defendant guilty beyond a

15   reasonable doubt.  In determining whether the People have

16   satisfied their burden of proving defendant's guilt beyond

17   a reasonable doubt, you may consider all the evidence

18   presented, whether by the People or by the defendant.  In

19   doing so, however, remember that even though the defendant

20   introduced evidence, the burden of proof remains on the

21   People.

22             The defendant is not required to prove that he is

23   not guilty.  In fact, the defendant is not required to

24   prove or disprove anything.  To the contrary, the People

25   have the burden of proving the defendant guilty beyond a

- Court Charge -

1    reasonable doubt.  That means before you can find the

2    defendant guilty of a crime, the People must prove beyond a

3    reasonable doubt every element of the crime, including that

4    the defendant is the person who committed that crime.

5         The burden of proof never shifts from the People

6    to the defendant.  If the People fail to satisfy their

7    burden of proof, you must find the defendant not guilty.

8    If the People satisfy their burden of proof, you must find

9    the defendant guilty.

10        And what does our law mean when it requires proof

11   of guilt beyond a reasonable doubt?  The law uses that term

12   "proof beyond a reasonable doubt" to tell you how

13   convincing the evidence of guilt must be to permit a

14   verdict of guilty.  The law does recognize that in dealing

15   with human affairs there are very few things in this world

16   that we know with absolute certainty.  Therefore, the law

17   does not require the People to prove a defendant guilty

18   beyond all possible doubt.  On the other hand, it is not

19   sufficient to prove that the defendant is probably guilty.

20   In a criminal case, the proof of guilt must be stronger

21   than that.  Again, it must be beyond a reasonable doubt.

22        A reasonable doubt is an honest doubt of the

23   defendant's guilt for which a reason exists based upon the

24   nature and quality of the evidence.  It's an actual doubt,

25   not an imaginary doubt.  It is a doubt that a reasonable

- Court Charge -

1   person acting in a matter of this importance would be

2   likely to entertain because of the evidence that was

3   presented or because of the lack of convincing evidence.

4   Proof of guilt beyond a reasonable doubt is proof that

5   leaves you so firmly convinced of the defendant's guilt

6   that you have no reasonable doubt of the existence of any

7   element of the crime, or of the defendant's identity as the

8   person who committed the crime.

9           In determining whether the People have proven the

10  defendant's guilt beyond a reasonable doubt you should be

11  guided solely by a full and fair evaluation of the

12  evidence.  After carefully evaluating the evidence, each of

13  you must decide whether or not that evidence convinces you

14  beyond a reasonable doubt of the defendant's guilt.

15  Whatever your verdict may be, ladies and gentlemen, it must

16  not rest upon baseless speculation, nor may it be

17  influenced in any way by bias, prejudice, sympathy, or by a

18  desire to bring an end to your deliberations or to avoid an

19  unpleasant duty.  If you are not convinced beyond a

20  reasonable doubt that the defendant is guilty of a charged

21  crime, you must find the defendant not guilty of that

22  crime.  If you are convinced beyond a reasonable doubt that

23  the defendant is guilty of a charged crime, you must find

24  the defendant guilty of that crime.

25          As the jury, as the judges of the facts, you

- Court Charge -

1   alone determine the truthfulness and accuracy of the

2   testimony of each witness.  You must decide whether a

3   witness told the truth and was accurate, or instead,

4   testified falsely or was mistaken.  You must also decide

5   what importance to give to the testimony you accept as

6   truthful and accurate.  Again, it's the quality of the

7   testimony that controls, not the number of witnesses who

8   testify.

9         If you find any witness has intentionally

10  testified falsely as to any material fact, you may

11  disregard the witness' entire testimony, or you may

12  disregard so much of it as you find was untruthful, and

13  accept so much of it as you find to have been truthful and

14  accurate.

15        There is no particular formula for evaluating the

16  truthfulness and accuracy of another person's statements or

17  testimony.  You bring to this process all of your varied

18  life experiences.  In life, you frequently have to decide

19  the truthfulness and accuracy of statements made to you by

20  other people.  The same factors that you would use to make

21  those decisions should be used here when evaluating the

22  testimony.

23        Some of the factors you may wish to consider in

24  evaluating the testimony of witnesses are:  Did the witness

25  have an opportunity to see or hear the events upon which he

- Court Charge -

1    or she testified?  Did the witness have the ability to

2    recall those events accurately?  Was the testimony of the

3    witness plausible and likely to be true?  Or was it

4    implausible and not likely to be true?  Was the testimony

5    of the witness consistent or inconsistent with other

6    testimony or evidence in the case?  Did the manner in which

7    the witness testify reflect upon the truthfulness of that

8    witness' testimony?  To what extent if any did the witness'

9    background, training, education or experience affect the

10   believability of that witness' testimony?  Did the witness

11   have a bias, hostility or some other attitude that affected

12   the truthfulness of the witness' testimony?

13          You may consider whether a witness had or did not

14   have a motive to lie.  If a witness had a motive to lie,

15   you may consider whether and to what extent if any that

16   motive affected the truthfulness of that witness'

17   testimony.  If a witness did not have a motive to lie, you

18   may consider that as well in evaluating the witness'

19   truthfulness.

20          You may consider whether a witness hopes for or

21   expects to receive a benefit for testifying.  If so, you

22   may consider whether and to what extent it affected the

23   truthfulness of the witness' testimony.

24          You may consider, folks, whether a witness has

25   any interest in the outcome of the case, or instead,

- Court Charge -

1   whether the witness has so no such interest.  A defendant

2   who testifies is a person who has an interest in the

3   outcome of the case.  You are not required to reject the

4   testimony of an interested witness or to accept the

5   testimony of a witness who has no interest in the outcome

6   of the case.  You may, however, consider whether an

7   interest in the outcome or the lack of such interest

8   affected the truthfulness of the witness' testimony.  You

9   may also consider in determining credibility whether a

10  witness has been convicted of a crime, or has engaged in

11  criminal conduct and if so, whether and to what extent it

12  affects the truthfulness of that witness' testimony.

13          You are not required to reject the testimony of a

14  witness who has been convicted of a crime or has engaged in

15  criminal conduct, or to accept the testimony of a witness

16  who has not.  You may, however, consider whether a witness'

17  criminal conviction or conduct has affected the

18  truthfulness of that witness's testimony.

19          With respect to the defendant, such prior

20  convictions or criminal conduct are not evidence of the

21  defendant's guilt in this case, or evidence that the

22  defendant is a person who is disposed to commit crimes.

23  You are permitted to consider such convictions or conduct

24  only to evaluate the defendant's truthfulness.  You may

25  consider in determining credibility whether a witness made

1    statements at this trial that are inconsistent with each

2    other.   You may also consider whether a witness made

3    previous statements that are inconsistent with hers or his

4    trial testimony.

5              If a witness made inconsistent statements or

6    omissions, you may consider whether and to what extent they

7    affect the truthfulness or accuracy of that witness'

8    testimony here at this trial.   The content of a prior

9    inconsistent statement is not proof of what happened.   You

10   may use that evidence of a prior inconsistent statement

11   only to evaluate the truthfulness or for accuracy of the

12   witness' testimony here at trial.   You may consider whether

13   a witness' testimony is consistent with the testimony of

14   other witnesses or with evidence in the case.   If there

15   were inconsistencies by and among witnesses, you may

16   consider whether they were significant inconsistencies

17   related to important facts, or instead were the kind of

18   minor inconsistencies that one might expect from multiple

19   witnesses to the same event.

20             In this case, ladies and gentlemen, we heard the

21   testimony of police officers.   The testimony of a witness

22   should not be believed solely and simply because the

23   witness is a police officer.   And at the same time, a

24   witness' testimony should not be disbelieved solely and

25   simply because a witness is a police officer.   You must

1  evaluate a police officer's testimony in the same way you

2  would evaluate the testimony of any other witness.

3        You will recall that we heard from Jennifer

4  Wilson in this trial about certain scientific, medical or

5  technical matters, and offered an opinion on such matters.

6  Miss Wilson testified as an expert in the field of forensic

7  chemistry.  Ordinarily, a witness is limited to testify

8  about facts and is not permitted to give an opinion.

9  Where, however, scientific, medical, technical or other

10  specialized knowledge will assist the jury to understand

11  evidence, or to determine a fact at issue, a witness with

12  expertise in a specialized field may render an opinion

13  about such matters.  You should evaluate the testimony of

14  any such witness just as you would the testimony of any

15  other witness.  You may accept -- you may accept or reject

16  such testimony in whole or in part just as you may with

17  respect to the testimony of any other witness.

18        In deciding whether to accept such testimony, you

19  should consider the following:  The qualifications and the

20  believability of the witness; the facts and other

21  circumstances upon which the witness' opinion was based;

22  the reasons given for the opinion; whether the witness'

23  opinion is consistent or inconsistent with other evidence

24  in the case; and the accuracy or inaccuracy of any assumed

25  or hypothetical fact upon which the opinion was based.

- Court Charge -                              341

Let me now instruct you on the law applicable to the charged offenses.  Those offenses are:  Criminal possession of a controlled substance in the third degree; and criminal possession of a controlled substance in the fifth degree.  Under our law, a person is guilty of criminal possession of a controlled substance in the third degree when that person knowingly and unlawfully possesses a narcotic drug with the intent to sell it.

Some of the terms used in this definition have their special meaning in our law.  I will give you the definition of:  Narcotic drug, possess, knowingly, unlawfully, sell, and intent.  The term narcotic drug includes cocaine.  Possess means to have physical possession or otherwise exercise dominion and control over tangible property.

A person knowingly possesses cocaine when that person is aware that he is in possession of cocaine.  A person unlawfully possesses cocaine when that person has no legal right to possess it.  Under our law, with certain exceptions not applicable here, a person has no legal right to possess cocaine.  Sell means to sell, exchange, give or dispose of to another.  Intent means a person's conscious objective or purpose.  Thus, a person possesses with intent to sell it when his conscious objective or purpose is to sell the cocaine.

- Court Charge -

1    In order for you to find the defendant guilty of

2  this crime, the People are required to prove from all the

3  evidence in the case beyond a reasonable doubt each of the

4  following three elements:  That on or about January 5th

5  2016, in Onondaga County, the defendant Tony Jennings

6  possessed cocaine.  Two, that the defendant did so

7  knowingly, and unlawfully.  And Three, that the defendant

8  possessed the cocaine with the intent to sell it.

9    If you find the People have proven beyond a

10  reasonable doubt each of those elements, you must find the

11  defendant guilty of the crime of criminal possession of a

12  controlled substance in the third degree as charged in the

13  First Count.  On the other hand, if you find the People

14  have not proven beyond a reasonable doubt any one or more

15  of those elements, you must find the defendant not guilty

16  of the crime of criminal possession of a controlled

17  substance in the third degree.

18    The Second Count, ladies and gentlemen, is

19  criminal possession of a controlled substance in the fifth

20  degree.  A person is guilty of criminal possession of a

21  controlled substance in the fifth degree when that person

22  knowingly and unlawfully possesses cocaine, and said

23  cocaine ways 500 milligrams or more.  I have given you the

24  definition of possess, knowingly, and unlawfully.  In order

25  for you to find the defendant guilty of this crime, the

- Court Charge -

1   People are required to prove from all the evidence in the
2   case beyond a reasonable doubt each of the following three
3   elements:  That on or about January 5th 2016, in Onondaga
4   County, the defendant Tony Jennings possessed cocaine.  And
5   Two, that the defendant did so knowingly and unlawfully.
6   And Three, that the cocaine weighed 500 milligrams or more.
7        If you find the People have proven beyond a
8   reasonable doubt each of those elements, you must find the
9   defendant guilty of the crime of criminal possession of a
10  controlled substance in the fifth degree.   On the other
11  hand, if you find the People have not proven beyond a
12  reasonable doubt any one or more of those elements, you
13  must find the defendant not guilty of the crime of criminal
14  possession of a controlled substance in the fifth degree,
15  which is our Second Count.
16        Folks, your verdict as to each count that you
17  consider, whether guilty or not guilty, must be unanimous.
18  That is, each and every juror must agree to it.  To reach a
19  unanimous verdict, you must deliberate with the other
20  jurors.  That means you should discuss the evidence and
21  consult with other each other.  Listen to each other.  Give
22  each other's views careful consideration, and reason
23  together when considering the evidence.  And when you
24  deliberate, you should do so with a view towards reaching
25  an agreement if that can be done without surrendering

1   individual judgment.  Each of you must decide the case for

2   yourself, but only after a fair and impartial consideration

3   of the evidence with the other jurors.  You should not

4   surrender an honest view of the evidence simply because you

5   want the trial to end or you are outvoted.  At the same

6   time, you should not hesitate to re-examine your views and

7   change your mind if you become convinced that your position

8   was not correct.

9        You are going to see the exhibits that were

10  received in evidence.  Again, we are going to send those in

11  to you with the verdict sheet.

12       You may also have the testimony of any witness

13  read back to you in whole or in part.  If you want a

14  readback, write me a note telling me what testimony you

15  wish to hear.  If you are only interested in hearing a

16  portion of a witness' testimony, please specify in your

17  note which witness and with as much detail as possible

18  which part of the testimony you want to hear.

19       Of course when testimony is read back, questions

20  to which an objection was sustained, or material was

21  otherwise struck from the record is not read back.

22       If you have a question on the law write me a

23  notes specifying what you want me to review with you.

24       Mr. Reagan has taken down every word of the

25  trial.  If you want to hear Jennifer Wilson's direct

- Court Charge -

1    testimony -- write a note:  We would like to hear Jennifer

2    Wilson's testimony.  Your foreperson will sign your note.

3    I don't know how your handwriting is, sir.  So let's have

4    it written by somebody that has good penmanship.  But we

5    have the foreperson sign it, just to indicate to us it

6    comes from the jury.  The more specificity you can give us,

7    the better.  But if you want Miss Wilson's entire testimony

8    or any other witness, we will get that done.  It does take

9    time for testimony to be read back to you because Mr.

10   Reagan has to find it.  We have to agree on it, and then we

11   read it back.

12           If you want anything regarding the law, that's

13   easy because I have it right here in front of me.  And as

14   soon as we can get everybody back together, we will give

15   you any readback you want on the law, if you need it.

16           Under our law, our first juror selected is known

17   as the foreperson.  And I have my final juror, it's Mr.

18   McCarthy?

19           JUROR NO. 1:  Yes.

20           THE COURT:  Mr. McCarthy, you are the foreperson

21   during deliberations.  The foreperson's opinion and vote

22   are not entitled to any more importance than that of the

23   other jurors.  What we ask the foreman to do, as I

24   mentioned, to sign any written note that the jury sends to

25   the Court.  The foreperson doesn't have to write it or

- Court Charge -

1    agree with it.  We just have the signature, as I said, to

2    make sure we know it's coming from the jury.

3         When the jury has reached a verdict, guilty or

4    not guilty as to each count, the entire jury will be asked

5    to come into the court.  The foreperson will be asked

6    whether the jury has reached a verdict.  And if you say

7    yes, we will then ask you what the verdict is.  And we may

8    ask all the jurors if that is your verdict.

9         Again, I am going to give you the verdict sheet.

10   It is Court Exhibit A.  It lists each count that's

11   submitted for your consideration.  Use the form to record

12   your verdict.  And you will have that with you when you

13   come back into court to let you know what the verdict is.

14        There are a few remaining rules which you must

15   observe during your deliberations.  While you're in the

16   courthouse deliberating on the case, you're going to be

17   kept together in the juryroom.  You cannot leave the

18   juryroom during deliberations.  Of course, we are going to

19   provide lunch to you.  If you have a cellphone or any other

20   electronic device, we will have you give it to the court

21   officer to hold for you while you're engaged in

22   deliberations.

23        Again, as I said, you can only deliberate about

24   the case when you're all gathered together.  If for some

25   reason someone or more than one needs to leave the room

1    with one of our court officers, deliberations cease until

2    you're all 12 together.

3              During your deliberations, you must discuss the

4    case only among yourselves.  You must not discuss the case

5    with anyone else, including the court officer, or permit

6    anyone other than a fellow juror to discuss the case in

7    your presence.  If you have a question or a request, again,

8    you're going to communicate with me by a written note,

9    which you will give to the court officer, who will give it

10   to me.

11             I should explain to you that under the law, I'm

12   not permitted to have a conversation about the facts of the

13   case or possible verdict or vote of the jury on any count

14   with any juror or group of jurors or even all the jurors.

15   Thus, in any note that you send me, please don't tell me

16   what the vote is as to any count.

17             In closing, and before I send you off for your

18   deliberations, folks, during the course of the trial you

19   have undoubtedly received certain impressions as to how the

20   issues ought to be decided.  You should not allow those

21   impressions to become so fixed in your mind that they

22   prevent you from fairly and frankly discussing this case

23   with each other in the juryroom, and discussing your

24   thoughts on the case with those who may have a different

25   point of view.  While it is the duty of each of you to

- Court Charge -

1    discuss and consider the opinions of others, you must

2    decide the case solely upon your opinion of the evidence,

3    and on your ability and conscience.  It's your duty to give

4    us an absolutely fair and impartial verdict.  The parties

5    are entitled to your fairest and your absolute impartial

6    consideration.  You must base your verdict upon the

7    evidence alone.  Your judgment should not be based on

8    sympathy or any consideration outside of the evidence.

9    When you were sworn as jurors, you accepted the obligation

10    to set aside all sympathy, and decide this case upon the

11    evidence that you have heard and under the rules of law

12    that I have given you.  Both the defendant and the

13    prosecutor are entitled to a fair and impartial verdict.

14            Could I have counsel at the Bench for a moment,

15    please?

16    (Conference at the Bench, with two lawyers and the

17  defendant.)

18            THE COURT:  We have had a brief discussion at the

19    Bench, with counsel.  Folks, we are ready to send you back

20    to begin your deliberations.  We wish you the best of luck

21    in this.  I am going to ask our alternates, Mr. Deitz and

22    Miss Grome, to stay here with us momentarily.  And we would

23    send the 12 of you in there.  We are going to have the

24    lunches here we hope around 11:30.  We will get you

25    started.  As I said, if you have any notes, write those for

- Jury deliberations -

1    us.  We might not be able to get back to you until about

2    12:30 because -- the first note, because of other things we

3    have to do.

4          If we could be of any assistance let us know,

5    good luck, okay?

6    (Jury left the courtroom at 11:00 a.m.)

7          COURT ATTENDANT:  If the alternates could stand

8    right here?

9          THE COURT:  Come on back up please, counsel.  I

10   should have asked.

11   (Conference at Bench.)

12         THE COURT:  We are outside the presence of the

13   jury.  We have our alternates here.  Mr. Centra, I brought

14   both counsel and Mr. Jennings to the Bench at the close of

15   my charge.  I asked if there was any objection to the

16   charge.  And you indicated that you had no objection?

17         MR. CENTRA:  That's correct, Your Honor.

18         THE COURT:  Same with Mr. LoFaro?

19         MR. LOFARO:  Correct, Judge.

20         THE COURT:  All right.  Also, we have our two

21   alternates, Mr. Dietz and Miss Grome.  It's like being the

22   bridesmaid, okay?  Here you are, you're almost there.  And

23   now the jury has retired.  We are not done with you yet.

24   At some point we may release you today.  It's a decision to

25   be made by the parties.  But we will put you in a room

1   separate from our jurors.  And we will get you lunch.  Your

2   lunch is coming, I think, at 11:30.  And we will get that

3   to you.  And then when we come back, at 12:30, we will know

4   better whether you're going to stay or whether you're going

5   to go, okay?  Thank you, folks.

6           You're all set with this, Chrissie?

7           COURT ATTENDANT:  Yes.

8   (Alternates left the courtroom at 11:02 a.m.)

9           THE COURT:  Outside the presence of the jury, as

10  I said, gentlemen I have to go impanel a new Grand Jury.

11  Mr. Reagan and I are going to do that now.  And that's

12  going to take us an hour.  Their lunches will come.  I want

13  to give our court staff an hour for lunch.  So we will get

14  ahold of both of you as soon as we hear something.  I have

15  a feeling they probably want something.  So maybe we could

16  plan on reconvening at 12:30.  But if you have to wait for

17  a call, feel free, you know.  It's up to the two of you.

18          Let's get the exhibits together.  And here is the

19  verdict sheet.  We will send those into the jury.

20  (Pause for organizing exhibits.)

21          THE COURT:  Thank you.  So let's reconvene at

22  12:30 just to see where we are.  Is that all right?

23          MR. LOFARO:  Yes, that's fine, Judge.

24          THE COURT:  Okay.  All right.  Thank you.

25  (Recessed at 11:03 a.m.)

351

- Jury Note -

1                    *                    *                    *

2        (At 11:30, a jury note was received and later marked as

3    Court Exhibit B.)

4                    *                    *                    *

5        (At 12:34 p.m., the following occurred in court:)

6                    THE COURT:  We are back in session.  Mr. Centra,

7    Mr. LoFaro, Mr. Jennings.  I received a note from the jury

8    which I marked Court's Exhibit B.  The question from the

9    jury, gentlemen:  What is Molly?  What does it look like?

10                   I can't answer that question.  There is no

11   evidence that I can give, nothing that I can say about it.

12   My answer is going to be:  I can't answer that question.

13   Okay.  Whatever testimony there was in the record about it,

14   we have asked Mr. Reagan to look that up.  And in the event

15   that the jury wants to hear.  I don't think there was

16   anything that's helpful there either.  But we are not going

17   to give that to them now.

18                   What I am going to say is, I appreciate your

19   questions.  I can't answer them.

20                   Anything else that anybody wants me to say?

21                   MR. CENTRA:  No, Your Honor.

22                   MR. LOFARO:  No, Your Honor.

23                   THE COURT:  Let's have the jury.  We are going to

24   let the alternates go?

25                   MR. LOFARO:  Certainly.

352

- Jury Note - Court Exhibit B -

1      THE COURT:  I have to ask that question:  Under

2  no circumstances would you let them enter the deliberations

3  now?

4  (The jury entered the courtroom at 12:38 p.m.)

5      THE COURT:  Good afternoon, folks.  I hope the

6  lunch was okay.  We are back in the presence of the jury.

7  Mr. Centra, Mr. LoFaro, Mr. Jennings.

8      Folks, I received a noted, signed by the

9  foreperson.  I have marked it Court's Exhibit B.  Two

10  questions.  What is Molly?  What does it look like?

11      I can't answer either question for you.  All

12  right.  The only thing we can answer is evidence that has

13  been presented at the trial.  I can't affirmatively answer

14  those types of things.  I did ask Mr. Reagan, our court

15  reporter, to find references to that in the record, should

16  that help you later.  We do have that if you want that.

17      Later, if you send out a note if you want it,

18  that's up to you.  But as far as that goes, it's not much

19  more I can tell you, except to send you back to continue to

20  deliberate.

21      If there is anything else that we can, that we

22  can help you with, let us know.

23      And we certainly will ask our alternates to stay

24  with us for now.  And the rest of you, we will send you

25  back to keep deliberating.  Thank you.  Sorry.

- Alternates -

1    (The jury left the courtroom at 12:39 p.m.)

2    (Pause as the alternates are present in the courtroom.)

3         THE COURT:  We are outside the presence of the 12

4    sworn jurors.  And we have our two alternates with us:  Mr.

5    Dietz and Miss Grome.  The jury has now been deliberating

6    for more than an hour, and is deep into the deliberations.

7         And Mr. LoFaro, do you know -- that's a standard

8    question that I have to ask in order to release our

9    alternate -- is there any circumstance now that you can

10   envision where if we lost one of our jurors, you would

11   allow the alternates or one of the alternates to enter the

12   juryroom?

13        MR. LOFARO:  No, Your Honor.

14        THE COURT:  And you discussed this with Mr.

15   Jennings, we are going to relieve and release our

16   alternates?

17        MR. LOFARO:  That's correct, Your Honor.  I will

18   thank Mr. Dietz and Ms. Grome as well.

19        THE COURT:  I know Mr. Centra joins in that, as

20   do I.  It has been a relatively short trial.  And what I do

21   often during the trial is look to see what the jurors are

22   doing.  You know, and what I noticed during this entire

23   trial, including the two of you, is our jurors have been

24   riveted on the testimony.  And I appreciate that.  And I

25   know both of you were ready to enter the deliberations if

- Alternates -

1    called upon.  We were lucky we hadn't gotten to that point.

2    No one was gotten sick or not appeared.

3             So, your service is done, with our thanks.  We

4    have a parting gift.  Don't, it's not $100,000 but it is a

5    certificate.  One more is coming.  This is for Ms. Grome.

6    The other, Sabrina is going to have for us.

7             Folks, there was a prohibition for you talking to

8    the attorneys.  That's gone.  I am not saying you have to,

9    but you may.  All right?  You may talk to each other about

10   it.  Just to be, we see the jurors, where you are going to

11   talk to them, we are going to collect your -- we will get

12   your things.  You will be free to go, again, with our

13   thanks, and with thanks of Mr. Jennings, Mr. LoFaro, Mr.

14   Centra.  Okay.

15             MR. CENTRA:  Thank you.

16             THE COURT:  Thank you.  Mr. Dietz, we will get

17   that to you before you go.

18             ALTERNATE JUROR:  Thanks.

19             THE COURT:  Thank you.

20             *              *              *

21   (At 1:16 p.m., jury note marked Court Exhibit C.)

22             THE COURT:  We have got to put some stuff on the

23   record.  We are back in session without the jury.  Mr.

24   Centra is here.  Mr. LoFaro is here.  Mr. Jennings is here.

25             I received another note from the jury which I

- Jury Note - Court Exhibit C -

1    have given copies to you all, Exhibit C:  What are the

2    three rules for sentencing on the two counts?  I am

3    assuming, and I will ask our foreman, Mr. McCarthy, they

4    mean the elements of the two counts.  Because as you both

5    recall, there are three elements as to each count.

6    Obviously, sentencing is not something for them to

7    consider.  I am guessing they wrote the wrong word.

8              THE CLERK:  Maybe.  Sure.  Nobody --

9              THE COURT:  Is that up or next door?  So,

10   gentlemen, any problem with the way I want to handle it?

11             MR. LOFARO:  That sounds great.

12             MR. CENTRA:  That's fine with me, Your Honor.

13             THE COURT:  Okay.  Fantastic.  Let me find it.

14   Chrissie, get the jury.

15   (The jury entered the courtroom at 1:19 p.m.)

16             THE COURT:  Back in the presence of the jury,

17   with both counsel and Mr. Jennings.

18             I know there is some banging going on.  They are

19   doing some reconstruction or something.  I apologize for

20   that.  If it continues we will try to speak up a little

21   louder, if we need to.

22             I did receive a note from the jury, Exhibit C,

23   signed by our foreperson:  What are the three rules for

24   sentencing?  On the two counts.

25             Mr. McCarthy, I am assuming -- and I have

356

- Jury Note - Court Exhibit C -

1  discussed this with the attorneys -- I am assuming you mean
2  the three elements as to each count?
3                    THE FOREMAN:  Correct.
4                    THE COURT:  Yes?
5                    THE FOREMAN:  Yes.
6                    THE COURT:  That's what we thought.  As you know,
7  folks, and it's easy, we throw out a lot of these terms
8  during the course of a trial.  If there is -- you know,
9  this, I just want to warn you again if there is to be any
10  sentencing, if there is, that's up to me.  I know this was
11  just a word that was misplaced.  It should have been:  What
12  are the three elements on the two counts?  I will give
13  those to you now.  Count One is criminal possession of a
14  controlled substance in the third degree.  A person is
15  guilty of criminal possession of a controlled substance in
16  the third degree when that person knowingly and unlawfully
17  possesses a narcotic drug with the intent to sell it.  In
18  order for you to find the defendant guilty of this crime,
19  the People are required to prove from all of the evidence
20  in the case, beyond a reasonable doubt, each of the
21  following three elements:  That on or about January 5th,
22  2016, in Onondaga County, the defendant Tony Jennings
23  possessed cocaine.  And Two, that the defendant did so
24  knowingly, and unlawfully.  And Three, that the defendant
25  possessed cocaine with the intent to sell it.

- Jury Note - Court Exhibit C -

1    If you find the People have proven both -- all

2    three elements, beyond a reasonable doubt, you must find

3    the defendant guilty.  If you find the People have not

4    proven beyond a reasonable doubt any one or more of those

5    elements, then you must find the defendant not guilty.

6         Criminal possession of a controlled substance in

7    the fifth degree.  A person is guilty of criminal

8    possession of a controlled substance in the fifth degree

9    when that person knowingly and unlawfully possesses

10   cocaine, and said cocaine weighs 500 milligrams or more.

11   In order for you to find the defendant guilty of this

12   crime, the People are required to prove from all of the

13   evidence in the case, beyond a reasonable doubt, each of

14   the following three elements:  That on or about the 5th day

15   of January 2016, in the County of Onondaga, the defendant

16   Tony Jennings possessed cocaine.  And that the defendant

17   did so knowingly, and unlawfully.  And that the cocaine

18   weighed 500 milligrams or more.

19        If you find the People have proven beyond a

20   reasonable doubt each of those elements, you must find the

21   defendant guilty of that charge.  If you find the People

22   have not proven beyond a reasonable doubt any one or more

23   of those elements, you must find the defendant not guilty.

24        I hope that helps, folks.  If you need anything

25   else let us know.  Thank you.

- Verdict -

1    (The jury left the courtroom at 1:23 p.m.)

2                *           *           *

3    (Jury note marked at 2:45, and the following occurred in

4    court at 2:51 p.m.:)

5             THE COURT:  We are back in session, Pat.  We have

6    Mr. Centra, Mr. LoFaro, Mr. Jennings.  I have received a

7    note from the jury, Exhibit D, as marked.  And they tell us

8    that they have a verdict.  So if we could have the jury and

9    we will take the verdict, please?

10    (The jury entered the courtroom at 2:53 p.m.)

11             THE COURT:  All right.  Ladies and gentlemen, we

12    are back in session with our jury.  With Mr. Centra, Mr.

13    LoFaro, and Mr. Jennings.  I have received a note from the

14    jury.  We marked it as Exhibit D, indicating that the jury

15    has reached a verdict.  Is that correct, Mr. McCarthy?

16             JUROR NO. 1 (THE FOREMAN):  Yes.

17             THE COURT:  Do you mind standing for me, sir?

18    And as to Count One, criminal possession of a controlled

19    substance in the third degree, what is the verdict of the

20    jury?

21             THE FOREMAN:  Guilty, Your Honor.

22             THE COURT:  And sir, as to Count Two, criminal

23    possession of a controlled substance in the fifth degree,

24    the jury's verdict?

25             THE FOREMAN:  Guilty, also.

- Verdict -

1          THE COURT:  Thank you.  And you can sit down, Mr.

2     McCarthy.   Thank you.

3          And ladies and gentlemen of the jury, is that the

4     verdict of all of you as to Count One, guilty?

5     (Jury response.)

6          THE COURT:  And as to Count Two, also guilty?

7     (Jury response.)

8          THE COURT:  Do either counsel wish the jury to be

9     polled?

10         MR. LOFARO:  Please, Your Honor.

11         THE COURT:  All right.  Juror No. 1, that is your

12    verdict, guilty as to both counts?

13         THE FOREMAN:  Yes, sir.

14         THE COURT:  No. 2?

15         JUROR NO. 2:  Yes, sir.

16         THE COURT:  No. 3?

17         JUROR NO. 3:  Yes.

18         THE COURT:  No. 4?

19         JUROR NO. 4:  Yes.

20         THE COURT:  No. 5?

21         JUROR NO. 5:  Yes.

22         THE COURT:  No. 6?

23         JUROR No. 6:  Yes, sir.

24         THE COURT:  Juror No. 7, your verdict as to both

25    counts is guilty, is that correct?

- Verdict -

1        JUROR NO. 7:  Yes, sir.

2        THE COURT:  No. 8?

3        JUROR NO. 8:  Yes, sir.

4        THE COURT:  No. 9?

5        JUROR NO. 9:  Yes, sir.

6        THE COURT:  No. 10?

7        JUROR No. 10:  Yes.

8        THE COURT:  No. 11?

9        JUROR NO. 11:  Yes.

10        THE COURT:  12?

11        JUROR:  Yes.

12        MR. LOFARO:  Satisfied.

13        THE COURT:  Yes?

14        MR. LOFARO:  Yes, Your Honor.

15        THE COURT:  I have the verdict, folks.  There is

16   no way to properly thank you, I think, with words for what

17   you have done for these last few days.  I thank you on

18   behalf of everyone in here, whether it be the Court staff,

19   the deputies that have worked the case, Mr. Jennings, Mr.

20   LoFaro, and Mr. Centra.

21        Without you, the system doesn't work.  It just

22   works -- this is the example of how the system works.  The

23   12 of you getting together and giving us a verdict.  Your

24   service is over.  It will be over for the next ten years.

25   What I will do is I will come back and speak to you for a

- Verdict -

1    moment, and just see if I can answer any questions that you

2    may have before we have you go home.  We have something for

3    you.  Not much.  We have something for you.

4         But again, on behalf of all the attorneys, and

5    everyone else associated with the case, thank you very much

6    for your service.

7    (The jury left the courtroom at 2:55 p.m.)

8         THE COURT:  We are outside the presence of the

9    jury, both counsel and Mr. Jennings.  I am going to hold

10   Mr. Jennings without bail until the time of sentence.

11   Sentence will be on March the 8th.

12        Mr. Jennings, the probation department will

13   interview you and expect you to cooperate with them while

14   they do that interview.  And we will put it on for

15   sentencing on March 8th at 9:15.  Does that date work for

16   you, Mr. LoFaro?

17        MR. LOFARO:  It does, Your Honor.

18        THE COURT:  All right.  And anything else we need

19   to discuss, gentlemen, before we break?  Mr. Centra?

20        MR. CENTRA:  No, Your Honor.

21        THE COURT:  And Mr. LoFaro?

22        MR. LOFARO:  No, Your Honor.

23        THE COURT:  Okay.  Patrick, thank you very much.

24   Thank you.

25   (End of Trial at 2:56 p.m.)

**TRIAL INDEX**                                                   p. 363
**People v. TONY JENNINGS**
February 6, 7, and 8, 2007
Indictment #:  2016-0961-1;   Index #: 16-049

|                              | Pages: | Volume: |
|------------------------------|--------|---------|
| Monday, February 6, 2017     | 2      | I       |
| Tuesday, February 7, 2017    | 189    | II      |
| Wednesday, February 8, 2017  | 322    | II      |

| - Index/Exhibits | | 363/364 | |
| * | * | * | * |

| **Jury Selection:** | Court | Centra | LoFaro | Challenges |
|---------------------|-------|--------|--------|------------|
| Panel I             | 22    | 88     | 95     | 117        |
| Panel II            | 125   | 156    | 160    | 163        |

| Openings: | 169 | 192 | 196 |
|-----------|-----|-----|-----|

| **People's Witness:** | Direct | Cross | Redirect | Recross |
|-----------------------|--------|-------|----------|---------|
| Jeremy Decker         | 204    | 212   | 219/221  | 220     |
| Darrin Ettinger       | 221    | 227   | X        |         |
| Jennifer Wilson       | 233    | 242   |          |         |
| David P. Proud        | 247    | 254   |          |         |
| People rest           | 257    |       |          |         |

| **Defendant's Witness:** | | | | |
|--------------------------|-----|-----|-----|-----|
| Howard Davis             | 264 | 267 | 269 | 270 |
| Tony Jennings            | 271 | 290 |     |     |
| Defense rests            | 297 |     |     |     |

| Closing - LoFaro    | 301     |
|---------------------|---------|
| Closing - Centra    | 309     |
| Charge discussions  | 298/322 |
| Court Charge        | 328     |
| Jury Notes          | 351 - 358 |
| Verdict             | 358     |

| * | * | * |

page: 364

**TRIAL EXHIBITS**
**People v. TONY JENNINGS**
**February 6, 7 and 8, 2017**

**People's Exhibits:**

| Exhibit No. | Description | Marked | Received |
|---|---|---|---|
| 1 | Digital scale | 207 | 207 |
| 2 | Packaged drugs | 210 | 210 |

\*          \*          \*

**Defendant's Exhibit:**

| | | | |
|---|---|---|---|
| A | Photograph | 272 | |

\*          \*          \*

**Court's Exhibits:**

| | | | |
|---|---|---|---|
| A | Blank verdict sheet | 350 | |
| B | Jury Note (Molly) | 351 | |
| C | Jury Note (Elements of crime) | 354 | |
| D | Verdict reached | 358 | |

\*          \*          \*

PDR  7/27/12