1                    DEPOSITION of FRANK L. FOWLER

2

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   ************************************************************

6   TONY JENNINGS,

7                        Plaintiff,

8           v.                    CV #5:17-CV-0054

9   JEREMY DECKER, et al.,

10                       Defendants.

11  ************************************************************

12                    DEPOSITION of Defendant, CITY OF SYRACUSE, by

13      its Officer, Agent, or Employee, FRANK L. FOWLER, held in

14      the above-entitled matter pursuant to Notice of

15      Deposition on the 27th day of January, 2020, commencing

16      at 10:41 a.m. at the offices of the City of Syracuse

17      Department of Law, Corporation Counsel's Office, 233 East

18      Washington Street, Syracuse, New York, before Renée D.

19      Leguire, Certified Shorthand Reporter, Registered Merit

20      Reporter, Certified Realtime Reporter, and Notary Public

21      in the State of New York.

22

23

24

25

1

2  **A P P E A R A N C E S:**

3

4                    KEVIN M. CANNIZZARO, ESQ.
                     P.O. Box 10849
5                    Albany, New York  12208
                     Attorney for Plaintiff
6

7                    KRISTEN E. SMITH, Corporation Counsel
                     City of Syracuse Department of Law
8                    Syracuse, New York  13202
                     Attorney for Defendants
9                         BY:  CHRISTINA F. DeJOSEPH
                                Senior Assistant Corporation Counsel
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                           S T I P U L A T I O N S

4

5                IT IS HEREBY STIPULATED AND AGREED

6       by and between the parties hereto that all rights

7       provided by the FRCP, including the right to object to

8       any question except as to the form or to move to strike

9       any testimony at this examination, are reserved and, in

10      addition, the failure to object to any question or move

11      to strike testimony at this examination shall not be a

12      bar or waiver to make such motion at, and is reserved

13      for, the trial of this action.

14                   It is further stipulated and agreed that this

15      examination may be sworn to by the witness being examined

16      before a notary public other than the notary public

17      before whom this examination was begun.

18                   It is further stipulated and agreed that the

19      filing and certification of the original of this

20      examination are waived.

21

22                     *           *           *

23

24

25

<u>FRANK L. FOWLER,</u>

2        having been first duly sworn by Ms. Leguire, a notary

3        public in and for the State of New York, was examined and

4        testified as follows:

5    BY MR. CANNIZZARO:

6        Q.   Chief Fowler, my name is Kevin Cannizzaro.  I'm

7    here to discuss an incident on January 5th, 2016, regarding my

8    client, Tony Jennings.  Mr. Jennings filed suit, and I deposed

9    the officers involved in the case and just now Sergeant Ocker.

10            Before we begin, I want to lay down some

11   ground rules for the course of this deposition that we'll try

12   to abide by just to make the transcript clean for the

13   stenographer.  Sir, I ask that you answer every question to

14   the best of your ability based on what you recall.  If at any

15   time you don't understand a question, I don't want you to

16   answer.  I want you to let me know that you don't understand

17   it and ask me to rephrase, and I'll be happy to do that.  If

18   you do provide an answer, I'm going to presume that you

19   understood the question that was asked.  So, again, if at any

20   time you don't understand the question, feel free to ask.

21   Okay?

22        A.   (Witness nods head.)

23        Q.   And if you can stick to verbal responses.  As you

24   know, this is being transcribed, so we do need verbal

25   responses to each question asked.  Okay?

1      A.   Yes.

2      Q.   If you need a break at any time, that's fine, just

3  let your -- Ms. DeJoseph know or let me know, and we can do

4  that.  I just will ask that, if we're in the middle of a

5  question, that you answer the question that's on the table

6  before we take a break.  Okay?

7      A.   Sure.

8      Q.   And the final piece is I'm going to try and wait

9  until you finish giving your answer before I ask another

10  question, and I'd ask that you do the same.  Just wait until I

11  finish my question before you provide an answer so that we

12  don't interrupt each other.  Okay?

13      A.   Sure.

14      Q.   All right.  Can you spell your first and last name

15  for me?

16      A.   First name, Frank, F-r-a-n-k, last name, Fowler,

17  F-o-w-l-e-r.

18      Q.   And, Chief Fowler, have you ever been deposed

19  before in a setting such as this?

20      A.   Yes.

21      Q.   Okay.  About how many times?

22      A.   I don't recall.

23      Q.   Okay.  More than 50?

24      A.   No.

25      Q.   Less than 25?

1      A.    Could be.

2      Q.    Okay.  And in what context have you given testimony

3  in a deposition?  Are they for lawsuits, civil lawsuits?

4      A.    Yes, primarily.

5      Q.    In any other context have you sat for a deposition

6  like this before?

7      A.    Not that I can recall.

8      Q.    Do you feel prepared to answer the questions I'm

9  going to be asking you today?

10     A.    Well, it's kind of hard to answer that seeing that

11 I don't know what your questions are going to be.

12     Q.    Okay.  Is there anything that you're aware of that

13 you think would prevent you from giving your full attention

14 today?

15     A.    No.

16     Q.    And you referenced you're having a little bit of an

17 issue with your ear.  Do you think there's anything about that

18 that's going to affect your ability to understand and answer

19 the questions I'm going to be asking you?

20     A.    No.  That's why I told you about it up front --

21     Q.    Okay.

22     A.    -- and I also told you that it wouldn't have -- it

23 wouldn't be an issue.

24     Q.    Okay.

25     A.    Yes.

1      Q.   Okay.  And have you had any medical procedures in

2    the last 24 or 48 hours that you think would affect your

3    ability to understand and answer the questions I'm going to be

4    asking?

5      A.   No, I have not.

6      Q.   Are you on any medications that would affect your

7    ability to answer and understand the questions I'm going to be

8    asking you?

9      A.   No, not at all.

10     Q.   And do you have any physical or other condition

11   that would affect your ability to understand and answer

12   questions I'm going to be asking?

13     A.   No.

14     Q.   I want to get a little bit into your employment

15   background, Chief, and specifically direct your attention to

16   January of 2016.  Were you employed in January 2016?

17     A.   Yes.

18     Q.   And in what context were you employed?

19     A.   I was the chief of police for the City of Syracuse.

20     Q.   For the Syracuse Police Department?

21     A.   Yes.

22     Q.   And as of 2016 how long had you been employed as

23   the chief of police for the City of Syracuse?

24     A.   Approximately six years.

25     Q.   So approximately -- strike that.

1            You were Syracuse police chief from

2    approximately 2010 to what date?

3            (Pause.)

4        Q.   You can give me a year if you do not know the

5    specific date.

6        A.   Yeah, sure.  2019 -- I'm sorry, no, December of

7    2018.

8        Q.   December of 2018.  So is it fair to say that you

9    held the position of chief of the Syracuse Police Department

10   for, give or take, eight years or so?

11       A.   Nearly nine years.

12       Q.   Nearly nine?  And is the Syracuse police chief --

13   your position as the Syracuse police chief, is that an

14   appointed position?

15       A.   It is.

16       Q.   How does that occur?  How are you appointed the

17   Syracuse police chief?

18       A.   The chief of police for the City of Syracuse is

19   appointed by the mayor.

20       Q.   And does the mayor -- is it a unilateral choice by

21   the mayor?

22       A.   Yes.

23       Q.   Is there any involvement with the Syracuse Common

24   Council in terms of approving the choice of the Syracuse

25   police chief?

1      A.   No.

2      Q.   And who is the mayor that appointed you Syracuse

3   police chief?

4      A.   Stephanie Miner.

5      Q.   Chief, can you explain to me in whatever way that

6   seems most reasonable the role that the police chief -- the

7   Syracuse police chief plays in the police department?

8      A.   Sure.  The chief of police has the final say in all

9   matters concerning the Syracuse Police Department.  The chief

10  is responsible for creating and approving policy for the

11  police department, authorizing the budget, and overall

12  management of the police department, setting the goals and

13  objectives.

14     Q.   And I want to go into each one of those a little

15  bit.  Actually, let me back up a little bit.  Is the chief of

16  police -- as part of your duties when you're a chief of

17  police, were you also responsible for supervision, training,

18  and discipline of officers under your employ?

19     A.   Not direct supervision but more management than

20  supervision, and I'm of the opinion that there's a difference

21  between management and supervision.

22     Q.   All right.  Can you talk to me about -- explain to

23  me what the difference is between management and supervision

24  in that context?

25     A.   Sure.  So, supervision, supervision is the folks

1  who are in charge, and they have day-to-day direct contact

2  with the employees.  They assure that the employees are

3  adhering to the workplace standards and policies.  Management

4  oversees the supervisors, ensures that they are properly

5  trained, and also set policy and directives for the

6  subordinates that I just mentioned.

7       Q.   And in your role as Syracuse police chief, Chief,

8  did you -- were you responsible for creating training policies

9  for subordinates?

10      A.   For approving training.

11      Q.   You would approve training protocols?

12      A.   Yes.

13      Q.   And that applied to training protocols for all

14  types of training for the Syracuse Police subordinates?

15      A.   I'm not sure because I'm not sure what you mean by

16  all types of training.

17      Q.   So let me get a little bit more specific.  In terms

18  of the officers who were under your command, did you institute

19  training requirements for those officers?

20      A.   Yes, but -- yes.  Can I --

21      Q.   Sure.  Go ahead.

22      A.   All right.  So this -- in the police world,

23  training is ongoing.  Each and every day there's some aspect

24  of training that's taking place within the police department.

25  You have training that takes place at various levels.  You

1   have on-the-job training that takes place each and every day,

2   and I may not know that that's even occurring.  It should

3   occur, it does occur, but the chief of police will never know

4   what that --

5        Q.   You're not involved in that?

6        A.   Not at all.

7        Q.   Okay.

8        A.   Roll-call training, so there's training that takes

9   place within the rank and file.  Then there's in-service

10  training, and there's training associated with the entire

11  police department adhering to the goals and objectives that

12  are set by the police department, and that training will

13  locally take place in in-service training where there's a

14  standardized lesson plan that's created; and everyone or those

15  who have been identified that's going to be responsible for

16  adhering to the new policies or standards, they are trained.

17  They're given additional training so that they can meet those

18  standards.

19       Q.   And who in the department -- and if it's you, you

20  can just say it's you.  -- is responsible for creating the

21  standardized training that officers receive?  How does that

22  occur?  Who creates that policy and training procedures?

23       A.   It comes from various sources.

24       Q.   Are you involved in that process in terms of

25  creating the standardized training protocols for officers?

1    A.    Very seldom would I be involved in that.

2    Q.    Do you have any -- as police chief or in your time

3    that you were police chief, were you required to approve the

4    training, standardized training, that officers received?  Did

5    you have a role in approving that training?

6    A.    Some training.

7    Q.    And what training did you have a role in in that

8    context?

9    A.    If there's going to be a significant change to the

10   basic academy, that is something that would be brought to my

11   attention, and I would give approval for that.  If there is a

12   change in the law, if there's a change in the procedures,

13   standard operating procedures for police officers, if there's

14   a significant piece of equipment that police officers are

15   going to use and it's going to affect the entire police

16   department, if there's some type of a mandate that the police

17   department has, there's a likelihood that when that training

18   is finalized that -- I'm sorry, before that training is

19   implemented, that the chief of police would be consulted on

20   the final training.

21   Q.    And in those instances that you just described,

22   what is the consultation with the police chief -- excuse me.

23   Strike that.

24         In that process that you just described, what

25   does the consultation with the chief of police look like from

1    an operations standpoint?

2         A.    Sure.   The person that -- the training director?

3         Q.    Sure.   Let's say if one of your subordinates

4    proposed a change to the departmental policy, is that

5    something that you would have to approve as police chief?

6         A.    A policy?   Absolutely.

7         Q.    So talk to me about the process by which changes to

8    departmental policy were either approved or not approved by

9    you as police chief.

10              MS. DeJOSEPH:   Object to form.   You can

11         answer.

12         A.    Sure.   I don't completely understand.

13         Q.    Okay.   So, in the event that a change needs to be

14   made to a specific policy within the Syracuse Police

15   Department, can you walk me through start to finish how that

16   change could occur and specifically with your involvement.

17         A.    Well, all right.   There would probably be some

18   discussion in a staff meeting or someplace elsewhere.   We

19   would determine that the policy needed to be changed, and once

20   we agreed that the policy needs to be changed, then the policy

21   itself would be examined.   The current policy would be

22   examined.   The changes to the policies would be proposed, and

23   what -- we would review the current policy alongside the

24   proposed changes, discuss if we need to develop a training

25   component so that the policy would be smoothly implemented

1  throughout the police department, and once all of those things

2  have been discussed, then and only then would the policy be

3  agreed upon and finally signed off in a written form by me.

4        Q.   And as police chief did you -- you had final say on

5  any of those changes to departmental policy and procedure?

6        A.   Yes.

7        Q.   And just backing up a little bit, in your role as

8  police chief, you were the, essentially, final policy maker

9  for the department?

10       A.   Correct.

11       Q.   Were there any other of your command staff who was

12  involved in that process that you just described during your

13  time as police chief?

14       A.   Yes.

15       Q.   And who was that?

16       A.   It could -- it depends on what the policy is.

17       Q.   Sure.

18       A.   As I told you, there would be some discussion

19  beforehand, and the discussion would take place first with

20  those who had the most knowledge concerning the area of

21  policing that the policy is going to cover.  We have people

22  who, for lack of a better term, subject matter experts, so

23  those personnel would be involved in a pretty healthy

24  discussion prior to any decision being made, and then senior

25  management, the deputy chiefs, would be involved in the

[FRANK L. FOWLER - Mr. Cannizzaro]

1    process, not all of them, but just those whose personnel would

2    be mostly affected by the policy.  For example, if it involves

3    detectives, then the deputy chief of the Investigation Bureau

4    would be involved in the process.

5        Q.   And is it the same process for developing training

6    policies and procedures for the department?  Does the same

7    process occur that you just described?

8                MS. DeJOSEPH:  Object to form.  You can answer

9        it.

10       Q.   Is there any difference from what you just

11   described with regard to departmental policies in terms of the

12   training policies that you developed?

13       A.   I'm not -- I'm still not sure I understand the

14   question.

15       Q.   Sure.  So how are training policies -- departmental

16   training, standardized training, how is that developed by the

17   police department in your time as Syracuse police chief?

18       A.   Sure.  That's developed through our Training

19   Division.  We have -- the Syracuse Police Department has a

20   specific division, and their responsibility is to develop

21   training and to conduct training.

22       Q.   And where does the Training Division fall in the

23   hierarchy of the Syracuse Police Department?

24       A.   It's just another division within the police

25   department.

1      Q.   So there's no command staff that are part of the

2   Training Division?

3      A.   Yes.

4      Q.   Okay.  Who are the command staff that are part of

5   the Training Division?

6      A.   Well, you would have the first deputy chief.  The

7   Training Division falls under the first deputy chief, and then

8   there would be a commander in charge of the Training Division

9   and, depending on the strength of the police department, there

10   would be a supervisor, and that would be the entire

11   Training -- chain of command for the Training Division.

12      Q.   And, Chief, does the Training Division, in the

13   event it's needed, make recommended changes to training

14   protocols?

15      A.   Yes.

16      Q.   Can you tell me about how that would occur in the

17   event a change to a training -- standardized training protocol

18   was needed?

19      A.   So the need would be identified and deemed

20   necessary and, once that happens, that Training Division would

21   identify the person within the police department that is

22   properly trained and has the most knowledge in that particular

23   area.  That person would likely be tasked to develop a lesson

24   plan, and that lesson plan would be reviewed and approved by

25   the supervisor or and/or the commanding officer of the

1    Training Division, and that's how it's developed.

2         Q.   And, Chief, did you have any involvement in

3    approving either lessons planned for training materials or

4    changes to those lessons plans?

5         A.   No.

6         Q.   No involvement in that process?

7         A.   No.

8         Q.   Who was the final decision maker on those training

9    policies and changes to those policies, then?

10        A.   That would be the commanding officer for the

11   Training Division.

12        Q.   And the commanding officer could unilaterally make

13   those changes without your approval?

14        A.   I'm going to say no --

15        Q.   Okay.

16        A.   -- and then I'm going to -- is it okay if I

17   continue?

18        Q.   Oh, sure.  Go ahead.

19        A.   Then I'm going to refer back to how I originally

20   answered your question in that, before a change is even

21   discussed, the change has to be identified, and it has to be

22   an acceptable change for the police department, and only after

23   that do -- does the police department set about making

24   changes.

25        Q.   And, Chief, who makes that determination as to

1    whether a change to a training protocol is acceptable?

2        A.   The decision is made based on the need.

3        Q.   Okay.

4        A.   For example, the Syracuse Police Department could

5    receive body cameras.  Once they receive the body cameras,

6    obviously the officers would have to know how to use the body

7    cameras, and obviously a policy would be created as to how the

8    police department wants them to use the body cameras.  So

9    there the training need has been identified.  Then the people

10   who have been properly trained on the use, maintenance of the

11   body cam's are consulted, and training -- then a training

12   outline or a lesson plan is developed, and then the training

13   begins.

14       Q.   Okay.  And changes to those lessons plans, again,

15   you don't have any involvement in decisions regarding changes

16   to those lessons plans as police chief?

17       A.   No.

18       Q.   Okay.  Okay.  So, Chief, did you have a policy in

19   place in 2016 with regard to the use of force by officers?

20       A.   Yes.

21               MR. CANNIZZARO:  Okay.  I'm going to have this

22        marked as Plaintiff's Exhibit A.

23               MS. DeJOSEPH:  Do you want to use the one

24        that's already been marked?

25               (Discussion off the record.)

1              (A document purporting to be Section 3.00

2        entitled "Use of Physical Force" was marked for

3        identification as Plaintiff's Exhibit A, this date.)

4   BY MR. CANNIZZARO:

5        Q.   Chief, I just handed you what's been marked as

6   Plaintiff's Exhibit A.  This was the use of force policy that

7   was in place in 2016.  Do you recognize this document?

8              (The witness reviewed the document.)

9        A.   Yes.

10       Q.   And if I could direct your attention to the last

11  page, there's a section that says "Policy Revision History".

12  Can you explain what that is there to indicate?

13       A.   This is there to indicate the -- when there's a

14  significant -- I'm sorry.  When there's a change to the

15  policy --

16       Q.   Okay.

17       A.   -- so that we can compare it to what we had

18  previously versus what the new standard is.

19       Q.   Okay.  And, if you look down in that section, there

20  there's a -- along the top there's a notation that says "G.O.

21  Number", what does that stand for?

22       A.   General order number.

23       Q.   And what are general orders?  How does that came

24  into place with regard to revisions?

25       A.   Sure.  Once a policy change is made, then that's

1  something that has to be communicated out to the entire police

2  department, and the way we go about doing that is by issuing a

3  general order, and all are instructed to read and acknowledge

4  the general orders.

5      Q.   And, Chief, I want to talk to you a little bit

6  about this policy specific to your expectations with officers

7  for the use of force.  Chief, can you explain to me how --

8  what guides an officer's use of force?  What should an officer

9  use to guide his decision in the use of force?

10     A.   Well, use of forces primarily are reactionary.

11     Q.   And what is that?  What do you mean by that?

12     A.   What I mean by that is that the officers use that

13 force necessary to control a situation.

14     Q.   And it seems in previous depositions we talked a

15 lot about the concept of necessary and necessity.  Can you

16 talk to me about how the concept of necessity plays into a use

17 of force?

18     A.   I don't know the distinction.

19     Q.   Sure.

20     A.   As I sit here between necessity and necessary --

21     Q.   Okay.

22     A.   -- because once the determination has been made

23 that force -- use of force is necessary, then the officers are

24 guided by what they're allowed to do by policy and what is

25 necessary to bring the subject under control.  The ultimate

1    goal during any use of force is compliance.  Once you've

2    achieved that, then the force stops.

3        Q.   Once a suspect is compliant, there should be no

4    further force used; is that right?

5        A.   Correct.

6              MS. DeJOSEPH:  Can I -- sorry to interrupt for

7         a moment.

8              MR. CANNIZZARO:  Sure.

9              MS. DeJOSEPH:  With Judge Dancks we had a

10        discussion about kind of the parameters of this

11        deposition --

12             MR. CANNIZZARO:  Yes.

13             MS. DeJOSEPH:  -- and we're -- I'm trying to

14        be respectful of your line of questioning.  I just think

15        we're dabbling into something that's outside the scope of

16        his deposition.

17             MR. CANNIZZARO:  I'm going to quickly get

18        to -- can we go off the record a minute?

19             (Discussion off the record.)

20    BY MR. CANNIZZARO:

21        Q.   So, Chief Fowler, I'm going to direct your

22    attention to the definitions section of this policy on Page 1.

23        A.   Sure.  Yes, m-m h-m-m.

24        Q.   Chief, if you read along with me:  *Physical force*

25    *is defined as a degree of physical contact that includes but*

1   *is not limited to striking, kicking, pushing, biting, or*

2   *disabling action by means of chemical agent capable of causing*

3   *discomfort or pain when such contact is unlikely to result in*

4   *serious physical injury or death.*  Did I read that right?

5        A.   Yes.

6        Q.   And is that -- is that definition there to describe

7   to officers the acceptable range of force that they may use in

8   any given instance?

9        A.   I don't know if it's necessary range, but it's

10   certainly options.

11        Q.   Okay.  These are options that an officer could

12   consider using?

13        A.   Yes.

14        Q.   And, again, that decision is guided by what?  What

15   should that decision be guided by an individual officer?

16        A.   That decision is guided by a number of factors:

17   Environment, the subject themselves, the officers, the

18   officer's physical capabilities.  So a number of factors could

19   play into what type of force the officer would use in that

20   situation.

21        Q.   Is it -- Chief Fowler, are you familiar with a

22   concept in police practice called a continuum of force?

23        A.   The use-of-force continuum?

24        Q.   Yes.

25        A.   Yes.

1       Q.   Can you explain that to me from your experience in

2   your role as a police chief?

3       A.   Well, the use-of-force continuum when it was

4   introduced was identified as a ladder that the officer would

5   use in terms of force.  The ladder would -- the bottom rung of

6   the ladder would indicate the minimum of force; and then,

7   based on the subject's resistance, the officer can build up on

8   that ladder of force right from the use of hand control

9   techniques right up to deadly physical force.

10      Q.   And, Chief, is it accurate to say that the use of

11  force is largely driven by the suspect's actions?

12      A.   Yes.

13      Q.   Chief, I want to direct your attention to Page 4 of

14  Plaintiff's Exhibit A, and if you'd direct your attention to

15  Section 3.15, Subsection E.  Chief, again, Section 3.15,

16  Subsection E, can you take a minute to read just that

17  Subsection E on Page 4 and let me know when you're done.

18      A.   Sure.

19               (The witness complied.)

20      A.   Yep.

21      Q.   Chief, can you talk to me what role you played as

22  chief of police in the review of reports of physical force?

23               MS. DeJOSEPH:  In this case specifically?

24               MR. CANNIZZARO:  Just generally.

25      Q.   Just generally what role, Chief, you played in

1    reviewing administrative reports regarding the use of physical

2    force.  Generally.

3        A.    Sure.  Generally the chief of police would have a

4    minimum role in reviewing the use of force.

5        Q.    Is there someone in your hierarchy or command staff

6    or otherwise who had a primary role in that process?

7        A.    Absolutely.

8        Q.    Okay.  And who was that?

9        A.    It would be the commanding officer and the deputy

10   chief.

11       Q.    And when you say "commanding officer", do you mean

12   of a particular unit?

13       A.    Yes.

14       Q.    Okay.  Who was the deputy chief in 2016, do you

15   recall?

16       A.    Of what division?

17       Q.    Oh, I'm sorry.  Let me back up.  That was a

18   misunderstanding on my part.

19       A.    What bureau actually.

20       Q.    So deputy chiefs are the heads of individual

21   bureaus in the Syracuse Police Department?

22       A.    Correct, yes.

23       Q.    Okay.  I've got you.  I misunderstand stood the

24   structure there.

25       A.    That's fine.

1      Q.   So I'm going to direct your attention, Chief,

2  looking at this same page, to Section B, as in boy.

3      A.   Sure.

4      Q.   Take a second to read that, and then I have a

5  couple questions for you.

6      A.   Okay.

7               (The witness complied.)

8      A.   Yes.

9      Q.   Chief, can you explain to me generally the role

10  that the Office of Professional Standards plays regarding the

11  investigation of complaints received regarding the use of

12  force?

13      A.   So the Office of Professional Standards reviews the

14  use of force.

15      Q.   And how did they decide which uses of force to

16  review?  How did they decide that?  Is it complaints that they

17  received?

18      A.   It's complaint driven, yes.

19      Q.   Okay.  And what role, if any, do you have as chief

20  of police with regard to those investigations that the Office

21  of Professional Standards did under the use of force?

22      A.   Once the Office of Professional Standards has

23  conducted their final investigation, their final investigation

24  is reviewed by the senior management of the police department,

25  depending on the bureau.  It would go from the Office of

1    Professional Standards to the bureau -- the deputy chief of

2    the bureau, to the first deputy chief for review, and then

3    ultimately to the chief of police for review and for final

4    sign-off.

5        Q.    And would you -- I mean, generally did you sign off

6    physically, or was it an auto-penned type situation?

7        A.    Physically sign off.

8        Q.    Beyond signing off on reports coming from the

9    Office of Professional Standards regarding use of force, did

10   you do your own independent investigation of these reports?

11       A.    No.

12             MS. DeJOSEPH:  I'm going to ask you to have

13        questions that are specific to this case.

14             MR. CANNIZZARO:  Yes.

15       Q.    So, Chief, can you tell me if you recall -- let me

16   back up.  Actually, I'm going to move out of that.  We'll get

17   back to specifics to this case regarding the investigation

18   into the use of force.  You can put that aside for the moment.

19   So, Chief, did you also have in place during your time and

20   specifically in 2016 a policy regarding prohibiting racial

21   profiling, profiling based on ethnic, religious, national

22   origin, and sexual orientation?  Did you have a policy in

23   place to prohibit that kind of profiling?

24       A.    Yes.

25             MR. CANNIZZARO:  Okay.  I'm going to have this

1      marked as Plaintiff's Exhibit B.

2                  (A document further described herein was

3      marked for identification as Plaintiff's Exhibit B, this

4      date.)

5  BY MR. CANNIZZARO:

6      Q.   Chief, I'm going to give you a minute to take a

7  look at Plaintiff's Exhibit B.  Do you recognize what this is,

8  and feel free to take a look at it before you answer.

9                  (The document was handed to the witness, and

10     the witness reviewed the document.)

11     A.   What's your question?

12     Q.   You're all ready?  You're done reviewing it?

13     A.   Yes.

14     Q.   Can you tell me what this document is?

15     A.   Yes.  It's Volume 1, Article 4 of the Syracuse

16  Police Department rules and regulations, and it's for

17  prohibition against racial, ethnic, religious, and national

18  origin, immigration status, sexual orientation, and gender

19  profiling.

20     Q.   And was this policy in place and active in 2016?

21     A.   Yes.

22     Q.   So I want to direct your attention, Chief, to

23  Section 18.15, and it's titled "Responsibilities of the Office

24  of Professional Standards".  If you'll read along with me, in

25  Section 8, Chief, it says:  *The Office of Professional*

1    *Standards is responsible for the department's internal affairs*

2    *function and shall investigate racial- and gender-profiling*

3    *complaints.*  Did I read that correctly?

4         A.   Yes.

5         Q.   So can you talk to me, Chief, how the Office of

6    Professional Standards would go about investigating claims of

7    racial profiling that the Syracuse Police Department received?

8         A.   Well, obviously it's complaint driven.

9         Q.   M-m h-m-m.

10        A.   Someone would lodge a complaint either through the

11   Office of Professional Standards directly, the Syracuse Police

12   Department tips line, or the Citizens Review Board; and once

13   that complaint is lodged, the Office of Professional Standards

14   would make every effort to identify the source, and through

15   identifying the source, they would then identify potential

16   witnesses, then look to corroborate the person's claim.

17        Q.   And what role, if any, did you play in that

18   investigation?

19        A.   My only role would be to review the final

20   investigation and determine that it was conducted in

21   accordance to the Syracuse Police Department standards and

22   then ultimately sign off on whether I agree with it or not.

23        Q.   And in instances where you disagreed with an Office

24   of Professional Standards investigation, what was the process

25   for -- what would happen?  What happens if you disagree with

[FRANK L. FOWLER - Mr. Cannizzaro]

1  the Office of Professional Standards during a racial-profiling

2  investigation?

3      A.   I would identify the area of disagreement and

4  instruct them to conduct further follow-up.

5      Q.   Are you aware of whether an investigation into this

6  incident, the incident that we're here to discuss on January

7  5th, 2016, occurred by the Office of Professional Standards?

8      A.   Actually, I'm not.

9      Q.   So you don't recall if one occurred?

10     A.   I am not.

11     Q.   Okay.  We're going to get into the report that

12  occurred, but you don't have any personal recollection of this

13  incident.

14     A.   No.

15     Q.   Okay.  Do you personally remember ever receiving

16  the complaint regarding excessive force and racial profiling

17  regarding this incident?

18     A.   No, I don't recall.

19     Q.   So I want to back up a little more probably.  With

20  regard to the Syracuse Police Department, can you talk to me

21  about on average, in your experience as chief, how many

22  complaints the Office of Professional Standards and/or the

23  Syracuse Police Department would receive annually regarding

24  racial profiling?  Do you have numbers that would show those

25  reports?

1      A.   Do I have numbers?

2      Q.   Yes, or does the police department maintain numbers

3   regarding racial-profiling complaints?

4      A.   Yes, the police department does keep those numbers.

5      Q.   And where are those records kept?  How does the

6   Syracuse Police Department keep those records?

7      A.   (There was no response.)

8      Q.   So, regarding complaints of racial profiling, where

9   would those records be kept in the Syracuse Police Department?

10  Are you aware?

11     A.   Within the Office of Professional Standards.

12     Q.   And the Syracuse Police Department and the Office

13  of Professional Standards kept track of complaints of racial

14  profiling lodged against Syracuse Police Department officers?

15     A.   The Office of Professional Standards in the

16  Syracuse Police Department keeps track of all complaints

17  regardless to the nature.

18     Q.   And are you aware if there are specific reports

19  recording racial profiling that you reviewed as Syracuse

20  police chief?

21          MS. DeJOSEPH:  I'm going to object to form.

22     You can answer the question, chief.

23     A.   Sure.  I don't know if I can answer the question.

24     Q.   Why can't you?

25     A.   Well, you said do I recall reviewing any reports of

1    racial profiling.

2        Q.    M-m h-m-m.

3        A.    The reports that I reviewed would be an allegation.

4        Q.    M-m h-m-m.

5        A.    In order for me or anyone else to qualify them as

6    being racial profiling, the allegation has to be confirmed.

7        Q.    Okay.  So, to the extent that --

8              MR. CANNIZZARO:  Christie, I'm going to make a

9         preservation of a document request.  To the extent that

10        the Office of Professional Standards has documentation

11        reflecting reports on racial profiling, we're going to

12        request those.

13             MS. DeJOSEPH:  We've already discussed this in

14        the scope of discovery.

15             MR. CANNIZZARO:  They don't -- you don't have

16        any?

17             MS. DeJOSEPH:  Well, Judge Dancks ordered me

18        to produce substantiated complaints, and I did.

19             MR. CANNIZZARO:  Sure.

20        Q.    Let me ask you something, Chief:  Are there

21    statistical records kept by the Syracuse Police Department

22    regarding and tracking complaints of racial profiling?  Does

23    the police department keep statistical records on that?

24        A.    Yes, they would.

25             MR. CANNIZZARO:  Okay.  Same request.  We're

1    going to request that statistical documentation, which

2    we've requested before, be turned over to the plaintiff

3    in this case.  We requested those in our document

4    request.

5           MS. DeJOSEPH:  You did not.

6           MR. CANNIZZARO:  We didn't?

7           MS. DeJOSEPH:  If I recall correctly.  I'll

8    double-check.

9           MR. CANNIZZARO:  Well, we're requesting them

10   now.

11          MS. DeJOSEPH:  We were required to produce

12   documents within a five-year time frame, and we complied

13   with what we had.

14          MR. CANNIZZARO:  Nonetheless, I'm going to

15   request those documents to the extent they exist.

16          MS. DeJOSEPH:  You can put it in writing.

17          MR. CANNIZZARO:  Sure.  I will.

18          (Discussion off the record.)

19          (A recess was taken.)

20   BY MR. CANNIZZARO:

21      Q.   So, Chief, I want to turn your attention back to

22   Plaintiff's Exhibit B, specifically Section 18.16, titled

23   "Training Division Responsibilities".  Take a second to

24   read -- to read Section 18.16, and I've got a few questions

25   for you.  Let me know when you're ready.

1       A.    M-m h-m-m.

2                   (The witness complied.)

3       A.    Okay.

4       Q.    Okay?  So, Chief, after reading Section 18.16, it

5  seems to discuss the Training Division's responsibilities with

6  regard to standards related to racial profiling.  What

7  training was in place during your time as police chief that

8  all officers had to undergo with regard to racial profiling?

9       A.    In terms of specific training --

10      Q.    M-m h-m-m.

11      A.    -- I don't recall --

12      Q.    Okay.

13      A.    -- but in general?

14      Q.    Sure.  You can go generally.

15      A.    The basic academy class where I know that the

16  Department for Criminal Justice Services requires a certain

17  amount of hours as it relates to this type of training, the

18  Syracuse Police Department far exceeded those amount of hours

19  required.  That's --

20      Q.    Can I stop you there?  I'm going to stop you just

21  as you talk.  Sorry to interrupt.  I broke one of my own

22  rules.

23      A.    No, that's fine.

24      Q.    You note that there's a Department of Criminal

25  Justice Services, I think you said, requirement for hours of

1   training regarding racial profiling.  Do you know offhand what

2   that is?

3       A.   I do not, no.

4       Q.   But the Syracuse Police Department did more?

5       A.   Did more, yes.

6       Q.   Do you know how much more they did?

7       A.   I think it's more than twice the amount required by

8   them.

9       Q.   Okay.  So continue talking to me about what

10   training was in place.  You mentioned the basic academy.  Did

11   all officers receive that training or required to receive that

12   training?

13       A.   Yes.

14       Q.   What other types of training would they have

15   received with regard to racial profiling?

16       A.   Sure.  Annual in-service training.

17       Q.   And, speaks for itself, but is that once a year?

18       A.   Yes.  And when the lower-level command personnel

19   deemed it necessary, roll-call training.

20       Q.   And, Chief, what is roll-call training?

21       A.   Roll-call training is conducted for patrol-level

22   police officers when they start their shift.

23       Q.   And you mentioned that that roll-call training

24   would occur when it was deemed necessary.  Can you talk to me

25   about how roll-call training regarding racial profiling may be

[FRANK L. FOWLER - Mr. Cannizzaro]

1    deemed necessary?  What context would that occur in?

2                   MS. DeJOSEPH:  Object to form.  You can answer

3         if you can.

4         A.   Okay.  So I was -- when I said that, remember I

5    said I was answering your question in general.

6         Q.   Sure.  I'm going to let you keep going generally

7    because I'm sort of --

8         A.   Well, I don't have any -- now you're asking for

9    specifics when I gave you answers in general, so I'm not able

10   to provide you with specifics.

11        Q.   So let's go back and continue on where you were

12   going generally with the training.

13        A.   I'm done.

14        Q.   You're done?

15        A.   Yes.

16        Q.   So it sounds like there's academy training with

17   regard to racial profiling; is that right?

18        A.   Correct.

19        Q.   Then there are annual in-service training with

20   regard to racial profiling, correct?

21        A.   Correct.

22        Q.   And are all officers required to do annual

23   in-service racial-profiling trainings?

24        A.   Yes.

25        Q.   And you also mentioned that there's roll call -- at

1    times there can be roll-call trainings when deemed necessary.

2        A.    Yes.

3        Q.    With regard to roll-call trainings, who is making

4    the determination that they are deemed necessary?

5        A.    That would be the commanding officer.

6        Q.    And did you have any involvement -- in instances in

7    which a commanding officer deemed roll call training necessary

8    with regard to racial profiling or otherwise, what involvement

9    did you have in either approving or disapproving that

10   training?

11       A.    None.

12       Q.    None.  Did your deputy chiefs have any involvement

13   in those decisions --

14       A.    No.

15       Q.    -- regarding training?

16       A.    No.

17       Q.    Was the commanding officer, commander, he or she

18   would be the final say with regard to those roll-call

19   trainings?

20       A.    Yes.

21       Q.    Chief I want to move on a little bit.  Can you talk

22   to me, Chief, what role the chief of police has in

23   disciplining officers who have been found to violate

24   departmental policy?

25       A.    Sure.  The chief of police has the final say in

1    discipline.  Recommendations are made by the bureau chief when

2    a -- sorry.  Can I back up?  Is that okay?

3        Q.    Sure.

4        A.    So, when a complaint is founded and it has been

5    deemed that the officer acted outside the scope of

6    departmental policies or rules or whatever the violation is,

7    then the case goes before the bureau chief first.  I've got to

8    back up a little before -- it's been a while.

9        Q.    Yeah.  Take your time.

10       A.    So a complaint can come from different sources.

11       Q.    And what are those sources?

12       A.    An external complaint would always go through the

13   Office of Professional Standards.  An internal complaint for a

14   violation of the rules and regulations can come from

15   commanding officer then to the Office of Professional

16   Standards and to the Office of the Chief of Police.  If it

17   comes from a commanding officer, that commanding officer can

18   also make recommendations for discipline.  Then it would go

19   through the Office of Professional Standards and then to the

20   Office of the Chief of Police.  So at some point when it

21   arrives through the Office of Professional Standards to the

22   Office of the Chief of Police, it lands on the bureau chief's

23   desk first.  The bureau chief either agrees with the

24   recommendation for discipline or make recommended changes.

25   Then it goes to the first deputy chief who follows the same

1    actions.  Then it arrives at the desk of the chief of police

2    for final decision on discipline.

3        Q.   And, Chief, with regard to founded allegations,

4    allegations that were founded against an officer, you were the

5    final and sole decision maker whether discipline was imposed

6    or not?

7        A.   Yes.

8        Q.   And this is probably something that you may not

9    remember, but in your time as police chief do you recall how

10   many -- approximately on a yearly basis how many of these

11   disciplinary decisions you'd have to make as police chief in

12   this final stage?

13             MS. DeJOSEPH:  I'm going to object to form.

14        I'm also going to want you to ask questions that relate

15        to the racial-profiling thing only.

16             MR. CANNIZZARO:  Okay.  We can stick it --

17        Q.   Let's back up.  In any given year can you recall

18   how many complaints of racial profiling you recall coming into

19   the Syracuse Police Department?

20        A.   No.

21        Q.   Okay.  Do you recall -- would you have been made

22   aware of reports that reflect the number of complaints that

23   are coming into the Syracuse Police Department regarding

24   racial profiling?

25        A.   Yes.

1    Q.   You would have been given some sort of a summary of

2  those complaints regarding racial profiling?  How would that

3  occur?

4    A.   Okay.  Can you ask me a question?  Can you just ask

5  me a question --

6    Q.   Sure.

7    A.   -- because --

8    Q.   Yeah.  I'm trying to understand, with regard to

9  complaints and, you know, the number of complaints received in

10  the department involving racial profiling, did you become

11  involved in monitoring the number of those complaints that

12  were coming in?

13         MS. DeJOSEPH:  Object to form.  Also assumes

14     facts.  You're assuming he was aware of racial-profiling

15     complaints.

16    Q.   Okay.  Let's back up.  Would you have been made

17  aware of issues with racial profiling occurring in the

18  Syracuse Police Department during your time as the chief of

19  police?  Would that be something you would have been made

20  aware of as part of your role?

21         MS. DeJOSEPH:  I'm going to object to form.

22     Again, I think we're talking about allegations.  You can

23     answer if you can, Chief.

24    A.   All right.  I would be made aware of allegations or

25  complaints --

1     Q.   Yep.

2     A.   -- alleging racial profiling, yes.

3     Q.   And, on a larger level, would you be made aware of

4  departmental issues with racial profiling brought to your

5  attention by subordinates to the extent they occurred?

6     A.   I'm not sure I understand the question.

7     Q.   So, if there was -- Chief, if there were issues, if

8  there were training deficiencies, who in your command staff

9  would bring that to your attention?

10         MS. DeJOSEPH:  Are we talking about racial

11     profiling?

12         MR. CANNIZZARO:  With regard to racial

13     profiling.

14     A.   Training deficiencies?  The Training Division.

15     Q.   The training -- it would come from the Training

16  Division?

17     A.   Yes.

18     Q.   And you already said this, I think, Chief, so

19  forgive me if I ask this again, but in terms of making changes

20  to training protocols, that was your -- the final decision

21  rested with you as chief of police?

22     A.   (There was no response.)

23     Q.   Changes to training protocols, was that your

24  decision ultimately?

25     A.   No.

1    Q.   No.  Okay.

2    A.   That's still the Training Division.

3    Q.   Okay.  Can I talk to you, Chief, about -- you

4  mentioned there are processes for external complaints and

5  internal complaints.  How do external complaints come into the

6  Syracuse Police Department, from what sources?

7              MS. DeJOSEPH:  Are we talking about racial

8        profiling?

9              MR. CANNIZZARO:  Well, generally.  I'm just

10       trying to understand the process first.

11             MS. DeJOSEPH:  I think that Judge Dancks was

12       pretty clear about the scope of the deposition and what

13       the *Monell* claim is, and I'd like to have you abide by

14       that.

15             MR. CANNIZZARO:  Christie, there's serious

16       issues with the investigation, and we'll get into that.

17             MS. DeJOSEPH:  Well then ask questions about

18       the investigation.

19             MR. CANNIZZARO:  Oh, I will.  I know.  We're

20       getting there, but I'm trying to understand the process,

21       and at this point that is extremely relevant to the

22       issues that are with the investigation.  So I'm trying to

23       determine the process of how these investigations occur

24       so when we get to the investigation itself there's less

25       issues because we've covered all that ground.

1          MS. DeJOSEPH:  Okay.

2          MR. CANNIZZARO:  Okay?  Can you read back what

3     my last question was?

4               (The pending question was read by the

5     stenographer.)

6     A.    A person can come right into the Office of

7  Professional Standards and lodge a complaint that way.  In the

8  City of Syracuse we have the Citizens Review Board where

9  people can come right into the Citizens Review Board to file a

10 complaint, and we have an anonymous tips line that a person

11 could file a complaint over the anonymous tips line as well.

12    Q.    Okay.  So, Chief, you mentioned the Citizens Review

13 Board.  Can you tell me what that is?  What's the Citizens

14 Review Board?

15    A.    It's a review board that was formed by the city,

16 for lack of a better term, police oversight.

17    Q.    And did it exist during your time as police chief?

18    A.    Yes.

19    Q.    Okay.  Do you recall how it came into existence?

20    A.    I do.

21    Q.    Okay.  Can you tell me about that?

22    A.    Sure.  I don't remember the exact time frame, but

23 the Council at the time conducted a study to assess whether

24 the City of Syracuse Police Department was engaging in racial

25 profiling, and from that a series of discussions took place,

1  and they decided that they would form a Citizens Review Board

2  for the City of Syracuse.

3      Q.   Chief, I want to focus on that.  What was the

4  reason that a study was conducted into racial profiling?  What

5  was the reason for that, if you know?

6      A.   I don't know why.

7      Q.   Was the Syracuse Police Department having

8  departmental-wide issues with racial profiling?

9                MS. DeJOSEPH:  Object to form.  You can answer

10      if you can.

11      A.   No.

12      Q.   Do you know how that study was approved, who in the

13  Syracuse government approved that study?

14      A.   I don't know who approved it.

15      Q.   Do you recall when it occurred, when the study on

16  racial profiling occurred?

17      A.   Not specifically, no.

18      Q.   But sometime during your time as police chief with

19  the Syracuse Police Department?

20      A.   No.

21      Q.   No?  Before you got there?

22      A.   Yes.

23      Q.   Okay.  Did you ever have an opportunity to read and

24  review the study on racial profiling done regarding the

25  Syracuse Police Department?

1        A.    There were two.

2        Q.    There were two.  Did you have an opportunity to

3    read both of them?

4        A.    I did.

5        Q.    Okay.  And what -- from your recollection, what did

6    those studies indicate?

7        A.    The studies combined indicated a conflict.

8        Q.    Now, what do you mean by that?

9        A.    One study was conducted by a group of -- a group

10   from Syracuse University, and they indicated that there was a

11   disparity in terms of people of color being stopped over white

12   people and --

13       Q.    Sir, let me stop you, please.  That study indicated

14   there was some disparity about people of color being stopped

15   by Syracuse police officers versus people -- versus white

16   people?

17       A.    Yes.

18       Q.    What else?  Anything else?  Did that indicate

19   anything else?

20       A.    That's all I recall and just in general.

21       Q.    So is it fair to say that that study indicated that

22   there may be some issue with racial profiling with regard to

23   the Syracuse Police Department?

24             MS. DeJOSEPH:  Object to form.  You can answer

25        if you can.

1     A.    That study indicated that there may be, yes.

2     Q.    Okay.  And was there anything else relevant to

3  racial profiling in the study other than what you've already

4  discussed?

5     A.    No.

6     Q.    Okay.  And you mentioned another study.  Can you

7  talk to me about the other study that you mentioned involving

8  racial profiling?

9     A.    Sure.  That study was conducted by the Finn

10  Institute --

11     Q.    Okay.

12     A.    -- and that's a group of criminologists, and they

13  evaluated the same data that the folks from the Syracuse

14  University examined, and they determined that there was no

15  bias, no disparity within the stops.

16     Q.    And do you recall why that study was conducted, the

17  Finn Institute study?

18     A.    Yes.  That study was conducted because it was

19  determined that the Syracuse University did not look at all

20  the variables associated with different types of stops.

21     Q.    And, Chief, did you read -- I'm sorry.  I may have

22  asked this, but did you read both studies --

23     A.    Yes.

24     Q.    -- with regard to the Finn institute study that you

25  were just referencing, was there a conclusion regarding racial

1    profiling in the City of Syracuse by officers?

2        A.   Yes.

3        Q.   Do you recall what the conclusion was?

4        A.   The conclusion was that there was no disparity and

5    no bias indicated.

6        Q.   And, Chief, after reading those two studies, did

7    you take any steps to do your own independent investigation

8    with regard to racial profiling occurring by officers employed

9    by the City of Syracuse?

10       A.   Do you recall that I said I was not the chief at

11   the time of those studies?

12       Q.   I think I need to clarify my question.  I realize

13   you were chief between 2010 and approximately 2018.

14       A.   (Witness nods head.)

15       Q.   So these studies occurred prior to your coming on

16   board, correct?

17       A.   As chief, yes.

18       Q.   And you read these studies at some point in your

19   tenure, correct?

20       A.   I did.

21       Q.   After reading them, did those reports give you any

22   concern that motivated you to do your own investigation into

23   racial profiling in the City of Syracuse Police Department?

24       A.   No.  I -- the -- I wasn't the chief at the time, so

25   I really didn't have the authority to conduct any type of

1    investigation of that nature at that particular time.

2         Q.   Okay.  For the period that the studies covered?

3         A.   Yes.

4         Q.   Okay.  But you didn't -- did you ever, during your

5    time as police chief, investigate whether any of that activity

6    known in those reports was ongoing?

7         A.   I'm sorry?

8         Q.   So, in your time as police chief, did you ever make

9    any command decisions to investigate the status of racial

10   profiling by your officers?

11        A.   I can't answer that with a yes-or-no answer --

12        Q.   Okay.  It doesn't have to be yes or no.

13        A.   -- but I can respond to that.

14        Q.   Sure.

15        A.   Certainly.  So, to have an indication of the

16   existence of racial profiling, it would be likely complaint

17   driven.

18        Q.   Okay.

19        A.   We made every effort to create, as I've already

20   described, different ways that people can file a complaint

21   with the Syracuse Police Department, and it's through those

22   complaints that we would identify potential problem areas; and

23   so from those complaints, if there was an issue, that's where

24   I would learn it from.

25        Q.   Okay.  Chief, I want to shift gears a little bit,

 1    back to the Citizens Review Board, and I'm going to introduce

 2    an exhibit here.

 3                    MR. CANNIZZARO:  I'll have this marked as

 4         Plaintiff's C.  This is Local Law 1 for 2012 amending

 5         Local Law 11 from '93 establishing the Citizens Review

 6         Board.

 7                    (The above-described document was marked for

 8         identification as Plaintiff's Exhibit C, this date.)

 9    BY MR. CANNIZZARO:

10         Q.   Chief, I'm handing you what's been marked as

11    Plaintiff's Exhibit C.  This is Local Law 1 of the year 2012.

12    It's a Local Law of the City of Syracuse amending Local Law 11

13    for 1993 which established the Citizens Review Board.  Have

14    you ever seen this document before?

15         A.   No.

16         Q.   Okay.  Have you ever read Local Law 1 for 2012?

17         A.   No.

18         Q.   Okay.  So I want to go a little bit into Local

19    Law 1 for 2012.  Okay.  Are you aware of how this law was

20    enacted?  In terms of was it the Common Council who passed it?

21    Was it the mayor who instituted it?

22         A.   The Common Council.

23         Q.   Okay.  And it appears, if you turn to -- actually,

24    I'm going to direct your attention, it's easier to read this

25    way, if you turn to Page 2 of the document, do you see the

[FRANK L. FOWLER - Mr. Cannizzaro]

1    section that says "Passage by the local legislative body with

2    approval"?  Do you see that section?

3          A.    Would that be Section 2, Paragraph 2?

4          Q.    Section 2, yes.

5          A.    I'm sorry, Paragraph 2, yes.

6          Q.    It appears, reading Section 2, that the City of

7    Syracuse duly passed this on December 29th, 2011; is that

8    right?  Did I read that accurately?

9          A.    Yes, you're correct.

10         Q.    Okay.  And do you have any recollection of this law

11   being passed through the Common Council?

12         A.    Just vague recollection.

13         Q.    Okay.  You were police chief in December of 2011?

14         A.    Yes.

15         Q.    Okay.  And, Chief, is it the Syracuse Police

16   Department's practice to comply with local laws that are

17   passed by the Syracuse Common Council?

18         A.    Yes.

19         Q.    Chief, could you turn to Page 4 -- actually, it's

20   Page 5, rather, of this local law and specifically to

21   Section 1 of the law.  Tell me when you get there.

22                     (Pause.)

23         Q.    I'll just read, Chief, the first sentence.  Just

24   read along with me.

25         A.    Let me just make sure I'm in -- because the pages

1    are not numbered.

2        Q.   They aren't numbered.  We're on Page 4, Chief, and

3    the pages are not numbered but just counting.

4        A.   Okay.

5        Q.   Okay.  And that section that says "Section 1:

6    Purpose", do you see that chief?

7        A.   I've got it.

8        Q.   I'm just going to read that first sentence:  *To*

9    *establish an open citizen control process for reviewing*

10   *grievances involving members of the Syracuse Police Department*

11   *and provide a nonexclusive alternative to civil litigation,*

12   and I'll read the next sentence as well, *in order to ensure*

13   *public accountability over the powers exercised by the members*

14   *of the Syracuse Police Department.*

15              Chief, is that your understanding of the role

16   that the Citizens Review Board played during your time as

17   police chief?

18       A.   That was their directive, yes.

19       Q.   Okay.  And I'm going to direct you to Section 3,

20   Chief, regarding jurisdiction on the next page.

21       A.   Yes.

22       Q.   And, Chief, it says there in Section 3 that the

23   Citizens Review Board -- *there shall be established a Citizens*

24   *Review Board independent of the Syracuse Police Department*

25   *which shall hear, investigate, and review complaints and*

1    *recommend action regarding police misconduct.*

2                        Chief, can you talk to me about the role the

3    Citizens Review Board plays and the interplay between the

4    Citizens Review Board and the Syracuse Police Department with

5    regard to investigating and reviewing complaints regarding

6    police misconduct?

7        A.    Sure.  The Citizens Review Board conducts an

8    independent investigation.

9        Q.    And you're not -- the Syracuse Police Department

10   would not be involved in that in any way?

11       A.    We are not involved in their investigation.

12       Q.    Are you involved in any way in any other manner

13   other than the investigation?

14       A.    Yes.

15       Q.    How?  How so?

16       A.    Once they conduct their investigation -- I'm sorry.

17   Once they receive a complaint, they communicate to the Office

18   of Professional Standards that they do, indeed, have a

19   complaint, and ask the Office of Professional Standards for

20   any police reports or anything else that they may have to

21   assist them in conducting their investigation; and once they

22   conclude their investigation, that investigation, along with

23   their recommendation, is forwarded over through the Office of

24   Professional Standards to the chief of police for

25   consideration when making the final decision as it relates to

1    the investigation.

2        Q.    Okay.  And that would come to you?  That would come

3    to you as chief of police?

4        A.    Ultimately.

5        Q.    Ultimately.  In the end you as chief of police

6    would make the final decision with regard to a particular

7    investigation coming from the Citizens Review Board?

8        A.    Yes.

9        Q.    Chief, I'm going to direct your attention to

10   Section 7 of this local law, and it's titled "Powers and

11   Duties", and, Chief, specifically to Subsection 3(a) which is

12   on the next page, Chief, can you take a minute to read Section

13   7, Subsection 3(a), titled "Receipt, Review, and Response to

14   Complaints", and Section A is "Initiation of Complaints".

15   Read that and let me know when you're done.

16       A.    3(a) under 7, "Initiation of Complaints" and what

17   else?

18       Q.    Just that.  Just that, please.

19       A.    Okay.

20                  (The witness reviewed the document.)

21       A.    Yep.

22       Q.    Okay.  So, Chief, you just read Section 3(a),

23   correct?

24       A.    Yes.

25       Q.    Okay.  On the second page, right above Section B,

1  essentially it says:  *Within 60 days of the receipt of a*

2  *complaint the Citizens Review Board shall complete its*

3  *investigation, determine whether there's reasonable cause to*

4  *proceed to hearing, conduct a hearing, and issue its findings*

5  *and recommendation to the chief and to corporation counsel.*

6          Chief Fowler, the chief that's referenced in

7  that section, is that the chief of police?

8      A.   It is.

9      Q.   Okay.  So is it accurate to say that when the

10  Citizens Review Board -- and let's just use -- well, when the

11  Citizens Review Board received complaints, this local

12  law dictated that they should complete their investigation

13  within 60 days; is that right?

14      A.   Yes.

15      Q.   And at that point they would forward their

16  recommendations on to you as police chief?

17      A.   Yes.

18      Q.   Okay.  And then from there you would either agree

19  or disagree with their findings; is that right?

20      A.   Yes.

21      Q.   And in instances that the Citizens Review Board did

22  an investigation, finds -- or has found that officers violated

23  policy and you agreed, what would be the next step?

24      A.   The next step would be discipline.

25      Q.   Of the individual officer?

1    A.   Yes, because, in order for me to identify -- agree

2    with them, it would be based on an investigation, a full

3    investigation that was conducted.

4        Q.   And in your time as police chief, do you recall

5    receiving recommendations regarding discipline for officers in

6    the Syracuse Police Department?

7              (There was no response.)

8        Q.   So had you ever received recommendations from a

9    Citizens Review Board that an officer be disciplined during

10   your time as police chief?

11       A.   Oh, yes.  Yes.

12       Q.   About how many times?

13       A.   Don't recall.

14       Q.   More than a hundred?

15       A.   I don't recall.

16       Q.   You just don't recall the number at all?

17       A.   No.

18       Q.   Okay.  Did you -- in your time as police chief, do

19   you recall ever disciplining an officer as a result of a

20   Citizens Review Board recommendation?

21       A.   I'm sure that that has happened, but I don't recall

22   specifically.

23       Q.   Okay.  Chief, I'm going to direct your attention to

24   Section 3(c) of the law.  3(c) is in cap [sic].

25       A.   Okay.

1      Q.   Take a minute to read the Section 3(c),

2    Subsection 4?

3                MS. DeJOSEPH:  What page are you on?

4                MR. CANNIZZARO:  It's on Page 14, but you'd

5      have to count.

6      A.   Is it Investigation?

7      Q.   "Investigation of Complaints", yes.  Section C is

8    "Investigation of Complaints".  Do you see that?

9      A.   Yes.

10      Q.   So, if you turn over to Section 4 --

11      A.   Got you.

12      Q.   -- can you just read to yourself Section 4 --

13      A.   Sure.

14      Q.   -- and then I have a question for you.

15                (The witness reviewed the document.)

16      A.   Okay.

17      Q.   Okay.  Chief, after reading Section 3(c)(4) on Page

18    14 -- or, actually, I'm sorry.  It's Section 7, Subsection

19    3(c)(4) on Page 14 of Local Law 1 for 2012.  It appears that

20    the law requires that you as police chief *take no action on a*

21    *complaint, whether received directly by the Syracuse Police*

22    *Department or CRB, until 60 days from the receipt of the*

23    *complaint or upon receipt of the Board findings and*

24    *recommendations.*  Do you see that there?

25      A.   I do.

1       Q.   So this law, in other words, prevented you from

2   taking action on a complaint received unless 60 days had

3   passed or you got findings from the Citizens Review Board,

4   right?

5              (The witness reviewed the document.)

6       A.   There's a caveat toward the end.

7       Q.   Sure.  Just talk to me about that.  What's the

8   caveat?

9       A.   It says:  *The aforementioned provision shall not be*

10  *interpreted as a restriction on the authority of the chiefs of*

11  *police to order disciplinary measures during the 60-day time*

12  *period as he or she deemed necessary.*

13      Q.   What do you understand that to mean?  Did you

14  understand that to mean that you could act before the 60 days

15  was up if you were going to impose discipline?

16      A.   Well, no, it's not limited --

17      Q.   Okay.

18      A.   -- as to whether I was going to impose discipline.

19  It means that I can act toward concluding an investigation

20  however that investigation is concluded.

21      Q.   Okay.  So in your time as police chief, would it be

22  a standard practice for you to close an investigation before a

23  60-day time frame is up as noted in this local law?

24      A.   You said a standard practice?

25      Q.   Standard practice?

1      A.   You know, it's tough to use the term "standard

2  practice" as it relates to an investigation --

3      Q.   Sure.

4      A.   -- because an investigation, depending upon the

5  nature of the investigation, the difficulty and the -- our

6  ability to gather the necessary information to make a

7  conclusion, that would determine at the time of the

8  investigation.

9      Q.   Do you recall, Chief, during your time as police

10  chief, if you had closed investigations in context that fell

11  outside of what's in this local law Section 4?

12      A.   Do I recall?

13      Q.   Yeah.  So were there other circumstances that would

14  cause you to make a finding regarding an investigation that

15  does not comport with Section 4 that we just read here?  So

16  what other context would make you not comply with Section 4 of

17  the law or not be able to comply with Section 4 of this law?

18            MS. DeJOSEPH:   I'm going to object to form.

19      A.   I don't know of any others --

20      Q.   Okay.

21      A.   -- other than the -- what we just discussed.

22      Q.   Okay.

23      A.   If the information is there and based on the

24  authority that I have as the chief of police to conduct an

25  investigation, then I think there's nothing outside of that

1    would compel me to close the investigation any faster.

2        Q.   Okay.  Chief, in your time as police chief, with

3    regard to complaints and investigations regarding officer

4    misconduct, did you typically wait for CRB, Citizens Review

5    Board approval prior to making a finding?

6        A.   Sorry.  Could you ask me --

7        Q.   Sure.  Let me split that up.  The Citizens Review

8    Board, there were -- some complaints came in by channel of the

9    Citizens Review Board; is that right?

10       A.   Yes.

11       Q.   And in instances that they did come in through the

12   Citizens Review Board, this Local Law 1 for 2012 seems to set

13   the guidelines for this process.  Would you agree with that?

14       A.   To some degree, yes.

15       Q.   Okay.  And in instances where the department

16   received a complaint through the Citizens Review Board, did

17   you typically wait for findings, to receive findings from the

18   Citizens Review Board investigation before you'd close a file?

19       A.   If the Citizens Review Board investigation was in

20   compliance with this law, yes.

21       Q.   And what if it wasn't?

22       A.   If it wasn't, I still have an obligation to do my

23   job, to conduct an investigation.  So I would have no way of

24   knowing -- if they are acting outside the scope of this law,

25   right, meaning that their investigations are exceeding well

```
 1   beyond the 60 days, and they have not responded back to the
 2   Syracuse Police Department to indicate that they need some
 3   more time or what that reason -- what that reason is, then we
 4   have to proceed.
 5       Q.   Okay.  Chief, I want to turn to one more section.
 6   This is Section 7, same Section 7, but it's Subsection G which
 7   is two pages further in, and it's titled "Response from the
 8   Chief of Police".  Do you see that section?
 9       A.   Yes.
10       Q.   Chief, I'm just going to read it because it's
11   short.  It says:  *Within 30 days of the receipt of a*
12   *recommendation from a hearing panel, the chief of police shall*
13   *advise the board in writing as to what type of actions or*
14   *sanctions were imposed and the reasons if none were imposed.*
15   Did I read that correctly?
16       A.   Yes.
17       Q.   So, according to Section 7, Subsection G, the chief
18   of police has some reporting duties with regard to imposition
19   of discipline; is that right?
20       A.   Yes.
21       Q.   Can you talk to me in your experience what that
22   entailed?
23       A.   It entails communicating to the CRB the findings of
24   the -- of our internal investigation and the actions that were
25   taken by the chief of police.
```

1    Q.   And, Chief, as police chief, did you normally

2    ensure that those reports were sent to the Citizens Review

3    Board as required by Section 7(g) of Local Law 1 for 2012?

4    A.   Yes.

5    Q.   Were there any times where you did not?

6    A.   I don't recall.

7    Q.   Chief, have you ever -- is the relationship between

8    the Citizens Review Board and the Syracuse Police Department,

9    in your experience, adversarial?

10            MS. DeJOSEPH:  Object to form.

11   A.   No.

12   Q.   Okay.  Has the Syracuse Police Department ever been

13   brought to court by the Citizens Review Board in any context?

14            MS. DeJOSEPH:  Object to form.  Relevance.

15   Foundation.  You can answer.

16   Q.   That you're aware of I should say.

17   A.   Brought to court.  As it relates to that question,

18   not that I'm aware of.

19   Q.   Okay.  Are you aware of any administrative

20   proceedings brought by the Citizens Review Board against the

21   Syracuse Police Department in the Supreme Court, here in State

22   Supreme Court?

23   A.   Yes, but not specifically.  Yes, I'm aware of some

24   actions but not specifically what they were and the time frame

25   in which they occurred.

1    Q.    What are you aware of?

2    A.    Only that it took place.

3    Q.    That what took place?

4    A.    That some type of action was filed with the Supreme

5    Court.

6    Q.    Do you recall when?

7    A.    No.  I said that.  I answered that.

8    Q.    Okay.  Were you as police chief involved in that

9    action in any way?

10             MS. DeJOSEPH:  I'm going to object to form;

11        and to the extent there's any attorney-client privilege,

12        I'm going to also --

13    Q.    Sure.  Yeah, Chief, I don't want you to tell me

14    anything about any discussions you had with attorneys or

15    litigation strategy related to the matter you're referring to.

16    I just want to know, are you aware of, were you involved in

17    that action that you referenced?

18    A.    If I were involved, that would be the extent of my

19    involvement what you just --

20    Q.    Were you involved as a defendant or a respondent?

21    A.    I'm not sure.

22    Q.    Chief, in your time as police chief, did your

23    office, the Office of the Chief of Police, receive any type of

24    annual or quarterly reports from the Citizens Review Board on

25    a regular basis?

1      A.   Yes.

2      Q.   And what were those reports, do you recall?

3      A.   Annual reports.

4      Q.   So you'd receive annual reports --

5      A.   I'm sorry.  No, it wasn't annual.  It was -- it

6  could have been biannual.

7      Q.   Okay.  But you recall receiving some --

8      A.   Yes.

9      Q.   -- annual or biannual reports?

10     A.   Yes.

11     Q.   And what was the nature of the reports that you

12 received from the Citizens Review Board, if you recall?

13     A.   I don't recall.  The only part I do recall but not

14 in any specific terms is that was some statistical data in the

15 reports.

16          MR. CANNIZZARO:  Okay, Chief, I'm going to

17     have this marked as Plaintiff's Exhibit D.

18          MS. DeJOSEPH:  What is that?

19          MR. CANNIZZARO:  This is the Annual Report,

20     January 1 to December 31, 2012, of the Citizens Review

21     Board.

22          (The above-described document was marked for

23     identification as Plaintiff's Exhibit D, this date.)

24 BY MR. CANNIZZARO:

25     Q.   Chief, I'm handing you what's been marked as

[FRANK L. FOWLER - Mr. Cannizzaro]

1    Plaintiff's Exhibit D.  Do you recognize what that document

2    is?

3         A.   Yeah, it's the -- it appears to be the CRB's,

4    Citizens Review Board Annual Report for 2012.

5         Q.   And are these -- you just referenced that the

6    Office of the Chief of Police received annual or biannual

7    reports.  Do you know, are those the reports that you

8    received, those types of reports?

9         A.   Those, yes.

10        Q.   You can just put that to the side.

11             (The witness complied.)

12        Q.   And, Chief, did you receive these reports, that is,

13   listed in "D", those type of reports each year that you were

14   chief of police?

15        A.   Yes.

16        Q.   Chief, I want to change gears again on you, and you

17   can put aside if you haven't already, Plaintiff's C and B.

18   Chief, I want to direct your attention to 2016.  Are you

19   familiar with the Syracuse Housing Authority?

20        A.   I am.

21        Q.   Okay.  What is the Syracuse Housing Authority?

22        A.   The Syracuse Housing Authority is the government or

23   controlling body for public housing not in -- maybe -- I don't

24   know if it's the entire public housing but some is public

25   housing within the City of Syracuse.

1      Q.   And to what extent, if any, did you have

2  interaction with leadership within the Syracuse Housing

3  Authority?

4                (Pause.)

5      Q.   Chief, let me direct your attention to something

6  more specific, and I'm going to introduce the next exhibit

7  here, which is Plaintiff's Exhibit E.

8                (A document further described herein was

9          marked for identification as Plaintiff's Exhibit E, this

10         date.)

11  BY MR. CANNIZZARO:

12     Q.   Chief, I'm showing you what's been marked as

13  Plaintiff's Exhibit E for identification.  Can you take a look

14  at that and, when you're ready, tell me what this is?

15                (The witness reviewed the document.)

16     A.   This is a letter from William J. Simmons, the

17  executive director of the Housing Authority, and it is

18  addressed to me, and it's in reference to a trespass letter of

19  consent, and in the body of the letter Director Simmons

20  authorizes the police officers employed by the City of

21  Syracuse to enforce Article 140 of the New York State Penal

22  Law on all Housing Authority properties.

23     Q.   And, Chief, do you recall receiving this letter?

24     A.   No, I don't recall receiving it, but I'm sure I

25  did.

1    Q.   Chief, do you recall the circumstances under which

2  Mr. Simmons, the director of the Housing Authority, requested

3  that officers act as his agent?

4    A.   No.

5    Q.   Were you in any way involved in the decision to

6  allow officers to act as agents for the Syracuse Housing

7  Authority?

8         MS. DeJOSEPH:  Object to form.  You can

9    answer.

10   A.   Directly, no.

11   Q.   How about indirectly?

12   A.   Indirectly, based on this letter and if the

13 officers -- if any officer took any actions as it relates to

14 this letter, then I would have to say indirectly, yes.

15   Q.   Okay.  Do you recall, was there a reason that -- do

16 you recall the reason for Mr. Simmons, the executive director

17 of the Syracuse Housing Authority, requesting Syracuse PD to

18 act as his agent in regard to policing Syracuse Housing

19 Authority properties?

20   A.   I don't recall.

21   Q.   Do you recall having -- if your officers did, in

22 fact, act as agents based on Mr. Simmons' request?

23        MS. DeJOSEPH:  Object to form.

24   A.   I don't recall.

25   Q.   Do you recall if your officers during your time as

1  police chief would patrol the Syracuse Housing Authority

2  properties?

3      A.   Of course, yes.

4      Q.   Where are the Syracuse -- where are Syracuse

5  Housing Authority properties in the City of Syracuse?

6      A.   They are located throughout the City of Syracuse.

7  There's a property on the south side of the City of Syracuse,

8  two large apartment areas on the south side, another known as

9  the Pioneer Homes, a multiunit apartment complex.  There's

10  Central Village by the same description.  There are high-rise

11  buildings located on the south side that the Syracuse Housing

12  Authority controls.  There are scattered sites commonly

13  referred to as town homes.  There is the James Geddes housing

14  project which is a multiunit housing complex.  In close

15  proximity to the James Geddes housing complex there are

16  high-rise buildings that are controlled by the Housing

17  Authority.  In Eastwood, same thing, Eastwood Village,

18  multiunit housing apartment complex.  I'm unaware if there are

19  high-rises.  However, at various locations throughout the

20  north side there are high-rise apartment buildings that are

21  controlled by the Syracuse Housing Authority.

22      Q.   Chief, you mentioned the Pioneer Homes.  Are you

23  familiar with the Pioneer Homes?

24      A.   How so?

25      Q.   What can you tell me about the Pioneer Homes

1 housing complex?  Can you describe it for me?  Is it

2 low-income housing?  What's the nature of the housing complex,

3 just Syracuse Housing?

4     A.   It's public housing controlled by the Syracuse

5 Housing Authority.  Beyond that I don't know.

6     Q.   Okay.  So, Chief, the reason I'm asking about this

7 is in prior testimony, Officers Decker and Ettinger our

8 defendants here, indicated that they were aware of this

9 request by Mr. Simmons to act to essentially remove

10 trespassers from Syracuse Housing Authority.  Do you have any

11 idea how Officer Ettinger and Decker would have come aware of

12 this request?

13             MS. DeJOSEPH:  I'm going to object to form.

14     You can answer it.

15     A.   How they would become aware of this request?

16     Q.   Sure.  Yeah, was it a departmental memo?  How would

17 an individual line officer be aware of a request to the chief

18 of police?

19             MS. DeJOSEPH:  Object to form.  You can

20     answer.

21     A.   Can I ask -- can I respond for purposes of clarity?

22     Q.   Sure.

23     A.   You started off asking me a question one way.  Then

24 you kind of changed it up a little bit.

25     Q.   Sure.

1    A.   So can you just ask me another question, and then

2  I'll respond to that?

3    Q.   Yeah.  I'm trying to determine if patrol officers

4  were aware that the executive director -- strike that.

5              At any time did you as police chief give

6  guidance or your deputies and command staff give guidance

7  regarding Executive Director Simmons' request that officers

8  act his agent on Syracuse Housing Authority property?

9    A.   Okay.  My direct answer to your question is I don't

10  know if we did specifically.

11    Q.   Okay.

12    A.   However, upon receiving a letter like this, there

13  is a high probability that the -- that the existence of this

14  letter would be communicated down the chain of command to

15  those who are responsible for enforcement.

16    Q.   How would it be communicated down the chain of

17  command?

18    A.   The Syracuse Police Department conducts operations

19  meetings every week, and all of the commanders that have

20  operational units, meaning units that go out and actively

21  enforce the laws within the City of Syracuse, are present at

22  that time, and that's a great opportunity for something like

23  this to be communicated.

24    Q.   Do you have any -- are you aware of any

25  documentation that describes how this letter may have been

1    communicated to Syracuse officers --

2         A.    No.

3         Q.    -- down the line of patrol?

4         A.    No.

5         Q.    Chief, are you aware of any training that was given

6    to officers regarding the request from the Syracuse Housing

7    Authority?

8         A.    I am not.

9         Q.    Chief, going back to the Pioneer Homes.  Are you

10   aware of any complaints that you received from citizens or any

11   other avenue regarding racial-profiling issues with officers

12   who patrolled the area?

13        A.    Specifically...

14        Q.    Specifically the Pioneer Homes.

15        A.    No.

16        Q.    How about specific to the Syracuse Housing

17   Authority properties?

18        A.    Not that I can recall.

19        Q.    Chief, can you tell me, going to -- I want to

20   direct your attention to the incident that's the subject of

21   this complaint.  Chief, can you tell me how you became aware

22   of this incident that's the subject of Mr. Jennings'

23   Complaint?  When did you first become aware of it?

24              MS. DeJOSEPH:  Object to form.  You can

25        answer.

1     A.   I don't recall.

2     Q.   Okay.  Do you recall it at all during your time as

3   police chief in 2016?

4     A.   No.

5     Q.   Okay.  Do you recall being involved in an Office of

6   Professional Standards investigation in the incident that is

7   the subject of this Complaint?

8     A.   No.

9     Q.   Chief, you can put aside Plaintiff's E.

10              (The witness complied.)

11    Q.   Chief, I'm going to have this next exhibit marked

12   as Plaintiff's Exhibit F?

13              (A document further described herein was

14        marked for identification as Plaintiff's Exhibit F, this

15        date.)

16   BY MR. CANNIZZARO:

17    Q.   Chief, I'm going to give you a minute to look at

18   this document and then let me know when you're ready.

19              (The document was handed to the witness, and

20        the witness reviewed the document.)

21              MS. DeJOSEPH:  Do you want him to read the

22        entire thing?

23              MR. CANNIZZARO:  No, just the front page.  I'm

24        sorry.  It's a number of documents.  Just let me know

25        when you're ready, whenever you're ready.

1    A.    Okay.

2    Q.    You're ready?

3    A.    I guess I'm --

4    Q.    Chief, have you ever seen this document before?

5    A.    I don't recall seeing this document before.  I

6  could have, but I don't recall.

7    Q.    So, Chief, this is the Complaint that was filed

8  with the Citizens Review Board by my client in 2016 and, upon

9  information and belief, it was subsequently given to the

10  Office of Professional Standards.  Do you know if you had any

11  involvement in reviewing this when it came in?

12    A.    I don't recall.

13    Q.    Okay.  Chief I'm going to have this next exhibit

14  marked as Plaintiff's Exhibit -- and you can just hold "F"

15  with you right there.  This is "G".

16                (A document further described herein was

17        marked for identification as Plaintiff's Exhibit G, this

18        date.)

19  BY MR. CANNIZZARO:

20    Q.    Chief, I'm handing you what's been marked as

21  Plaintiff's Exhibit G for identification.  Chief, this has

22  been disclosed in discovery, and it is the Office of

23  Professional Standards case report involving Tony Jennings.

24  Do you recall ever reviewing this document?

25    A.    No, I don't recall, but clearly I did as indicated

1  by my signature.

2      Q.  Sure.  So just -- so we'll go to the back page of

3  this, Chief.  Looking to the signature, that's your signature

4  there under "Chief's Acknowledgment"?

5      A.  It is, yes.

6      Q.  And so you would have physically signed this

7  yourself?

8      A.  Yes.

9      Q.  And who are the other signatures there, if you

10 recognize them, to the extent you recognize them?

11     A.  Yes.  The first signature, meaning the upper

12 left-hand corner, that's Lieutenant Dave Brown.

13     Q.  Okay.

14     A.  To the right of Lieutenant Dave Brown's signature

15 is the bureau chief's signature, and I don't know whose

16 signature that is.

17     Q.  Okay.

18     A.  And then the lower left-hand corner, that's the

19 signature of the first deputy chief, Joseph Cecile.  I

20 recognize that signature.

21     Q.  Okay, Chief, in signing -- I know you don't

22 remember reviewing this document.  I think that was your

23 testimony, right?  You don't remember reviewing this document?

24     A.  I do not.

25     Q.  Chief, is it accurate to say that your signature at

1    the end of the document would be an indication that at the

2    time in 2016 you would have reviewed the document or you did

3    review this document?

4         A.   Yes.

5         Q.   And, Chief, what role does Lieutenant David Brown

6    play in the Office of Professional Standards at this time?

7         A.   He would be the person conducting the

8    investigation.

9         Q.   So he would have been the -- is it fair to say he

10   would have been the chief investigator on Mr. Jennings'

11   complaint to the Citizens Review Board?

12        A.   That's fair.

13        Q.   Okay.  And what about -- oh, I'm sorry.  Strike

14   that.

15             Chief, it seems that this -- if you look at

16   the first page of Plaintiff's Exhibit G, it seems that there's

17   a date of August 1st, 2016.  Does that date reflect when you

18   received the document?  And I also just want to at the same

19   time point you back to the last page.  There's another date,

20   8/18/16.  Let me back up.

21             Do you know when you received this document?

22        A.   No.

23        Q.   So you don't know if it was on the August 1st date?

24        A.   I don't know specifically when I received the

25   document.

[FRANK L. FOWLER - Mr. Cannizzaro]

 1        Q.   Is it fair to assume that somewhere between

 2   August 1st, 2016, which is on the front of the document, and

 3   August 18th, '16, you received this document?

 4        A.   No.

 5        Q.   Could you have received it after August 18th, 2016?

 6        A.   I don't know.

 7        Q.   What's the typical -- Chief, in your experience,

 8   what was the typical turnaround time from an investigation

 9   coming into the -- from the Citizens Review Board going

10   through the Office of Professional Standards and getting to

11   your desk?

12        A.   There is no typical turnaround time.

13        Q.   Is there an average turnaround time in your

14   experience?

15        A.   No.  As I indicated earlier, the investigation --

16   the nature of the investigation itself would dictate how long

17   it would take.  If there's multiple witnesses and there's

18   difficulty locating them, waiting for evidence to be

19   processed, there's a lot of variables to take into

20   consideration that would extend an investigation.

21        Q.   Okay.  But at some time, Chief, you would have been

22   in position to review this report; is that right?

23        A.   That's correct.

24        Q.   And what went into reviewing this report, do you

25   recall?

1   A. From my perspective?

2   Q. From your perspective.

3   A. Certainly. The investigation would indicate all

4 the witnesses that were -- all the witnesses that were

5 interviewed, the evidence that was analyzed and collected, if

6 any, associated with the investigation, and the Citizens

7 Review Board investigation and any other documentation that

8 was relative to the investigation, all of those items would be

9 reviewed before making a final decision.

10   Q. Okay. And, Chief, at any point did you interview

11 witnesses yourself regarding this Office of Professional

12 Standards investigation?

13   A. No.

14   Q. Did you review any documentation regarding the

15 investigation beyond the report itself?

16   A. So I can't answer that specifically because I've

17 indicated to you several times that I don't recall this

18 investigation.

19   Q. Okay. You just don't remember it at all?

20   A. Yes.

21   Q. Okay.

22   A. However, I can tell you that, as a standard

23 practice --

24   Q. Sure.

25   A. -- I would review all of the reports that are

1    contained in the file.

2        Q.   Okay.  And walk me through your standard practice.

3    Once you received one of these reports, what did you do, not

4    specific to this one because you don't remember, but generally

5    what would you do?

6        A.   Upon receiving one of these reports, that would be

7    an indication that the investigation is concluded.  However,

8    no matter what the findings are, the investigation is

9    concluded.

10        Q.   So, Chief, can I stop you?  If you received these

11    reports, your investigative staff is signaling to you that the

12    investigation is done; is that right?

13        A.   From their perspective, yes.

14        Q.   From their perspective.  Okay.

15        A.   However, it's reviewed by all the other personnel

16    that has signed off on it, the bureau chief, the first deputy

17    chief, and then ultimately the chief of police.

18        Q.   Okay.

19        A.   At any point they can direct the investigators to

20    answer specific questions, go back and pursue or gather

21    additional information.  So, even though in this case

22    Lieutenant Brown could have concluded this investigation and

23    felt that it was ready to go forward to our office, there's

24    three opportunities before someone from the Office of the

25    Chief of Police to request additional information and/or

1   further investigation to some aspect of the complaint.

2       Q.   Okay.  And, Chief, so I just want you to continue

3   to walk me through.  So, after you receive one of these

4   complaints, what did you personally do with regard to Office

5   of Professional Standards complaints beyond what you've

6   already described?  Is there anything else you would do?

7       A.   No, nothing other than what I've just described to

8   you.

9       Q.   And if you agreed with the recommendations of the

10  various levels of review that had occurred, what would be the

11  final step?

12      A.   The final step would be I would sign off indicating

13  that I concur.

14      Q.   Okay.

15      A.   And if -- and then if discipline is recommended,

16  then I would then impose specific discipline.

17      Q.   And that discipline, Chief, would come directly

18  from your office, the chief of police's office?

19      A.   Yes.

20      Q.   Chief, you can put Plaintiff's Exhibit G aside.

21  Okay, Chief, so I'm going to have these next exhibits marked

22  for identification.  I'm going to have these both marked as

23  "H" and "I".

24                   (Documents further described herein were

25       marked for identification as Plaintiff's Exhibits H

1       and I, this date.)

2   BY MR. CANNIZZARO:

3       Q.   Chief, I just handed you what's been marked for

4   identification as Plaintiff's H and I.  Do you recognize what

5   these documents are?  Let me start with "H".  Let me just

6   start with "H" here.  So, looking at "H", do you recognize

7   what's been marked as Plaintiff's Exhibit H?

8       A.   Yes, this is a letter addressed to Mr. Tony

9   Jennings indicating that we have received his -- that the

10  Syracuse Police Department has received his complaint and has

11  conducted an investigation and taken the appropriate actions.

12      Q.   Okay.  And is there any indication in this letter

13  to Mr. Jennings with regard to what action was taken or, if no

14  action was taken, that no action was taken?

15      A.   There's no indication of that.

16      Q.   And, Chief, is it the policy or was it the policy

17  in your time as police chief to notify a complainant with

18  regard to actions taken by the department after investigation?

19      A.   (There was no response.)

20      Q.   So would you normally notify a complainant what

21  action was taken after a complaint was investigated?

22      A.   No.  The complainant would receive this letter.

23      Q.   This would be the letter they'd receive?

24      A.   (Witness nods head.)

25      Q.   Okay.  Is there anything else that you typically

1  would send to a complainant beyond this letter?

2      A.   No.

3      Q.   Okay.  Turning to --

4           MR. CANNIZZARO:  And I'm going to mark one

5      more exhibit as Plaintiff's Exhibit J.

6           (A document further described herein was

7      marked for identification as Plaintiff's Exhibit J, this

8      date.)

9  BY MR. CANNIZZARO:

10     Q.   Chief, if you would take a look at what's been

11 marked as Plaintiff's Exhibit I and Plaintiff's Exhibit J and.

12 Let me know when you're ready.

13          (The documents were handed to the witness, and

14 the witness reviewed the documents.)

15     A.   Okay.

16     Q.   Okay.  Chief, what is contained within Plaintiff's

17 Exhibit I?

18     A.   "I" is a letter addressed to Police Officer

19 Ettinger, and it's from me serving as the chief of police at

20 the time, and it identifies the subject, which is Office of

21 Professional Standards investigation, and it's advising

22 Officer Ettinger that I have reviewed the Office of

23 Professional Standards investigation regarding the complaint

24 from the subject Mr. Tony Jennings, and it advises him that

25 the case was closed, unsubstantiated.

1        Q.   What about what's been marked as Exhibit J?

2        A.   Exhibit J references the same case with the same

3    information, however, it is addressed to Officer Jeremy Decker

4    indicating the same as the letter addressed to Officer

5    Ettinger.

6        Q.   And these both, both "I" and "J", came from your

7    office?

8        A.   That's correct.

9        Q.   And, tell me, was it standard procedure to issue

10   these letters after investigations close?

11       A.   It is.

12       Q.   And it appears that, if you look at what's been

13   marked as Exhibits H, I, and J, all three of them appear to be

14   dated on the same date, September 7, 2016.  Is that right?

15       A.   That's correct.

16       Q.   Now, would this indicate, these letters as of

17   September -- dated September 7, 2016, would these -- or did

18   these indicate that the investigation was closed from your

19   perspective as of this date?

20       A.   I'm not sure.

21       Q.   Okay.

22       A.   I'm not sure.

23       Q.   Is there any documentation that you normally would

24   have that would reflect that this investigation be closed?  Is

25   there something you're not seeing that you'd expect to see?

[FRANK L. FOWLER - Mr. Cannizzaro]

1      A.   No.

2      Q.   Okay.  Ultimately, Chief, you concurred with the

3 finding from Office of Professional Standards regarding this

4 case; is that right?

5      A.   Yes.

6      Q.   And you agreed that it should be closed as

7 unsubstantiated?

8      A.   Yes.

9      Q.   Okay.  And, Chief, I'm just trying to get a

10 time frame here.  We talked about the date that is -- and we

11 can turn back to it if you need.  -- the date that is present

12 on the Office of Professional Standards exhibit, so that's

13 Exhibit --

14           MS. DeJOSEPH:   "G".

15      Q.   I think it's "G".

16      A.   Okay.

17      Q.   I'm trying to get a time frame here, Chief, and was

18 wondering if you can clear this up for us.  We're not sure

19 after discussing the Office of Professional Standards when you

20 received it and how long it took for you to make your

21 determination here.  However, Exhibits H, I, and J are dated

22 September 7th.  That's about -- August 1st, 2016, to

23 September 7, 2016, that's a little over a month.  You agree

24 with that, right?

25      A.   Yes.

1    Q.   Are we to assume that this investigation and your

2  conclusions occurred within that time frame?

3    A.   I'm really not sure.

4    Q.   Okay.  Is there any document that would give us an

5  idea that would be -- that you're aware of that would give us

6  an idea of the time frame of when this investigation occurred?

7    A.   Not that I'm aware of.

8    Q.   So we're going to have to go with the dates that

9  are present on these exhibits, is that right --

10             MS. DeJOSEPH:  Object to form.  You can answer

11     it.

12    Q.   -- for figuring out --

13    A.   That's not necessarily right.

14    Q.   Okay.  How are we to determine when this

15  investigation into Mr. Jennings' complaint occurred, the

16  time frame from it?

17    A.   I think the person that could best answer that

18  question is Lieutenant Brown.

19    Q.   Lieutenant Brown.  And are you aware if Lieutenant

20  Brown is still employed with the Syracuse Police Department?

21    A.   No, I don't think he is.

22    Q.   Do you know if he's retired or --

23    A.   Retired, yes.

24    Q.   Okay.  Chief, you can put all these exhibits to the

25  side.

1                    (The witness complied.)

2        Q.   Chief, there was no discipline imposed on Officers

3   Decker and Ettinger?

4        A.   For this case?

5        Q.   For this incident?

6        A.   No.

7        Q.   Are was there any training directive that they

8   should involve themselves in?

9        A.   As it relates to --

10       Q.   As it relates to this incident.

11       A.   No.

12       Q.   Okay.  And, Chief, do you recall at any point --

13   strike that.

14                   Chief, we discussed previously Local Law 1 for

15   2012, specifically the section which requires you to inform

16   the Citizens Review Board of your findings.  Do you recall in

17   this instance regarding Mr. Tony Jennings if you ever informed

18   the Citizens Review Board that you closed the case as

19   unsubstantiated with no discipline?

20       A.   I don't recall.

21       Q.   Chief, are you aware or have you become aware that

22   the Citizens Review Board did their own investigation into

23   Mr. Jennings' complaint?

24       A.   I don't recall.

25       Q.   Okay.  Do you remember ever receiving a report from

1    the Citizens Review Board regarding an investigation into

2    Mr. Jennings' claims?

3         A.   Don't recall.

4         Q.   Okay.  So, Chief, I'm going to have this marked as

5    Plaintiff's Exhibit K.

6                   (A document further described herein was

7         marked for identification as Plaintiff's Exhibit K, this

8         date.)

9    BY MR. CANNIZZARO:

10        Q.   Chief, do you recognize what's in Plaintiff's

11   Exhibit K?  Have you seen that document before?

12        A.   I don't recall.

13        Q.   Okay.  So, Chief, I just want to start with the

14   first page.  What this is is a letter from the Citizens Review

15   Board dated November 23rd, 2016, and this letter is directed

16   to you, correct?

17        A.   It is.

18        Q.   Okay.  And it appears to be regarding the matter of

19   Tony Jennings versus Officers Decker and Ettinger and Sergeant

20   Ocker regarding allegations of excessive force, false

21   reporting, illegal search, and racial profiling.  Do you agree

22   with that --

23        A.   I agree --

24        Q.   -- that's the subject?

25        A.   -- that that's the subject, yes.

1      Q.   If you fast-forward in the middle under "CRB

2  Findings", it appears that the Citizens Review Board sustained

3  findings of excessive force and racial profiling against

4  Officers Decker and Ettinger.  Do you see that?

5      A.   Yes.

6      Q.   Can you tell me or, if you remember, when the

7  police department received this document or when your office

8  who it's directed to received this document, did that cause

9  you to re-examine the investigation into the incident on

10  January 5th, 2016?

11      A.   I don't recall.

12      Q.   Okay.  Would -- Chief, in your experience, would a

13  finding by the Citizens Review Board typically trigger a

14  reopening of a closed investigation?

15      A.   It could.

16      Q.   Under what circumstances could a report finding

17  that the Citizens Review Board had sustained allegations

18  reopen an investigation?

19      A.   In general?

20      Q.   In general.

21      A.   In general, once the Citizens Review Board

22  complaint is read and if they indicate that there are

23  witnesses that were made available to them that we weren't

24  aware of or were not made available to us, if there's some

25  information that was provided to them that was not provided to

1   us but we now have access to, then those items would be

2   examined; and if, upon examining those items or those -- the

3   people, we decide from that that we need to look a little

4   further into an investigation, then we would absolutely do

5   that.

6        Q.   Okay.  Chief, in your experience, how often did the

7   findings of the Citizens Review Board match Office of

8   Professional Standards investigation.  I'm talking percent.

9   Is it never, 50/50?  How often would they match?

10       A.   I don't know.

11            MS. DeJOSEPH:  Who are we talking about?

12            MR. CANNIZZARO:  So I'm trying to determine

13       how often the --

14       Q.   Okay.  So what was the -- Chief, did you receive

15   reports from the Citizens Review Board regarding these types

16   of investigations on a regular basis?

17       A.   Yes.

18       Q.   Okay.  And in 2016 or during your time as police

19   chief had you previously received reports from the Citizens

20   Review Board in which they had done an investigation and

21   sustained findings against officers?

22            MS. DeJOSEPH:  Object to form.  What findings?

23            MR. CANNIZZARO:  Findings regarding misconduct

24       of officers in excessive force or racial profiling.

25       A.   I missed the front part of your question.

1     Q.   Sure.  So in your time as police chief did you

2  receive reports from the Citizens Review Board which

3  substantiated findings of excessive force and/or racial

4  profiling against officers?

5     A.   I have, yes.

6     Q.   Okay.  And in those instances when you received

7  those reports, did you concur or regularly -- did you

8  regularly agree with them?

9           MS. DeJOSEPH:  Object to form.  You can

10     answer.

11     A.   I don't recall.  I know that there have been times

12  where I've agreed, and there have been times where I've

13  disagreed, so...

14     Q.   How many times in your recollection have you agreed

15  with the sustained finding of the misconduct we've been

16  discussing from the Citizens Review Board, to your

17  recollection?

18     A.   I don't recall.

19     Q.   How many times have you disagreed with findings

20  from the Citizens Review Board regarding the investigations or

21  the complaints we're discussing?

22     A.   I don't recall.

23     Q.   Have you ever agreed with the Citizens Review Board

24  with regard to sustaining a finding of officer misconduct?

25     A.   I have.

[FRANK L. FOWLER - Mr. Cannizzaro]

1    Q.   And, Chief, to your knowledge -- well, strike that.

2  Let me back up.

3            So we just discussed the letters you sent to

4  Officer Decker and Ettinger finding that the case was closed,

5  correct?

6    A.   Yes.

7    Q.   And those were dated September 7, 2016.  I can show

8  you them again if you'd like to look at them.  They're --

9    A.   Yes.

10   Q.   And they're -- okay.  Is that right, they're dated

11 September 7th?

12   A.   That is the date on the letter, yes.

13   Q.   Can you tell me if any further investigation went

14 on from your office from September 7th to November 23rd, 2016,

15 regarding this incident?

16   A.   I don't recall.

17   Q.   How about after November 23rd, 2016?

18   A.   I don't recall.

19   Q.   Were you aware of any documentation regarding a

20 reopening of the investigation after September 7 of 2016?

21   A.   I am not.

22   Q.   How about are you aware of when the investigation

23 into Mr. Jennings' complaint was officially closed by your

24 office?

25   A.   No.

1        Q.   Chief, you can put that aside.

2                   (The witness complied.)

3        Q.   So, Chief, you previously mentioned some studies

4    regarding racial profiling in the City of Syracuse, correct?

5        A.   Yes.

6                   MR. CANNIZZARO:  Okay.  And I'm going to have

7        this marked as Plaintiff's Exhibit L.

8                   (A document further described herein was

9        marked for identification as Plaintiff's Exhibit L, this

10       date.)

11   BY MR. CANNIZZARO:

12       Q.   Chief, is this the study that you were referring to

13   earlier in our discussion today?  And you can take as much

14   time as you need to look at it.

15                  (The document was handed to the witness, and

16       the witness reviewed the document.)

17       A.   Yes.

18       Q.   And, Chief, could you turn to Page 7 -- or, I'm

19   sorry, this is the study you were referring to earlier?

20       A.   This is one of the studies.

21       Q.   One of the studies?

22       A.   I told you that there were two.

23       Q.   There were two.  This is one of the two studies?

24       A.   It is.

25       Q.   The other being the Finn study?

1      A.   Yes.

2      Q.   With regard to the study in front of you, it

3 appears it was conducted by William Horrace --

4      A.   Yes.

5      Q.   -- and Shawn Rohlin, Syracuse University and

6 University of Akron, correct?

7      A.   Yes.

8      Q.   And it was done ton September 3rd, 2010; is that

9 right?

10      A.   Yes.

11      Q.   And you were chief on September 3rd, 2010, on that

12 date?

13      A.   This is when the study was entered --

14      Q.   Yes.

15      A.   -- was concluded.

16      Q.   That's when the study was concluded.

17      A.   The study began prior to me becoming the chief.

18      Q.   Okay.  But you were the chief in September of 2010?

19      A.   Yes.

20      Q.   Okay.  Now, Chief, if you turn to Page 7 -- and

21 we've discussed this before, but turn to Page 7, if you will,

22 under the "Conclusions" section, and I'm just going to read

23 the first sentence, if you'll read along with me:  *The results*

24 *of the study indicate that there is differential treatment by*

25 *race for police-citizen encounters in the City of Syracuse.*

1    Did I read that correctly?

2         A.   Yes.

3         Q.   And this is the finding that we discussed earlier,

4    that this study determined there was differential treatment by

5    race for police-citizen encounters in the City of Syracuse; is

6    that correct?

7         A.   That's correct.

8         Q.   And that covered the period from 2006 to 2009?

9         A.   Yes.

10        Q.   Okay.  Chief, you reviewed this document at some

11   point?

12        A.   Yes.

13        Q.   Chief, did this study or the Finn study cause the

14   Syracuse Police Department to reevaluate their training

15   regarding racial profiling?

16                  MS. DeJOSEPH:  Object to form.  You can answer

17        it.

18        A.   Yes.

19        Q.   In what ways did it cause the police department to

20   reevaluate those items?

21        A.   A number of ways.  I don't remember them all.

22        Q.   Sure.

23        A.   I could tell you that, one, this study here

24   identified one thing that really sticks out to me and that is

25   that, when they went to collect their data, that we noticed

1    that they were missing a chunk of data as it relates to police

2    encounters.

3        Q.    And what data was that?

4        A.    Well, when they were basing it on police reports,

5    and when you conduct Vehicle & Traffic stops, it's a high

6    level of citizen contact, there's no race associated with a

7    Vehicle & Traffic stop.  When we were conducting

8    citizen-encounter stops on the street, if there were no arrest

9    or it didn't generate a Police Report for that particular

10   stop, then there was no indication as to the race or ethnicity

11   of the person being stopped.  So, as a result, we created a

12   form that officers were instructed to fill out upon having any

13   citizen contact in those areas that created the gap

14   originally.

15       Q.    Chief, can I ask, were there specific areas of the

16   city that this study focused on, to your recollection, or was

17   it, rather, a citywide study?

18       A.    You know, I really don't recall.

19       Q.    Okay.  Chief, after this study and the Finn study

20   were conducted, although it focused on a period in which you

21   weren't police chief, did it cause you to make any changes to

22   the training procedures and protocols that you developed for

23   City of Syracuse police officers?

24       A.    There were changes that were made.  Specifically I

25   don't know, you know, what changes there were.

1     Q.   The changes that were made, were they because of

2   the racial profiling studies that were done?

3                  MS. DeJOSEPH:  Object to form.

4     Q.   Do you know the answer to that?  Is there -- were

5   they connected in any way to the conclusions contained within

6   the racial profiling studies?

7                  MS. DeJOSEPH:  Same objection.

8     A.   Yeah, I don't -- they could have been.  I don't

9   remember.

10    Q.   Okay.  Do you remember, Chief, having any

11  discussions with command staff with regard to changing

12  training protocols due to these racial-profiling studies?

13                  MS. DeJOSEPH:  Same objection.  You can answer

14    it.

15    A.   I don't recall.

16    Q.   Okay.  And, Chief, what about policies,

17  departmental policies, did these racial-profiling studies

18  cause you to reevaluate the departmental policies with regard

19  racial profiling in the police department?

20                  MS. DeJOSEPH:  Same objection.  You can

21    answer.

22    A.   I don't recall specifically.

23                  MR. CANNIZZARO:  Do you mind if I take a

24    break?

25                  (A recess was taken.)

1    BY MR. CANNIZZARO:

2        Q.   Chief, do you recall during your time as police

3    chief after these studies we've been discussing were

4    conducted, did you receive any direction from the mayor of the

5    city to investigate the issue of racial profiling in the

6    department?

7        A.   I don't recall.

8        Q.   Do you recall if the Common Council gave the police

9    department any direction, whether through resolution,

10   ordinance, or local law, regarding an investigation into

11   racial profiling by City of Syracuse police officers?

12       A.   I don't recall.

13       Q.   Chief, in your time at the Syracuse Police

14   Department as police chief, did you make any -- I may have

15   asked you this before.  Did you make any significant changes

16   to training regarding racial profiling with your officers

17   after these studies were done?

18              MS. DeJOSEPH:  Object to form.  You can

19       answer.

20       A.   I don't recall.

21       Q.   Okay.  Chief, I want to change gears a little bit.

22   In your experience as either police chief or as an officer,

23   are you familiar with the concept of policing called criminal

24   profiling?

25       A.   Yes.

1    Q.   Can you tell me what that concept -- the basics of

2    that concept?  What does it mean?  What does it mean to

3    criminally profile?

4    A.   So criminal profiling is based on behavior that has

5    a level of reasonable suspicion attached to it, and that is

6    the first consideration to a police encounter is that level of

7    reasonable suspicion.

8    Q.   Chief, can you explain to me how criminal

9    profiling -- how the concept of criminal profiling is used to

10   train officers in terms of performing their duties as police

11   officers?

12            MS. DeJOSEPH:  Objection to form.  Foundation.

13   A.   I don't know if it is necessarily used to train

14   officers.

15   Q.   So let me back up.  Sorry.  When you were City of

16   Syracuse police chief, did your officers receive training, to

17   your knowledge, in the concepts of criminal profiling?

18   A.   I'm not exactly sure.

19   Q.   Okay.  So I want to go back to your description of

20   criminal profiling.  You noted that -- sorry.  Actually,

21   strike that.

22            How does an officer employ the idea of

23   criminal profiling in making an arrest in your experience as

24   an officer?  How does it come into play?

25   A.   The officers -- it would be based on the officer's

1  observation, the officer's knowledge of the law or the

2  specific area of the law, and subject's behavior.  If the

3  subject's behavior rises to the level of reasonable suspicion

4  and then, based on what I've said just prior to that, the

5  officer then engages the person for purposes of conducting an

6  investigation.

7      Q.   Chief, criminal profiling, is it used by officers

8  in your experience as a basis for initiating a street

9  encounter?

10      A.   It could be.

11      Q.   And can you distinguish, Chief, how -- you know,

12  what the difference is between criminal profiling and racial

13  profiling?

14      A.   Sure.  Criminal profiling is based solely upon

15  behavior that either falls completely outside the scope of the

16  law or rises to the level of reasonable suspicion.  Racial

17  profiling is when an officer engages a person and their only

18  rationale for doing so is race, is based on race.

19      Q.   Chief, are you aware during your time as police

20  chief if as part of your training regarding racial profiling,

21  the training, the lessons plans, your officers received

22  training regarding the differences between criminal profiling

23  and racial profiling?

24      A.   Yes.

25      Q.   Okay.  And what was that?  What did they -- what

[FRANK L. FOWLER - Mr. Cannizzaro]

1    lesson plan?  What did they receive, do you know?

2         A.   Well, through the basic academy class that our

3    officers are trained in bias-based policing and racial

4    profiling and then periodically an in-service training.

5         Q.   And, Chief, when you started as police chief in

6    approximately 2010 -- 2010, correct?

7         A.   Yes.

8         Q.   -- 2010, did you review the training protocols and

9    lessons plans regarding the differences between racial

10   profiling and criminal profiling?

11        A.   I was already familiar with those.

12        Q.   Do you remember specifically reviewing the Syracuse

13   Police Department policies when you started as police chief?

14        A.   The entire policies?

15        Q.   Or any part of it.

16        A.   As it relates to racial profiling?

17        Q.   As it relates -- sorry, as it relates to the

18   interplay between racial profiling and criminal profiling, the

19   training that officers received to explain the difference

20   between the two.

21        A.   Yes.  Not only did I review them, I was already

22   familiar with them.

23        Q.   Okay.

24        A.   I was an instructor for --

25        Q.   You were an instructor for what?

1        A.    For racial profiling, ethnic sensitivity,

2   bias-based policing, all of those --

3        Q.    When --

4        A.    -- at one point.

5        Q.    I'm sorry.  Go ahead.

6        A.    At one point.

7        Q.    At one point in your career.  Did you, Chief, find

8   that the policies in place in 2010 and during your time as

9   police chief met the relevant standards regarding training for

10  racial-profiling practices?

11       A.    Yes.

12       Q.    And were the policies that were in place when you

13  came in as police chief generally were the same as the

14  policies in place under the previous police chief?

15             MS. DeJOSEPH:  Object to form.

16       A.    I don't recall because policies are fluid.  They're

17  forever changing.

18       Q.    Okay.  Do you recall when you began as police chief

19  making significant adjustments to the training regarding

20  facial profiling?

21       A.    No.

22             MS. DeJOSEPH:  Object to form.

23       Q.    Chief, in your experience, what were the main --

24  I'm going to strike that.

25             Chief, did you ever make recommendations to

1   the mayor or the Common Council regarding changes to the

2   training officers received on racial profiling?

3          A.   No.

4          Q.   No?  Never made any recommendations to change the

5   policy?

6          A.   No, that's not how it works.

7          Q.   Okay.  So the -- let me ask you, Chief, there's

8   no -- there's no process in place for the police chief, in

9   your experience, to make recommendations to other governmental

10  actors in the City of Syracuse to change policies?

11         A.   No.  The chief of police is the policymaker for the

12  police department.

13         Q.   So, I mean, the buck stops with the chief of

14  police, right?

15         A.   As it relates to policymaking, yes.

16         Q.   And is that the same, the buck stops with you with

17  regard to training, training of officers?

18         A.   That's true.

19         Q.   And the same thing with discipline of officers --

20         A.   Yes, sir.

21         Q.   -- the buck stops there?

22         A.   Yes, sir.

23         Q.   Chief, is there anything else that you want to say

24  regarding this matter before we close here?

25         A.   No.

1    Q.   Okay.  And, Chief, you are confident that --

2    A.   Excuse me for a second.  I'm sorry.  I answered you

3  too quickly.  May I?

4    Q.   Oh, no, go ahead.

5    A.   So you handed me the study from Dr. Horrace, and I

6  indicated to you that there was another study.

7    Q.   Yes.

8    A.   The second study, it goes more in depth.  It's

9  conducted by a group of criminologists that provides more and

10  specific details as it relates to racial profiling.  This does

11  not.

12    Q.   M-m h-m-m.

13    A.   In reviewing both those policies, I found that the

14  second policy became a greater training tool for management as

15  opposed to this one here.  That's it.

16    Q.   Chief, the second study you're referring to is the

17  Finn study?

18    A.   Yes.

19    Q.   And can you explain to me how, after reviewing the

20  Finn study, you found that it was -- I think you said it was a

21  greater tool for management but, correct me if I'm wrong, tell

22  me how it was a greater tool?

23    A.   Because of the way that the study -- the Finn

24  Institute study was conducted.

25    Q.   Okay.

1      A.   It took into consideration the demographics of the

2  area of study --

3      Q.   M-m h-m-m.

4      A.   -- the time of day, the type of -- and those two,

5  taking those two into consideration, it changes the entire

6  dynamics of who is of your sample and your sample being the

7  people, right?

8      Q.   Sure.

9      A.   So the Finn Institute used those examples, the time

10 of day, and location in their study.

11     Q.   And, Chief, is it accurate to say, tell me if it's

12 not, that you found the Finn study to more accurately reflect

13 the day-to-day policing practices of an officer, and that's

14 why you found it to be a better tool?

15     A.   Yes.

16              MR. CANNIZZARO:  And, Chief, I think that's

17         all I have for you.

18              MS. DeJOSEPH:  I'm all set.

19              (Whereupon, at 1:23 p.m., the examination of

20         FRANK L. FOWLER in the above-entitled matter was

21         concluded.)

22

23                    *          *          *

24

25

**<u>INDEX TO EXHIBITS</u>**

PLAINTIFF'S
**EXHIBIT**          **<u>DESCRIPTION</u>**                          **<u>ID</u>**

A      Section 3.00 - "Use of Physical Force"      19

B      Volume I, Article 4, Syracuse Police        27
       Department rules and regulations

C      Local Law 1 for 2012                        48

D      Citizens Review Board Annual Report -       62
       January 1 to December 31, 2012

E      Letter dated 11/4/15 to Chief Fowler from   64
       William J. Simmons

F      "Citizen Complaint Report"                  70

G      Office of Professional Standards Case       71
       Report

H      Letter dated 9/7/16 to Mr. Jennings from    77
       Chief Fowler

I      Letter dated 9/7/16 to Officer Ettinger     77
       from Chief Fowler

J      Letter dated 9/7/16 to Officer Decker from  79
       Chief Fowler

K      Letter dated 11/23/16 to Chief Fowler from  84
       Citizens Review Board - David Chaplin

L      City of Syracuse Police - Citizen Encounter 89
       Study


                    *          *          *

# ERRATA SHEET

I, FRANK L. FOWLER, have read the transcript of my
testimony and would like to make the following changes:

| PAGE: | LINE: | CHANGE FROM: | CHANGE TO: |
|-------|-------|--------------|------------|
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |
|       |       |              |            |

Subscribed and sworn to before me
this _____ day of _____, 20__.

_____        _____
        Notary Public                              FRANK L. FOWLER

STATE OF NEW YORK    )

COUNTY OF            )


       I have read the foregoing record of my
testimony taken at the time and place noted in the
heading hereof, and I do hereby acknowledge it to be a
true and accurate transcript of the same.


_____

                FRANK L. FOWLER


Sworn to before me this

_____ day of _____, 2020.


_____

        NOTARY PUBLIC

RE:     Jennings v. Decker, et al.

AT:     233 East Washington Street
        Syracuse, New York

DATE:   January 27, 2020


C E R T I F I C A T I O N


        I, RENÉE D. LEGUIRE, a Certified Shorthand

Reporter (License Number 924-1), Registered Merit

Reporter, Certified Realtime Reporter, and Notary Public

in and for the State of New York, do hereby certify that

the foregoing record taken by me at the time and place as

noted in the heading hereof is a true and accurate

transcript of same to the best of my ability and belief.



        RENÉE D. LEGUIRE, RMR, CRR,
        Certified Shorthand Reporter



Date: _____February 4, 2020_____

**#5:17-CV-0054 [1]** - 1:8

**'16 [1]** - 74:3

**'93 [1]** - 48:5

**1 [15]** - 21:22, 27:15, 48:4, 48:11, 48:16, 48:19, 49:21, 50:5, 55:19, 58:12, 60:3, 62:20, 83:14, 102:8, 102:10

**10849 [1]** - 2:4

**10:41 [1]** - 1:16

**11 [2]** - 48:5, 48:12

**11/23/16 [1]** - 102:19

**11/4/15 [1]** - 102:11

**12208 [1]** - 2:5

**13202 [1]** - 2:8

**14 [3]** - 55:4, 55:18, 55:19

**140 [1]** - 64:21

**18.15 [1]** - 27:23

**18.16 [3]** - 32:22, 32:24, 33:4

**18th [2]** - 74:3, 74:5

**19 [1]** - 102:6

**1993 [1]** - 48:13

**1:23 [1]** - 101:19

**1st [4]** - 73:17, 73:23, 74:2, 81:22

**2 [6]** - 48:25, 49:3, 49:4, 49:5, 49:6

**20 [1]** - 103:23

**2006 [1]** - 91:8

**2009 [1]** - 91:8

**2010 [9]** - 8:2, 46:13, 90:8, 90:11, 90:18, 97:6, 97:8, 98:8

**2011 [2]** - 49:7, 49:13

**2012 [12]** - 48:4, 48:11, 48:16, 48:19, 55:19, 58:12, 60:3, 62:20, 63:4, 83:15, 102:8, 102:10

**2016 [28]** - 4:7, 7:16, 7:22, 18:19, 19:7, 24:14, 26:20, 27:20, 29:7, 63:18, 70:3, 71:8, 73:2, 73:17, 74:2, 74:5, 80:14, 80:17, 81:22, 81:23, 84:15, 85:10, 86:18, 88:7, 88:14, 88:17, 88:20

**2018 [3]** - 8:7, 8:8, 46:13

**2019 [1]** - 8:6

**2020 [4]** - 1:15, 104:18, 105:3, 105:21

**233 [2]** - 1:17, 105:2

**23rd [3]** - 84:15, 88:14, 88:17

**24 [1]** - 7:2

**25 [1]** - 5:25

**27 [2]** - 102:7, 105:3

**27th [1]** - 1:15

**29th [1]** - 49:7

**3 [2]** - 50:19, 50:22

**3(a [4]** - 52:11, 52:13, 52:16, 52:22

**3(c [3]** - 54:24, 55:1

**3(c)(4 [2]** - 55:17, 55:19

**3.00 [2]** - 19:1, 102:6

**3.15 [2]** - 23:15

**30 [1]** - 59:11

**31 [2]** - 62:20, 102:10

**3rd [2]** - 90:8, 90:11

**4 [14]** - 23:13, 23:17, 27:15, 49:19, 50:2, 55:2, 55:10, 55:12, 57:11, 57:15, 57:16, 57:17, 102:7, 105:21

**48 [2]** - 7:2, 102:8

**5 [1]** - 49:20

**50 [1]** - 5:23

**50/50 [1]** - 86:9

**5th [3]** - 4:7, 29:7, 85:10

**60 [6]** - 53:1, 53:13, 55:22, 56:2, 56:14, 59:1

**60-day [2]** - 56:11, 56:23

**62 [1]** - 102:9

**64 [1]** - 102:11

**7 [15]** - 52:10, 52:13, 52:16, 55:18, 59:6, 59:17, 80:14, 80:17, 81:23, 88:7, 88:20, 89:18, 90:20, 90:21

**7(g [1]** - 60:3

**70 [1]** - 102:12

**71 [1]** - 102:13

**77 [2]** - 102:15, 102:16

**79 [1]** - 102:18

**7th [3]** - 81:22, 88:11, 88:14

**8 [1]** - 27:25

**8/18/16 [1]** - 73:20

**84 [1]** - 102:19

**89 [1]** - 102:21

**9/7/16 [3]** - 102:15, 102:16, 102:18

**924-1 [1]** - 105:9

**a.m [1]** - 1:16

**abide [2]** - 4:12, 41:13

**ability [7]** - 4:14, 6:18, 7:3, 7:7, 7:11, 57:6, 105:14

**able [2]** - 35:9, 57:17

**about [41]** - 5:21, 6:17, 6:20, 9:22, 13:7, 16:16, 17:23, 20:2, 20:6, 20:15, 20:16, 21:10, 28:6, 29:21, 34:9, 34:25, 39:22, 40:10, 41:3, 41:7, 41:12, 41:17, 42:21, 44:14, 45:7, 51:2, 54:12, 56:7, 61:14, 65:11, 66:25, 67:6, 69:16, 73:13, 80:1, 81:10, 81:22, 86:11, 88:17, 88:22, 93:16

**above [5]** - 1:14, 48:7, 52:25, 62:22, 101:20

**above-described [2]** - 48:7, 62:22

**above-entitled [2]** - 1:14, 101:20

**absolutely [3]** - 13:6, 24:7, 86:4

**academy [5]** - 12:10, 33:15, 34:10, 35:16, 97:2

**acceptable [3]** - 17:22, 18:1, 22:7

**access [1]** - 86:1

**accordance [1]** - 28:21

**according [1]** - 59:17

**accountability [1]** - 50:13

**accurate [6]** - 23:10, 53:9, 72:25, 101:11, 104:10, 105:13

**accurately [2]** - 49:8, 101:12

**achieved [1]** - 21:2

**acknowledge [2]** - 20:3, 104:9

**Acknowledgment [1]** - 72:4

**act [8]** - 56:14, 56:19, 65:3, 65:6, 65:18, 65:22, 67:9, 68:8

**acted [1]** - 37:5

**acting [1]** - 58:24

**action [12]** - 3:13, 22:2, 51:1, 55:20, 56:2, 61:4, 61:9, 61:17, 78:13, 78:14, 78:21

**actions [8]** - 23:11, 38:1, 59:13, 59:24, 60:24, 65:13, 78:11, 78:18

**active [1]** - 27:20

**actively [1]** - 68:20

**activity [1]** - 47:5

**actors [1]** - 99:10

**actually [8]** - 9:15, 24:19, 26:16, 29:8, 48:23, 49:19, 55:18, 95:20

**addition [1]** - 3:10

**additional [3]** - 11:17, 76:21, 76:25

**addressed [5]** - 64:18, 78:8, 79:18, 80:3, 80:4

**adhering [3]** - 10:3, 11:11, 11:16

**adjustments [1]** - 98:19

**administrative [2]** - 24:1, 60:19

**adversarial [1]** - 60:9

**advise [1]** - 59:13

**advises [1]** - 79:24

**advising [1]** - 79:21

**affairs [1]** - 28:1

**affect [5]** - 6:18, 7:2, 7:6, 7:11, 12:15

**affected [1]** - 15:2

**aforementioned [1]** - 56:9

**after [17]** - 17:22, 33:4, 46:6, 46:21, 55:17, 74:5, 77:3, 78:18, 78:21, 80:10, 81:19, 88:17, 88:20, 92:19, 94:3, 94:17, 100:19

**against [7]** - 27:17, 30:14, 38:4, 60:20, 85:3, 86:21, 87:4

**Agent [1]** - 1:13

**agent [4]** - 22:2, 65:3, 65:18, 68:8

**agents [2]** - 65:6, 65:22

**agree [8]** - 28:22, 53:18, 54:1, 58:13, 81:23, 84:21, 84:23, 87:8

**agreed [10]** - 3:14, 3:18, 13:20, 14:3, 53:23, 77:9, 81:6, 87:12, 87:14, 87:23

**AGREED [1]** - 3:5

**agrees [1]** - 37:23

**ahead [4]** - 10:21, 17:18, 98:5, 100:4

**Akron [1]** - 90:6

**al [2]** - 1:9, 105:1

**Albany [1]** - 2:5

**allegation [2]** - 31:3, 31:6

**allegations [6]** - 38:3, 38:4, 39:22, 39:24, 84:20, 85:17

**alleging [1]** - 40:2

**allow [1]** - 65:6

**allowed [1]** - 20:24

**along [6]** - 19:20, 21:24, 27:24, 49:24, 51:22, 90:23

**alongside [1]** - 13:23

**already [9]** - 18:24, 31:13, 40:18, 45:3, 47:19, 63:17, 77:6, 97:11, 97:21

**also [10]** - 6:22, 9:17, 10:5, 26:19, 35:25, 37:18, 38:14, 39:13, 61:12, 73:18

**alternative [1]** - 50:11

**although [1]** - 92:20

**always [1]** - 37:12

**am [4]** - 29:10, 63:20, 69:8, 88:21

**amending [2]** - 48:4, 48:12

**amount [3]** - 33:17, 33:18, 34:7

**analyzed [1]** - 75:5

**AND [1]** - 3:5

**and/or [4]** - 16:25, 29:22, 76:25, 87:3

**Annual [3]** - 62:19, 63:4, 102:9
**annual [9]** - 34:16, 35:19, 35:22, 61:24, 62:3, 62:4, 62:5, 62:9, 63:6
**annually [1]** - 29:23
**anonymous [2]** - 42:10, 42:11
**another [7]** - 5:9, 15:24, 45:6, 66:8, 68:1, 73:19, 100:6
**answer [39]** - 4:13, 4:16, 4:18, 5:5, 5:9, 5:11, 6:8, 6:10, 6:18, 7:3, 7:7, 7:11, 13:11, 15:8, 27:8, 30:22, 30:23, 35:2, 39:23, 43:9, 44:24, 47:11, 60:15, 65:9, 67:14, 67:20, 68:9, 69:25, 75:16, 76:20, 82:10, 82:17, 87:10, 91:16, 93:4, 93:13, 93:21, 94:19
**answered [3]** - 17:20, 61:7, 100:2
**answering [1]** - 35:5
**answers [1]** - 35:9
**anyone [1]** - 31:5
**anything [10]** - 6:12, 6:17, 44:18, 44:19, 45:2, 51:20, 61:14, 77:6, 78:25, 99:23
**apartment [4]** - 66:8, 66:9, 66:18, 66:20
**appear [1]** - 80:13
**appears [8]** - 48:23, 49:6, 55:19, 63:3, 80:12, 84:18, 85:2, 90:3
**applied [1]** - 10:13
**appointed [4]** - 8:14, 8:16, 8:19, 9:2
**appropriate [1]** - 78:11
**approval [4]** - 12:11, 17:13, 49:2, 58:5
**approve [3]** - 10:11, 12:3, 13:5
**approved [6]** - 13:8, 16:24, 43:12, 43:13, 43:14
**approving [6]** - 8:24, 9:10, 10:10, 12:5, 17:3, 36:9
**approximately [6]** - 7:24, 7:25, 8:2, 38:10, 46:13, 97:6
**area [6]** - 14:20, 16:23, 29:3, 69:12, 96:2, 101:2
**areas [4]** - 47:22, 66:8, 92:13, 92:15
**aren't [1]** - 50:2
**arrest [2]** - 92:8, 95:23
**arrives [2]** - 37:21, 38:1
**Article [3]** - 27:15, 64:21, 102:7

**aside [5]** - 26:18, 63:17, 70:9, 77:20, 89:1
**ask [19]** - 4:13, 4:17, 4:20, 5:4, 5:9, 5:10, 26:12, 31:20, 38:14, 39:4, 40:19, 41:17, 51:19, 58:6, 67:21, 68:1, 92:15, 99:7
**asked [4]** - 4:19, 4:25, 45:22, 94:15
**asking [8]** - 6:9, 6:19, 7:4, 7:8, 7:12, 35:8, 67:6, 67:23
**aspect [2]** - 10:23, 77:1
**assess [1]** - 42:23
**assist [1]** - 51:21
**Assistant [1]** - 2:9
**associated [4]** - 11:10, 45:20, 75:6, 92:6
**assume [2]** - 74:1, 82:1
**assumes [1]** - 39:13
**assuming [1]** - 39:14
**assure [1]** - 10:2
**AT [1]** - 105:2
**attached [1]** - 95:5
**attention [18]** - 6:13, 7:15, 12:11, 19:10, 21:22, 23:13, 23:14, 25:1, 27:22, 32:21, 40:5, 40:9, 48:24, 52:9, 54:23, 63:18, 64:5, 69:20
**Attorney [2]** - 2:5, 2:8
**attorney [1]** - 61:11
**attorney-client [1]** - 61:11
**attorneys [1]** - 61:14
**August [6]** - 73:17, 73:23, 74:2, 74:3, 74:5, 81:22
**authority [3]** - 46:25, 56:10, 57:24
**Authority [20]** - 63:19, 63:21, 63:22, 64:3, 64:17, 64:22, 65:2, 65:7, 65:17, 65:19, 66:1, 66:5, 66:12, 66:17, 66:21, 67:5, 67:10, 68:8, 69:7, 69:17
**authorizes [1]** - 64:20
**authorizing [1]** - 9:11
**auto [1]** - 26:6
**auto-penned [1]** - 26:6
**available [2]** - 85:23, 85:24
**avenue [1]** - 69:11
**average [2]** - 29:21, 74:13
**aware [36]** - 6:12, 29:5, 30:10, 30:18, 38:22, 39:14, 39:17, 39:20, 39:24, 40:3, 48:19, 60:16, 60:18, 60:19, 60:23, 61:1, 61:16, 67:8, 67:11, 67:15, 67:17, 68:4, 68:24, 69:5, 69:10, 69:21, 69:23, 82:5, 82:7, 82:19, 83:21, 85:24, 88:19, 88:22, 96:19

**B [8]** - 25:2, 27:1, 27:3, 27:7, 32:22, 52:25, 63:17, 102:7
**back [24]** - 9:15, 17:19, 24:17, 26:16, 26:17, 29:19, 32:21, 35:11, 37:2, 37:8, 38:17, 39:16, 42:2, 48:1, 59:1, 69:9, 72:2, 73:19, 73:20, 76:20, 81:11, 88:2, 95:15, 95:19
**background [1]** - 7:15
**backing [1]** - 14:7
**bar [1]** - 3:12
**based [15]** - 4:14, 18:2, 23:7, 26:21, 54:2, 57:23, 65:12, 65:22, 95:4, 95:25, 96:4, 96:14, 96:18, 97:3, 98:2
**basic [4]** - 12:10, 33:15, 34:10, 97:2
**basics [1]** - 95:1
**basing [1]** - 92:4
**basis [4]** - 38:10, 61:25, 86:16, 96:8
**became [2]** - 69:21, 100:14
**because [15]** - 10:15, 20:22, 35:7, 39:7, 41:25, 45:18, 49:25, 54:1, 57:4, 59:10, 75:16, 76:4, 93:1, 98:16, 100:23
**become [4]** - 39:10, 67:15, 69:23, 83:21
**becoming [1]** - 90:17
**before [30]** - 1:18, 3:16, 3:17, 4:10, 5:6, 5:9, 5:11, 5:19, 6:6, 12:18, 17:20, 27:8, 32:2, 37:7, 37:8, 43:21, 48:14, 56:14, 56:22, 58:18, 71:4, 71:5, 75:9, 76:24, 84:11, 90:21, 94:15, 99:24, 103:23, 104:17
**beforehand [1]** - 14:19
**began [2]** - 90:17, 98:18
**begin [1]** - 4:10
**begins [1]** - 18:13
**begun [1]** - 3:17
**behavior [4]** - 95:4, 96:2, 96:3, 96:15
**being [11]** - 3:15, 4:24, 14:24, 31:6, 44:11, 44:14, 49:11, 70:5, 89:25, 92:11, 101:6
**belief [2]** - 71:9, 105:14
**best [3]** - 4:14, 82:17, 105:14
**better [3]** - 14:22, 42:16, 101:14
**between [13]** - 3:6, 9:21, 9:23, 20:20, 46:13, 51:3, 60:7, 74:1, 96:12, 96:22, 97:9, 97:18, 97:20
**beyond [6]** - 26:8, 59:1, 67:5,

75:15, 77:5, 79:1
**biannual [3]** - 62:6, 62:9, 63:6
**bias [4]** - 45:15, 46:5, 97:3, 98:2
**bias-based [2]** - 97:3, 98:2
**bit [12]** - 6:16, 7:14, 9:15, 10:17, 14:7, 20:5, 36:21, 47:25, 48:18, 67:24, 94:21
**biting [1]** - 22:1
**Board [61]** - 28:12, 42:8, 42:9, 42:13, 42:14, 43:1, 48:1, 48:6, 48:13, 50:16, 50:23, 50:24, 51:3, 51:4, 51:7, 52:7, 53:2, 53:10, 53:11, 53:21, 54:9, 54:20, 55:23, 56:3, 58:5, 58:8, 58:9, 58:12, 58:16, 58:18, 58:19, 60:3, 60:8, 60:13, 60:20, 61:24, 62:12, 62:21, 63:4, 71:8, 73:11, 74:9, 75:7, 83:16, 83:18, 83:22, 84:1, 84:15, 85:2, 85:13, 85:17, 85:21, 86:7, 86:15, 86:20, 87:2, 87:16, 87:20, 87:23, 102:9, 102:20
**board [3]** - 42:15, 46:16, 59:13
**body [8]** - 18:5, 18:6, 18:8, 18:11, 49:1, 63:23, 64:19
**both [6]** - 44:3, 45:22, 77:22, 80:6, 100:13
**bottom [1]** - 23:5
**Box [1]** - 2:4
**boy [1]** - 25:2
**break [3]** - 5:2, 5:6, 93:24
**bring [2]** - 20:25, 40:9
**broke [1]** - 33:21
**brought [5]** - 12:10, 40:4, 60:13, 60:17, 60:20
**Brown [6]** - 72:12, 73:5, 76:22, 82:18, 82:19, 82:20
**Brown's [1]** - 72:14
**buck [3]** - 99:13, 99:16, 99:21
**budget [1]** - 9:11
**build [1]** - 23:7
**buildings [3]** - 66:11, 66:16, 66:20
**bureau [10]** - 24:19, 25:25, 26:1, 26:2, 37:1, 37:7, 37:22, 37:23, 72:15, 76:16
**Bureau [1]** - 15:3
**bureaus [1]** - 24:21
**BY [16]** - 2:9, 4:5, 19:4, 21:20, 27:5, 32:20, 48:9, 62:24, 64:11, 70:16, 71:19, 78:2, 79:9, 84:9, 89:11, 94:1
**C [9]** - 2:2, 48:4, 48:8, 48:11, 55:7, 63:17, 102:8, 105:6

**call [11]** - 11:8, 34:19, 34:20, 34:21, 34:23, 34:25, 35:25, 36:1, 36:3, 36:7, 36:18
**called [2]** - 22:22, 94:23
**cam's [1]** - 18:11
**came [6]** - 19:23, 42:19, 58:8, 71:11, 80:6, 98:13
**cameras [4]** - 18:5, 18:7, 18:8
**can't [3]** - 30:24, 47:11, 75:16
**CANNIZZARO [48]** - 2:4, 4:5, 18:21, 19:4, 21:8, 21:12, 21:17, 21:20, 23:24, 26:14, 26:25, 27:5, 31:8, 31:15, 31:19, 31:25, 32:6, 32:9, 32:14, 32:17, 32:20, 38:16, 40:12, 41:9, 41:15, 41:19, 42:2, 48:3, 48:9, 55:4, 62:16, 62:19, 62:24, 64:11, 70:16, 70:23, 71:19, 78:2, 79:4, 79:9, 84:9, 86:12, 86:23, 89:6, 89:11, 93:23, 94:1, 101:16
**Cannizzaro [1]** - 4:6
**cap [1]** - 54:24
**capabilities [1]** - 22:18
**capable [1]** - 22:2
**career [1]** - 98:7
**Case [1]** - 102:13
**case [14]** - 4:9, 23:23, 26:13, 26:17, 32:3, 37:7, 71:23, 76:21, 79:25, 80:2, 81:4, 83:4, 83:18, 88:4
**cause [7]** - 53:3, 57:14, 85:8, 91:13, 91:19, 92:21, 93:18
**causing [1]** - 22:2
**caveat [2]** - 56:6, 56:8
**Cecile [1]** - 72:19
**Central [1]** - 66:10
**certain [1]** - 33:16
**certainly [3]** - 22:10, 47:15, 75:3
**certification [1]** - 3:19
**Certified [5]** - 1:19, 1:20, 105:8, 105:10, 105:17
**certify [1]** - 105:11
**chain [3]** - 16:11, 68:14, 68:16
**change [17]** - 12:9, 12:12, 13:4, 13:13, 13:16, 16:17, 17:20, 17:21, 17:22, 18:1, 19:14, 19:25, 63:16, 94:21, 99:4, 99:10
**CHANGE [2]** - 103:5
**changed [3]** - 13:19, 13:20, 67:24
**changes [22]** - 13:7, 13:22, 13:24, 14:5, 16:13, 17:4, 17:9, 17:13, 17:24, 18:14, 18:15,

37:24, 40:19, 40:23, 92:21, 92:24, 92:25, 93:1, 94:15, 99:1, 101:5, 103:3
**changing [2]** - 93:11, 98:17
**channel [1]** - 58:8
**Chaplin [1]** - 102:20
**charge [2]** - 10:1, 16:8
**check [1]** - 32:8
**chemical [1]** - 22:2
**chief [186]** - 4:6, 7:19, 7:23, 8:1, 8:9, 8:12, 8:13, 8:17, 8:18, 8:25, 9:3, 9:5, 9:6, 9:7, 9:8, 9:9, 9:15, 9:16, 10:7, 11:3, 12:2, 12:3, 12:19, 12:22, 12:25, 13:5, 13:9, 14:4, 14:8, 14:13, 15:3, 15:17, 16:6, 16:7, 18:16, 19:5, 20:7, 21:24, 23:2, 23:13, 23:15, 23:21, 23:22, 24:3, 24:10, 24:14, 25:9, 25:19, 26:1, 26:2, 26:3, 27:6, 29:21, 30:20, 30:22, 33:7, 36:21, 36:22, 36:25, 37:1, 37:7, 37:23, 37:25, 38:1, 38:9, 38:11, 39:18, 40:21, 42:17, 43:3, 43:18, 46:10, 46:13, 46:17, 46:24, 47:5, 47:8, 47:25, 48:10, 49:13, 49:19, 50:6, 50:15, 50:17, 51:2, 51:24, 52:3, 52:5, 52:9, 53:5, 53:6, 53:7, 53:16, 54:4, 54:10, 54:18, 54:23, 55:20, 56:21, 57:10, 57:24, 58:2, 59:5, 59:10, 59:12, 59:17, 59:25, 60:1, 60:7, 61:8, 61:22, 62:25, 63:14, 63:16, 63:18, 64:5, 64:12, 65:1, 66:1, 66:22, 67:17, 68:5, 69:5, 69:9, 69:19, 69:21, 70:3, 70:9, 70:11, 70:17, 71:4, 71:13, 71:20, 71:21, 72:19, 72:25, 73:10, 73:15, 76:16, 76:17, 77:18, 77:20, 78:3, 78:17, 79:10, 79:19, 82:24, 83:2, 83:14, 83:21, 84:10, 86:6, 86:19, 87:1, 89:1, 89:12, 90:11, 90:17, 90:18, 91:10, 91:13, 92:15, 92:19, 92:21, 94:2, 94:3, 94:13, 94:14, 94:21, 94:22, 95:8, 95:16, 96:7, 96:20, 97:5, 97:13, 98:9, 98:13, 98:14, 98:18, 99:8, 99:11, 99:13
**Chief [99]** - 5:18, 7:15, 10:7, 16:12, 17:2, 17:25, 18:18, 20:5, 21:21, 22:21, 23:10, 23:25, 25:1, 26:15, 26:19, 27:22, 27:25, 28:5, 31:20, 32:21, 33:4, 34:20, 36:22, 37:16, 37:20, 37:22, 38:3,

39:23, 40:7, 40:18, 41:3, 42:12, 45:21, 46:6, 49:15, 49:23, 50:2, 50:20, 50:22, 52:11, 52:12, 52:22, 53:6, 55:17, 57:9, 59:8, 60:1, 61:13, 61:23, 62:16, 63:6, 63:12, 64:23, 67:6, 71:7, 72:3, 72:21, 73:5, 74:7, 74:21, 75:10, 76:10, 76:25, 77:2, 77:17, 77:21, 78:16, 79:16, 81:2, 81:9, 81:17, 83:12, 84:4, 84:13, 85:12, 86:14, 88:1, 89:3, 89:18, 90:20, 93:10, 93:16, 96:11, 96:19, 97:5, 98:7, 98:23, 98:25, 99:7, 99:23, 100:1, 100:16, 100:11, 101:16, 102:11, 102:15, 102:17, 102:18, 102:19
**Chief's [1]** - 72:4
**chief's [2]** - 37:22, 72:15
**chiefs [4]** - 14:25, 24:20, 36:12, 56:10
**choice [2]** - 8:20, 8:24
**Christie [2]** - 31:8, 41:15
**CHRISTINA [1]** - 2:9
**chunk [1]** - 92:1
**circumstances [3]** - 57:13, 65:1, 85:16
**citizen [6]** - 50:9, 90:25, 91:5, 92:6, 92:8, 92:13
**Citizen [2]** - 102:12, 102:21
**citizen-encounter [1]** - 92:8
**Citizens [60]** - 28:12, 42:8, 42:9, 42:12, 42:13, 43:1, 48:1, 48:5, 48:13, 50:16, 50:23, 51:3, 51:4, 51:7, 52:7, 53:2, 53:10, 53:11, 53:21, 54:9, 54:20, 56:3, 58:4, 58:7, 58:9, 58:12, 58:16, 58:18, 58:19, 60:2, 60:8, 60:13, 60:20, 61:24, 62:12, 62:20, 63:4, 71:8, 73:11, 74:9, 75:6, 83:16, 83:18, 83:22, 84:1, 84:14, 85:2, 85:13, 85:17, 85:21, 86:7, 86:15, 86:19, 87:2, 87:16, 87:20, 87:23, 102:9, 102:20
**citizens [1]** - 69:10
**city [3]** - 42:15, 92:16, 94:5
**CITY [1]** - 1:12
**City [27]** - 1:16, 2:7, 7:19, 7:23, 8:18, 42:8, 42:24, 43:2, 46:1, 46:9, 46:23, 48:12, 49:6, 63:25, 64:20, 66:5, 66:6, 66:7, 68:21, 89:4, 90:25, 91:5, 92:23, 94:11, 95:15, 99:10, 102:21
**citywide [1]** - 92:17

**civil [2]** - 6:3, 50:11
**claim [2]** - 28:16, 41:13
**claims [2]** - 28:6, 84:2
**clarify [1]** - 46:12
**clarity [1]** - 67:21
**class [2]** - 33:15, 97:2
**clean [1]** - 4:12
**clear [2]** - 41:12, 81:18
**clearly [1]** - 71:25
**client [3]** - 4:8, 61:11, 71:8
**close [6]** - 56:22, 58:1, 58:18, 66:14, 80:10, 99:24
**closed [9]** - 57:10, 79:25, 80:18, 80:24, 81:6, 83:18, 85:14, 88:4, 88:23
**collect [1]** - 91:25
**collected [1]** - 75:5
**color [2]** - 44:11, 44:14
**combined [1]** - 44:7
**come [12]** - 37:10, 37:14, 40:15, 41:5, 42:6, 42:9, 52:2, 58:11, 67:11, 77:17, 95:24
**comes [2]** - 11:23, 37:17
**coming [7]** - 26:8, 38:18, 38:23, 39:12, 46:15, 52:7, 74:9
**command [13]** - 10:18, 14:11, 16:1, 16:4, 16:11, 24:5, 34:18, 40:8, 47:9, 68:6, 68:14, 68:17, 93:11
**commander [2]** - 16:8, 36:17
**commanders [1]** - 68:19
**commanding [11]** - 16:25, 17:10, 17:12, 24:9, 24:11, 36:5, 36:7, 36:17, 37:15, 37:17
**commencing [1]** - 1:15
**Common [7]** - 8:23, 48:20, 48:22, 49:11, 49:17, 94:8, 99:1
**commonly [1]** - 66:12
**communicate [1]** - 51:17
**communicated [5]** - 20:1, 68:14, 68:16, 68:23, 69:11
**communicating [1]** - 59:23
**compare [1]** - 19:17
**compel [1]** - 58:1
**complainant [4]** - 78:17, 78:20, 78:22, 79:1
**complaint [31]** - 25:18, 28:8, 28:10, 28:13, 29:16, 37:4, 37:10, 37:12, 37:13, 42:7, 42:10, 42:11, 47:16, 47:20, 51:17, 51:19, 53:2, 55:21, 55:23, 56:2, 58:16, 62:9, 73:11, 77:1, 78:10, 78:21, 79:23, 82:15, 83:23, 85:22, 88:23

**Complaint [4]** - 69:23, 70:7, 71:7, 102:12

**Complaints [3]** - 52:14, 52:16, 55:7

**complaints [32]** - 25:11, 25:16, 28:3, 29:22, 30:3, 30:8, 30:13, 30:16, 31:18, 31:22, 38:18, 38:22, 39:2, 39:9, 39:11, 39:15, 39:25, 41:4, 41:5, 47:22, 47:23, 50:25, 51:5, 53:11, 58:3, 58:8, 69:10, 77:4, 77:5, 87:21

**Complaints" [2]** - 52:14, 55:8

**complete [2]** - 53:2, 53:12

**completely [2]** - 13:12, 96:15

**complex [6]** - 66:9, 66:14, 66:15, 66:18, 67:1, 67:2

**compliance [2]** - 21:1, 58:20

**compliant [1]** - 21:3

**complied [8]** - 23:19, 25:7, 32:12, 33:2, 63:11, 70:10, 83:1, 89:2

**comply [3]** - 49:16, 57:16, 57:17

**component [1]** - 13:25

**comport [1]** - 57:15

**concept [7]** - 20:15, 20:16, 22:22, 94:23, 95:1, 95:2, 95:9

**concepts [1]** - 95:17

**concern [1]** - 46:22

**concerning [2]** - 9:9, 14:20

**conclude [1]** - 51:22

**concluded [7]** - 56:20, 76:7, 76:9, 76:22, 90:15, 90:16, 101:21

**concluding [1]** - 56:19

**conclusion [4]** - 45:25, 46:3, 46:4, 57:7

**conclusions [2]** - 82:2, 93:5

**Conclusions [1]** - 90:22

**concur [2]** - 77:13, 87:7

**concurred [1]** - 81:2

**condition [1]** - 7:10

**conduct [8]** - 15:21, 29:4, 46:25, 51:16, 53:4, 57:24, 58:23, 92:5

**conducted [16]** - 25:23, 28:20, 34:21, 42:23, 43:4, 44:9, 45:9, 45:16, 45:18, 54:3, 78:11, 90:3, 92:20, 94:4, 100:9, 100:24

**conducting [4]** - 51:21, 73:7, 92:7, 96:5

**conducts [2]** - 51:7, 68:18

**confident [1]** - 100:1

**confirmed [1]** - 31:6

**conflict [1]** - 44:7

**connected [1]** - 93:5

**consent [1]** - 64:19

**consider [1]** - 22:12

**consideration [5]** - 51:25, 74:20, 95:6, 101:1, 101:5

**consultation [2]** - 12:22, 12:25

**consulted [2]** - 12:19, 18:11

**contact [5]** - 10:1, 21:25, 22:3, 92:6, 92:13

**contained [3]** - 76:1, 79:16, 93:5

**context [9]** - 6:2, 6:5, 7:18, 9:24, 12:8, 35:1, 57:10, 57:16, 60:13

**continue [4]** - 17:17, 34:9, 35:11, 77:2

**continuum [3]** - 22:22, 22:23, 23:3

**control [4]** - 20:13, 20:25, 23:8, 50:9

**controlled [3]** - 66:16, 66:21, 67:4

**controlling [1]** - 63:23

**controls [1]** - 66:12

**corner [2]** - 72:12, 72:18

**corporation [1]** - 53:5

**Corporation [3]** - 1:17, 2:7, 2:9

**correctly [4]** - 28:3, 32:7, 59:15, 91:1

**corroborate [1]** - 28:16

**could [23]** - 6:1, 13:16, 14:16, 17:12, 18:4, 19:10, 22:11, 22:18, 42:11, 49:19, 56:14, 58:6, 62:6, 71:6, 74:5, 76:22, 82:17, 85:15, 85:16, 89:18, 91:23, 93:8, 96:10

**Council [2]** - 8:24, 42:23, 48:20, 48:22, 49:11, 49:17, 94:8, 99:1

**Counsel [2]** - 2:7, 2:9

**counsel [1]** - 53:5

**Counsel's [1]** - 1:17

**count [1]** - 55:5

**counting [1]** - 50:3

**COUNTY [1]** - 104:4

**couple [1]** - 25:5

**course [2]** - 4:11, 66:3

**court [2]** - 60:13, 60:17

**COURT [1]** - 1:4

**Court [3]** - 60:21, 60:22, 61:5

**cover [1]** - 14:21

**covered [3]** - 41:25, 47:2, 91:8

**CRB [4]** - 55:22, 58:4, 59:23, 85:1

**CRB's [1]** - 63:3

**create [1]** - 47:19

**created [4]** - 11:14, 18:7, 92:11, 92:13

**creates [1]** - 11:22

**creating [4]** - 9:10, 10:8, 11:20, 11:25

**criminal [13]** - 94:23, 95:4, 95:8, 95:9, 95:17, 95:20, 95:23, 96:7, 96:12, 96:14, 96:22, 97:10, 97:18

**Criminal [2]** - 33:16, 33:24

**criminally [1]** - 95:3

**criminologists [2]** - 45:12, 100:9

**CRR [1]** - 105:17

**current [2]** - 13:21, 13:23

**CV [1]** - 1:8

**D [8]** - 1:18, 62:17, 62:23, 63:1, 63:13, 102:9, 105:8, 105:17

**dabbling [1]** - 21:15

**Dancks [3]** - 21:9, 31:17, 41:11

**data [5]** - 45:13, 62:14, 91:25, 92:1, 92:3

**DATE [1]** - 105:3

**date [23]** - 8:2, 8:5, 19:3, 27:4, 48:8, 62:23, 64:10, 70:15, 71:18, 73:17, 73:19, 73:23, 78:1, 79:8, 80:14, 80:19, 81:10, 81:11, 84:8, 88:12, 89:10, 90:12

**Date [1]** - 105:21

**dated [11]** - 80:14, 80:17, 81:21, 84:15, 88:7, 88:10, 102:11, 102:15, 102:16, 102:18, 102:19

**dates [1]** - 82:8

**Dave [2]** - 72:12, 72:14

**David [2]** - 73:5, 102:20

**day [11]** - 1:15, 10:1, 10:23, 11:1, 101:4, 101:10, 101:13, 103:23, 104:18

**day-to-day [2]** - 10:1, 101:13

**days [7]** - 53:1, 53:13, 55:22, 56:2, 56:14, 59:1, 59:11

**deadly [1]** - 23:9

**death [1]** - 22:4

**December [6]** - 8:6, 8:8, 49:7, 49:13, 62:20, 102:10

**decide [3]** - 25:15, 25:16, 86:3

**decided [1]** - 43:1

**decision [15]** - 14:24, 17:8,

18:2, 20:9, 22:14, 22:15, 22:16, 38:2, 38:5, 40:20, 40:24, 51:25, 52:6, 65:5, 75:9

**decisions [4]** - 18:15, 36:13, 38:11, 47:9

**Decker [9]** - 67:7, 67:11, 80:3, 83:3, 84:19, 85:4, 88:4, 102:18, 105:1

**DECKER [1]** - 1:9

**deemed [9]** - 16:19, 34:19, 34:24, 35:1, 36:1, 36:4, 36:7, 37:5, 56:12

**Defendant [1]** - 1:12

**defendant [1]** - 61:20

**defendants [1]** - 67:8

**Defendants [2]** - 1:10, 2:8

**deficiencies [2]** - 40:8, 40:14

**defined [1]** - 21:25

**definition [1]** - 22:6

**definitions [1]** - 21:22

**degree [2]** - 21:25, 58:14

**DeJoseph [55]** - 2:9, 5:3, 13:10, 15:8, 18:23, 21:6, 21:9, 21:13, 23:23, 26:12, 30:21, 31:13, 31:17, 32:5, 32:7, 32:11, 32:16, 35:2, 38:13, 39:13, 39:21, 40:10, 41:7, 41:11, 41:17, 42:1, 43:9, 44:24, 55:3, 57:18, 60:10, 60:14, 61:10, 62:18, 65:8, 65:23, 67:13, 67:19, 69:24, 70:21, 81:14, 82:10, 86:11, 86:22, 87:9, 91:16, 93:3, 93:7, 93:13, 93:20, 94:18, 95:12, 98:15, 98:22, 101:18

**demographics [1]** - 101:1

**department [33]** - 9:7, 9:11, 9:12, 10:24, 11:11, 11:12, 11:19, 12:16, 12:17, 14:1, 14:9, 15:6, 15:17, 15:25, 16:9, 16:21, 17:22, 17:23, 18:8, 20:2, 25:24, 30:2, 30:4, 31:23, 39:10, 58:15, 78:18, 85:7, 91:19, 93:19, 94:6, 94:9, 99:12

**Department [55]** - 1:17, 2:7, 7:20, 8:9, 9:9, 13:15, 15:19, 15:23, 18:4, 24:21, 27:16, 28:7, 28:12, 28:21, 29:20, 29:23, 30:6, 30:9, 30:12, 30:14, 30:16, 31:21, 33:16, 33:18, 33:24, 34:4, 38:19, 38:23, 39:18, 41:6, 42:24, 43:7, 43:19, 43:25, 44:23, 46:23, 47:21, 50:10, 50:14, 50:24, 51:4, 51:9, 54:6, 55:22, 59:2, 60:8, 60:12, 60:21, 68:18, 78:10, 82:20, 91:14, 94:14, 97:13, 102:7

**department's [1]** - 28:1
**Department's [1]** - 49:16
**departmental [12]** - 13:4, 13:8, 14:5, 15:11, 15:15, 36:24, 37:6, 40:4, 43:8, 67:16, 93:17, 93:18
**departmental-wide [1]** - 43:8
**depending [3]** - 16:9, 25:25, 57:4
**depends [1]** - 14:16
**deposed [2]** - 4:8, 5:18
**DEPOSITION [2]** - 1:1, 1:12
**deposition [6]** - 4:11, 6:3, 6:5, 21:11, 21:16, 41:12
**Deposition [1]** - 1:15
**depositions [1]** - 20:14
**depth [1]** - 100:8
**deputies [1]** - 68:6
**deputy [13]** - 14:25, 15:3, 16:6, 16:7, 24:9, 24:14, 24:20, 26:1, 26:2, 36:12, 37:25, 72:19, 76:16
**describe [2]** - 22:6, 67:1
**described [18]** - 12:21, 12:24, 14:12, 15:7, 15:11, 27:2, 47:20, 48:7, 62:22, 64:8, 70:13, 71:16, 77:6, 77:7, 77:24, 79:6, 84:6, 89:8
**describes [1]** - 68:25
**description [2]** - 66:10, 95:19
**DESCRIPTION [1]** - 102:5
**desk [3]** - 37:23, 38:1, 74:11
**details [1]** - 100:10
**detectives [1]** - 15:3
**determination [4]** - 17:25, 20:22, 36:4, 81:21
**determine [8]** - 13:19, 28:20, 41:23, 53:3, 57:7, 68:3, 82:14, 86:12
**determined [3]** - 45:14, 45:19, 91:4
**develop [3]** - 13:24, 15:20, 16:23
**developed [6]** - 15:12, 15:16, 15:18, 17:1, 18:12, 92:22
**developing [1]** - 15:5
**dictate [1]** - 74:16
**dictated [1]** - 53:12
**didn't [4]** - 32:6, 46:25, 47:4, 92:9
**difference [5]** - 9:20, 9:23, 15:10, 96:12, 97:19
**differences [2]** - 96:22, 97:9
**different [3]** - 37:10, 45:20,

47:20
**differential [2]** - 90:24, 91:4
**difficulty [2]** - 57:5, 74:18
**direct [18]** - 7:15, 9:19, 10:1, 19:10, 21:21, 23:13, 23:14, 25:1, 27:22, 48:24, 50:19, 52:9, 54:23, 63:18, 64:5, 68:9, 69:20, 76:19
**directed [2]** - 84:15, 85:8
**direction [2]** - 94:4, 94:9
**directive [2]** - 50:18, 83:7
**directives [1]** - 10:5
**directly [4]** - 28:11, 55:21, 65:10, 77:17
**director [5]** - 13:2, 64:17, 65:2, 65:16, 68:4
**Director [2]** - 64:19, 68:7
**disabling [1]** - 22:2
**disagree [2]** - 28:25, 53:19
**disagreed [3]** - 28:23, 87:13, 87:19
**disagreement [1]** - 29:3
**disapproving [1]** - 36:9
**disciplinary [2]** - 38:11, 56:11
**discipline [17]** - 9:18, 37:1, 37:18, 37:24, 38:2, 38:5, 53:24, 54:5, 56:15, 56:18, 59:19, 77:15, 77:16, 77:17, 83:2, 83:19, 99:19
**disciplined [1]** - 54:9
**disciplining [2]** - 36:23, 54:19
**disclosed [1]** - 71:22
**discomfort [1]** - 22:3
**discovery [2]** - 31:14, 71:22
**discuss [4]** - 4:7, 13:24, 29:6, 33:5
**discussed [9]** - 14:2, 17:21, 31:13, 45:4, 57:21, 83:14, 88:3, 90:21, 91:3
**discussing [4]** - 81:19, 87:16, 87:21, 94:3
**Discussion [3]** - 18:25, 21:19, 32:18
**discussion [6]** - 13:18, 14:18, 14:19, 14:24, 21:10, 89:13
**discussions [3]** - 42:25, 61:14, 93:11
**disparity [4]** - 44:11, 44:14, 45:15, 46:4
**distinction [1]** - 20:18
**distinguish [1]** - 96:11
**DISTRICT [2]** - 1:4, 1:4
**Division [15]** - 15:19, 15:22, 16:2, 16:5, 16:7, 16:8, 16:11,

16:12, 16:20, 17:1, 17:11, 32:23, 40:14, 40:16, 41:2
**division [3]** - 15:20, 15:24, 26:16
**Division's [1]** - 33:5
**document [47]** - 19:1, 19:7, 19:8, 27:2, 27:9, 27:10, 27:14, 31:9, 32:3, 48:7, 48:14, 48:25, 52:20, 55:15, 56:5, 62:22, 63:1, 64:8, 64:15, 70:13, 70:18, 70:19, 70:20, 71:4, 71:5, 71:16, 71:24, 72:22, 72:23, 73:1, 73:2, 73:3, 73:18, 73:21, 73:25, 74:2, 74:3, 79:6, 82:4, 84:6, 84:11, 85:7, 85:8, 89:8, 89:15, 89:16, 91:10
**documentation [7]** - 31:10, 32:1, 68:25, 75:7, 75:14, 80:23, 88:19
**Documents [1]** - 77:24
**documents [6]** - 32:12, 32:15, 70:24, 78:5, 79:13, 79:14
**doesn't [1]** - 47:12
**doing [2]** - 20:2, 96:18
**done [11]** - 23:17, 27:12, 35:13, 35:14, 43:24, 52:15, 76:12, 86:20, 90:8, 93:2, 94:17
**double [1]** - 32:8
**double-check [1]** - 32:8
**down [4]** - 4:10, 19:19, 68:14, 68:16, 69:3
**Dr [1]** - 100:5
**driven [4]** - 23:11, 25:18, 28:8, 47:17
**due [1]** - 93:12
**duly [2]** - 4:2, 49:7
**during [19]** - 14:12, 21:1, 26:19, 29:1, 33:7, 39:18, 42:17, 43:18, 47:4, 50:16, 54:9, 56:11, 57:9, 65:25, 70:2, 86:18, 94:2, 96:19, 98:8
**Duties [1]** - 52:11
**duties [3]** - 9:16, 59:18, 95:10
**dynamics [1]** - 101:6
**E [12]** - 2:2, 2:7, 23:15, 23:16, 23:17, 64:7, 64:9, 64:13, 70:9, 102:11, 105:6
**e [1]** - 5:17
**each [6]** - 4:25, 5:12, 9:14, 10:23, 11:1, 63:13
**ear [1]** - 6:17
**earlier [4]** - 74:15, 89:13, 89:19, 91:3
**easier [1]** - 48:24
**East [2]** - 1:17, 105:2

**Eastwood [2]** - 66:17
**effort [2]** - 28:14, 47:19
**eight [1]** - 8:10
**either [8]** - 13:8, 17:3, 28:10, 36:9, 37:23, 53:18, 94:22, 96:15
**else [10]** - 31:5, 44:18, 44:19, 45:2, 51:20, 52:17, 77:6, 78:25, 99:23
**elsewhere [1]** - 13:18
**employ [2]** - 9:18, 95:22
**employed [6]** - 7:16, 7:18, 7:22, 46:8, 64:20, 82:20
**Employee [1]** - 1:13
**employees [2]** - 10:2
**employment [1]** - 7:14
**enacted [1]** - 48:20
**Encounter [1]** - 102:21
**encounter [3]** - 92:8, 95:6, 96:9
**encounters [3]** - 90:25, 91:5, 92:2
**end [3]** - 52:5, 56:6, 73:1
**enforce [2]** - 64:21, 68:21
**enforcement [1]** - 68:15
**engages [2]** - 96:5, 96:17
**engaging [1]** - 42:24
**ensure [2]** - 50:12, 60:2
**ensures [1]** - 10:4
**entailed [1]** - 59:22
**entails [1]** - 59:23
**entered [1]** - 90:13
**entire [8]** - 11:10, 12:15, 16:10, 20:1, 63:24, 70:22, 97:14, 101:5
**entitled [1]** - 1:14, 19:2, 101:20
**environment [1]** - 22:17
**equipment [1]** - 12:14
**ERRATA [1]** - 103:1
**ESQ [1]** - 2:4
**essentially [3]** - 14:8, 53:1, 67:9
**establish [1]** - 50:9
**established [2]** - 48:13, 50:23
**establishing [1]** - 48:5
**et [2]** - 1:9, 105:1
**ethnic [3]** - 26:21, 27:17, 98:1
**ethnicity [1]** - 92:10
**Ettinger [10]** - 67:7, 67:11, 79:19, 79:22, 80:5, 83:3, 84:19, 85:4, 88:4, 102:16
**evaluated [1]** - 45:13
**even [3]** - 11:2, 17:20, 76:21

**event [3]** - 13:13, 16:13, 16:17
**ever [17]** - 5:18, 29:15, 43:23, 47:4, 47:8, 48:14, 48:16, 54:8, 54:19, 60:7, 60:12, 71:4, 71:24, 83:17, 83:25, 87:23, 98:25
**every [6]** - 4:13, 10:23, 11:1, 28:14, 47:19, 68:19
**everyone [1]** - 11:14
**evidence [2]** - 74:18, 75:5
**exact [1]** - 42:22
**exactly [1]** - 95:18
**examination [6]** - 3:9, 3:11, 3:15, 3:17, 3:20, 101:19
**examine [1]** - 85:9
**examined [6]** - 3:15, 4:3, 13:21, 13:22, 45:14, 86:2
**examining [1]** - 86:2
**example [2]** - 15:2, 18:4
**examples [1]** - 101:9
**exceeded [1]** - 33:18
**exceeding [1]** - 58:25
**except [1]** - 3:8
**excessive [5]** - 29:16, 84:20, 85:3, 86:24, 87:3
**excuse [2]** - 12:22, 100:2
**executive [3]** - 64:17, 65:16, 68:4
**Executive [1]** - 68:7
**exercised [1]** - 50:13
**exhibit [6]** - 48:2, 64:6, 70:11, 71:13, 79:5, 81:12
**Exhibit [37]** - 18:22, 19:3, 19:6, 23:14, 27:1, 27:3, 27:7, 32:22, 48:8, 48:11, 62:17, 62:23, 63:1, 64:7, 64:9, 64:13, 70:12, 70:14, 71:14, 71:17, 71:21, 73:16, 77:20, 78:7, 79:5, 79:7, 79:11, 79:17, 80:1, 80:2, 81:13, 84:5, 84:7, 84:11, 89:7, 89:9
**EXHIBIT [1]** - 102:5
**exhibits [3]** - 77:21, 82:9, 82:24
**EXHIBITS [1]** - 102:2
**Exhibits [3]** - 77:25, 80:13, 81:21
**exist [2]** - 32:15, 42:17
**existence [3]** - 42:19, 47:16, 68:13
**expect [1]** - 80:25
**expectations [1]** - 20:6
**experience [13]** - 23:1, 29:21, 59:21, 60:9, 74:7, 74:14, 85:12, 86:6, 94:22, 95:23, 96:8, 98:23, 99:9

**experts [1]** - 14:22
**explain [9]** - 9:5, 9:22, 19:12, 20:7, 23:1, 25:9, 95:8, 97:19, 100:19
**extend [1]** - 74:20
**extent [8]** - 31:7, 31:9, 32:15, 40:5, 61:11, 61:18, 64:1, 72:10
**external [3]** - 37:12, 41:4, 41:5
**extremely [1]** - 41:21
**F [7]** - 2:9, 5:17, 70:12, 70:14, 71:14, 102:12, 105:6
**F-o-w-l-e-r [1]** - 5:17
**facial [1]** - 98:20
**fact [1]** - 65:22
**factors [2]** - 22:16, 22:18
**facts [1]** - 39:14
**failure [1]** - 3:10
**fair [5]** - 8:8, 44:21, 73:9, 73:12, 74:1
**fall [1]** - 15:22
**falls [2]** - 16:7, 96:15
**false [1]** - 84:20
**familiar [5]** - 22:21, 63:19, 66:23, 94:23, 97:11, 97:22
**far [1]** - 33:18
**fast [1]** - 85:1
**fast-forward [1]** - 85:1
**faster [1]** - 58:1
**February [1]** - 105:21
**feel [3]** - 4:20, 6:8, 27:8
**fell [1]** - 57:10
**felt [1]** - 76:23
**few [1]** - 32:24
**figuring [1]** - 82:12
**file [6]** - 11:9, 42:9, 42:11, 47:20, 58:18, 76:1
**filed [3]** - 4:8, 61:4, 71:7
**filing [1]** - 3:19
**fill [1]** - 92:12
**final [21]** - 5:8, 9:8, 12:20, 14:4, 14:8, 17:8, 25:23, 26:3, 28:19, 36:18, 36:25, 38:2, 38:5, 38:12, 40:20, 51:25, 52:6, 75:9, 77:11, 77:12
**finalized [1]** - 12:18
**finally [1]** - 14:3
**find [1]** - 98:7
**finding [9]** - 57:14, 58:5, 81:3, 85:13, 85:16, 87:15, 87:24, 88:4, 91:3
**findings [16]** - 53:4, 53:19, 55:23, 56:3, 58:17, 59:23, 76:8, 83:16, 85:3, 86:7, 86:21, 86:22, 86:23, 87:3, 87:19

**Findings [1]** - 85:2
**finds [1]** - 53:22
**fine [3]** - 5:2, 24:25, 33:23
**finish [2]** - 5:9, 5:11, 13:15
**Finn [11]** - 45:9, 45:17, 45:24, 89:25, 91:13, 92:19, 100:17, 100:20, 100:23, 101:9, 101:12
**first [21]** - 4:2, 5:14, 5:16, 14:19, 16:6, 16:7, 26:2, 37:7, 37:23, 37:25, 41:10, 49:23, 50:8, 69:23, 72:11, 72:19, 73:16, 76:16, 84:14, 90:23, 95:6
**five [1]** - 32:12
**five-year [1]** - 32:12
**fluid [1]** - 98:16
**focus [1]** - 43:3
**focused [2]** - 92:16, 92:20
**folks [2]** - 9:25, 45:13
**follow [1]** - 29:4
**follow-up [1]** - 29:4
**following [1]** - 103:3
**follows [2]** - 4:4, 37:25
**force [37]** - 18:19, 19:6, 20:7, 20:8, 20:9, 20:13, 20:17, 20:23, 21:1, 21:2, 21:4, 21:24, 22:7, 22:19, 22:22, 22:23, 23:3, 23:5, 23:6, 23:8, 23:9, 23:11, 23:22, 24:2, 24:4, 25:12, 25:14, 25:15, 25:21, 26:9, 26:18, 29:16, 84:20, 85:3, 86:24, 87:3
**Force [2]** - 19:2, 102:6
**forces [1]** - 20:10
**foregoing [1]** - 104:7, 105:12
**forever [1]** - 98:17
**forgive [1]** - 40:19
**form [31]** - 3:8, 13:10, 14:3, 15:8, 30:21, 35:2, 38:13, 39:13, 39:21, 43:1, 43:9, 44:24, 57:18, 60:10, 60:14, 61:10, 65:8, 65:23, 67:13, 67:19, 69:24, 82:10, 86:22, 87:9, 91:16, 92:12, 93:3, 94:18, 95:12, 98:15, 98:22
**formed [1]** - 42:15
**forward [3]** - 53:15, 76:23, 85:1
**forwarded [1]** - 51:23
**found [6]** - 36:23, 53:22, 100:13, 100:20, 101:12, 101:14
**foundation [2]** - 60:15, 95:12
**founded [1]** - 37:4, 38:3, 38:4
**Fowler [11]** - 4:6, 5:16, 5:18, 21:21, 22:21, 53:6, 102:11,

102:15, 102:17, 102:18, 102:19
**FOWLER [7]** - 1:1, 1:13, 4:1, 101:20, 103:2, 103:25, 104:14
**frame [9]** - 32:12, 42:22, 56:23, 60:24, 81:10, 81:17, 82:2, 82:6, 82:16
**Frank [1]** - 5:16
**FRANK [8]** - 1:1, 1:13, 4:1, 5:16, 101:20, 103:2, 103:25, 104:14
**FRCP [1]** - 3:7
**free [2]** - 4:20, 27:8
**FROM [1]** - 103:5
**front [5]** - 6:20, 70:23, 74:2, 86:25, 90:2
**full [2]** - 6:13, 54:2
**function [1]** - 28:2
**further [16]** - 3:14, 3:18, 21:4, 27:2, 29:4, 59:7, 64:8, 70:13, 71:16, 77:1, 77:24, 79:6, 84:6, 86:4, 88:13, 89:8
**G [7]** - 59:6, 59:17, 71:17, 71:21, 73:16, 77:20, 102:13
**G" [3]** - 71:15, 81:14, 81:15
**G.O [1]** - 19:20
**gap [1]** - 92:13
**gather [2]** - 57:6, 76:20
**gave [2]** - 35:9, 94:8
**gears [3]** - 47:25, 63:16, 94:21
**Geddes [2]** - 66:13, 66:15
**gender [2]** - 27:18, 28:2
**gender-profiling [1]** - 28:2
**general [11]** - 19:22, 19:23, 20:3, 20:4, 33:13, 35:5, 35:9, 44:20, 85:19, 85:20, 85:21
**generally [12]** - 23:24, 23:25, 24:2, 24:3, 25:9, 26:5, 33:14, 35:6, 35:12, 41:9, 76:4, 98:13
**generate [1]** - 92:9
**get [10]** - 7:14, 10:17, 21:17, 26:16, 29:11, 41:16, 41:24, 49:21, 81:9, 81:17
**getting [2]** - 41:20, 74:10
**give [10]** - 8:4, 8:10, 12:11, 27:6, 46:21, 68:5, 68:6, 70:17, 82:4, 82:5
**given [7]** - 6:2, 11:17, 22:8, 38:17, 39:1, 69:5, 71:9
**giving [2]** - 5:9, 6:13
**goal [1]** - 21:1
**goals [2]** - 9:12, 11:11
**goes [3]** - 37:7, 37:25, 100:8
**going [67]** - 4:18, 5:8, 6:9, 6:11, 6:18, 6:19, 7:3, 7:7, 7:12,

11:15, 12:9, 12:15, 14:21, 17:14, 17:16, 17:19, 18:21, 21:17, 21:21, 25:1, 26:12, 26:16, 26:25, 27:6, 29:11, 30:21, 31:8, 31:11, 32:1, 32:14, 33:20, 35:6, 35:12, 38:13, 38:14, 39:21, 48:1, 48:24, 50:8, 50:19, 52:9, 54:23, 56:15, 56:18, 57:18, 59:10, 61:10, 61:12, 62:16, 64:6, 67:13, 69:9, 69:19, 70:11, 70:17, 71:13, 74:9, 77:21, 77:22, 79:4, 82:8, 84:4, 89:6, 90:22, 98:24

**government [2]** - 43:13, 63:22

**governmental [1]** - 99:9

**great [1]** - 68:22

**greater [3]** - 100:14, 100:21, 100:22

**grievances [1]** - 50:10

**ground [2]** - 4:11, 41:25

**group [4]** - 44:9, 45:12, 100:9

**guess [1]** - 71:3

**guidance [2]** - 68:6

**guide [1]** - 20:9

**guided [4]** - 20:24, 22:14, 22:15, 22:16

**guidelines [1]** - 58:13

**guides [1]** - 20:8

**H [9]** - 77:23, 77:25, 78:4, 78:6, 78:7, 80:13, 81:21, 102:15

**h [8]** - 21:23, 28:9, 31:2, 31:4, 33:1, 33:10, 100:12, 101:3

**H" [1]** - 78:5

**h-m-m [8]** - 21:23, 28:9, 31:2, 31:4, 33:1, 33:10, 100:12, 101:3

**hand [3]** - 23:8, 72:12, 72:18

**handed [7]** - 19:5, 27:9, 70:19, 78:3, 79:13, 89:15, 100:5

**handing [3]** - 48:10, 62:25, 71:20

**happen [1]** - 28:25

**happened [1]** - 54:21

**happens [2]** - 16:20, 28:25

**happy [1]** - 4:17

**hard [1]** - 6:10

**has [24]** - 9:8, 12:17, 15:19, 16:22, 17:21, 18:9, 20:1, 20:22, 25:22, 31:6, 31:10, 36:22, 36:25, 37:4, 53:22, 54:21, 59:18, 60:12, 71:21, 76:16, 78:10, 95:4

**haven't [1]** - 63:17

**having [6]** - 4:2, 6:16, 43:7,

65:21, 92:12, 93:10

**he's [1]** - 82:22

**head [3]** - 4:22, 46:14, 78:24

**heading [2]** - 104:9, 105:13

**heads [1]** - 24:20

**healthy [1]** - 14:23

**hear [1]** - 50:25

**hearing [3]** - 53:4, 59:12

**held [2]** - 1:13, 8:9

**here [15]** - 4:7, 20:20, 29:6, 48:2, 57:15, 60:21, 64:7, 67:8, 78:6, 81:10, 81:17, 81:21, 91:23, 99:24, 100:15

**hereby [2]** - 104:9, 105:11

**HEREBY [1]** - 3:5

**herein [8]** - 27:2, 64:8, 70:13, 71:16, 77:24, 79:6, 84:6, 89:8

**hereof [2]** - 104:9, 105:13

**hereto [1]** - 3:6

**hierarchy [2]** - 15:23, 24:5

**high [6]** - 66:10, 66:16, 66:19, 66:20, 68:13, 92:5

**high-rise [3]** - 66:10, 66:16, 66:20

**high-rises [1]** - 66:19

**His [7]** - 20:9, 21:16, 65:3, 65:18, 68:8, 78:9, 78:10

**History" [1]** - 19:11

**hold [1]** - 71:14

**Homes [6]** - 66:9, 66:22, 66:23, 66:25, 69:9, 69:14

**homes [1]** - 66:13

**Horrace [2]** - 90:3, 100:5

**hours [4]** - 7:2, 33:17, 33:18, 33:25

**Housing [21]** - 63:19, 63:21, 63:22, 64:2, 64:17, 64:22, 65:2, 65:6, 65:17, 65:18, 66:1, 66:5, 66:11, 66:16, 66:21, 67:3, 67:5, 67:10, 68:8, 69:6, 69:16

**housing [11]** - 63:23, 63:24, 63:25, 66:13, 66:14, 66:15, 66:18, 67:1, 67:2, 67:4

**however [8]** - 56:20, 66:19, 68:12, 75:22, 76:7, 76:15, 80:3, 81:21

**hundred [1]** - 54:14

**I" [1]** - 77:23

**ID [1]** - 102:5

**idea [4]** - 67:11, 82:5, 82:6, 95:22

**identification [15]** - 19:3, 27:3, 48:8, 62:23, 64:9, 64:13, 70:14, 71:17, 71:21, 77:22,

77:25, 78:4, 79:7, 84:7, 89:9

**identified [6]** - 11:15, 16:19, 17:21, 18:9, 23:4, 91:24

**identifies [1]** - 79:20

**identify [6]** - 16:21, 28:14, 28:15, 29:3, 47:22, 54:1

**identifying [1]** - 28:15

**illegal [1]** - 84:21

**immigration [1]** - 27:18

**implemented [2]** - 12:19, 13:25

**impose [3]** - 56:15, 56:18, 77:16

**imposed [4]** - 38:5, 59:14, 83:2

**imposition [1]** - 59:18

**in-service [6]** - 11:9, 11:13, 34:16, 35:19, 35:23, 97:4

**incident [12]** - 4:7, 29:6, 29:13, 29:17, 69:20, 69:22, 70:6, 83:5, 83:10, 85:9, 88:15

**includes [1]** - 21:25

**including [1]** - 3:7

**income [1]** - 67:2

**indeed [1]** - 51:18

**independent [4]** - 26:10, 46:7, 50:24, 51:8

**INDEX [1]** - 102:2

**indicate [11]** - 19:12, 19:13, 23:6, 44:6, 44:18, 59:2, 75:3, 80:16, 80:18, 85:22, 90:24

**indicated [11]** - 44:7, 44:10, 44:13, 44:21, 45:1, 46:5, 67:8, 71:25, 74:15, 75:17, 100:6

**indicating [3]** - 77:12, 78:9, 80:4

**indication [6]** - 47:15, 73:1, 76:7, 78:12, 78:15, 92:10

**indirectly [3]** - 65:11, 65:12, 65:14

**individual [4]** - 22:15, 24:20, 53:25, 67:17

**inform [1]** - 83:15

**information [7]** - 57:6, 57:23, 71:9, 76:21, 76:25, 80:3, 85:25

**informed [1]** - 83:17

**initiating [1]** - 96:8

**Initiation [2]** - 52:14, 52:16

**injury [1]** - 22:4

**instance [2]** - 22:8, 83:17

**instances [7]** - 12:21, 28:23, 36:6, 53:21, 58:11, 58:15, 87:6

**institute [1]** - 10:18, 45:24

**Institute [4]** - 45:10, 45:17, 100:24, 101:9

**instituted [1]** - 48:21

**instruct [1]** - 29:4

**instructed [2]** - 20:3, 92:12

**instructor [2]** - 97:24, 97:25

**interaction [1]** - 64:2

**internal [4]** - 28:1, 37:13, 41:5, 59:24

**interplay [2]** - 51:3, 97:18

**interpreted [1]** - 56:10

**interrupt [3]** - 5:12, 21:6, 33:21

**interview [1]** - 75:10

**interviewed [1]** - 75:5

**into [32]** - 7:14, 9:14, 19:24, 20:16, 21:15, 22:19, 26:18, 29:5, 29:11, 38:18, 38:23, 41:5, 41:16, 42:6, 42:9, 42:19, 43:4, 46:22, 48:18, 74:9, 74:19, 74:24, 82:15, 83:22, 84:1, 85:9, 86:4, 88:23, 94:10, 95:24, 101:1, 101:5

**introduce [2]** - 48:1, 64:6

**introduced [1]** - 23:4

**investigate [5]** - 28:2, 47:5, 47:9, 50:25, 94:5

**investigated [1]** - 78:21

**investigating [2]** - 28:6, 51:5

**Investigation [3]** - 15:3, 55:6, 55:8

**investigation [86]** - 25:11, 25:23, 26:10, 26:17, 28:18, 28:20, 28:24, 29:2, 29:5, 41:16, 41:18, 41:22, 41:24, 46:7, 46:22, 47:1, 51:8, 51:11, 51:13, 51:16, 51:21, 51:22, 52:1, 52:7, 53:3, 53:12, 53:22, 54:2, 54:3, 55:7, 56:19, 56:20, 56:22, 57:4, 57:5, 57:8, 57:14, 57:25, 58:1, 58:18, 58:19, 58:23, 59:24, 70:6, 73:8, 74:8, 74:15, 74:16, 74:20, 75:3, 75:6, 75:7, 75:8, 75:12, 75:15, 75:18, 76:7, 76:8, 76:12, 76:22, 77:1, 78:11, 78:18, 79:21, 79:23, 80:18, 80:24, 82:1, 82:6, 82:15, 83:22, 84:1, 85:9, 85:14, 85:18, 86:4, 86:8, 86:20, 88:13, 88:20, 88:22, 94:10, 96:6

**investigations [8]** - 25:20, 41:23, 57:10, 58:3, 58:25, 80:10, 86:16, 87:20

**investigative [1]** - 76:11

**investigator [1]** - 73:10

**investigators [1]** - 76:19

**involve [1]** - 83:8

**involved [18]** - 4:9, 11:5, 11:24, 12:1, 14:12, 14:23, 14:25, 15:4, 39:11, 51:10, 51:11, 51:12, 61:8, 61:16, 61:18, 61:20, 65:5, 70:5

**involvement [10]** - 8:23, 13:16, 17:2, 17:6, 18:15, 36:6, 36:8, 36:12, 61:19, 71:11

**involves [1]** - 15:2

**involving [4]** - 39:10, 45:7, 50:10, 71:23

**IS [1]** - 3:5

**issue [7]** - 6:17, 6:23, 44:22, 47:23, 53:4, 80:9, 94:5

**issues [8]** - 39:17, 40:4, 40:7, 41:16, 41:22, 41:25, 43:8, 69:11

**issuing [1]** - 20:2

**IT [1]** - 3:5

**items [4]** - 75:8, 86:1, 86:2, 91:20

**its [3]** - 1:13, 53:2, 53:4

**itself [5]** - 13:21, 34:17, 41:24, 74:16, 75:15

**J [11]** - 64:16, 79:5, 79:7, 79:11, 80:1, 80:2, 80:6, 80:13, 81:21, 102:11, 102:18

**James [2]** - 66:13, 66:15

**January [9]** - 1:15, 4:7, 7:16, 29:6, 62:20, 85:10, 102:10, 105:3

**Jennings [10]** - 4:8, 71:23, 78:9, 78:13, 79:24, 83:17, 84:19, 102:15, 105:1

**JENNINGS [1]** - 1:6

**Jennings' [6]** - 69:22, 73:10, 82:15, 83:23, 84:2, 88:23

**Jeremy [1]** - 80:3

**JEREMY [1]** - 1:9

**job [2]** - 11:1, 58:23

**Joseph [1]** - 72:19

**Judge [3]** - 21:9, 31:17, 41:11

**jurisdiction [1]** - 50:20

**Justice [2]** - 33:16, 33:25

**K [4]** - 84:5, 84:7, 84:11, 102:19

**keep [4]** - 30:4, 30:6, 31:23, 35:6

**keeps [1]** - 30:16

**kept [4]** - 30:5, 30:9, 30:13, 31:21

**KEVIN [1]** - 2:4

**Kevin [1]** - 4:6

**kicking [1]** - 22:1

**kind [4]** - 6:10, 21:10, 26:23, 67:24

**knowing [1]** - 58:24

**knowledge [5]** - 14:20, 16:22, 88:1, 95:17, 96:1

**known [2]** - 47:6, 66:8

**KRISTEN [1]** - 2:7

**l [1]** - 5:17

**L [11]** - 1:1, 1:13, 3:3, 4:1, 89:7, 89:9, 101:20, 102:21, 103:2, 103:25, 104:14

**lack [2]** - 14:22, 42:16

**ladder [4]** - 23:4, 23:5, 23:6, 23:8

**lands [1]** - 37:22

**large [1]** - 66:8

**largely [1]** - 23:11

**larger [1]** - 40:3

**last [6]** - 5:14, 5:16, 7:2, 19:10, 42:3, 73:19

**Law [15]** - 1:17, 2:7, 48:4, 48:5, 48:11, 48:12, 48:16, 48:19, 55:19, 58:12, 60:3, 64:22, 83:14, 102:8

**law [20]** - 12:12, 48:19, 49:10, 49:20, 49:21, 52:10, 53:12, 54:24, 55:20, 56:1, 56:23, 57:11, 57:17, 58:20, 58:24, 94:10, 96:1, 96:2, 96:16

**laws [2]** - 49:16, 68:21

**lawsuits [2]** - 6:3

**lay [1]** - 4:10

**leadership [1]** - 64:2

**learn [1]** - 47:24

**left [2]** - 72:12, 72:18

**left-hand [2]** - 72:12, 72:18

**legislative [1]** - 49:1

**Leguire [2]** - 1:19, 4:2

**LEGUIRE [2]** - 105:8, 105:17

**less [2]** - 5:25, 41:24

**lesson [5]** - 11:14, 16:23, 16:24, 18:12, 97:1

**lessons [6]** - 17:3, 17:4, 18:14, 18:16, 96:21, 97:9

**let [25]** - 4:16, 5:3, 9:15, 10:17, 23:17, 24:17, 26:15, 31:20, 32:25, 35:6, 44:13, 49:25, 52:15, 58:7, 64:5, 70:18, 70:24, 73:20, 78:5, 79:12, 88:2, 95:15, 99:7

**let's [5]** - 13:3, 35:11, 38:17, 39:16, 53:10

**Letter [5]** - 102:11, 102:15, 102:16, 102:18, 102:19

**letter [19]** - 64:16, 64:18, 64:19, 64:23, 65:12, 65:14, 68:12, 68:14, 68:25, 78:8, 78:12, 78:22, 78:23, 79:1, 79:18, 80:4, 84:14, 84:15, 88:12

**letters [3]** - 80:10, 80:16, 88:3

**level [8]** - 34:18, 34:21, 40:3, 92:6, 95:5, 95:6, 96:3, 96:16

**levels [2]** - 10:25, 77:10

**License [1]** - 105:9

**Lieutenant [7]** - 72:12, 72:14, 73:5, 76:22, 82:18, 82:19

**likelihood [1]** - 12:17

**likely [2]** - 16:23, 47:16

**limited [2]** - 22:1, 56:16

**LINE [1]** - 103:5

**line [6]** - 21:14, 28:12, 42:10, 42:11, 67:17, 69:3

**listed [1]** - 63:13

**litigation [2]** - 50:11, 61:15

**little [16]** - 6:16, 7:14, 9:14, 9:15, 10:17, 14:7, 20:5, 29:19, 36:21, 37:8, 47:25, 48:18, 67:24, 81:23, 86:3, 94:21

**Local [12]** - 48:4, 48:5, 48:11, 48:12, 48:16, 48:18, 55:19, 58:12, 60:3, 83:14, 102:8

**local [9]** - 49:1, 49:16, 49:20, 52:10, 53:11, 56:23, 57:11, 94:10

**locally [1]** - 11:13

**located [2]** - 66:6, 66:11

**locating [1]** - 74:18

**location [1]** - 101:10

**locations [1]** - 66:19

**lodge [2]** - 28:10, 42:7

**lodged [2]** - 28:13, 30:14

**long [3]** - 7:22, 74:16, 81:20

**look [14]** - 12:25, 19:19, 27:7, 27:8, 28:16, 45:19, 64:13, 70:17, 73:15, 79:10, 80:12, 86:3, 88:8, 89:14

**looking [3]** - 25:2, 72:3, 78:6

**lot [2]** - 20:15, 74:19

**low [1]** - 67:2

**low-income [1]** - 67:2

**lower [2]** - 34:18, 72:18

**lower-level [1]** - 34:18

**M [1]** - 2:4

**m [16]** - 21:23, 28:9, 31:2, 31:4, 33:1, 33:10, 100:12, 101:3

**made [17]** - 13:14, 14:24, 18:2, 19:25, 20:22, 37:1, 38:21, 39:16, 39:19, 39:24, 40:3, 47:19, 85:23, 85:24, 92:24, 93:1, 99:4

**main [1]** - 98:23

**maintain [1]** - 30:2

**maintenance [1]** - 18:10

**make [22]** - 3:12, 4:12, 16:13, 17:12, 28:14, 31:8, 37:18, 37:24, 38:11, 47:8, 49:25, 52:6, 57:6, 57:14, 57:16, 81:20, 92:21, 94:14, 94:15, 98:25, 99:9, 103:3

**maker [3]** - 14:8, 17:8, 38:5

**makes [1]** - 17:25

**making [8]** - 17:23, 36:3, 40:19, 51:25, 58:5, 75:9, 95:23, 98:19

**management [9]** - 9:12, 9:19, 9:21, 9:23, 10:3, 14:25, 25:24, 100:14, 100:21

**mandate [1]** - 12:16

**manner [1]** - 51:12

**many [8]** - 5:21, 29:21, 38:10, 38:18, 54:12, 87:14, 87:19

**mark [1]** - 79:4

**marked [32]** - 18:22, 18:24, 19:2, 19:5, 27:1, 27:3, 48:3, 48:7, 48:10, 62:17, 62:22, 62:25, 64:9, 64:12, 70:11, 70:14, 71:14, 71:17, 71:20, 77:21, 77:22, 77:25, 78:3, 78:7, 79:7, 79:11, 80:1, 80:13, 84:4, 84:7, 89:7, 89:9

**match [2]** - 86:7, 86:9

**materials [1]** - 17:3

**matter [7]** - 1:14, 14:22, 61:15, 76:8, 84:18, 99:24, 101:20

**matters [1]** - 9:9

**may [12]** - 3:15, 11:2, 22:7, 34:25, 38:8, 44:22, 45:1, 45:21, 51:20, 68:25, 94:14, 100:3

**maybe [1]** - 63:23

**mayor [7]** - 8:19, 8:20, 8:21, 9:2, 48:21, 94:4, 99:1

**me [93]** - 4:16, 4:17, 5:3, 5:15, 8:4, 9:5, 9:15, 9:22, 9:23, 10:17, 12:22, 13:7, 13:15, 14:3, 16:16, 20:7, 20:16, 21:24, 23:1, 23:17, 23:21, 24:17, 25:9, 26:15, 27:14, 27:24, 28:5, 29:20, 31:5, 31:17, 31:20, 32:25, 34:9, 34:24, 36:22, 39:4, 39:5, 40:19, 42:13, 42:21, 44:13, 45:7, 49:21, 49:24, 49:25, 51:2, 52:15, 54:1, 56:7, 58:1, 58:6, 58:7, 59:21, 61:13, 64:5, 64:14, 64:18, 66:25, 67:1, 67:23, 68:1, 69:19, 69:21,

9

70:18, 70:24, 73:20, 76:2, 77:3, 78:5, 79:12, 79:19, 80:9, 85:6, 88:2, 88:13, 90:17, 90:23, 91:24, 95:1, 95:8, 95:15, 99:7, 100:2, 100:5, 100:19, 100:21, 100:22, 101:11, 103:23, 104:17, 105:12
**mean [11]** - 10:15, 20:11, 20:12, 24:11, 26:5, 44:8, 56:13, 56:14, 95:2, 99:13
**meaning [3]** - 58:25, 68:20, 72:11
**means [2]** - 22:2, 56:19
**measures [1]** - 56:11
**medical [1]** - 7:1
**medications [1]** - 7:6
**meet [1]** - 11:17
**meeting [1]** - 13:18
**meetings [1]** - 68:19
**members [2]** - 50:10, 50:13
**memo [1]** - 67:16
**mentioned [10]** - 10:6, 34:10, 34:23, 35:25, 41:4, 42:12, 45:6, 45:7, 66:22, 89:3
**Merit [2]** - 1:19, 105:9
**met [1]** - 98:9
**middle [2]** - 5:4, 85:1
**mind [1]** - 93:23
**Miner [1]** - 9:4
**minimum [2]** - 23:6, 24:4
**minute [6]** - 21:18, 23:16, 27:6, 52:12, 55:1, 70:17
**misconduct [6]** - 51:1, 51:6, 58:4, 86:23, 87:15, 87:24
**missed [1]** - 86:25
**missing [1]** - 92:1
**misunderstand [1]** - 24:23
**misunderstanding [1]** - 24:18
**MM [8]** - 21:23, 28:9, 31:2, 31:4, 33:1, 33:10, 100:12, 101:3
**moment [2]** - 21:7, 26:18
**Monell [1]** - 41:13
**monitoring [1]** - 39:11
**month [1]** - 81:23
**more [16]** - 5:23, 9:19, 10:17, 29:19, 34:4, 34:5, 34:6, 34:7, 54:14, 59:3, 59:5, 64:6, 79:5, 100:8, 100:9, 101:12
**most [3]** - 9:6, 14:20, 16:22
**mostly [1]** - 15:2
**motion [1]** - 3:12
**motivated [1]** - 46:22

**move [4]** - 3:8, 3:10, 26:16, 36:21
**much [2]** - 34:6, 89:13
**multiple [1]** - 74:17
**multiunit [3]** - 66:9, 66:14, 66:18
**my [18]** - 4:6, 4:7, 5:11, 12:10, 24:18, 28:19, 33:21, 42:3, 46:12, 58:22, 61:18, 68:9, 71:8, 72:1, 75:1, 103:2, 104:7, 105:14

**N [3]** - 2:2, 3:3, 105:6
**name [4]** - 4:6, 5:14, 5:16
**national [2]** - 26:21, 27:17
**nature [3]** - 30:17, 47:1, 57:5, 62:11, 67:2, 74:16
**nearly [2]** - 8:11, 8:12
**necessarily [2]** - 82:13, 95:13
**necessary [15]** - 16:20, 20:13, 20:15, 20:20, 20:23, 20:25, 22:9, 34:19, 34:24, 35:1, 36:1, 36:4, 36:7, 56:12, 57:6
**necessity [3]** - 20:15, 20:16, 20:20
**need [11]** - 4:24, 5:2, 13:24, 16:19, 18:2, 18:9, 46:12, 59:2, 81:11, 86:3, 89:14
**needed [3]** - 13:19, 16:13, 16:18
**needs [2]** - 13:13, 13:20
**never [3]** - 11:3, 86:9, 99:4
**NEW [2]** - 1:4, 104:3
**new [2]** - 11:16, 19:18
**New [8]** - 1:18, 1:21, 2:5, 2:8, 4:3, 64:21, 105:2, 105:11
**next [9]** - 50:12, 50:20, 52:12, 53:23, 53:24, 64:6, 70:11, 71:13, 77:21
**nine [2]** - 8:11, 8:12
**no [90]** - 5:24, 6:15, 6:20, 7:5, 7:9, 7:13, 8:6, 9:1, 16:1, 17:5, 17:6, 17:7, 17:14, 21:3, 26:11, 29:14, 29:18, 30:7, 33:23, 34:3, 36:14, 36:16, 38:20, 40:22, 40:25, 41:1, 43:11, 43:17, 43:20, 43:21, 45:5, 45:14, 45:15, 46:4, 46:5, 46:24, 47:11, 47:12, 48:15, 48:17, 54:7, 54:17, 55:20, 56:16, 58:23, 60:11, 61:7, 62:5, 64:24, 65:4, 65:10, 69:2, 69:4, 69:15, 70:4, 70:8, 70:23, 71:25, 73:22, 74:4, 74:12, 74:15, 75:13, 76:8, 77:7, 78:13, 78:14, 78:15, 78:19, 78:22, 79:2, 81:1, 82:21, 83:2,

83:6, 83:11, 83:19, 88:25, 92:6, 92:8, 92:10, 98:21, 99:3, 99:4, 99:6, 99:8, 99:11, 99:25, 100:4
**No [1]** - 18:17
**nods [2]** - 4:22, 46:14, 78:24
**none [3]** - 36:11, 36:12, 59:14
**nonetheless [1]** - 32:14
**nonexclusive [1]** - 50:11
**normally [1]** - 60:1, 78:20, 80:23
**north [1]** - 66:20
**NORTHERN [1]** - 1:4
**NOTARY [1]** - 104:21
**notary [3]** - 3:16, 4:2
**Notary [2]** - 1:20, 103:25, 105:10
**notation [1]** - 19:20
**note [1]** - 33:24
**noted [4]** - 56:23, 95:20, 104:8, 105:13
**nothing [1]** - 57:25, 77:7
**Notice [1]** - 1:14
**noticed [1]** - 91:25
**notify [2]** - 78:17, 78:20
**November [3]** - 84:15, 88:14, 88:17
**Number [2]** - 19:21, 105:9
**number [9]** - 19:22, 22:16, 22:18, 38:22, 39:9, 39:11, 54:16, 70:24, 91:21
**numbered [3]** - 50:1, 50:2, 50:3
**numbers [4]** - 29:24, 30:1, 30:2, 30:4

**O [2]** - 3:3, 105:6
**o [1]** - 5:17
**object [28]** - 3:7, 3:10, 13:10, 15:8, 30:21, 35:2, 38:13, 39:13, 39:21, 43:9, 44:24, 57:18, 60:10, 60:14, 61:10, 65:8, 65:23, 67:13, 67:19, 69:24, 82:10, 86:22, 87:9, 91:16, 93:3, 94:18, 98:15, 98:22
**objection [4]** - 93:7, 93:13, 93:20, 95:12
**objectives [2]** - 9:13, 11:11
**obligation [1]** - 58:22
**observation [1]** - 96:1
**obviously [3]** - 18:6, 18:7, 28:8
**occur [11]** - 8:16, 11:3, 11:22, 13:16, 15:7, 16:16, 34:24, 35:1, 39:3, 41:23

**occurred [12]** - 29:7, 29:9, 29:12, 40:5, 43:15, 43:16, 46:15, 60:25, 77:10, 82:2, 82:6, 82:15
**occurring [3]** - 11:2, 39:17, 46:8
**Ocker [2]** - 4:9, 84:20
**OF [4]** - 1:4, 1:12, 104:3, 104:4
**off [13]** - 14:3, 18:25, 21:18, 21:19, 26:4, 26:5, 26:7, 26:8, 28:22, 32:18, 67:23, 76:16, 77:12
**offhand [1]** - 34:1
**office [8]** - 61:23, 76:23, 77:18, 80:7, 85:7, 88:14, 88:24
**Office [48]** - 1:17, 25:10, 25:13, 25:20, 25:22, 25:25, 26:9, 27:23, 27:25, 28:5, 28:11, 28:13, 28:23, 29:1, 29:7, 29:22, 30:11, 30:12, 30:15, 31:10, 37:13, 37:15, 37:16, 37:19, 37:20, 37:21, 37:22, 42:6, 51:17, 51:19, 51:23, 61:23, 63:6, 70:5, 71:10, 71:22, 73:6, 74:10, 75:11, 76:24, 77:4, 79:20, 79:22, 81:3, 81:12, 81:19, 86:7, 102:13
**officer [32]** - 16:25, 17:10, 17:12, 20:8, 22:11, 22:15, 22:19, 23:4, 23:7, 24:9, 24:11, 36:5, 36:7, 36:17, 37:5, 37:15, 37:17, 38:4, 53:25, 54:9, 54:19, 58:3, 65:13, 67:17, 87:24, 94:22, 95:22, 95:24, 96:5, 96:17, 101:13
**Officer [9]** - 1:13, 67:11, 79:18, 79:22, 80:3, 80:4, 88:4, 102:16, 102:18
**officer's [4]** - 20:8, 22:18, 95:25, 96:1
**Officers [4]** - 67:7, 83:2, 84:19, 85:4
**officers [58]** - 4:9, 9:18, 10:18, 10:19, 11:21, 11:25, 12:4, 12:13, 12:14, 18:6, 18:19, 20:6, 20:12, 20:23, 22:7, 22:17, 30:14, 33:8, 34:11, 34:22, 35:22, 36:23, 44:15, 46:1, 46:8, 47:10, 53:22, 54:5, 64:20, 65:3, 65:6, 65:13, 65:21, 65:25, 68:3, 68:7, 69:1, 69:6, 69:11, 86:21, 86:24, 87:4, 92:12, 92:23, 94:11, 94:16, 95:10, 95:11, 95:14, 95:16, 95:25, 96:7, 96:21, 97:3, 97:19, 99:2, 99:17, 99:19

**offices** [1] - 1:16
**officially** [1] - 88:23
**often** [3] - 86:6, 86:9, 86:13
**oh** [6] - 17:18, 24:17, 41:19, 54:11, 73:13, 100:4
**on-the-job** [1] - 11:1
**once** [16] - 13:19, 14:1, 16:20, 18:5, 19:25, 20:22, 21:1, 21:3, 25:22, 28:12, 34:17, 51:16, 51:17, 51:21, 76:3, 85:21
**ongoing** [2] - 10:23, 47:6
**only** [8] - 14:2, 17:22, 28:19, 38:15, 61:2, 62:13, 96:17, 97:21
**open** [1] - 50:7
**operating** [1] - 12:13
**operational** [1] - 68:20
**operations** [2] - 13:1, 68:18
**opinion** [1] - 9:20
**opportunities** [1] - 76:24
**opportunity** [3] - 43:23, 44:2, 68:22
**opposed** [1] - 100:15
**options** [2] - 22:10, 22:11
**order** [6] - 19:22, 20:3, 31:5, 50:12, 54:1, 56:11
**ordered** [1] - 31:17
**orders** [2] - 19:23, 20:4
**ordinance** [1] - 94:10
**orientation** [2] - 26:22, 27:18
**origin** [2] - 26:22, 27:18
**original** [1] - 3:19
**originally** [2] - 17:19, 92:14
**other** [21] - 3:16, 5:12, 6:5, 7:10, 14:11, 34:14, 45:3, 45:7, 51:12, 51:13, 56:1, 57:13, 57:16, 57:21, 69:11, 72:9, 75:7, 76:15, 77:7, 89:25, 99:9
**others** [1] - 57:19
**otherwise** [2] - 24:6, 36:8
**our** [8] - 15:18, 32:3, 57:5, 59:24, 67:7, 76:23, 89:13, 97:2
**out** [6] - 20:1, 26:16, 68:20, 82:12, 91:24, 92:12
**outline** [1] - 18:12
**outside** [6] - 21:15, 37:5, 57:11, 57:25, 58:24, 96:15
**over** [7] - 32:2, 42:11, 44:11, 50:13, 51:23, 55:10, 81:23
**overall** [1] - 9:11

**oversees** [1] - 10:4
**oversight** [1] - 42:16
**own** [5] - 26:10, 33:21, 46:7, 46:22, 83:22
**P** [3] - 2:2, 3:3
**p.m** [1] - 101:19
**P.O** [1] - 2:4
**page** [11] - 19:11, 25:2, 50:20, 52:12, 52:25, 55:3, 70:23, 72:2, 73:16, 73:19, 84:14
**PAGE** [1] - 103:5
**Page** [13] - 21:22, 23:13, 23:17, 48:25, 49:19, 49:20, 50:2, 55:4, 55:17, 55:19, 89:18, 90:20, 90:21
**pages** [3] - 49:25, 50:3, 59:7
**pain** [1] - 22:3
**panel** [1] - 59:12
**Paragraph** [2] - 49:3, 49:5
**parameters** [1] - 21:10
**part** [9] - 9:16, 16:1, 16:4, 24:18, 39:20, 62:13, 86:25, 96:20, 97:15
**particular** [5] - 16:22, 24:12, 47:1, 52:6, 92:9
**parties** [1] - 3:6
**Passage** [1] - 49:1
**passed** [5] - 48:20, 49:7, 49:11, 49:17, 56:3
**patrol** [4] - 34:21, 66:1, 68:3, 69:3
**patrol-level** [1] - 34:21
**patrolled** [1] - 69:12
**Pause** [3] - 8:3, 49:22, 64:4
**PD** [1] - 65:17
**Penal** [1] - 64:21
**pending** [1] - 42:4
**penned** [1] - 26:6
**people** [11] - 14:21, 18:9, 42:9, 44:11, 44:12, 44:14, 44:15, 44:16, 47:20, 86:3, 101:7
**percent** [1] - 86:8
**performing** [1] - 95:10
**period** [4] - 47:2, 56:12, 91:8, 92:20
**periodically** [1] - 97:4
**person** [10] - 13:2, 16:21, 16:23, 42:6, 42:10, 73:7, 82:17, 92:11, 96:5, 96:17
**person's** [1] - 28:16
**personal** [1] - 29:12
**personally** [2] - 29:15, 77:4
**personnel** [4] - 14:23, 15:1, 34:18, 76:15

**perspective** [5] - 75:1, 75:2, 76:13, 76:14, 80:19
**physical** [8] - 7:10, 21:24, 21:25, 22:4, 22:18, 23:9, 23:22, 24:1
**Physical** [2] - 19:2, 102:6
**physically** [2] - 26:6, 26:7, 72:6
**piece** [2] - 5:8, 12:14
**Pioneer** [6] - 66:9, 66:22, 66:23, 66:25, 69:9, 69:14
**place** [23] - 10:24, 10:25, 11:1, 11:9, 11:13, 14:19, 18:19, 19:7, 19:24, 26:19, 26:23, 27:20, 33:7, 34:10, 42:25, 61:2, 61:3, 98:8, 98:12, 98:14, 99:8, 104:8, 105:12
**Plaintiff** [2] - 1:7, 2:5
**plaintiff** [1] - 32:2
**PLAINTIFF'S** [1] - 102:4
**Plaintiff's** [39] - 18:22, 19:3, 19:6, 23:14, 27:1, 27:3, 27:7, 32:22, 48:4, 48:8, 48:11, 62:17, 62:23, 63:1, 63:17, 64:7, 64:9, 64:13, 70:9, 70:12, 70:14, 71:14, 71:17, 71:21, 73:16, 77:20, 77:25, 78:4, 78:7, 79:5, 79:7, 79:11, 79:16, 84:5, 84:7, 84:10, 89:7, 89:9
**plan** [5] - 11:14, 16:24, 18:12, 97:1
**planned** [1] - 17:3
**plans** [5] - 17:4, 18:14, 18:16, 96:21, 97:9
**play** [4] - 22:19, 28:17, 73:6, 95:24
**played** [3] - 23:21, 23:25, 50:16
**plays** [4] - 9:7, 20:16, 25:10, 51:3
**please** [2] - 44:13, 52:18
**point** [12] - 37:20, 41:21, 46:18, 53:15, 73:19, 75:10, 76:19, 83:12, 91:11, 98:4, 98:6, 98:7
**police** [138] - 7:19, 7:23, 8:1, 8:12, 8:13, 8:17, 8:18, 8:25, 9:3, 9:6, 9:7, 9:8, 9:11, 9:12, 9:16, 9:17, 10:7, 10:22, 10:24, 11:3, 11:11, 11:12, 12:2, 12:3, 12:13, 12:14, 12:15, 12:16, 12:19, 12:22, 12:25, 13:5, 13:9, 14:1, 14:4, 14:8, 14:13, 15:17, 15:24, 16:9, 16:21, 17:22, 17:23, 18:8, 18:16, 20:1, 22:22, 23:2, 23:22, 24:3, 25:20, 25:24, 26:3, 30:2, 30:4, 30:20, 31:23, 33:7, 34:22,

36:22, 36:25, 38:1, 38:9, 38:11, 39:19, 40:21, 42:16, 42:17, 43:18, 44:15, 47:5, 47:8, 49:13, 50:17, 51:1, 51:6, 51:20, 51:24, 52:3, 52:5, 53:7, 53:16, 54:4, 54:10, 54:18, 55:20, 56:11, 56:21, 57:9, 57:24, 58:2, 59:12, 59:18, 59:25, 60:1, 61:8, 61:22, 63:14, 64:20, 66:1, 67:18, 68:5, 70:3, 76:17, 78:17, 79:19, 85:7, 86:18, 87:1, 90:25, 91:5, 91:19, 92:1, 92:4, 92:21, 92:23, 93:19, 94:2, 94:8, 94:11, 94:14, 94:22, 95:6, 95:10, 95:16, 96:19, 97:5, 97:13, 98:9, 98:13, 98:14, 98:18, 99:8, 99:11, 99:12, 99:14
**Police** [62] - 7:20, 8:9, 9:9, 10:14, 13:14, 15:19, 15:23, 18:4, 24:21, 27:16, 28:7, 28:11, 28:21, 29:20, 29:23, 30:6, 30:9, 30:12, 30:14, 30:16, 31:21, 33:18, 34:4, 37:16, 37:20, 37:22, 38:19, 38:23, 39:18, 41:6, 42:24, 43:7, 43:19, 43:25, 44:23, 46:23, 47:21, 49:15, 50:10, 50:14, 50:24, 51:4, 51:9, 54:6, 55:21, 59:2, 60:8, 60:12, 60:21, 61:23, 63:6, 68:18, 76:25, 78:10, 79:18, 82:20, 91:14, 92:9, 94:13, 97:13, 102:7, 102:21
**Police"** [1] - 59:8
**police's** [1] - 77:18
**police-citizen** [2] - 90:25, 91:5
**policies** [22] - 10:3, 10:8, 11:16, 13:22, 15:6, 15:11, 15:12, 15:15, 17:9, 37:6, 93:16, 93:17, 93:18, 97:13, 97:14, 98:8, 98:12, 98:14, 98:16, 99:10, 100:13
**policing** [6] - 14:21, 65:18, 94:23, 97:3, 98:2, 101:13
**Policy** [1] - 19:11
**policy** [36] - 9:10, 10:5, 11:22, 13:4, 13:6, 13:8, 13:14, 13:19, 13:20, 13:21, 13:23, 13:25, 14:2, 14:5, 14:8, 14:16, 14:21, 15:2, 18:7, 18:18, 19:6, 19:15, 19:25, 20:6, 20:24, 21:22, 26:20, 26:22, 27:20, 36:24, 53:23, 78:16, 99:5, 100:14
**policymaker** [1] - 99:11
**policymaking** [1] - 99:15
**position** [4] - 8:9, 8:13, 8:14,

74:22

**potential [2]** - 28:15, 47:22
**powers [1]** - 50:13
**Powers [1]** - 52:10
**practice [8]** - 22:22, 49:16, 56:22, 56:24, 56:25, 57:2, 75:23, 76:2
**practices [2]** - 98:10, 101:13
**prepared [1]** - 6:8
**present [3]** - 68:21, 81:11, 82:9
**preservation [1]** - 31:9
**presume [1]** - 4:18
**pretty [2]** - 14:23, 41:12
**prevent [1]** - 6:13
**prevented [1]** - 56:1
**previous [2]** - 20:14, 98:14
**previously [4]** - 19:18, 83:14, 86:19, 89:3
**primarily [2]** - 6:4, 20:10
**primary [1]** - 24:6
**prior [6]** - 14:24, 46:15, 58:5, 67:7, 90:17, 96:4
**privilege [1]** - 61:11
**probability [1]** - 68:13
**probably [3]** - 13:17, 29:19, 38:8
**problem [1]** - 47:22
**procedure [2]** - 14:5, 80:9
**procedures [6]** - 7:1, 11:22, 12:12, 12:13, 15:6, 92:22
**proceed [2]** - 53:4, 59:4
**proceedings [1]** - 60:20
**process [17]** - 11:24, 12:24, 13:7, 14:12, 15:1, 15:4, 15:5, 15:7, 17:6, 24:6, 28:24, 41:10, 41:20, 41:23, 50:9, 58:13, 99:8
**processed [1]** - 74:19
**processes [1]** - 41:4
**produce [2]** - 31:18, 32:11
**Professional [41]** - 25:10, 25:13, 25:21, 25:22, 26:1, 26:9, 27:24, 27:25, 28:6, 28:11, 28:13, 28:24, 29:1, 29:7, 29:22, 30:11, 30:13, 30:15, 31:10, 37:13, 37:15, 37:19, 37:21, 42:7, 51:18, 51:19, 51:24, 70:6, 71:10, 71:23, 73:6, 74:10, 75:11, 77:5, 79:21, 79:23, 81:3, 81:12, 81:19, 86:8, 102:13
**profile [1]** - 95:3
**profiling [92]** - 26:21, 26:23, 27:19, 28:2, 28:7, 29:1, 29:16, 29:24, 30:3, 30:8, 30:14, 30:19, 31:1, 31:6, 31:11,

31:22, 33:6, 33:8, 34:1, 34:15, 34:25, 35:17, 35:20, 35:23, 36:8, 38:15, 38:18, 38:24, 39:2, 39:10, 39:14, 39:17, 40:2, 40:4, 40:11, 40:13, 41:8, 42:25, 43:4, 43:8, 43:16, 43:24, 44:22, 45:3, 45:8, 46:1, 46:8, 46:23, 47:10, 47:16, 69:11, 84:21, 85:3, 86:24, 87:4, 89:4, 91:15, 93:2, 93:6, 93:12, 93:17, 93:19, 94:5, 94:11, 94:16, 94:24, 95:4, 95:9, 95:17, 95:20, 95:23, 96:7, 96:12, 96:13, 96:14, 96:17, 96:20, 96:22, 96:23, 97:4, 97:10, 97:16, 97:18, 98:1, 98:10, 98:20, 99:2, 100:10
**prohibit [1]** - 26:23
**prohibiting [1]** - 26:20
**prohibition [1]** - 27:17
**project [1]** - 66:14
**properly [3]** - 10:4, 16:22, 18:10
**properties [5]** - 64:22, 65:19, 66:2, 66:5, 69:17
**property [2]** - 66:7, 68:8
**proposed [3]** - 13:4, 13:22, 13:24
**protocol [2]** - 16:17, 18:1
**protocols [9]** - 10:11, 10:13, 11:25, 16:14, 40:20, 40:23, 92:22, 93:12, 97:8
**provide [4]** - 4:18, 5:11, 35:10, 50:11
**provided [3]** - 3:7, 85:25
**provides [1]** - 100:9
**provision [1]** - 56:9
**proximity [1]** - 66:15
**public [8]** - 3:16, 4:3, 50:13, 63:23, 63:24, 67:4
**PUBLIC [1]** - 104:21
**Public [3]** - 1:20, 103:25, 105:10
**purporting [1]** - 19:1
**purpose [1]** - 50:6
**purposes [2]** - 67:21, 96:5
**pursuant [1]** - 1:14
**pursue [1]** - 76:20
**pushing [1]** - 22:1
**put [8]** - 26:18, 32:16, 63:10, 63:17, 70:9, 77:20, 82:24, 89:1
**qualify [1]** - 31:5
**quarterly [1]** - 61:24
**question [30]** - 3:8, 3:10, 4:13, 4:15, 4:19, 4:20, 4:25,

5:5, 5:10, 5:11, 15:14, 17:20, 27:11, 30:22, 30:23, 35:5, 39:4, 39:5, 40:6, 42:3, 42:4, 46:12, 55:14, 60:17, 67:23, 68:1, 68:9, 82:18, 86:25
**questioning [1]** - 21:14
**questions [12]** - 6:8, 6:11, 6:19, 7:3, 7:7, 7:12, 25:5, 26:13, 32:24, 38:14, 41:17, 76:20
**quickly [2]** - 21:17, 100:3
**r [1]** - 5:17
**R [2]** - 2:2, 105:6
**race [6]** - 90:25, 91:5, 92:6, 92:10, 96:18
**racial [76]** - 26:20, 27:17, 28:2, 28:7, 29:1, 29:16, 29:24, 30:3, 30:8, 30:13, 30:19, 31:1, 31:6, 31:11, 31:22, 33:6, 33:8, 34:1, 34:15, 35:20, 35:23, 36:8, 38:15, 38:18, 38:24, 39:2, 39:10, 39:14, 39:17, 40:2, 40:4, 40:10, 40:12, 41:7, 42:24, 43:4, 43:8, 43:16, 43:24, 44:22, 45:3, 45:8, 45:25, 46:8, 46:23, 47:9, 47:16, 69:11, 84:21, 85:3, 86:24, 87:3, 89:4, 91:15, 93:2, 93:6, 93:12, 93:17, 93:19, 94:5, 94:11, 94:16, 96:12, 96:16, 96:20, 96:23, 97:3, 97:9, 97:16, 97:18, 98:1, 98:10, 99:2, 100:10
**racial-profiling [9]** - 29:1, 30:3, 35:23, 38:15, 39:14, 69:11, 93:12, 93:17, 98:10
**range [2]** - 22:7, 22:9
**rank [1]** - 11:9
**rather [2]** - 49:20, 92:17
**rationale [1]** - 96:18
**re [1]** - 85:9
**RE [1]** - 105:1
**re-examine [1]** - 85:9
**reactionary [1]** - 20:10
**read [38]** - 20:3, 21:24, 22:4, 23:16, 25:4, 27:24, 28:3, 32:24, 42:2, 42:4, 43:23, 44:3, 45:21, 45:22, 46:18, 48:16, 48:24, 49:8, 49:23, 49:24, 50:8, 50:12, 52:12, 52:15, 52:22, 55:1, 55:12, 57:15, 59:10, 59:15, 70:21, 85:22, 90:22, 90:23, 91:1, 103:2, 104:7
**reading [5]** - 33:4, 46:6, 46:21, 49:6, 55:17
**ready [9]** - 27:12, 32:25,

64:14, 70:18, 70:25, 71:2, 76:23, 79:12
**realize [1]** - 46:12
**really [4]** - 46:25, 82:3, 91:24, 92:18
**Realtime [2]** - 1:20, 105:10
**reason [7]** - 43:4, 43:5, 59:3, 65:15, 65:16, 67:6
**reasonable [6]** - 9:6, 53:3, 95:5, 95:7, 96:3, 96:16
**reasons [1]** - 59:14
**recall [77]** - 4:14, 5:22, 6:7, 24:15, 26:15, 29:9, 29:18, 30:25, 32:7, 33:11, 38:9, 38:17, 38:18, 38:21, 42:19, 43:15, 44:20, 45:16, 46:3, 46:10, 54:4, 54:13, 54:15, 54:16, 54:19, 54:21, 57:9, 57:12, 60:6, 61:6, 62:2, 62:7, 62:12, 62:13, 64:23, 64:24, 65:1, 65:15, 65:16, 65:20, 65:21, 65:24, 65:25, 69:18, 70:1, 70:2, 70:5, 71:5, 71:6, 71:12, 71:24, 71:25, 74:25, 75:17, 83:12, 83:16, 83:20, 83:24, 84:3, 84:12, 85:11, 87:11, 87:18, 87:22, 88:16, 88:18, 92:18, 93:15, 93:22, 94:2, 94:7, 94:8, 94:12, 94:20, 98:16, 98:18
**Receipt [1]** - 52:13
**receipt [4]** - 53:1, 55:22, 55:23, 59:11
**receive [19]** - 11:21, 18:5, 29:23, 34:11, 51:17, 58:17, 61:23, 62:4, 63:12, 77:3, 78:22, 78:23, 86:14, 87:2, 94:4, 95:16, 97:1
**received [32]** - 12:4, 25:11, 25:17, 28:7, 34:15, 39:9, 53:11, 54:8, 55:21, 56:2, 58:16, 62:12, 63:6, 63:8, 69:10, 73:18, 73:21, 73:24, 74:3, 74:5, 76:3, 76:10, 78:9, 78:10, 81:20, 85:7, 85:8, 86:19, 87:6, 96:21, 97:19, 99:2
**receiving [8]** - 29:15, 54:5, 62:7, 64:23, 64:24, 68:12, 76:6, 83:25
**recess [2]** - 32:19, 93:25
**recognize [9]** - 19:7, 27:7, 63:1, 72:10, 72:20, 78:4, 78:6, 84:10
**recollection [7]** - 29:12, 44:5, 49:10, 49:12, 87:14, 87:17, 92:16
**recommend [1]** - 51:1
**recommendation [5]** -

37:24, 51:23, 53:5, 54:20, 59:12

**recommendations [10]** - 37:1, 37:18, 53:16, 54:5, 54:8, 55:24, 77:9, 98:25, 99:4, 99:9

**recommended [2]** - 16:13, 37:24, 77:15

**record [6]** - 18:25, 21:18, 21:19, 32:18, 104:7, 105:12

**recording [1]** - 30:19

**records [5]** - 30:5, 30:6, 30:9, 31:21, 31:23

**reevaluate [3]** - 91:14, 91:20, 93:18

**refer [1]** - 17:19

**reference [1]** - 64:18

**referenced [4]** - 6:16, 53:6, 61:17, 63:5

**references [1]** - 80:2

**referencing [1]** - 45:25

**referred [1]** - 66:13

**referring [4]** - 61:15, 89:12, 89:19, 100:16

**reflect [4]** - 38:22, 73:17, 80:24, 101:12

**reflecting [1]** - 31:11

**regard [32]** - 15:11, 18:19, 19:24, 25:20, 29:20, 33:6, 33:8, 34:15, 35:17, 35:20, 36:3, 36:8, 36:18, 38:3, 39:8, 40:12, 44:22, 45:24, 46:8, 51:5, 52:6, 58:3, 59:18, 65:18, 77:4, 78:13, 78:18, 87:24, 90:2, 93:11, 93:18, 99:17

**regarding [54]** - 4:7, 18:15, 24:1, 25:10, 25:11, 26:9, 26:17, 26:20, 29:16, 29:17, 29:23, 30:3, 30:8, 31:22, 34:1, 34:25, 36:15, 38:23, 39:2, 43:24, 45:25, 50:20, 51:1, 51:5, 54:5, 57:14, 58:3, 68:7, 69:6, 69:11, 75:11, 75:14, 79:23, 81:3, 83:17, 84:1, 84:18, 84:20, 86:15, 86:23, 87:20, 88:15, 88:19, 89:4, 91:15, 94:10, 94:16, 96:20, 96:22, 97:9, 98:9, 98:19, 99:1, 99:24

**regardless [1]** - 30:17

**Registered [2]** - 1:19, 105:9

**regular [2]** - 61:25, 86:16

**regularly [2]** - 87:7, 87:8

**regulations [3]** - 27:16, 37:14, 102:7

**relate [1]** - 38:14

**related [2]** - 33:6, 61:15

**relates [13]** - 33:17, 51:25,

57:2, 60:17, 65:13, 83:9, 83:10, 92:1, 97:16, 97:17, 99:15, 100:10

**relationship [1]** - 60:7

**relative [1]** - 75:8

**relevance [1]** - 60:14

**relevant [3]** - 41:21, 45:2, 98:9

**religious [2]** - 26:21, 27:17

**remember [14]** - 29:15, 35:4, 38:9, 42:22, 72:22, 72:23, 75:19, 76:4, 83:25, 85:6, 91:21, 93:9, 93:10, 97:12

**remove [1]** - 67:9

**RENÉE [2]** - 105:8, 105:17

**Renée [1]** - 1:18

**reopen [1]** - 85:18

**reopening [2]** - 85:14, 88:20

**rephrase [1]** - 4:17

**Report [6]** - 62:19, 63:4, 92:9, 102:9, 102:12, 102:14

**report [7]** - 29:11, 71:23, 74:22, 74:24, 75:15, 83:25, 85:16

**Reporter [7]** - 1:19, 1:20, 105:9, 105:10, 105:17

**reporting [2]** - 59:18, 84:21

**reports [35]** - 23:22, 24:1, 26:8, 26:10, 29:25, 30:18, 30:25, 31:3, 31:11, 38:22, 46:21, 47:6, 51:20, 60:2, 61:24, 62:2, 62:3, 62:4, 62:9, 62:11, 62:15, 63:7, 63:8, 63:12, 63:13, 75:25, 76:3, 76:6, 76:11, 86:15, 86:19, 87:2, 87:7, 92:4

**request [14]** - 31:9, 31:12, 31:25, 32:1, 32:4, 32:15, 65:22, 67:9, 67:12, 67:15, 67:17, 68:7, 69:6, 76:25

**requested [3]** - 32:2, 32:3, 65:2

**requesting [2]** - 32:9, 65:17

**required [7]** - 12:3, 32:11, 33:19, 34:7, 34:11, 35:22, 60:3

**requirement [1]** - 33:25

**requirements [1]** - 10:19

**requires [3]** - 33:16, 55:20, 83:15

**reserved [2]** - 3:9, 3:12

**resistance [1]** - 23:7

**resolution [1]** - 94:9

**respectful [1]** - 21:14

**respond [3]** - 47:13, 67:21, 68:2

**responded [1]** - 59:1

**respondent [1]** - 61:20

**Response [2]** - 52:13, 59:7

**response [4]** - 30:7, 40:22, 54:7, 78:19

**responses [2]** - 4:23, 4:25

**responsibilities [1]** - 33:5

**Responsibilities [1]** - 27:23

**Responsibilities" [1]** - 32:23

**responsibility [1]** - 15:20

**responsible [7]** - 9:10, 9:17, 10:8, 11:15, 11:20, 28:1, 68:15

**rested [1]** - 40:21

**restriction [1]** - 56:10

**result [3]** - 22:3, 54:19, 92:11

**results [1]** - 90:23

**retired [2]** - 82:22, 82:23

**review [16]** - 13:23, 23:22, 25:16, 26:2, 26:3, 28:19, 42:15, 43:24, 50:25, 73:3, 74:22, 75:14, 75:25, 77:10, 97:8, 97:21

**Review [61]** - 28:12, 42:8, 42:9, 42:12, 42:14, 43:1, 48:1, 48:5, 48:13, 50:16, 50:23, 50:24, 51:3, 51:4, 51:7, 52:7, 52:13, 53:2, 53:10, 53:11, 53:21, 54:9, 54:20, 56:3, 58:4, 58:7, 58:9, 58:12, 58:16, 58:18, 58:19, 60:2, 60:8, 60:13, 60:20, 61:24, 62:12, 62:20, 63:4, 71:8, 73:11, 74:9, 75:7, 83:16, 83:18, 83:22, 84:1, 84:14, 85:2, 85:13, 85:17, 85:21, 86:7, 86:15, 86:20, 87:2, 87:16, 87:20, 87:23, 102:9, 102:20

**reviewed [18]** - 16:24, 19:8, 25:24, 27:10, 30:19, 31:3, 52:20, 55:15, 56:5, 64:15, 70:20, 73:2, 75:9, 76:15, 79:14, 79:22, 89:16, 91:10

**reviewing [14]** - 24:1, 24:4, 27:12, 30:25, 50:9, 51:5, 71:11, 71:24, 72:22, 72:23, 74:24, 97:12, 100:13, 100:19

**reviews [1]** - 25:13

**Revision [1]** - 19:11

**revisions [1]** - 19:24

**right [35]** - 3:7, 5:14, 9:22, 10:22, 13:17, 21:4, 22:4, 23:8, 23:9, 35:17, 39:24, 42:6, 42:9, 49:8, 52:25, 53:13, 53:19, 56:4, 58:9, 58:25, 59:19, 71:15, 72:14, 72:23, 74:22, 76:12, 80:14, 81:4, 81:24, 82:9, 82:13, 88:10, 90:9, 99:14, 101:7

**rights [1]** - 3:6

**rise [3]** - 66:10, 66:16, 66:20

**rises [3]** - 66:19, 96:3, 96:16

**RMR [1]** - 105:17

**Rohlin [1]** - 90:5

**role [19]** - 9:6, 10:7, 12:5, 12:7, 14:7, 23:2, 23:21, 23:25, 24:4, 24:6, 25:9, 25:19, 28:17, 28:19, 36:22, 39:20, 50:15, 51:2, 73:5

**roll [11]** - 11:8, 34:19, 34:20, 34:21, 34:23, 34:25, 35:25, 36:1, 36:3, 36:7, 36:18

**roll-call [9]** - 11:8, 34:19, 34:20, 34:21, 34:23, 34:25, 36:1, 36:3, 36:18

**rules [6]** - 4:11, 27:16, 33:22, 37:6, 37:14, 102:7

**rung [1]** - 23:5

**S [3]** - 2:2, 3:3

**said [10]** - 30:25, 33:25, 35:4, 35:5, 40:18, 46:10, 56:24, 61:7, 96:4, 100:20

**same [23]** - 5:10, 15:5, 15:6, 25:2, 31:25, 37:25, 45:13, 59:6, 66:10, 66:17, 73:18, 80:2, 80:4, 80:14, 93:7, 93:13, 93:20, 98:13, 99:16, 99:19, 104:10, 105:14

**sample [2]** - 101:6

**sanctions [1]** - 59:14

**sat [1]** - 6:5

**say [18]** - 8:8, 9:8, 11:20, 13:3, 14:4, 17:14, 23:10, 24:11, 36:18, 36:25, 44:21, 53:9, 60:16, 65:14, 72:25, 73:9, 99:23, 101:11

**says [9]** - 19:11, 19:20, 27:25, 49:1, 50:5, 50:22, 53:1, 56:9, 59:11

**scattered [1]** - 66:12

**scope [6]** - 21:15, 31:14, 37:5, 41:12, 58:24, 96:15

**search [1]** - 84:21

**second [7]** - 25:4, 32:23, 52:25, 100:2, 100:8, 100:14, 100:16

**Section [37]** - 19:1, 23:15, 25:2, 27:23, 27:25, 32:22, 32:24, 33:4, 49:3, 49:4, 49:6, 49:21, 50:5, 50:19, 50:22, 52:10, 52:12, 52:14, 52:22, 52:25, 54:24, 55:1, 55:7, 55:10, 55:12, 55:17, 55:18, 57:11, 57:15, 57:16, 57:17, 59:6, 59:17, 60:3, 102:6

**section [11]** - 19:11, 19:19, 21:22, 49:1, 49:2, 50:5, 53:7,

59:5, 59:8, 83:15, 90:22

**see [8]** - 48:25, 49:2, 50:6, 55:8, 55:24, 59:8, 80:25, 85:4

**seeing [3]** - 6:10, 71:5, 80:25

**seems [6]** - 9:6, 20:14, 33:5, 58:12, 73:15, 73:16

**seen [3]** - 48:14, 71:4, 84:11

**seldom [1]** - 12:1

**send [1]** - 79:1

**Senior [1]** - 2:9

**senior [2]** - 14:24, 25:24

**sensitivity [1]** - 98:1

**sent [2]** - 60:2, 88:3

**sentence [4]** - 49:23, 50:8, 50:12, 90:23

**September [12]** - 80:14, 80:17, 81:22, 81:23, 88:7, 88:11, 88:14, 88:20, 90:8, 90:11, 90:18

**Sergeant [2]** - 4:9, 84:19

**series [1]** - 42:25

**serious [2]** - 22:4, 41:15

**service [6]** - 11:9, 11:13, 34:16, 35:19, 35:23, 97:4

**Services [2]** - 33:16, 33:25

**serving [1]** - 79:19

**set [5]** - 10:5, 11:12, 17:23, 58:12, 101:18

**setting [2]** - 5:19, 9:12

**several [1]** - 75:17

**sexual [2]** - 26:22, 27:18

**shall [7]** - 3:11, 28:2, 50:23, 50:25, 53:2, 56:9, 59:12

**Shawn [1]** - 90:5

**SHEET [1]** - 103:1

**shift [2]** - 34:22, 47:25

**short [1]** - 59:11

**Shorthand [3]** - 1:19, 105:8, 105:17

**should [8]** - 11:2, 20:8, 21:3, 22:15, 53:12, 60:16, 81:6, 83:8

**show [2]** - 29:24, 88:7

**showing [1]** - 64:12

**sic] [1]** - 54:24

**side [6]** - 63:10, 66:7, 66:8, 66:11, 66:20, 82:25

**sign [5]** - 26:4, 26:5, 26:7, 28:22, 77:12

**sign-off [1]** - 26:4

**signaling [1]** - 76:11

**signature [10]** - 72:1, 72:3, 72:11, 72:14, 72:15, 72:16, 72:19, 72:20, 72:25

**signatures [1]** - 72:9

**signed [3]** - 14:3, 72:6, 76:16

**significant [5]** - 12:9, 12:14, 19:14, 94:15, 98:19

**signing [2]** - 26:8, 72:21

**Simmons [6]** - 64:16, 64:19, 65:2, 65:16, 67:9, 102:11

**Simmons' [2]** - 65:22, 68:7

**sir [4]** - 4:13, 44:13, 99:20, 99:22

**sit [1]** - 20:20

**sites [1]** - 66:12

**situation [3]** - 20:13, 22:20, 26:6

**six [1]** - 7:24

**SMITH [1]** - 2:7

**smoothly [1]** - 13:25

**so.. [1]** - 87:13

**sole [1]** - 38:5

**solely [1]** - 96:14

**some [25]** - 4:10, 10:23, 12:6, 12:16, 13:17, 14:18, 37:20, 39:1, 44:14, 44:22, 46:18, 58:8, 58:14, 59:2, 59:18, 60:23, 61:4, 62:7, 62:14, 63:24, 74:21, 77:1, 85:24, 89:3, 91:10

**someone [3]** - 24:5, 28:10, 76:24

**someplace [1]** - 13:18

**something [10]** - 12:10, 13:5, 20:1, 21:15, 31:20, 38:8, 39:19, 64:5, 68:22, 80:25

**sometime [1]** - 43:18

**somewhere [1]** - 74:1

**sorry [22]** - 8:6, 12:18, 19:14, 21:6, 24:17, 33:21, 37:2, 45:21, 47:7, 49:5, 51:16, 55:18, 58:6, 62:5, 70:24, 73:13, 89:19, 95:15, 95:20, 97:17, 98:5, 100:2

**sort [2]** - 35:7, 39:1

**sounds [1]** - 35:16

**source [2]** - 28:14, 28:15

**sources [4]** - 11:23, 37:10, 37:11, 41:6

**south [3]** - 66:7, 66:8, 66:11

**speaks [1]** - 34:17

**specific [17]** - 8:5, 10:17, 13:14, 15:20, 20:6, 26:13, 30:18, 33:9, 62:14, 64:6, 69:16, 76:4, 76:20, 77:16, 92:15, 96:2, 100:10

**specifically [19]** - 7:15, 13:16, 23:23, 26:20, 32:22, 43:17, 49:20, 52:11, 54:22, 60:23, 60:24, 68:10, 69:14, 73:24, 75:16, 83:15, 92:24,

93:22, 97:12

**specifically.. [1]** - 69:13

**specifics [3]** - 26:17, 35:9, 35:10

**spell [1]** - 5:14

**split [1]** - 58:7

**staff [9]** - 13:18, 14:11, 16:1, 16:4, 24:5, 40:8, 68:6, 76:11, 93:11

**stage [1]** - 38:12

**stand [1]** - 19:21

**standard [9]** - 12:13, 19:18, 56:22, 56:24, 56:25, 57:1, 75:22, 76:2, 80:9

**standardized [6]** - 11:14, 11:21, 11:25, 12:4, 15:16, 16:17

**Standards [40]** - 25:10, 25:13, 25:21, 25:22, 26:1, 26:9, 28:1, 28:6, 28:11, 28:13, 28:24, 29:1, 29:7, 29:22, 30:11, 30:13, 30:15, 31:10, 37:13, 37:16, 37:19, 37:21, 42:7, 51:18, 51:19, 51:24, 70:6, 71:10, 71:23, 73:6, 74:10, 75:12, 77:5, 79:21, 79:23, 81:3, 81:12, 81:19, 86:8, 102:13

**standards [6]** - 10:3, 11:16, 11:18, 28:21, 33:6, 98:9

**Standards" [1]** - 27:24

**standpoint [1]** - 13:1

**start [5]** - 13:15, 34:22, 78:5, 78:6, 84:13

**started [3]** - 67:23, 97:5, 97:13

**State [5]** - 1:21, 4:3, 60:21, 64:21, 105:11

**STATE [1]** - 104:3

**STATES [1]** - 1:4

**statistical [4]** - 31:21, 31:23, 32:1, 62:14

**status [2]** - 27:18, 47:9

**stenographer [2]** - 4:13, 42:5

**step [4]** - 53:23, 53:24, 77:11, 77:12

**Stephanie [1]** - 9:4

**steps [1]** - 46:7

**stick [2]** - 4:23, 38:16

**sticks [1]** - 91:24

**still [4]** - 15:13, 41:2, 58:22, 82:20

**stipulated [2]** - 3:14, 3:18

**STIPULATED [1]** - 3:5

**stood [1]** - 24:23

**stop [6]** - 33:20, 44:13, 76:10,

92:7, 92:10

**stopped [3]** - 44:11, 44:14, 92:11

**stops [8]** - 21:2, 45:15, 45:20, 92:5, 92:8, 99:13, 99:16, 99:21

**strategy [1]** - 61:15

**street [2]** - 92:8, 96:8

**Street [2]** - 1:18, 105:2

**strength [1]** - 16:9

**strike [10]** - 3:8, 3:11, 7:25, 12:23, 68:4, 73:13, 83:13, 88:1, 95:21, 98:24

**striking [1]** - 22:1

**structure [1]** - 24:24

**studies [18]** - 44:6, 44:7, 45:22, 46:6, 46:11, 46:15, 46:18, 47:2, 89:3, 89:20, 89:21, 89:23, 93:2, 93:6, 93:12, 93:17, 94:3, 94:17

**Study [1]** - 102:21

**study [45]** - 42:23, 43:4, 43:12, 43:13, 43:15, 43:24, 44:9, 44:13, 44:21, 45:1, 45:3, 45:6, 45:7, 45:9, 45:16, 45:17, 45:18, 45:24, 89:12, 89:19, 89:25, 90:2, 90:13, 90:16, 90:17, 90:24, 91:4, 91:13, 91:23, 92:16, 92:17, 92:19, 100:5, 100:6, 100:8, 100:16, 100:17, 100:20, 100:23, 100:24, 101:2, 101:10, 101:12

**subject [10]** - 14:22, 20:25, 22:17, 69:20, 69:22, 70:7, 79:20, 79:24, 84:24, 84:25

**subject's [3]** - 23:7, 96:2, 96:3

**subordinates [5]** - 10:6, 10:9, 10:14, 13:3, 40:5

**Subscribed [1]** - 103:23

**Subsection [9]** - 23:15, 23:16, 23:17, 52:11, 52:13, 55:2, 55:18, 59:6, 59:17

**subsequently [1]** - 71:9

**substantiated [2]** - 31:18, 87:3

**such [3]** - 3:12, 5:19, 22:3

**suit [1]** - 4:8

**summary [1]** - 39:1

**supervision [7]** - 9:17, 9:19, 9:20, 9:21, 9:23, 9:25

**supervisor [2]** - 16:10, 16:25

**supervisors [1]** - 10:4

**Supreme [3]** - 60:21, 60:22, 61:4

**sure [60]** - 5:7, 5:13, 8:6, 9:8, 9:25, 10:15, 10:21, 13:2, 13:3, 13:12, 14:17, 15:13, 15:15,

15:18, 17:18, 19:25, 20:19, 21:8, 21:23, 23:18, 24:3, 25:3, 30:23, 31:19, 32:17, 33:14, 34:16, 35:6, 36:25, 37:3, 39:6, 40:6, 42:22, 45:9, 47:14, 49:25, 51:7, 54:21, 55:13, 56:7, 57:3, 58:7, 61:13, 61:21, 64:24, 67:16, 67:22, 67:25, 72:2, 75:24, 80:20, 80:22, 81:18, 82:3, 87:1, 91:22, 95:18, 96:14, 101:8

**suspect** [1] - 21:3
**suspect's** [1] - 23:11
**suspicion** [4] - 95:5, 95:7, 96:3, 96:16
**sustained** [4] - 85:2, 85:17, 86:21, 87:15
**sustaining** [1] - 87:24
**sworn** [4] - 3:15, 4:2, 103:23, 104:17
**SYRACUSE** [1] - 1:12
**Syracuse** [119] - 1:16, 1:18, 2:7, 2:8, 7:19, 7:20, 7:23, 8:1, 8:9, 8:12, 8:13, 8:17, 8:18, 8:23, 8:24, 9:2, 9:7, 9:9, 10:7, 10:14, 13:14, 15:17, 15:19, 15:23, 18:4, 24:21, 27:15, 28:7, 28:11, 28:21, 29:20, 29:23, 30:6, 30:9, 30:12, 30:14, 30:16, 30:19, 31:21, 33:18, 34:4, 38:19, 38:23, 39:18, 41:6, 42:8, 42:24, 43:2, 43:7, 43:13, 43:19, 43:25, 44:10, 44:15, 44:23, 45:13, 45:19, 46:1, 46:9, 46:23, 47:21, 48:12, 49:7, 49:15, 49:17, 50:10, 50:14, 50:24, 51:4, 51:9, 54:6, 55:21, 59:2, 60:8, 60:12, 60:21, 63:19, 63:21, 63:22, 63:25, 64:2, 64:21, 65:6, 65:17, 65:18, 66:1, 66:4, 66:5, 66:6, 66:7, 66:11, 66:21, 67:3, 67:4, 67:10, 68:8, 68:18, 68:21, 69:1, 69:6, 69:16, 78:10, 82:20, 89:4, 90:5, 90:25, 91:5, 91:14, 92:23, 94:11, 94:13, 95:16, 97:12, 99:10, 102:7, 102:21, 105:2
**T** [4] - 3:3, 105:6
**table** [1] - 5:5
**take** [20] - 5:6, 8:10, 11:13, 14:19, 23:16, 25:4, 27:6, 27:8, 32:23, 37:9, 46:7, 52:12, 55:1, 55:20, 64:13, 74:17, 74:19, 79:10, 89:13, 93:23
**taken** [11] - 32:19, 59:25, 78:11, 78:13, 78:14, 78:18, 78:21, 93:25, 104:8, 105:12

**takes** [3] - 10:25, 11:1, 11:8
**taking** [3] - 10:24, 56:2, 101:5
**talk** [15] - 9:22, 13:7, 20:5, 20:16, 23:21, 28:5, 29:20, 33:21, 34:24, 36:21, 41:3, 45:7, 51:2, 56:7, 59:21
**talked** [2] - 20:14, 81:10
**talking** [6] - 34:9, 39:22, 40:10, 41:7, 86:8, 86:11
**tasked** [1] - 16:23
**techniques** [1] - 23:9
**tell** [19] - 16:16, 26:15, 27:14, 42:13, 42:21, 49:21, 61:13, 64:14, 66:25, 69:19, 69:21, 75:22, 80:9, 85:6, 88:13, 91:23, 95:1, 100:21, 101:11
**tenure** [1] - 46:19
**term** [3] - 14:22, 42:16, 57:1
**terms** [11] - 8:24, 10:17, 11:24, 15:11, 23:5, 33:9, 40:19, 44:11, 48:20, 62:14, 95:10
**testified** [1] - 4:4
**testimony** [7] - 3:9, 3:11, 6:2, 67:7, 72:23, 103:3, 104:8
**than** [10] - 3:16, 5:23, 5:25, 9:19, 34:7, 45:3, 51:13, 54:14, 57:21, 77:7
**their** [22] - 15:20, 25:23, 34:22, 50:18, 51:11, 51:16, 51:21, 51:22, 51:23, 53:12, 53:15, 53:19, 58:25, 76:13, 76:14, 83:22, 91:14, 91:25, 95:10, 96:17, 101:10
**them** [22] - 15:1, 18:8, 29:4, 31:5, 32:9, 34:8, 44:3, 46:21, 51:21, 54:2, 72:10, 74:18, 80:13, 85:23, 85:25, 87:8, 88:8, 91:21, 97:21, 97:22
**themselves** [2] - 22:17, 83:8
**these** [27] - 22:11, 26:10, 38:10, 41:23, 46:15, 46:18, 63:5, 63:12, 76:3, 76:6, 76:10, 77:3, 77:21, 77:22, 78:5, 80:6, 80:10, 80:16, 80:17, 80:18, 82:9, 82:24, 86:15, 93:12, 93:17, 94:3, 94:17
**they'd** [1] - 78:23
**they're** [6] - 11:17, 20:24, 88:8, 88:10, 98:16
**thing** [5] - 38:15, 66:17, 70:22, 91:24, 99:19
**things** [1] - 14:1
**think** [17] - 6:13, 6:17, 7:2, 21:14, 33:25, 34:7, 39:22, 40:18, 41:11, 46:12, 57:25, 72:22, 81:15, 82:17, 82:21,

100:20, 101:16
**those** [60] - 9:14, 10:19, 11:14, 11:17, 12:21, 14:1, 14:5, 14:20, 14:23, 15:1, 17:4, 17:8, 17:9, 17:13, 18:14, 18:16, 25:20, 29:24, 30:4, 30:5, 30:6, 30:9, 31:12, 32:3, 32:15, 33:18, 36:13, 36:18, 37:11, 39:2, 39:11, 44:6, 46:6, 46:11, 46:21, 47:6, 47:21, 47:23, 60:2, 62:2, 63:7, 63:8, 63:9, 63:13, 68:15, 75:8, 86:1, 86:2, 87:6, 87:7, 88:7, 91:20, 92:13, 97:11, 98:2, 100:13, 101:4, 101:5, 101:9
**though** [1] - 76:21
**three** [2] - 76:24, 80:13
**through** [17] - 13:15, 15:18, 28:10, 28:14, 37:12, 37:19, 37:21, 47:21, 49:11, 51:23, 58:11, 58:16, 74:10, 76:2, 77:3, 94:9, 97:2
**throughout** [3] - 14:1, 66:6, 66:19
**time** [63] - 4:15, 4:20, 5:2, 12:2, 14:13, 15:17, 26:19, 32:12, 33:7, 37:9, 38:9, 39:18, 42:17, 42:22, 42:23, 43:18, 46:11, 46:24, 47:1, 47:5, 47:8, 50:16, 54:4, 54:10, 54:18, 56:11, 56:21, 56:23, 57:7, 57:9, 58:2, 59:3, 60:24, 61:22, 65:25, 68:5, 68:22, 70:2, 73:2, 73:6, 73:19, 74:8, 74:12, 74:13, 74:21, 78:17, 79:20, 81:10, 81:17, 82:2, 82:6, 82:16, 86:18, 87:1, 89:14, 94:2, 94:13, 96:19, 98:8, 101:4, 101:9, 104:8, 105:12
**times** [9] - 5:21, 36:1, 54:12, 60:5, 75:17, 87:11, 87:12, 87:14, 87:19
**tips** [3] - 28:12, 42:10, 42:11
**titled** [5] - 27:23, 32:22, 52:10, 52:13, 59:7
**TO** [2] - 102:2, 103:5
**today** [3] - 6:9, 6:14, 89:13
**told** [4] - 6:20, 6:22, 14:18, 89:22
**ton** [1] - 90:8
**TONY** [1] - 1:6
**Tony** [6] - 4:8, 71:23, 78:8, 79:24, 83:17, 84:19
**too** [1] - 100:3
**took** [6] - 42:25, 61:2, 61:3, 65:13, 81:20, 101:1
**tool** [4] - 100:14, 100:21, 100:22, 101:14

**top** [1] - 19:20
**tough** [1] - 57:1
**toward** [2] - 56:6, 56:19
**town** [1] - 66:13
**track** [2] - 30:13, 30:16
**tracking** [1] - 31:22
**Traffic** [2] - 92:5, 92:7
**train** [2] - 95:10, 95:13
**trained** [5] - 10:5, 11:16, 16:22, 18:10, 97:3
**training** [93] - 9:17, 10:8, 10:10, 10:11, 10:13, 10:14, 10:16, 10:19, 10:23, 10:24, 10:25, 11:1, 11:8, 11:10, 11:12, 11:13, 11:17, 11:21, 11:22, 11:25, 12:4, 12:5, 12:6, 12:7, 12:17, 12:18, 12:20, 13:2, 13:24, 15:5, 15:12, 15:15, 15:16, 15:21, 16:13, 16:17, 17:3, 17:8, 18:1, 18:9, 18:11, 18:12, 33:7, 33:9, 33:17, 34:1, 34:10, 34:11, 34:12, 34:14, 34:16, 34:19, 34:20, 34:21, 34:23, 34:25, 35:12, 35:16, 35:19, 36:7, 36:10, 36:15, 40:8, 40:14, 40:15, 40:20, 40:23, 69:5, 83:7, 91:14, 92:22, 93:12, 94:16, 95:16, 96:20, 96:21, 96:22, 97:4, 97:8, 97:19, 98:9, 98:19, 99:2, 99:17, 100:14
**Training** [17] - 15:18, 15:22, 16:2, 16:5, 16:7, 16:8, 16:11, 16:12, 16:20, 17:1, 17:11, 32:23, 33:5, 40:14, 40:15, 41:2
**trainings** [4] - 35:23, 36:1, 36:3, 36:19
**transcript** [4] - 4:12, 103:2, 104:10, 105:14
**transcripted** [1] - 4:24
**treatment** [2] - 90:24, 91:4
**trespass** [1] - 64:18
**trespassers** [1] - 67:10
**trial** [1] - 3:13
**trigger** [1] - 85:13
**true** [3] - 99:18, 104:10, 105:13
**try** [2] - 4:11, 5:8
**trying** [9] - 21:13, 39:8, 41:10, 41:20, 41:22, 68:3, 81:9, 81:17, 86:12
**turn** [10] - 32:21, 48:23, 48:25, 49:19, 51:10, 59:5, 81:11, 89:18, 90:20, 90:21
**turnaround** [3] - 74:8, 74:12, 74:13
**turned** [1] - 32:2

**turning [1]** - 79:3

**twice [1]** - 34:7

**two [11]** - 44:1, 44:2, 46:6, 59:7, 66:8, 89:22, 89:23, 97:20, 101:4, 101:5

**type [10]** - 12:16, 22:19, 26:6, 33:17, 46:25, 59:13, 61:4, 61:23, 63:13, 101:4

**types [6]** - 10:14, 10:16, 34:14, 45:20, 63:8, 86:15

**typical [3]** - 74:7, 74:8, 74:12

**typically [4]** - 58:4, 58:17, 78:25, 85:13

**U [1]** - 3:3

**ultimate [1]** - 20:25

**ultimately [7]** - 26:3, 28:22, 40:24, 52:4, 52:5, 76:17, 81:2

**unaware [1]** - 66:18

**under [12]** - 9:18, 10:18, 16:7, 20:25, 25:21, 52:16, 65:1, 72:4, 85:1, 85:16, 90:22, 98:14

**undergo [1]** - 33:8

**understand [15]** - 4:15, 4:16, 4:20, 6:18, 7:3, 7:7, 7:11, 13:12, 15:13, 39:8, 40:6, 41:10, 41:20, 56:13, 56:14

**understanding [1]** - 50:15

**understood [1]** - 4:19

**unilateral [1]** - 8:20

**unilaterally [1]** - 17:12

**unit [1]** - 24:12

**UNITED [1]** - 1:4

**units [2]** - 68:20

**University [5]** - 44:10, 45:14, 45:19, 90:5, 90:6

**unless [1]** - 56:2

**unlikely [1]** - 22:3

**unsubstantiated [3]** - 79:25, 81:7, 83:19

**until [3]** - 5:9, 5:10, 55:22

**up [21]** - 6:20, 9:15, 14:7, 23:7, 23:9, 24:17, 26:16, 29:4, 29:19, 37:2, 37:8, 38:17, 39:16, 56:15, 56:23, 58:7, 67:24, 73:20, 81:18, 88:2, 95:15

**upon [9]** - 14:3, 55:23, 57:4, 68:12, 71:8, 76:6, 86:2, 92:12, 96:14

**upper [1]** - 72:11

**Use [2]** - 19:2, 102:6

**use [32]** - 12:15, 18:6, 18:8, 18:10, 18:19, 18:23, 19:6, 20:7, 20:8, 20:9, 20:10, 20:12, 20:16, 20:23, 21:1, 22:7, 22:19, 22:23, 23:3, 23:5, 23:8,

23:10, 24:1, 24:4, 25:11, 25:14, 25:21, 26:9, 26:18, 53:10, 57:1

**use-of-force [2]** - 22:23, 23:3

**used [5]** - 21:4, 95:9, 95:13, 96:7, 101:9

**uses [1]** - 25:15

**using [1]** - 22:12

**v [2]** - 1:8, 105:1

**vague [1]** - 49:12

**variables [2]** - 45:20, 74:19

**various [4]** - 10:25, 11:23, 66:19, 77:10

**Vehicle [2]** - 92:5, 92:7

**verbal [2]** - 4:23, 4:24

**versus [4]** - 19:18, 44:15, 84:19

**very [1]** - 12:1

**Village [2]** - 66:10, 66:17

**violate [1]** - 36:23

**violated [1]** - 53:22

**violation [2]** - 37:6, 37:14

**Volume [2]** - 27:15, 102:7

**w [1]** - 5:17

**wait [4]** - 5:8, 5:10, 58:4, 58:17

**waiting [1]** - 74:18

**waived [1]** - 3:20

**waiver [1]** - 3:12

**walk [3]** - 13:15, 76:2, 77:3

**want [29]** - 4:10, 4:15, 4:16, 7:14, 9:14, 18:23, 20:5, 23:13, 27:22, 29:19, 32:21, 36:21, 38:14, 43:3, 47:25, 48:18, 59:5, 61:13, 61:16, 63:16, 63:18, 69:19, 70:21, 73:18, 77:2, 84:13, 94:21, 95:19, 99:23

**wants [1]** - 18:8

**Washington [2]** - 1:18, 105:2

**wasn't [4]** - 46:24, 58:21, 58:22, 62:5

**way [12]** - 9:5, 20:2, 42:7, 48:25, 51:10, 51:12, 58:23, 61:9, 65:5, 67:23, 93:5, 100:23

**ways [3]** - 47:20, 91:19, 91:21

**we'll [4]** - 4:11, 26:16, 41:16, 72:2

**We're [1]** - 41:19

**we're [13]** - 5:4, 21:13, 21:15, 29:6, 29:11, 31:11, 31:25, 32:9, 39:22, 50:2, 81:18, 82:8, 87:21

**we've [6]** - 31:13, 32:2, 41:25, 87:15, 90:21, 94:3

**week [1]** - 68:19

**well [20]** - 6:10, 13:17, 16:6, 20:10, 23:3, 28:8, 30:25, 31:17, 32:9, 35:8, 41:9, 41:17, 42:11, 50:12, 53:10, 56:16, 58:25, 88:1, 92:4, 97:2

**went [3]** - 74:24, 88:13, 91:25

**weren't [2]** - 85:23, 92:21

**what's [17]** - 19:5, 27:11, 42:13, 48:10, 56:7, 57:11, 62:25, 64:12, 67:2, 71:20, 74:7, 78:3, 78:7, 79:10, 80:1, 80:12, 84:10

**whatever [2]** - 9:5, 37:6

**whenever [1]** - 70:25

**where [15]** - 11:13, 15:22, 28:23, 30:5, 30:8, 33:15, 35:11, 42:8, 47:23, 58:15, 60:5, 66:4, 87:12

**Whereupon [1]** - 101:19

**whether [10]** - 18:1, 28:22, 29:5, 38:5, 42:23, 47:5, 53:3, 55:21, 56:18, 94:9

**which [18]** - 13:7, 25:15, 32:1, 36:7, 48:13, 50:25, 52:11, 59:6, 60:25, 64:7, 65:1, 66:14, 74:2, 79:20, 83:15, 86:20, 87:2, 92:20

**while [1]** - 37:8

**white [2]** - 44:11, 44:15

**whom [1]** - 3:17

**whose [2]** - 15:1, 72:15

**wide [1]** - 43:8

**will [6]** - 5:4, 11:3, 11:12, 32:17, 41:19, 90:21

**William [3]** - 64:16, 90:3, 102:11

**within [17]** - 10:24, 11:9, 13:14, 15:24, 16:21, 30:11, 32:12, 45:15, 53:1, 53:13, 59:11, 63:25, 64:2, 68:21, 79:16, 82:2, 93:5

**without [1]** - 17:13

**witness [21]** - 3:15, 19:8, 23:19, 25:7, 27:9, 27:10, 33:2, 52:20, 55:15, 56:5, 63:11, 64:15, 70:10, 70:19, 70:20, 79:13, 79:14, 83:1, 89:2, 89:15, 89:16

**Witness [3]** - 4:22, 46:14, 78:24

**witnesses [6]** - 28:16, 74:17, 75:4, 75:11, 85:23

**wondering [1]** - 81:18

**words [1]** - 56:1

**workplace [1]** - 10:3

**works [1]** - 99:6

**world [1]** - 10:22

**wouldn't [2]** - 6:22, 6:23

**writing [2]** - 32:16, 59:13

**written [1]** - 14:3

**wrong [1]** - 100:21

**yeah [9]** - 8:6, 37:9, 39:8, 57:13, 61:13, 63:3, 67:16, 68:3, 93:8

**year [6]** - 8:4, 32:12, 34:17, 38:17, 48:11, 63:13

**yearly [1]** - 38:10

**years [3]** - 7:24, 8:10, 8:11

**yep [3]** - 23:20, 40:1, 52:21

**yes [134]** - 5:1, 5:20, 6:4, 6:25, 7:17, 7:21, 8:22, 10:12, 10:20, 14:6, 14:14, 16:3, 16:15, 18:20, 19:9, 21:12, 21:23, 22:5, 22:13, 22:24, 22:25, 23:12, 24:13, 24:22, 25:8, 25:18, 26:14, 26:24, 27:13, 27:15, 27:21, 28:4, 30:2, 30:4, 31:24, 34:5, 34:13, 34:18, 35:15, 35:24, 36:2, 36:20, 38:7, 38:25, 40:2, 40:17, 42:18, 43:22, 44:17, 45:1, 45:18, 45:23, 46:2, 46:17, 47:3, 47:11, 47:12, 49:4, 49:5, 49:9, 49:14, 49:18, 50:18, 50:21, 51:14, 52:8, 52:24, 53:14, 53:17, 53:20, 54:1, 54:11, 55:7, 55:9, 58:10, 58:14, 58:20, 59:9, 59:16, 59:20, 60:4, 60:23, 62:1, 62:8, 62:10, 63:9, 63:15, 65:14, 66:3, 72:5, 72:8, 72:11, 73:4, 75:20, 76:13, 77:19, 78:8, 81:5, 81:8, 81:25, 82:23, 84:25, 85:5, 86:17, 87:5, 88:6, 88:9, 88:12, 89:5, 89:17, 90:1, 90:4, 90:7, 90:10, 90:14, 90:19, 91:2, 91:9, 91:12, 91:18, 94:25, 96:24, 97:7, 97:21, 98:11, 99:15, 99:20, 99:22, 100:7, 100:18, 101:15

**yes-or-no [1]** - 47:11

**YORK [2]** - 1:4, 104:3

**York [8]** - 1:18, 1:21, 2:5, 2:8, 4:3, 64:21, 105:2, 105:11

**you'd [7]** - 23:14, 38:11, 55:4, 58:18, 62:4, 80:25, 88:8

**you'll [2]** - 27:24, 90:23

**you're [25]** - 6:12, 6:16, 9:16, 11:5, 23:17, 27:12, 32:25, 35:8, 35:14, 39:14, 49:9, 51:9, 52:15, 60:16, 61:15, 64:14, 70:18, 70:25, 71:2, 79:12, 80:25, 82:5, 100:16

**you've [3]** - 21:1, 45:3, 77:5

**yourself [3]** - 55:12, 72:7, 75:11