# City of Syracuse Police-Citizen Encounter Study
# (Preliminary Draft)

William C. Horrace and Shawn M. Rohlin
*Syracuse University and University of Akron*

September 3, 2010

## I. Introduction

The purpose of the study is to determine if Syracuse citizens of different races or ethnicities receive differential treatment when encountered by Syracuse police. The generally accepted methodology for analyzing differential treatment is an outcome-based approach. This is the same approach used in the 2006 study conducted for the City of Syracuse. The idea is to limit the analysis to only those police-citizen encounters where a police officer (at their own discretion) encounters a citizen and the objective of the encounter is to either arrest or issue a ticket to the citizen. This can be either a traffic or a non-traffic encounter, and we differentiate between the two in the analyses that follow. In our analyses a successful outcome to an encounter is always an arrest or ticket, and the statistic of interest is the percentage of successful encounters (arrest/ticket rates). This can be loosely interpreted as the percentage of the time that officers encounter citizens with good cause (or the rate at which encounters are well-justified *ex post*). Any significant differences in arrest/ticket rates across different races of citizens is deemed "differential treatment by race." The idea is that ideally arrest/ticket rates should be approximately equal across races of citizen, so any differences may be cause for concern. This study attempts to identify the existence of statistically significant differentials by race.

The analytical challenge is limiting the study to only those encounters where police officers believe (at their discretion) that a citizen will likely be arrested or ticketed. One approach is to limit the data to only "on view" encounters. We call these "stops," and subsequent analyses are deemed "conditional on stop." An alternative (and preferred) approach is to limit the analysis to only those encounters where the officer performed a frisk (of a person) or a search (of a vehicle). The idea is that when a frisk or search is performed the officer is mainly convinced that the objective of the action is an arrest or a ticket. Subsequent analyses are deemed "conditional on frisk/search." We perform the analysis both ways (conditional on stop and conditional on frisk/search). Neither approach yields a perfect measure of the arrest/ticket rate, because we can never know *ex post* what a police officer is thinking when they stop or frisk a citizen.[1] That is, we can always accurately measure the number of arrests or tickets an officer makes (the numerator of the rate), but we can never completely know which stops (and to a lesser extent which frisks/search) are for the purposes of arrest or ticketing (the denominator of the rate). However, as long as the officer's reasons for stops or frisks are identical for citizens of different races, the arrest/ticket rate *differential* should be relatively unaffected by the imperfections in the success rate measures. That is the arrest/ticket rates may be problematic for the reasons explained, but the arrest/ticket rate *differential* will not be.

---

[1] For example, Syracuse police officers speak of "quality of life stops," where the purpose of the encounter is to establish good relations with Syracuse citizens without the objective being a ticket or an arrest.

1

The interpretation of the arrest/ticket rate differential is best understood by considering an example. If the arrest rate conditional on a frisk is *lower* for race A than it is for race B, then citizens of race A are frisked too often without arrest, relative to race B. If a frisk is performed and an arrest is *not* made, then the officer has made a judgment error (the officer's arrest objective has not been met), so in this example officers are more likely to make frisk errors with race A then they are with race B. If police errors are truly random, then the arrest rates conditional on frisk would be identical. In terms of police bias, one might interpret this example as bias toward race A, because police make errors more frequently for race A relative to B.

Our approach is identical to that of the 2006 study. However, since we have more data for this study we have attempted to expand the scope of the analysis over the 2006 study. First, there are enough stops and frisk/searches for Hispanic citizens that we can conduct the analysis for this ethnic group. Therefore, we now look for differential treatment for Caucasians (whites), African-Americans (blacks), and Hispanics (Hispanics). Second, with the additional data it is theoretically possible to examine whether experienced police officers behave differently (have different success rates) than new recruits. However, there simply was not enough data on the new recruits to conduct this analysis. Finally, we have data for 2006 – 2009 (inclusive), so we consider how arrest/ticket rates has changed across these four years.

For our analysis and this report we calculate "arrest/ticket rates" for African-Americans, Hispanics and Caucasians in the following categories:
1. Conditional on a discretionary stop
2. Conditional on a discretionary stop by age of citizen (adult or youth)
3. Conditional on a discretionary stop by race composition of the stop location.
4. Conditional on a discretionary stop by crime statistics at the stop location.
5. Conditional on a frisk/search.
6. Conditional on a frisk/search by age of citizen (adult or youth)
7. Conditional on a frisk/search by race composition of the frisk/search location.
8. Conditional on a frisk/search by crime statistics at the frisk/search location.

In general we find that arrest/ticket rate differentials exist by race and that these differentials exist (and differ) based on the age of the citizen encountered and the encounter location in the City of Syracuse. Results that condition on frisk/search tend to be the most consistent in terms of the signs of the differentials, and they suggest that once a frisk or search is performed, minority citizen arrest rates are too low relative to Caucasians (although this is not always the case). In some cases the differentials are statistically significant while others are statistically insignificant. Our focus is on the statistically significant results. We find statistically significant differentials of varying magnitudes, some of which might be consider small and others that might be considered large.

In the following section we describe the data, including some broad descriptive statistics. In subsequent sections we present the results of the study and our conclusions.

2

**II. Data Summary**
There were four primary data sources used in the analysis:

**Syracuse Police Citizen-Stop Data** collected by police from 1/1/06 to 11/30/09.
**Syracuse Police Discretionary Arrest Data** collected by police from 1/1/06 to 11/30/09.
**Syracuse Police Offense Crime Data** collected by police from 1/1/06 to 11/22/09.
**Syracuse 2000 Census Data** collected by the US Census Bureau in 2000.

The Citizen-Stop Data is the data source for discretionary police-citizen encounters that *do not result in an arrest*. (It also contains data on police-citizen encounters that result in a ticket.) The form is completed electronically (with a few exceptions) by the encountering officer and contains information on the following:

1. Incident
    a. Date
    b. Time
    c. Location of encounter
    d. Anonymous Officer Id
    e. Vehicle or Pedestrian Stop
    f. Whether a Ticket was issued and what type
    g. etc.
2. Citizen
    a. Age
    b. Race
    c. Ethnicity
    d. Gender
    e. Known gang involvement or displayed gang colors
    f. Whether the person was frisked or search
    g. etc.
3. Officer
    a. Age
    b. Race
    c. Whether Hispanic
    d. Gender

After "cleaning" these data for miscoded or missing observations, we were left with 60,543 discretionary encounters which did not result in an arrest. Of these encounters, 27,538 (45%) were African-American citizens, 27,435 (45%) were Caucasian citizens, 3,896 (6%) were Hispanic citizens, and the remainder were citizens from other demographic groups. It should be noted that we consider an officer giving a ticket a "success" in the analysis to take into account incidents where the purpose of the stop was to issue a ticket and not make an arrest. Of the 60,543 discretionary encounters 44,792 or roughly 74% were issued a ticket.

The Discretionary Arrest Data contain all the fields of the Citizen-Stop Data plus additional arrest information, including charges filed against the citizen. These data contain records for

3

each charge filed in an arrest; hence, the data were provided to us at the "charge level".[2] Since we required observations at the "encounter or stop level" (and not at the charge level), the data were collapsed and "cleaned" resulting in 43,089 arrests for citizens for the 3 year and 11-month period, of which there were 26,841 arrests of African-Americans (62%), 12,341 arrests of Caucasians (28%), 3,261 arrests of Hispanic-Americans (8%), and the remainder were citizens from other demographic groups.

These two data sets were combined to capture all discretionary police encounters in Syracuse during the 4-year period, resulting in a total of 103,632 encounters of which 54,379 were African-American citizens, 39,776 were Caucasian citizens, 7,157 were Hispanic-American citizens, and the remainder were citizens from other demographic groups. We call these merged data sets the *Encounter Data*. These data were then "geo-coded" (based on the location of encounter provided in either the Citizen-Stop Data or the Arrest Data) and tagged with a census tract number, based on Syracuse census tracts, defined by the US Census Bureau in 2000.[3] We consider citizens 25 years of age and above to be "adults" and citizens below 25 years of age to be "youths". In the Encounter Data, there were 44,529 encounters with youths, of which 25,293 were African-American, 14,899 were Caucasian, 3,437 were Hispanic-American and the remainder were citizens from other demographic groups. The rest were adult encounters. Also, in the Encounter Data there were 52,049 instances of frisks or searches of a citizen (all arrested citizens are searched). African-Americans were frisked or searched 32,838 times, Caucasians were frisked or searched 14,343 times, Hispanic-Americans were frisked or searched 4,143 and the remainder of the frisked or searched stops is citizens from other demographic groups.

The Police Offense Crime Data contained counts of Part I offenses (murder, negligent & non-negligent manslaughter, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft) and drug offenses by census tract from 01/01/06 to 11/22/09. Part I crimes and drug crimes are some of the most violent crimes recorded, and there were 48,722 of them in Syracuse. The data were merged with the US Census Bureau Data to determine crime rates in each census tract. The distribution of offenses per census tract is as follows: First Quartile is 7 offenses per census tract during the time period. Median is 500 offenses per census tract during the time period. Third Quartile is 888 offenses per census tract during the time period. Census tracts with more than 500 offenses were deemed "high-crime" areas, and tracts with crimes below the 500 mark were deemed "low-crime" areas. Based on these definitions, of the 87 census tracts analyzed, 43 were high-crime areas and 44 were low-crime areas. Likewise, if census tracts had less than 7 offenses during the time period then they were deemed "lowest-crime" areas, and if census tracts had higher than 888 offenses during the time period then they were deemed "highest-crime" areas. There were 19 census tracts that were deemed "lowest-crime" areas, and 22 census tracts that were deemed "highest-crime" areas.

The US Census Bureau Data were used as described above and to calculate the population averages for all the census tracts that were a part of the study. Using the 2000 US Census, the population percentages for all the census tracts used in this study are 13.14% African-American

---

[2] That is, a single arrested citizen could receive multiple charges, so the unit of observation was "the charge" and not "the citizen".

[3] The 2000 US Census in the most current census. The next US census is in 2010.

and 82% Caucasian. A census tract is designated to be a "black area" if the percent of the population that is African-American is above 13.14% and any census tract with a Caucasian population greater than 65.36% is deemed to be a "white area". There are a total of 111 census tracts in the city; of these tracts, 35 are black areas and 76 are white areas.

### III. Outcome-based Analysis

The Knowles, Persico, and Todd (2001) model predicts that police adjust stop or frisk/search frequencies to maximize arrests (or some other outcome measure). To implement the model one simply calculates arrest/ticket rates (conditional on a discretionary stop or frisk/search) for African-Americans and for Caucasians and then compares the rates to determine treatment differentials by race. For example, if the arrest/ticket rate (conditional on a discretionary stop) is greater for Caucasians than for African-Americans, this means that police are stopping African-Americans too frequently without cause (as measured by arrest). We performed such an analysis and found mixed results. However, we can generally conclude that:

> *After being stopped by police, **young** Caucasians citizens were **more** likely to be arrested or ticketed than young African-American or Hispanics citizens who were stopped. This results is being largely driven by non-traffic stops. (Bias toward young minorities.)*

> *After being stopped by police in **black areas** of the city, Caucasians citizens were **less** likely to be arrested or ticketed than African-American or Hispanics citizens who were stopped in similar areas. This result is being largely driven by non-traffic stops of African-Americans and traffic stops of Hispanics. (Bias toward Caucasians.)*

> *After being stopped by police in the **lowest crime** areas of the city, Caucasians citizens were **more** likely to be arrested or ticketed than African-American citizens who were stopped in similar areas. This analysis produces one of the largest arrest/ticket differentials by race in the study and is robust to differentiation by traffic and non-traffic stops. (Bias toward African-Americans)*

> *After a **traffic** stop by police, Caucasians citizens were **more** likely to be arrested or ticketed than African-American citizens who were stopped in all areas of the city, except for predominantly black areas, where the arrest/ticket differential was statistically insignificant. (Bias toward African-Americans)*

We also conducted the same analysis "conditional on a frisk or search being performed". To continue the example, if the arrest rate *conditional on a search or frisk* is greater for Caucasians than for African-Americans, this means that police are "over-searching or over-frisking" African-Americans without cause (as measured by arrests). Our analysis shows:

> *After being frisked or searched by police, Caucasians citizens were **more** likely to be arrested or ticketed than African-American or Hispanic citizens who were frisked or searched in all areas of the city. These results are being largely driven by non-traffic stops. The largest differential occurs for African-Americans in the lowest crime areas of the city. (Bias toward minorities.)*

> *After being frisked or searched by police, Caucasians citizens were **more** likely to be arrested or ticketed than African-American or Hispanic citizens who were frisked or searched in each year of the study (2006-2009). These results are being largely driven by non-traffic stops. (Bias toward minorities.)*

The idea is that if "potential arrest or ticket" is the primary reason for a police-citizen encounter, then arrest/ticket rates should be about equal for blacks, whites and Hispanics once a stop has occurred. The concept is the same for frisks and searches of citizens; they too should ideally lead to an arrest/ticket if performed, and, conditional on them, arrest/ticket rates should be about the same across all races.

The results of the stop analysis are in Tables 3 and 4, and the results of the search/frisk analysis are in Tables 5 and 6. Table 3a shows that for all stops (traffic and non-traffic), police appear to stop young African-Americans and Hispanics too frequently without arrest or ticketing. That is, the arrest/ticket rates for young African-Americans (84.82%) and young Hispanics (83.56%) were lower than the arrest/ticket rates for young Caucasians (85.80%). This results is being driven by non-traffic stops (Table 3c), where arrest rate differentials are -5.24% and -8.82% for African-Americans and Hispanics, respectively. Things are reversed for all adult stops (Table 3a), where Caucasians are stopped too frequently without arrest or ticketing. That is, the arrest/ticket rates for adult African-Americans (85.22%) and adult Hispanics (85.99%) were greater than the arrest/ticket rates for young Caucasians (83.66%). This too is being driven by non-traffic stops (Table 3c), where arrest rate differentials are -5.19% and -3,25% for African-Americans and Hispanics, respectively.

Tables 4a-c show stop results based on high- and low-crime areas, lowest-crime areas, and black and white areas. The results are generally mixed. However, Table 4a shows that in the lowest crime areas of the city that African-Americans are stopped too frequently without arrest or ticketing relative to Caucasians. Compare 76.85% for African-Americans to 90.48% for Caucasians. This differential (-13.6%) is one of the largest in the study and is being largely driven by non-traffic stops (Table 4c) where the differential is -20.1%. However, in the predominantly black areas things are reversed. In these areas Caucasians are stopped without arrest or ticketing too frequently relative to African-Americans (82.76 < 84.42% in Table 4a). This is being driven by non-traffic stops (Table 4c), where the differential is +2.49. However, in Table 4b we see that African-Americans are subjected to traffic stops without arrest or ticketing more frequently than Caucasians in all areas on the city, except for the predominantly black areas, where the differential (-0.31) is statistically insignificant.

Table 5a shows that conditional on a frisk or search being performed, arrest rates for Caucasians were greater than arrest/ticket rates for African-Americans in the entire city (94.10% > 91.66%); in high-crime areas (93.99% > 91.65%); in low-crime areas (95.08% > 91.52%); in the highest-crime areas (93.68% > 90.96%); in the lowest-crime areas (93.83% > 71.43%); in black areas (92.39% > 91.10%); and in white areas (94.53% > 91.76%). The largest disparity was in the lowest-crime census tracts where African-Americans were about 22 percent more likely to be frisked or searched without an arrest or ticket. The results are similar for Hispanic-Caucasian arrest/ticket differentials throughout the city. The results are being driven by the large number of non-traffic frisks and searches in table 5c.

6

Tables 6a-c show citywide frisk/search results in each year of the study. Table 6a shows that conditional on a frisk or search being performed, arrest/ticket rates for Caucasians were greater than arrest/ticket rates for both African-Americans and Hispanics in each year. The results are all statistically significant at the 1% level except for Hispanics in 2007. The results are driven by the non-traffic stops in Table 6c. All differentials are negative and significant, indicating that arrest/ticket rates for Caucasians were greater than arrest/ticket rates for both African-Americans and Hispanics in each year. Notice in Tables 6a and 6c that the magnitude of the differentials is larger in 2008 and 2009 than in 2006 and 2007.

## IV. Conclusions

The results of the study indicate that there is differential treatment by race for police-citizen encounters in the city of Syracuse. The results are most striking for the frisk/search analysis. The sign and magnitude of the arrest/ticket differentials appear to be correlated with the age of the citizen and location of the encounter. It appears that not only does race matter in police behavior, but also age and context. While many of the differentials in the study were statistically significant, the largest differentials occur when the encounter is in the lowest crime areas in the city. Conditional on a stop, the African-American/Caucasian arrest/ticket differential is a significant -13.6% for all stops, -10.5% for traffic stops and -20.1% for non-traffic stops. Conditional on a frisk or search, two of these differentials were even larger: -22.4% for all frisks/searches and 21.2% for non-traffic frisks/searches. Conditional on frisk or search, the differentials are the worst for all stops of Hispanics in the lowest crime areas (-27.2%) and traffic stops of Hispanics in these areas (-64.3%). Fortunately, in all these "worst cases" the occurrences were very low. Over the 4 years of data, there were only 754 stops of Caucasians, African-Americans and Hispanics in lowest crime areas. Of these, only 143 frisks and searches were performed. However, it does appear that Syracuse police are using race and age of citizens and context as grounds for performing frisks or searches.

Conditional on stop, there appears to be meaningful differential treatment based on the age of the citizen encountered, particularly for non-traffic stops. Minority youths are stopped without arrest or ticketing more frequently than young Caucasians. Things are reversed with adults, with adult Caucasians being stopped without arrest or ticketing more frequently than adult minorities.

## V. Appendix

**Software**
All analyses were performed on a PC running Microsoft office XP. Software products used in the analysis were *MapInfo* 9.5, *ArcGIS* 10.0, and *Stata* 10.0.

7

**Tables**

Table 1. Citywide Stops Statistics by Age/Race of Citizen, 2006-2009

| Stop Type | Number of Stops | Caucasian | African-American | Hispanic |
|---|---|---|---|---|
| All Stops | 101,312 | 39,776 | 54,379 | 7,157 |
| Youth Stops* | 43,629 | 14,899 | 25,293 | 3,437 |
| Adult Stops* | 57,683 | 24,877 | 29,086 | 3,720 |

Discretionary stop counts exclude races and/or ethnicities other that Caucasian, African-American and Hispanic.

Table 2. Stops in Different Neighborhoods by Race, 2006-2009

| Area Type | Number of Census Tracts | Number of Stops | Caucasian | African-American | Hispanic |
|---|---|---|---|---|---|
| High-crime | 44 | 91,986 | 34,193 | 50,980 | 6,813 |
| Low-crime | 43 | 8,636 | 5,108 | 3,217 | 311 |
| Highest-crime | 22 | 54,579 | 18,502 | 31,065 | 5,012 |
| Lowest-crime | 19 | 754 | 525 | 203 | 26 |
| Black Area | 35 | 71,658 | 23,125 | 42,807 | 5,726 |
| White Area | 70 | 15,429 | 9,830 | 4,869 | 730 |

Discretionary stop counts exclude races and/or ethnicities other that Caucasian, African-American and Hispanic.

Table 3a. Citywide Stop Analysis for All Stops

| All Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|
| All Stops | 84.46% | 85.03% (+0.57)** | 84.82% (+0.36) |
| Youth Stops | 85.80% | 84.82% (-.98)*** | 83.56% (-2.24)*** |
| Adult Stops | 83.66% | 85.22% (+1.56)*** | 85.99% (+2.33)*** |

Discretionary arrest/ticket rates, conditional on stop, for the City of Syracuse by race.
Differentials relative to Caucasian rate. All stops include traffic and non-traffic stops.
\* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 3b. Citywide Stop Analysis for Traffic Stops

| Traffic Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|
| All Stops | 82.81% | 81.48% (-1.33)*** | 83.82% (+1.01) |
| Youth Stops | 81.96% | 81.21% (-0.75) | 82.52% (+0.56) |
| Adult Stops | 81.77% | 81.68% (-0.09) | 84.78% (+3.01)*** |

Discretionary arrest/ticket rates, conditional on stop, for the City of Syracuse by race.
Differentials relative to Caucasian rate.
\* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 3c. Citywide Stop Analysis for Non-Traffic Stops

| Non-Traffic Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|
| All Stops | 88.22% | 88.94% (+0.72)** | 86.05% (-2.17)*** |
| Youth Stops | 93.34% | 88.10% (-5.24)*** | 84.52% (-8.82)*** |
| Adult Stops | 84.64% | 89.83% (+5.19)*** | 87.89% (+3.25)*** |

Discretionary arrest/ticket rates, conditional on stop, for the City of Syracuse by race.
Differentials relative to Caucasian rate.
\* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 4a. Stop Analysis in Different Neighborhoods for All Stops

| Areas | All Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| High-crime | 91,987 | 84.79% | 85.22% (+0.43)* | 84.62% (-0.17) |
| Low-crime | 8,635 | 82.10% | 81.88% (-0.22) | 79.42% (-2.68) |
| Highest-crime | 54,580 | 84.52% | 84.70% (+0.18) | 83.60% (-0.92) |
| Lowest-crime | 754 | 90.48% | 76.85% (-13.6)*** | 88.46% (-2.02) |
| Black Area | 71,659 | 82.76% | 84.42% (+1.66)*** | 83.78% (+1.02)* |
| White Area | 15,429 | 84.17% | 83.47% (-0.70) | 86.03% (+1.86) |

Discretionary arrest/ticket rates, conditional on a stop, for various areas of the City of Syracuse by race. Differentials relative to Caucasian rate. All stops include traffic and non-traffic stops.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 4b. Stop Analysis in Different Neighborhoods for Traffic Stops

| Areas | Traffic Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| High-crime | 53,645 | 83.36% | 81.83% (-1.53)*** | 83.76% (+0.40) |
| Low-crime | 5,709 | 79.09% | 76.69% (-2.40)** | 83.89% (+4.80) |
| Highest-crime | 31,251 | 82.47% | 81.00% (-1.47)*** | 83.01% (+0.54) |
| Lowest-crime | 643 | 89.25% | 78.79% (-10.5)*** | 86.36% (-2.89) |
| Black Area | 42,490 | 81.77% | 81.46% (-0.31) | 83.29% (+1.52)** |
| White Area | 10,132 | 82.64% | 76.83% (-5.81)*** | 83.18% (+0.54) |

Discretionary arrest rates, conditional on a stop, for various areas of the City of Syracuse by race. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 4c. Stop Analysis in Different Neighborhoods for Non-Traffic Stops

| Areas | Non-Traffic Stops | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| High-crime | 38,319 | 87.95% | 88.89% (+0.94)*** | 85.65% (-2.30)*** |
| Low-crime | 2,925 | 89.88% | 88.89% (-0.99) | 93.89% (+4.01) |
| Highest-crime | 23,321 | 88.84% | 88.65% (-0.19) | 84.31% (-4.53)*** |
| Lowest-crime | 111 | 98.55% | 78.42% (-20.1)*** | 100% (+1.45) |
| Black Area | 29,146 | 85.33% | 87.82% (+2.49)*** | 84.38% (-0.95) |
| White Area | 5,295 | 88.20% | 91.09% (+2.89)*** | 90.34% (+2.14) |

Discretionary arrest rates, conditional on a stop, for various areas of the City of Syracuse by race. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

10

Table 5a. Frisk/Search Analysis in Different Neighborhoods for All Frisks/Searches

| Areas | All Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| Citywide | 51,324 | 94.10% | 91.66% (-2.44)*** | 89.33% (-4.77)*** |
| High-crime | 47,544 | 93.99% | 91.65% (-2.34)*** | 89.10% (-4.89)*** |
| Low-crime | 3,495 | 95.05% | 91.52% (-3.53)*** | 93.98% (-1.07)*** |
| Highest-crime | 29,598 | 93.68% | 90.96% (-2.72)*** | 87.81% (-5.87)*** |
| Lowest-crime | 143 | 93.83% | 71.43% (-22.4)*** | 66.67% (-27.2)*** |
| Black Area | 36,476 | 92.39% | 91.10% (-1.29)*** | 88.00% (-4.39)*** |
| White Area | 6,336 | 94.53% | 91.76% (-2.77)*** | 92.23% (-2.30)* |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate. All stops include traffic and non-traffic stops.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.


Table 5b. Frisk/Search Analysis in Different Neighborhoods for Traffic Frisks/Searches

| Areas | Traffic Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| Citywide | 12,404 | 85.86% | 87.05% (+1.19)* | 86.98% (+1.12) |
| High-crime | 11,607 | 85.99% | 87.22% (+1.23)* | 87.07% (+1.08) |
| Low-crime | 760 | 83.40% | 84.90% (+1.50) | 81.25% (-2.15) |
| Highest-crime | 7,604 | 84.89% | 86.25% (+1.36) | 85.98% (+1.09) |
| Lowest-crime | 39 | 64.29% | 60.87% (-3.42) | 00.00% (-64.3) |
| Black Area | 9,295 | 84.05% | 87.20% (+3.15)*** | 86.04% (+1.99) |
| White Area | 1,411 | 86.09% | 80.47% (-5.62)*** | 88.17% (+2.08) |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.


Table 5c. Frisk/Search Analysis in Different Neighborhoods for Non-Traffic Frisks/Searches

| Areas | Non-Traffic Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| Citywide | 37,225 | 96.57% | 93.16% (-3.41)*** | 90.11% (-6.46)*** |
| High-crime | 35,936 | 96.49% | 93.10% (-3.39)*** | 89.78% (-6.71)*** |
| Low-crime | 2,736 | 97.10% | 93.75% (-3.35)*** | 96.73% (-0.37)*** |
| Highest-crime | 21,993 | 96.73% | 92.58% (-4.15)*** | 88.46% (-8.27)*** |
| Lowest-crime | 104 | 100% | 78.79% (-21.2)*** | 100% (-0.00) |
| Black Area | 27,180 | 95.33% | 92.42% (-2.91)*** | 88.66% (-6.67)*** |
| White Area | 4,925 | 96.85% | 95.06% (-1.79)*** | 93.57% (-3.28)*** |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 6a. Frisk/Search Analysis by Year for All Stops

| Year | Total Number of Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| 2006 | 12,830 | 95.68% | 94.31% (-1.37)*** | 92.92% (-2.76)*** |
| 2007 | 13,124 | 94.88% | 93.38% (-1.50)*** | 93.83% (-1.05) |
| 2008 | 12,410 | 92.26% | 88.85% (-3.41)*** | 83.91% (-8.35)*** |
| 2009 | 12,952 | 93.58% | 90.02% (-3.56)*** | 86.60% (-6.98)*** |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate. All stops include traffic and non-traffic stops.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 6b. Frisk/Search Analysis by Year for Traffic Stops

| Year | Total Number of Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| 2006 | 4,048 | 93.72% | 92.44% (-1.28) | 94.44% (+0.72) |
| 2007 | 3,415 | 88.46% | 90.30% (+1.84) | 91.53% (+3.07) |
| 2008 | 2,386 | 75.39% | 80.17% (+4.78)** | 77.60% (+2.12) |
| 2009 | 2,551 | 77.92% | 80.86% (+2.94) | 80.22% (+2.30) |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

Table 6c. Frisk/Search Analysis by Year for Non-Traffic Stops

| Year | Total Number of Frisk/Search | Caucasian Arrest/Ticket Rate | African-American Arrest/Ticket Rate (Differential) | Hispanic Arrest/Ticket Rate (Differential) |
|---|---|---|---|---|
| 2006 | 8,782 | 96.54% | 95.20% (-1.34)*** | 92.28% (-4.26)*** |
| 2007 | 9,709 | 97.08% | 94.48% (-2.60)*** | 94.65% (-2.43)*** |
| 2008 | 10,024 | 95.93% | 90.99% (-4.94)*** | 85.44% (-10.5)*** |
| 2009 | 10,401 | 96.90% | 92.32% (-4.58)*** | 88.60% (-8.30)*** |

Discretionary arrest rates given that a frisk or search has been performed for various parts of the City or Syracuse. Differentials relative to Caucasian rate.
* - significant at 10% level, ** - significant at 5% level, *** - significant at the 1% level.

# Syracuse Police Department's Response to the

# City of Syracuse Police-Citizen Encounter Study

The Syracuse Police Department recognizes that the study conducted indicates some disparate treatment of persons of different races by the Syracuse Police Department. We do, however, propose that based on a number of factors as discussed below, the rate of differential treatment is minor and can be associated to a number of factors other than racial discrimination.

First of all, the idea that when a frisk or a search is performed the officer is mainly convinced that the objective of the action is an arrest or ticket is not accurate. In fact, frisks by their very definition and nature are conducted for officer safety and are done with the intent to find weapons, legal or illegally possessed, and are not completed in a manner that would lead to arrests for drugs or other criminal activity. The Knowles and Persico study, "Racial Bias in Motor Vehicle Searches: Theory and Evidence"; upon which Dr. Horrace's study of the Syracuse Police Department is based, analyzed searches of motorists' vehicles. The Syracuse Police Department would agree that the search of a vehicle is a better indication of an officer's objective to make an arrest or ticket the motorist. To expand this premise to person frisks and/or searches is not always accurate and could explain the slight differences in citizen arrest/ticket rates. In addition, the arrest data used in the study does not enable us to discriminate between (discretionary) searches that were conducted prior to a decision to arrest and searches that were conducted incident to arrest. It seems that this would be important to any analysis of search as a post-stop outcome and could explain the differential in race treatment within the Syracuse Police Department results.

Second, the Syracuse Police Department offers that frisks and searches not leading to arrest are going to be conducted with more frequency in areas of the city with high crime rates which are the same areas that are labeled "black" within the study. Officers responding to high crime areas are dealing with crimes that are of a violent nature and often involve weapons. Officers responding to these crimes are going to be frisking and searching suspects and those individuals present with those suspects more often. Over the last several years, the Syracuse Police Department has become more data driven in its response to crime. This proactive style of policing became well known in New York City as Compstat and was adopted more than 5 years ago by the Syracuse Police Department. The idea behind this style of

policing is to deploy police personnel based upon up to date crime analysis and intelligence. In other words the Department will deploy its officers based on areas of high crime and the focus will be on the known offenders. For the first part of 2010 (Jan through June 13th) African Americans accounted for 91% of known shooting suspects as reported by the victims and/or witnesses and 78% of those shooting victims were African American. African Americans accounted for 63% of known assault suspects as reported by the victims and/or witnesses and 60% of those assault victims were African American. Furthermore, African Americans accounted for 75% of all known robbery suspects as reported by the victim. Based on these facts, officers responding to violent crimes through proactive policing are going to be dealing with African Americans more often. This means officers will be frisking and searching African Americans more frequently due to the violent nature of the crime and the possibility of a weapon being involved. This policing style could be a contributing factor to the slight discrepancy in the treatment of persons of different races in the City of Syracuse.

The Syracuse Police Department is vigilant in its mission to provide policing to the City of Syracuse in a manner that is free from racial bias. The department conducts a comprehensive police academy and provides annual in-service training during which racial sensitivity and the department's policy on racial profiling are covered at length. In addition, the Syracuse Police Department has cooperated to the fullest extent with this study and all previous studies and will continue to do so to ensure the citizens of Syracuse are afforded the best policing possible.